**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **PERSONAL AUDIO, LLC,** | |
| **Plaintiff,** | Civil Action No. 17-cv-1751-VAC-CJB |
| **v.** | |
| **GOOGLE LLC,** | Jury Trial Demanded |
| **Defendant.** | |

**<u>DECLARATION OF KEVIN C. ALMEROTH, PH.D.
IN SUPPORT OF PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF</u>**

## <u>TABLE OF CONTENTS</u>

I.   Qualifications, Background, and Experience ........................................................ 1

II.   Background of the Invention ................................................................................ 7

III.   Claim Construction Opinion ............................................................................. 13

   A.  "FILE" ('076 patent, claims 1 & 14 and '178 patent, claim 1) ......................... 15

   B.  "SEQUENCING FILE" LIMITATIONS ......................................................... 19

   C.  "MEANS RESPONSIVE" TERMS ('076 patent, claims 1 & 14 and '178 patent, claim 1)
      23

      1.  The Playback Control Features in the Patents-In-Suit Do Not Necessitate the Use of a
      "Received" Sequencing File or Scanning "the" Sequencing File that was Received ......... 26

      2.  The Playback Control Features in the Patents-In-Suit Do Not Necessitate the Use of a
      "Usage Log File" ........................................................................................ 30

      3.  New Prosecution History Supports Plaintiff's Proposed Clarification to LocType....... 31

   D.  "MEANS FOR CONTINUOUSLY REPRODUCING" ..................................... 34

      1.  "Continuous Playback" Does Not Imply an Endless Loop.......................... 36

      2.  Fig. 3 Discloses the Corresponding Structure for "Means for Continuously Reproducing
      Said Program Segments in the Order Established By Said Sequence in ihe Absence of a
      Control Command." ..................................................................................... 43

      3.  Defendant's Modifications to the PTOs Construction are Incorrect............................. 46

      4.  The "R" LocType is Further Unnecessary Structure .................................... 48

   E.  "DOWNLOADING" ('076 patent, claims 1 & 14 and '178 patent, claim 1) .................. 49

   F.  "MEANS FOR DETECTING…" ('076 patent, claims 1 & 2) ........................... 53

   G.  "EDITING MEANS…" TERMS ('076 patent, claims 5 & 6) .......................... 55

H.  "PLAYER," "AUDIO PROGRAM PLAYER," "PROGRAMMED DIGITAL

COMPUTER" ('076 patent, claims 1-10, 13-17, 28-29 and '178 patent, claims 14 & 15)..... 59

I.  "SELECTED AUDIO PROGRAM SEGMENTS," "AUDIO PROGRAM SEGMENTS,"

"PROGRAM SEGMENTS" ('076 patent, claims 1, 14 & 15 and '178 patent, claims 6 & 14)

   60

J.  "MEANS FOR TRANSLATING SAID VOICE SIGNALS INTO SAID CONTROL

COMMANDS" ('076 patent, claim 13).................................................................................. 63

I, Kevin C. Almeroth, make the following declaration based on my personal knowledge, and, if called to testify before the Court, could and would testify as follows:

**I.   Qualifications, Background, and Experience**

1.      My name is Kevin C. Almeroth.  I understand that my declaration is being submitted in connection with the federal district court case, *Personal Audio, LLC v. Google LLC*, Case No. 17-cv-1751-VAC-CJB that is pending in the District of Delaware.  I have been asked to provide my opinion regarding how a person of ordinary skill in the art would understand various claim terms in U.S. Patent Nos. 6,119,076 and 7,509,178.

2.      I am currently a Professor in the Department of Computer Science at the University of California, Santa Barbara.  I also hold an appointment and am a founding member of the Computer Engineering (CE) Program.  I am a founding member of the Media Arts and Technology (MAT) Program, and the Technology Management Program (TMP).  I also served as the Associate Director of the Center for Information Technology and Society (CITS) from 1999 to 2012.  I have been a faculty member at UCSB since July 1997.

3.      I hold three degrees from the Georgia Institute of Technology: (1) a Bachelor of Science degree in Information and Computer Science (with minors in Economics, Technical Communication, American Literature) earned in June, 1992; (2) a Master of Science degree in Computer Science (with specialization in Networking and Systems) earned in June, 1994; and (3) a Doctor of Philosophy (Ph.D.) degree in Computer Science (Dissertation Title: Networking and System Support for the Efficient, Scalable Delivery of Services in Interactive Multimedia System, minor in Telecommunications Public Policy) earned in June, 1997.

4.      One of the major themes of my research has been the delivery of multimedia content and data between computing devices and users.  In my research I have looked at large-scale

content delivery systems and the use of servers located in a variety of geographic locations to provide scalable delivery to hundreds, even thousands, of users simultaneously.  I have also looked at smaller-scale content delivery systems in which content, including interactive communication like voice and video data, is exchanged between computers and portable computing devices.  As a broad theme, my work has examined how to exchange content more efficiently across computer networks, including the devices that switch and route data traffic. More specific topics include the scalable delivery of content to many users, mobile computing, satellite networking, delivering content to mobile devices, and network support for data delivery in wireless network.

5.     Beginning in 1992, when I started graduate school, the first focus of my research was on the provision of interactive functions (VCR-style functions like pause, rewind, and fast-forward) for near video-on-demand systems in cable systems, in particular, how to aggregate requests for movies at a cable head-end and then how to satisfy a multitude of requests using one audio/video stream broadcast to multiple receivers simultaneously.  Continued evolution of this research has resulted in the development of new techniques to scalably deliver on-demand content, including audio, video, web documents, and other types of data, through the Internet and over other types of networks, including over cable systems, broadband telephone lines, and satellite links.

6.     An important component of my research from the very beginning has been investigating the challenges of communicating multimedia content between computers and across networks.  Although the early Internet was designed mostly for text-based non-real time applications, the interest in sharing multimedia content quickly developed.  Multimedia-based applications ranged from downloading content to a device to streaming multimedia content to be

instantly used.  One of the challenges was that multimedia content is typically larger than text-only content but there are also opportunities to use different delivery techniques since multimedia content is more resilient to errors.  I have worked on a variety of research problems and used a number of systems that were developed to deliver multimedia content to users.

7.      In 1994, I began to research issues associated with the development and deployment of a one-to-many communication facility (called "multicast") on the Internet (first deployed as the Multicast Backbone, a virtual overlay network supporting one-to-many communication).  Some of my more recent research endeavors have looked at how to use the scalability offered by multicast to provide streaming media support for complex applications like distance learning, distributed collaboration, distributed games, and large-scale wireless communication.  Multicast has also been used as the delivery mechanism in systems that perform local filtering (i.e., sending the same content to a large number of users and allowing them to filter locally content in which they are not interested).

8.      Starting in 1997, I worked on a project to integrate the streaming media capabilities of the Internet together with the interactivity of the web.  I developed a project called the Interactive Multimedia Jukebox (IMJ).  Users would visit a web page and select content to view.  The content would then be scheduled on one of a number of channels, including delivery to students in Georgia Tech dorms delivered via the campus cable plant.  The content of each channel was delivered using multicast communication.

9.      In the IMJ, the number of channels varied depending on the capabilities of the server including the available bandwidth of its connection to the Internet.  If one of the channels was idle, the requesting user would be able to watch their selection immediately.  If all channels were streaming previously selected content, the user's selection would be queued on the channel with

the shortest wait time.  In the meantime, the user would see what content was currently playing on other channels, and because of the use of multicast, would be able to join one of the existing channels and watch the content at the point it was currently being transmitted.

10.     The IMJ service combined the interactivity of the web with the streaming capabilities of the Internet to create a jukebox-like service.  It supported true Video-on-Demand when capacity allowed, but scaled to any number of users based on queuing requested programs.  As part of the project, we obtained permission from Turner Broadcasting to transmit cartoons and other short-subject content.  We also attempted to connect the IMJ into the Georgia Tech campus cable television network so that students in their dorms could use the web to request content and then view that content on one of the campus's public access channels.

11.     More recently, I have also studied issues concerning how users choose content, especially when considering the price of that content. My research has examined how dynamic content pricing can be used to control system load. By raising prices when systems start to become overloaded (i.e., when all available resources are fully utilized) and reducing prices when system capacity is readily available, users' capacity to pay as well as their willingness can be used as factors in stabilizing the response time of a system. This capability is particularly useful in systems where content is downloaded or streamed to users on-demand.

12.     As a parallel research theme, starting in 1997, I began researching issues related to wireless devices. In particular, I was interested in showing how to provide greater communication capability to "lightweight devices," i.e., small form-factor, resource-constrained (e.g., CPU, memory, networking, and power) devices.  Starting by at least 2004 I researched techniques to wirelessly disseminate information, for example advertisements, between users

using ad hoc networks.  In the system, called Coupons, an incentive scheme is used to encourage users to relay information, including advertisements, to other nearby users.

13.     Starting in 1998, I published several papers on my work to develop a flexible, lightweight, battery-aware network protocol stack. The lightweight protocols we envisioned were similar in nature to protocols like Universal Plug and Play (UPnP) and Digital Living Network Alliance (DLNA).

14.     From this initial work, I have made wireless networking-including ad hoc and mesh networks and wireless devices-one of the major themes of my research. One topic includes developing applications for mobile devices, for example, virally exchanging and tracking "coupons" through "opportunistic contact" (i.e., communication with other devices coming into communication range with a user). Other topics include building network communication among a set of mobile devices unaided by any other kind of network infrastructure. Yet another theme is monitoring wireless networks, in particular different variants of IEEE 802.11 compliant networks, to (1) understand the operation of the various protocols used in real-world deployments, (2) use these measurements to characterize use of the networks and identify protocol limitations and weaknesses, and (3) propose and evaluate solutions to these problems.

15.     As an important component of my research program, I have been involved in the development of academic research into available technology in the market place.  One aspect of this work is my involvement in the Internet Engineering Task Force (IETF) including many content delivery-related working groups like the Audio Video Transport (AVT) group, the MBone Deployment (MBONED) group, Source Specific Multicast (SSM) group, the Inter-Domain Multicast Routing (IDMR) group, the Reliable Multicast Transport (RMT) group, the Protocol Independent Multicast (PIM) group, etc.  I have also served as a member of the

Multicast Directorate (MADDOGS), which oversaw the standardization of all things related to multicast in the IETF.  Finally, I was the Chair of the Internet2 Multicast Working Group for seven years.

16.     I am an author or co-author of nearly 200 technical papers, published software systems, IETF Internet Drafts and IETF Request for Comments (RFCs).

17.     My involvement in the research community extends to leadership positions for several journals and conferences. I am the co-chair of the Steering Committee for the ACM Network and System Support for Digital Audio and Video (NOSSDAV) workshop and on the Steering Committees for the International Conference on Network Protocols (ICNP), ACM Sigcomm Workshop on Challenged Networks (CHANTS), and IEEE Global Internet (GI) Symposium.  I have served or am serving on the editorial boards of IEEE/ACM Transactions on Networking, IEEE Transactions on Mobile Computing, IEEE Transactions on Networks and System Management, IEEE Network, ACM Computers in Entertainment, AACE Journal of Interactive Learning Research (JILR), and ACM Computer Communications Review.

18.     I have co-chaired a number of conferences and workshops including the IEEE International Conference on Network Protocols (ICNP), ACM International Conference on Next Generation Communication (CoNext), IEEE Conference on Sensor, Mesh and Ad Hoc Communications and Networks (SECON), International Conference on Communication Systems and Networks (COMSNETS), IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS), the International Workshop On Wireless Network Measurement (WiNMee), ACM Sigcomm Workshop on Challenged Networks (CHANTS), the Network Group Communication (NGC) workshop, and the Global Internet Symposium; and I have been on the program committee of numerous conferences.

19.      Furthermore, in the courses I teach, the class spends significant time covering all aspects of the Internet including each of the layers of the Open System Interconnect (OSI) protocol stack commonly used in the Internet.  These layers include the physical and data link layers and their handling of signal modulation, error control, and data transmission.  I also teach DOCSIS, DSL, and other standardized protocols for communicating across a variety of physical media including cable systems, telephone lines, wireless, and high-speed Local Area Networks (LANs).  I teach the configuration and operation of switches, routers, and gateways including routing and forwarding and the numerous respective protocols as they are standardized and used throughout the Internet.  Topics include a wide variety of standardized Internet protocols at the Network Layer (Layer 3), Transport Layer (Layer 4), and above.

20.      In addition to having co-founded a technology company myself, I have worked for, consulted with, and collaborated with companies such as IBM, Hitachi Telecom, Digital Fountain, RealNetworks, Intel Research, Cisco Systems, and Lockheed Martin.

21.      I am a Member of the Association of Computing Machinery (ACM) and a Fellow of the Institute of Electrical and Electronics Engineers (IEEE).

22.      Additional details about my employment history, fields of expertise, and publications are further described in my curriculum vitae (*see* **Attachment A**).  Included in this exhibit is a list of my prior testimony in the last four years.

## II.      Background of the Invention

23.      U.S. Patent No. 6,199,076 ("'076 Patent) is titled "Audio Program Player Including a Dynamic Program Selection Controller."  U.S. Patent No. 7,509,178 ("'178 Patent") is titled "Audio Program Distribution and Playback System" and is a continuation of the '076 Patent and

contains the same specification.  Collectively, I will refer to the '076 Patent and the '178 Patent as the "patents-in-suit."

24.     The patents-in-suit describe an audio-player client that is programmed to interact with a digital library host-server system and downloads "audio program segments" and a "predetermined schedule."  '076 patent, 2:6-11.  A key feature of the invention is the ability for the system to interactively select programs from a program library based upon user preferences and to then play those programs to the user using a sequencing file as part of a session.  '076 patent, 1:64-2:3.  These sequencing files are variously described by the Patents as a "predetermined schedule," "recommended Schedule Table 307," a "recommended program sequence file" or "selections file," and is sometimes referred to in the patents as a "sequencing file."

25.     The nature, form, content, and use of the disclosed "sequencing file" appears to be at the heart of the disputed subject matter between the Parties.  The Patents-in-Suit disclose that this "sequencing file" contains data that identifies the order in which program segments are to the played.  '076 patent, 2:6-10, 8:39-44, 18:21-30.  The specification discloses several sequencing files including a "session schedule," "sequence/sequencing file," "recommended program sequence file," "recommended program schedule," "Selections File 351," "Schedule Table 307" and "Schedule File 307." *Id.* 2:46, 6:14, 8:39, 12:5, 12:8, 18:59, 24:21.  There are many iterations and embodiments of a sequencing file, and it is therefore important to distinguish between the features inherent in a sequencing file and features or functionality that may be optionally be incorporated into a sequencing file.

26.     In some instances, the patents-in-suit generally describe features of a sequencing file, suggesting that these features are common to all of the aforementioned sequencing files.  For

example, the specification discloses that "the audio program player plays program segments in an order determined by *a __session schedule__ which identifies an ordered sequence of program segments*."[1] '076 patent, 2:44-47.  Later, the specification teaches that "[t]he data downloaded [by the player] includes a *recommended program sequence file which provisionally identifies the order in which downloaded program segments are to be played*, with the initial selection and sequence being established based on user preference data by the download compilation processing mechanism seen at 151 at the server." *Id.* 8:39-44. One embodiment discussed in the patents teaches that "*__Schedule Table 307__ . . . contains the recommended sequence of program segments for the next playback session*." '076 patent, 18:59-61.

27.      In other instances, the patents-in-suit teach a specific embodiment that uses a sequencing file having additional functionality and features.  For example, the specification teaches that the Selections File 351 is a sequencing file having additional features beyond simply identifying the order in which the program segments are to be played. *Id.* 12:3-15 ("[T]he sequence of program segments to be presented to the user is formed into a schedule file (seen at 307 in FIG. 4) consisting of a sequence of program segment identification numbers which are used to compile *a sequencing file, called the selections file, illustrated at 351 in FIG. 5, which contains more detailed information about the sequence of events which occur during playback*."). The patents further teach that the **selections file** may be used to control certain playback functions. *See, e.g., id.* 34:30-34 ("To control subject and topic skipping, as well as hyperlink jumps, the selections file seen generally at 301 in FIG. 4 preferably takes the form of a sequence of records…").  The specification also teaches a number of ways in which a sequencing file may be created.  As more fully explained below, a sequencing file may (1) be generated by

---

[1] The patents-in-suit do not teach that the "session schedule" must have a particular syntax or format or be stored in a specific manner.

the server in response to user selections or user-specific criteria; or (2) be generated or edited by

the player.

28.     The patents-in-suit disclose that a sequencing file called recommended schedule file

307 may be generated by the host server based upon selections made by or on behalf of a user:

> The data downloaded includes a recommended program sequence file which
> provisionally identifies the order in which downloaded program segments are to be
> played, with the initial selection and sequence being established based on user preference
> data by the download compilation processing mechanism seen at 151 at the server.
> '076 patent, 8:39-44.
> ***
> In accordance with the invention, the host server receives and supplements the user's
> initial selection of a sequence of desired programs, first by adding … additional program
> segments tailored to the subscriber's known preferences as indicated at 340 in FIG. 4,
> thereby producing the recommended Schedule Table 307 which is transferred to the
> subscriber, along with program segments, during the download transfer.
> '076 patent, 18:20-31.

29.     The patents then teach that the downloaded recommended sequencing file (i.e.,

Schedule Table 307) containing the initial playback sequence is used to create another

sequencing file (i.e., Selection File 351) with additional features added for control:

> the sequence of program segments to be presented to the user is formed into a
> **schedule file (seen at 307 in FIG. 4)** consisting of a sequence of program
> segment identification numbers which **are <u>used to compile</u> a sequencing file,
> called the selections file, illustrated at 351 in FIG. 5**, which contains more
> detailed information about the sequence of events which occur during
> playback.").

'076 patent, 12:4-10.  The patent further makes clear that the sequencing file that was

downloaded was recommended Schedule Table 307 and not the compiled "selections file 351":

> In accordance with the invention, the host server receives and supplements the
> user's initial selection of a sequence of desired programs…thereby producing **the
> recommended Schedule Table 307 which is transferred to the subscriber,
> along with program segments, during the <u>download</u> transfer**. Indeed, if the
> subscriber provides no selections at all, the host will prepare a Schedule Table
> 307 containing program segment selected entirely by the host on the subscriber's
> behalf.

'076 patent, 18:21-34.  Nowhere does the patent state that selections file 351 was downloaded from the host server.

30.      The following diagram shows the above-described operations of the Patented Embodiment, including the downloading of the program sequence and subsequent compilation of Selections File 351 based on recommended Schedule Table 307:



31.      I understand in a previous case Defendants in that case represented that schedule Table 307 and Selections File 351 are both downloaded to the player.  Nowhere in the specification, however, does it state that selections file 351 is downloaded.  In contrast, the specification directly states numerous times that schedule file 307 is downloaded. *See, e.g.*, '076 patent, 18:29-31, 27:15.  One skilled in the art would understand that selections file 351 would have been created on the player from downloaded schedule table 307 and not separately downloaded.  It makes no sense to download two files containing the same playback sequence as the operation would be wholly redundant.  Further, the specification does not suggest that selections file 351 is downloaded:

> The playback operation itself continues from the designated playback point in the selections file (seen at 351 in FIG. 5) which follows a **program sequence [i.e., schedule table 307] initially created by the host server and <u>downloaded</u>** with the program segments themselves, and **<u>then</u>** (optionally) **<u>modified</u>** by the addition, deletion and re-sequencing of segment identifiers as discussed earlier in connection with step 211 in FIG. 2.



*Id.* 12:21-27; Fig. 2.

32.     This quote states that the selection file follows a "program sequence" that was downloaded, not that the selections file itself was downloaded.  Of course, the referred-to downloaded "program sequence" is contained in schedule table or file 307, as explicitly disclosed in the patents and set forth above.  Furthermore, since the selections file 351 is the final program sequence file that is acted on by the controls and it is compiled from a "program sequence" that may have been "modified" by the player's editor, it was necessarily created on the player after the edits were made—not on the host server.  The specification further makes this clear:

> Before a playback session begins, as indicated at 211, the subscriber has the opportunity to review and alter the provisional program selections and sequence established as a default **by the downloaded information** from the server.  Utilizing the programming data and a utility program previously supplied by the server, the subscriber may alter the selection and sequence of program materials to be played, including altering the extent to which advertising will be played along with the selected programming

'076 patent, 8:45-53.

33.     Thus, the editing necessary to create the final selections file 351 was done on the already "downloaded information."  One skilled in the art would understand that final selections file 351 was created on the player after the download and not received from the host server.

34.     Importantly, the embodiment of the patents-in-suit discloses a host server compiling a sequencing file (*i.e.*, Schedule Table 307) based on user preferences that is downloaded and used

for establishing the sequence of playback control by being referenced to create selections file 351 within the memory of the player.  The user can further alter this sequence using the player's editor after it is downloaded.  **Thus, the downloaded sequencing file of the embodiment of the invention is not continuously referenced for use in playback control, but rather the downloaded file is used for playback control by being referenced once to provide the playback sequence used by the controls.  Furthermore, it is clear that not all sequencing files discussed in the patent were received from outside the player.**  These technical disclosures are highly relevant to the disputes over the meaning the claim language.

III.    **Claim Construction Opinion**

35.    It is my understanding that the parties disagree about the construction of the following terms:

- "file" (all claims)

- "sequencing file / file of data establishing a sequence / playback session sequencing file" (all claims)

- "means responsive to said first command for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which follows said currently playing program in said sequence" ('076 patent, claim 1)

- "means responsive to a single one of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of said currently playing program" ('076 patent, claim 2)

13

- "means responsive to two to the detection of two consecutive ones of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which precedes the currently playing program segment" ('076 patent, claim 3)

- "means for continuously reproducing said program segments in the order established by said sequence in the absence of a control command" ('076 patent, claim 1)

- "editing means for modifying said data establishing said sequence" ('076 patent, claim 5)

- "means for translating said voice signals into said voice control commands" ('076 patent, claim 13)

- "communications port for establishing a data communications link for downloading a plurality of separate digital compressed audio program files and a separate sequencing files from one or more server computers" ('178 patent, claim 1)

- "a processor … for discontinuing the reproduction of the currently playing audio program file and instead continuing the reproduction at the beginning of a listener selected one of said audio program files in said collection in response to a program selection command from said listener" ('178 patent, claim 1)

- "means for detecting a first command indicative of a request to skip forward" ('076 patent, claim1 )

- "[audio] program player" (all claims)

- "[selected] audio program segments" (all claims)

What follows is my expert opinion on how a person of ordinary skill in the art would understand these claim terms in view of the specification and the prosecution history.

36.     It is my understanding that many of these terms have been previously construed by either a court of law or the Patent Trial and Appeal Board.  These constructions are consistent with my own expert opinion regarding how these terms would be understood by a person having ordinary skill in the art.

### A.     "FILE" (all claims)

37.     I understand the parties have proposed constructions for the term "file as follows:

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "file" | any collection of data that is stored and manipulated as a unit | a collection of data that is stored and manipulated as a named unit by a file-management system. |

38.     It is my expert opinion that a person of ordinary skill in the art would understand the term file as used in the patents-in-suit to mean "any collection of data that is stored and manipulated as a unit."  This is my expert opinion based on the plain and ordinary meaning of this term as would be understood by a person of ordinary skill in the art.  My understanding of the term "file" is also confirmed by contemporaneous dictionary definitions:

IEEE Stand. Dictionary of Electrical Terms, 5th Ed. (1993) and 6th Ed. (1997) (information transfer) "One named collection of data"; (microprocessor operating systems) "A set of related records usually treated as a named unit of storage."

**Exhibit I** (IEEE Stand. Dictionary of Electrical Terms, 5th Ed. (1993)).

Barron's Dictionary of Computer and Internet Terms 5th Ed. (1996) "a block of information stored on a disk, tape or similar media. A file may contain a program, a document or a collection of data (such as a mailing list)."

**Exhibit J** (Barron's Dictionary of Computer and Internet Terms, 5th Ed. (1996)).

<u>Microsoft Press Computer Dictionary (1997)</u> "A complete, named collection of information, such as a program, a set of data used by a program, or a user-created document. A file is the basic unit of storage that enables a computer to distinguish one set of information from another. A file is the "glue" that binds a conglomeration of instructions, numbers, words, or images into a coherent unit that a user can retrieve, change, delete, save or send to an output device."

**Exhibit K** (Microsoft Press Computer Dictionary (1997)).


<u>Computer Dictionary, 4th Ed. (1985)</u> "A collection of related records treated as a unit."

**Exhibit L** (Computer Dictionary, 4th Ed. (1985)).

39.     It is my understanding that the Defendant's rely on the following dictionary definition to support their proposed constructions of file, which is "a collection of data that is stored and manipulated as a named unit by a file-management system."

<u>Academic Press Dictionary of Science and Technology, 1st Ed. (1992) (defendant's construction)</u> (Computer Programming) "1. a collection of items with certain common aspects, organized for a specific purpose and stored or processed as a unit.; 2. (defendant's definition) any collection of data that is stored and manipulated as a named unit by a file-management system."

**Exhibit M** (Academic Press Dictionary of Science and Technology, 1st Ed. (1992)).

40.     I have been informed Defendant proposes that the term "file" should be construed as "any collection of data that is stored and manipulated as a named unit *by a file-management system*."  I disagree with Defendant's construction because it suggests limiting the construction of "file" to only those data structures that are used by a "file management system."  This might incorrectly suggest that Defendant's database system and the "files" used by it are not files according to this proposed construction.  Although this distinction is irrelevant in my expert opinion, Plaintiff's proposed construction would resolve this dispute by excluding the "by a final-management system" language from the construction.

16

41.     At the outset, any construction of file that purports to exclude "files" used by database systems or otherwise limits "file" to only data structures used by file management systems from the claim scope is incorrect.  Nowhere does the term "file management system" appear within the patent.  More importantly, the patent discloses the preferred embodiment uses a "database system": "The relational database system employed by the preferred embodiment of the invention further includes…" '076 patent, 18:1-2.  Other parts of the specification describe using records and fields commonly used by database management systems. '076 patent, 5:53-55; 5:66-6:2; 6:38-44.

> The selections made by and uploaded from the subscriber take the form of a file (sequence) of 32 bit integers, each integer (ProgramID) designating a particular program segment. This file of integers is placed in a relational database Requested Table seen at 301 in FIG. 4, with each row(record) in the Requested Table being an identification number which specifies a corresponding record (row) in a database table 303 called the Programs Table. The Requested Table 301 includes not only express requests from the user based on catalog selections but also requests which result from failed hyperlink requests which occur when the listener requested hyperlinked information during the session which was unavailable in local storage at the player. The program segments (which include programs, advertising and announcements) have a plurality of attributes which are described in the data fields of each record (row) in the Program Table 303. The following Pascal type declarations define the content of each record in the Programs Table 303:

17

```
Type
      Classtype = (advertisement, program, announcement);
      Program_Segment = record
            ProgramID: integer; { unique key }
            ProviderID: integer;
            Class: Classtype;
            URL: pchar;
            Created: datetime;
            SubjectDesc: integer;
            TopicDesc: integer;
            GroupID, Episode: integer;
            CommentOn: integer;
            Subjects: array[0..15] of integer;
            Importance: array[0..15] of integer;
            Youngest, Oldest, male, female: byte;
            HouseLow, HouseHigh: byte;
            Duration: integer;
            Plays: integer;
            TotalTime: double;
            PlaysRate, TimeRate: integer;
            Timeliness: integer;
      end;
```

'076 Patent, 17:14-50.

42.     To the extent that Defendant contends that its proposed dictionary definition constitutes the ordinary plain meaning of the word "file" based on a definition in a single, alternative dictionary, I believe this is incorrect. In my expert opinion, the first definition of "file" in Defendant's dictionary is more consistent with the understanding of a person of ordinary skill in the art in view of the specification than the second definition, which appears to be relied on by Defendant. *See* **Exhibit M** (Academic Press Dictionary of Science and Technology, 1st Ed. (1992)).  However, to be clear, in my expert opinion, the definition of the term "file", as understood by a person of ordinary skill in the art neither requires nor excludes a "database system."  The term "file" would understood to be "any collection of data that is stored and manipulated as unit" without further limitations, including those proposed by Defendant.

## B.      "SEQUENCING FILE" LIMITATIONS (all claims)

43.     I have been informed the parties have proposed constructions for terms that relate to a

"sequencing file" as follows:

| Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "file of data establishing a sequence" (all asserted claims of '076 patent)<br><br>"sequencing file" ('178 patent claims 1-13)<br><br>"playback session sequencing file" ('178 patent claims 14-21, 28, 29) | a file of data that identifies the order in which audio program segments chosen by or for a user are to be played | a file that is received by the player, stored, and used by the processor to both control playback of each song in the ordered sequence and respond to control commands |

44.     The terms "sequencing file" and "playback session sequencing file" appear in claims 1

and 14 of the '178 patent respectively, while the term "file of data establishing a sequence" is

part of the functional description of the means-plus-function element "a means for receiving and

storing a file establishing a sequence." '178 patent, 45:60-64; 48:8-10; '076 patent, 46:18-21.  I

will refer to these limitations as the "sequencing file limitations."

45.     It is my expert opinion that a person of ordinary skill in the art would understand the

sequencing file limitations as used in the patents-in-suit to mean "a file of data that identifies the

order in which audio program segments chosen by or for a user are to be played." My opinion is

based on the plain and ordinary meaning of this term as would be understood by a person of

ordinary skill in the art.  It is also my understanding that this is the construction of these

limitations that were adopted by the Patent Trademark and Appeal Board.

46.     I have been informed Defendant's proposed construction seeks to add the following

limitations to the construction adopted by the PTAB: "a file that is [1] **received by the player**,

[2] **stored, and [3] used by the processor to both control playback of each song** in the

recommended order and respond **to control commands**.  Furthermore, with respect to "a file of

data establishing a sequence," Defendant's proposed construction modifies the algorithmic

description of the corresponding structure for the means plus function elements of "means for

receiving and storing a file of data establishing a sequence in which said program segments are

scheduled to be reproduced by said player."  By inserting the word "received" in front of the

term "sequencing file," Defendant's proposed construction appears to require continual reference

of the same sequencing file from which it received from the host server.  In other words,

Defendant's proposed contention would require that one and only one file must be referenced

continuously for playback control.  If so, such a construction is clearly contradicted by the

preferred embodiment player which downloads received sequencing file Schedule Table 307 and

references it to create Selections File 351 which is further acted on by the player for playback

control. *See* Section II.

47.     It is my understanding that the claim limitations "file of data establishing a sequence"

('076 patent, claims 1, 14), "sequencing file" ('178 patent, claim 1), and "playback session

sequencing file" ('178 patent, claim 14) were previously construed as "a file of data that

identifies the order in which audio program segments are to be played and that may contain

information about the sequence of events that occur during playback." **Exhibit D** (Order

Construing Claim Terms, *Personal Audio LLC v. Apple, Inc.*, No. 9-09-cv-111 (E.D. Tex. 2010))

at 18-21.  It is further my understanding that the PTAB ultimately modified the Court's

construction in two ways.  The PTAB removed the clause "that may contain information about

the sequence of events that occur during playback" because it "appear[ed] to be redundant" and further inserted the clause "chosen by or for a user" because the construction of this term "should be consistent with [the] construction of 'selected audio program files'" in context of the '076 patent. **Exhibit E** (Institution of Inter Partes Review, *Google, Inc. v. Personal Audio LLC*, IPR2015-00845 (PTAB 2015)) at 8-9.  In my expert opinion, both the original construction and the modified Construction are consistent with each other and with the understanding of a person of ordinary skill in the art.

48.	Nothing in the ordinary and plain meaning of the "sequencing file" limitations supports the imposition of the additional limitations proposed by Defendant or modification of the corresponding structure for the means-plus-function term that includes "a file of data establishing a sequence."  The sequencing file limitations are not terms of art and the plain language of these terms merely requires a file that identifies an order of playback of program data and makes no suggestion of the additional limitations proposed by Defendant.

49.	Moreover, the specification clearly uses the term "sequencing file" in a manner that contradicts the Defendant's proffered construction.  As discussed above in paragraphs 24-25, the term "sequencing file" is used in the specification to describe multiple files that contain some sequence used for playback, but that are not used in the manner that the Defendant now seeks to limit the terms.  Although some sequencing files such as "schedule file 307" are (1) received from outside the player, (2) stored and are (3) used by the player for playback by being referenced once to provide the sequence used to control playback, other uses of the term "sequencing file" plainly do not.  The specification indisputably uses the term "sequencing file" to describe selections file 351:

> the sequence of program segments to be presented to the user is formed into a
> schedule file (seen at 307 in FIG. 4) consisting of a sequence of program segment

identification numbers which are used to compile a sequencing file, called the selections file, illustrated at 351 in FIG. 5, which contains more detailed information about the sequence of events which occur during playback.").

'076 Patent, 12:4-10.

50.     As illustrated above in the diagram of paragraph 30, the disclosed sequencing file "selections file 351" is created after referencing downloaded sequencing file "307" to obtain a sequence for playback (and after being potentially edited by the user using the player to add additional "more detailed information" to the downloaded recommended schedule). The specification further makes clear that the schedule file 307 used to create selection file 351 was downloaded from the host server into the player:

> In accordance with the invention, the host server receives and supplements the user's initial selection of a sequence of desired programs…thereby producing **the recommended Schedule Table 307 which is transferred to the subscriber, along with program segments, during the <u>download</u> transfer**. Indeed, if the subscriber provides no selections at all, the host will prepare a Schedule Table 307 containing program segment selected entirely by the host on the subscriber's behalf.

*Id.* 18:21-34.  Thus, sequencing file 351 was not received from outside the player in the manner contemplated by Defendant in its construction,[2] but rather was created on the player from the downloaded sequencing 307 and demonstrates that the term "sequencing file" does not inherently contain the usage limitations sought by the Defendant.

51.     Furthermore, I have been informed that a means-plus-function cannot be construed by adopting a function different from that explicitly recited in the claims. Nothing about the plain meaning or explicit recitation of "a file of data establishing a sequence" is directed to the storage of a file, use of it for control or playback, or even receipt by the player.  The limitations sought

---

[2] Importantly, it appears that Defendant interprets the "received" and "used" elements of their proposed construction restrictively.  One uses a "received" sequencing file by referencing it at least once to obtain the playback sequence used by the controls.

by Defendant appear to describe how a given sequencing file may be used in the context of specific claimed functions of a player device—not inherent features of the terms "a file of data establishing a sequence" or "sequencing file."  The only function required by the explicit language here is a "file that establishes a sequence," and the remaining language of the means-plus-function term makes clear that this is a sequence of selected audio program segments to be played.  Defendant's construction of a "file establishing a sequence" adds the functions of storing, controlling playback, and responding to control commands, which vary from the explicitly recited function of the "means for receiving and storing a file of data establishing a sequence in which said program segments are scheduled to be reproduced by said player."

## C.   "MEANS RESPONSIVE" TERMS ('076 patent, claims 1-3)

52.    I have been informed the Parties have proposed the following constructions for the "means responsive" terms which appear in claims 1-3 of the '076 patent:

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "means responsive to said first command for discontinuing … of the currently playing program segment and instead continuing at the beginning of a program segment which follows said currently playing program in said sequence" | The structure corresponding to the claimed function is the following structure and equivalents thereof:<br><br>A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269 and 235 and more fully described at column 15, lines 21 to 25 and column 34, line 28 to column 35, line 48. | A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269 and 235 and described at column 15, lines 21 to 25 and column 34, line 28 to column 35, line 48. Specifically, this algorithm includes the following steps:<br><br>(1) scanning forward in the **received sequencing file** to locate the next Selection_Record of the appropriate LocType;<br><br>(2) resetting the CurrentPlay variable to the record number of that Selection_Record; and |

| | Specifically, this algorithm includes the following steps:<br><br>1. scanning forward in the sequence established by the file to locate the next Selection_Record of the appropriate LocType;<br><br>2. resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>3. fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record. | (3) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record. |
|---|---|---|
| means responsive to a single one of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of said currently playing program | 1. if the currently playing program segment has played for a predetermined amount of time, resetting the playback position to the beginning of the program segment; and<br><br>2. playing the program segment from its beginning. | (1) if the currently playing program segment has played for a predetermined amount of time **after the start time recorded in a usage log file**, resetting the playback position to the beginning of the program segment; and<br><br>(2) playing the program segment from its beginning. |
| means responsive to the detection of two | 1. in response to a first 'Back' command, | (1) in response to a first "Back" command, if the currently playing |

| | | |
|---|---|---|
| consecutive ones of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which precedes the currently playing program segment | if the currently playing program segment has played for a predetermined amount of time, resetting the playback position to the beginning of the program segment and playing the program segment from its beginning;<br><br>2. in response to a second 'Back' command, if the currently playing program segment has not yet played for said predetermined amount of time, scanning backward in the sequence established by the file to locate the previous Selection_Record of the appropriate LocType;<br><br>3. resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>4. fetching and playing the program segment identified by the ProgramID contained in the new | program segment has played for a predetermined amount of time **after the start time recorded in a usage log file**, resetting the playback position to the beginning of the program segment, and playing the program segment from its beginning;<br><br>(2) in response to a second "Back" command, if the currently playing program segment **is near its beginning**, scanning backward in the **received** sequencing file to locate the previous Selection_Record of the appropriate LocType;<br><br>(3) resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>(4) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record. |

| | Selection_Record. | |
|---|---|---|

53.     It is my expert opinion that a person of ordinary skill in the art would understand the terms in accordance with Plaintiff's proposed construction in the chart above.  Although the terms are different and thus require different constructions in many respects, it is my understanding that the parties' dispute relates to common features of the terms and not to the individual differences between these terms.  Thus, for sake of brevity, I believe it is appropriate to express an expert opinion with respect to the common features shared by all of the "means responsive" terms.  Except to the extent discussed below, the following opinions apply to all of the term identified in the chart.

54.     It is my expert opinion that: (1) contrary to Defendant's position that the algorithm of the playback controls must use the "received" sequencing file, the scanning forward or backward step merely requires scanning the sequence established by the file rather than scanning the file itself, and (2) that a LocType is "an identifier that indicates a characteristic of a selection record, for example, a playable content selection record."  I also disagree with Defendant's proposals seeking to expand the use of LocType and specific LocType values in corresponding structure, as well as to insert "received," "near the beginning," and "time recorded in a usage log" as additional limiting structure.

**1.     The Playback Control Features in the Patents-In-Suit Do Not Necessitate the Use of a "Received" Sequencing File or Scanning "the Sequencing File that was Received**

55.     It is my understanding Defendant's proposed construction seeks to insert a "received" limitation into the claim language.  Specifically, Defendant's proposed constructions inserts "received" between the words "the" and "sequencing file" in the algorithmic means plus function corresponding structure of claims 1 and 3 of the '076 Patent.  For example, Defendant seeks to

construe the first step of the "means responsive to said first command…" as "scanning forward in the **received** sequencing file to locate the next Selection_Record of the appropriate LocType." The addition of this language "**received** sequencing file" appears to suggest that the sequence information must be contained within a file and that this file must be continuously referenced in its original memory location during playback control, rather than being referenced once to obtain a sequence acted on by the controls.  For the same reasons as discussed in Section III(B) with respect to the sequencing file terms, I disagree with the insertion of "received" into the construction of the "means responsive" terms as the proposed limitation is inconsistent with the understanding of a person of ordinary skill in the art.

56.     A person of ordinary skill in the art would understand that the scanning forward and backward steps of the algorithm of the playback control terms merely requires scanning the sequence established by a sequencing file rather than scanning the "received" sequencing file itself.  To clarify this point, it would be appropriate to clarify the phrase "scanning forward in the sequencing file" as "scanning forward in the sequence established by the sequencing file." Alternatively, in my opinion, changing the word "the" of "scanning … in the sequencing file" to "scanning forward in **a** sequencing file" would similarly clarify that the sequencing file need not be received by the Player.  Either such clarification is supported by the plain language of the claim and the disclosures of the specification.

57.     The plain language of the claims clearly shows that the player controls act on sequencing data and do not require any particular "received" sequencing file.  In other words, there can be a distinction between the information contained in a file and the file itself.  For example, claim 1 of the '076 patent recites "means for receiving and storing **a file of data establishing a sequence in which said program segments are scheduled to be reproduced** by

said player," and further recites "means responsive to said first command for discontinuing the reproduction of the currently playing program segment and instead **continuing the reproduction at the beginning of a program segment which follows said currently playing program in said sequence**." '076 Patent, 46:14-33. Taking these two limitations together, claim 1 clearly does not require receiving and storing a file of data and then reproducing program segments using the *received* file of data.  Rather, this claim is clearly directed towards receiving and storing a file of data establishing a sequence, and then **using the sequence** rather than a specific file location to reproduce program segments.  Similarly, claim 1 of the '178 patent recites "a communications port for establishing a data communications link **for downloading** plurality of separate digital compressed audio program files and **a separate sequencing file** from one or more server computers" but "a processor for continuously delivering a succession of said audio program files in said collection to said audio output unit **in said ordered sequence specified by said sequencing file** in the absence of a program selection command from said listener . . . ." '178 patent, 45:60-46:18.  Like claim 1 of the '076 patent, claim 1 of the '178 patent is clearly directed towards continuous reproduction using the ordered sequence specified by the sequencing file, rather than using the actual downloaded sequencing file in a continuous way.  I have been informed that § 112 ¶ 6 does not permit limitation of a means-plus-function claim by adopting a function different from that **explicitly** recited in the claim.  Accordingly, it would be improper to read the function of the claims to include anything other than mere use of the sequence established by the file, which is the clarification requested by Plaintiff.

58.      As I explained in paragraphs 48-50, the specification discloses the player does not use a received sequencing file to control playback, but rather creates a sequencing file on the player using the data of the received sequencing file to control playback.  Specifically, the specifications

discloses scanning selections file 351 for playback control and thus this passage is corresponding structure:

> **FIG. 5 shows an illustrative sequence of Selection_ Records making up a selection file indicated generally at 351** which illustrates the manner in which the user may navigate the playback session between playback positions designated by the selection file. …If the user issues a skip command during or shortly after the time when subject announcement is played, the player executes a skip to the next subject, which is accomplished by **scanning the selection file 351** until the next subject Selection_Record seen at 360 is located, and then performing a jump…

'076 patent, 34:24-44.  The specification further discloses that sequencing file "selections file 351" was compiled **by the player** from a downloaded schedule file 307 and was not itself downloaded or received from outside the player. *See* Section II.  Thus, the corresponding structure would not be limited to only scanning "received" sequencing files.  Defendant's attempt to add this additional requirement to the algorithmic corresponding structure is inconsistent with the understanding of a person of ordinary skill in the art.

59.     Corresponding structure for these "means responsive" terms can also be found in the following passage:

> **The third command, the SKIP command indicated at 275 in FIG. 3, causes the player to advance to the beginning of the next program segment in the program sequence, recording the start of the next sequence at 267 and resetting the playback position at 269.** If the program segment [sic] has been subdivided (e.g. into paragraphs), the SKIP command causes the player to skip forward to beginning of the next subdivision within that segment. If desired, SKIP commands may be subdivided into two types, a SKIP TOPIC command and a SKIP SUBJECT command. When programming material such as news reports are grouped into topics within subject categories, as described later in connection With FIG. 5, a SKIP SUBJECT command allows the user to skip over all program segments within that subject and resume playback at the leading description of the next subject. In contrast, the SKIP TOPIC command always advances to the next topic (program segment or program segment subdivision) in the sequence. If desired, the SKIP TOPIC command can produce a jump to the next program segment or subdivision which does not contain advertising, making it unnecessary **for the listener to listen to advertising while scanning the program sequence for the next desired program segment.**

'076 Patent 15:21-42.  Just under the identified text, the description of the algorithm discloses "scanning the program *sequence*" without reference to any particular sequencing file.  Thus, the clearly linked corresponding structure of the skip control function does not require any reference to "scanning" any particular "sequencing file," but rather only scanning a "sequence" provided by a sequencing file.  This further supports rejection of the "received" language and supports the "scanning of the *sequence of* the sequencing file" modification requested by Plaintiff.

60.      Thus, a person of ordinary skill in the art would not understand the player algorithm terms to include a "received" limitation.  To the extent that clarification is needed, Plaintiff's proposed clarification that the algorithm requires use of the sequence of the sequencing file rather than the sequencing file itself is appropriate.

### 2. The Playback Control Features in the Patents-In-Suit Do Not Necessitate the Use of a "Usage Log File"

61.      I have been informed Defendant's proposed construction seeks to modify the predetermined time of the back functionality to include a "start time recorded in a usage log file."  I have also been informed that it is improper to interpret a means-plus-function term to include structures beyond those that are necessary to perform the claimed function.  As such, it would be improper in my expert opinion to add the requirement of a "usage log" to the corresponding algorithmic structure.  As described in the patents-in-suit, usage logging is for purposes of billing and user profiling.  However, usage logging is not necessary to perform the functions corresponding to either of the "means responsive to. . . said second commands" limitations.

62.      Defendants' proposed construction appears to suggest that determining whether a "program segment has played predetermined amount of time" must be expressed in terms of

certain time as opposed to a duration.  In other words, Defendant's proposed construction would appear to require the following four steps:

1. recording the time when the segment starts playing,

2. determining the time when said second command has been received

3. computing the difference between the segment start time and second command's time of receipt

4. determining if this difference is greater than or less than the predetermined amount of time

This is both inefficient and unnecessary to perform the claimed function, which could easily be performed using a simple timer set for the predetermined amount of time.

63.      The specification further confirms that Defendant's proposed modification is unnecessary to the claimed function and improperly attempts to import a limitation into the claim language in an effort to rewrite the claim.  The specification describes the usage log file as an optional feature that may be "advantageously included" and further describes other advantages of the features of the optional usage log file. '076 patent, 10:21-26.  Further, at **no** time does the specification of the Patents-in-Suit describe the player controls using data recorded in the usage log file.  Rather, the usage log is described by the Patents as a record of user activities to be subsequently uploaded to the server and processed to suggest future recommended programming. '076 patent, 6:40-50, 6:62-67.

### 3.      New Prosecution History Supports Plaintiff's Proposed Clarification to LocType

64.      In my expert opinion, a person of ordinary skill in the art would understand the term "LocType" as used in the algorithmic structure of the means plus function claims as follows:

a LocType is an identifier that indicates a characteristic of a selection record, for example, a playable content selection record.

The meaning of LocType is not readily ascertainable by its plain language and it is not a term of art in the industry.  In my expert opinion, LocType is a term that has been coined by the patent, and whose meaning has been informed by the specification.  Both the specification and the prosecution history support the above construction of LocType.

65.    Structurally, a LocType is disclosed in the specification as character identifier (numbers or letters) that describe the characteristics of a given selection record pertaining to a program segment.  The specification's pseudo-code clearly describes the LocType as being a "character":

> To control subject and topic skipping, as well as hyperlink jumps, the selections file seen generally at 301 in FIG. 4 preferably takes the form of a sequence of records, each having the structure defined by the following Pascal record definition:

```
type Selection_Record = record
        LocType: Char;
        Location: Integer;
     end;
```

> where LocType is a single byte character having the values and meanings shown in the following table:

| LocType | Meaning |
|---|---|
| "S", "s" | Subject Announcement |
| "T", "t" | Topic Announcement |
| "P", "p" | Programming content segment |
| "Q", "q" | Advertising segment |
| "G", "g" | Glue (announcement) segment |
| "H" | Highlight start offset |
| "E" | Highlight end offset |
| "A" | Anchor start offset |
| "M" | Bookmarked anchor start |
| "B" | Anchor end offset |
| "L" | Linked segment |
| "R" | Rewind to identified location |
| "I" | Image identification |
| "J" | Image display start offset |
| "K" | Image display end offset |
| "C" | Accept comment |
| "V" | Accept value designation |
| "X" | Accept list termination |
| "Y" | Accept "Yes"/"No" |

'076 Patent, 31:63-32:33.

66.     As shown above, one example of a LocType given in the patent is a LocType "P"
which indicates that the selection record corresponds to a "program content segment."  Another
example "Q", indicates an "advertising segment," which means that the selection record pertains
to an advertisement.  Other LocTypes indicate an image ("I"), or a particular subject or topic
("S" or "T") or a hyperlinked segment ("L").  In each of the above examples, the LocType is
structurally an identifier that indicates a type or characteristic of the given selection record,
which is precisely how this term would be understood by a person of ordinary skill in the art, as
stated above.

67.     The prosecution history further support this construction.  I have been informed
the meaning of LocType was addressed in Defendant's IPR proceeding.  It is my understanding
that the PTAB determined that scanning forward in a play list to find the next playable element

teaches the 'GO' command as claimed, including a LocType, which is merely a "variable name"

indicating a selection record of a "Playable object":

> According to Patent Owner, because Chase's play list is a directory, rather than a file, Chase cannot teach a file containing sequence data in the form of Selection_Records representing playable objects and, thus, **cannot teach a particular instance of the Selection_Record variable of an appropriate LocType**, as required by the first step of the algorithm... We are not persuaded by Patent Owner's argument... we agree with Petitioner **that the source code example in Chase of scanning forward in a play list to find a next playable element is a teaching of scanning forward in a sequencing file to locate a next selection record. Although Chase's source code does not use the same variable names**, we are persuaded, on this record, that **a skilled artisan would have understood Chase to teach the steps of the algorithm corresponding to the "means responsive to said first command**.

**Exhibit E** (Institution of Inter Partes Review, *Google, Inc. v. Personal Audio LLC*, IPR2015-

00845 (PTAB 2015)) at 29-30.

68.     This additional prosecution history provides further confirmation that a person of

ordinary skill in the art would understand the term LocType as described above.  It is my

opinion, that Plaintiff's proposed clarification is consistent with both the teachings of the patents,

the understandings of the Parties, and the prosecution history.

## D.     "MEANS FOR CONTINUOUSLY REPRODUCING" ('076 patent, claim 1)

69.     I have been informed the Parties have proposed the following constructions for the

"means for continuously reproducing" term which appear in claim 1 of the '076 patent:

| Claim Term | Plaintiff's Const. | Defendant's Const. |
|---|---|---|
| "Means for continuously reproducing said program segments in the order established | A sound card that includes a digital to analog converter; headphones or one or more speakers; and a general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 233, 235, 237, 239, and 261 and more fully described at column 12, line 16 to column 13, line | A sound card that includes a digital to analog converter; headphones or one or more speakers; and a general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 233, 235, 237, 239, and 261 and more fully described at column 12, line 16 to |

| by said sequence in the absence of a control command" | 11 and column 34, line 28 to column 35, line 44. | column 13, line 11 and column 34, line 28 to column 35, line 44. |
|---|---|---|
| | Specifically, this algorithm includes the following steps: | Specifically, this algorithm includes the following steps: |
| | 1.    beginning playback with the program segment identified by the ProgramID contained in the Selection_Record specified by the CurrentPlay variable;<br>2.    when the currently playing program segment concludes, incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the ProgramID contained in the next Selection_Record in the sequencing file;<br>3.    repeating step (2) **until a command is issued or that the sequence is completed.** | (1) beginning playback with the program segment identified by the ProgramID contained in the Selection_Record specified by the CurrentPlay variable;<br><br>(2) when the currently playing program segment concludes,<br><br>    **(a) if the concluded segment is a topic or subject announcement**, incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the ProgramID contained in the next Selection_Record in the **received** sequencing file, **and**<br><br>    **(b) if the concluded segment is a program segment,**<br><br>        **(i) scanning forward in the received sequencing file to locate the next Selection_Record containing the appropriate LocType;**<br><br>        **(ii) resetting the CurrentPlay variable to the record number of that Selection_Record; and**<br><br>        **(iii) fetching and playing the** |

| | | **program segment identified by the ProgramID contained in the new Selection_Record**; <br><br>(3) repeating step (2) until a **rewind Selection_Record (LocType: R)** in the **received** sequencing file is reached, which resets the CurrentPlay variable to "1" to begin the playing sequence again with the first Selection_Record in the **received** sequencing file. |
|---|---|---|

70.    I have been informed Plaintiff proposes modifying the E.D. Tex. Court's construction to clarify that "continuously reproducing said program segments… in the absence of a control command" does not require the sequence to be repeated in a circular endless loop fashion.

### 1.    "Continuous Playback" Does Not Imply an Endless Loop.

71.    In my expert opinion, the claim limitation "continuously reproducing said program segments in the order established by said sequence" merely requires advancing though the sequence of program segments without interruption and does not require playing the program segments in an endless loop after the conclusion of the last program segment in the sequence. "Continuous reproduction" is a term of art that refers to playing successive tracks in a playlist continuously without having to press play to advance to the next program in the sequence. Those of ordinary skill at the time of invention would understand "continuous playback" to merely require the reproduction of programs absent a control command and does not further include playback in an endless loop.  The continuous reproduction of each audio segment in a playlist absent a control command without repeating any segment in a loop is sufficient to fall within the recited function. My opinion is consistent the meaning of the term "continuously reproducing…in order of a sequence" as would be understood by one of ordinary skill in the art,

36

additional intrinsic and extrinsic evidence more fully described below, and the algorithmic

structure disclosed by the specification as performing the claimed function.

72.     The description of the algorithm for "continuously reproducing" is consistent with the

definition of "continuously reproducing" or "continuous playback" as understood by those of

ordinary skill.  For example, SoundCloud defines continuous play as playing the next track or

playlist at the conclusion of the currently playing track or playlist:

## Continuous play

Once your track or playlist finishes, you'll continue your listening experience with the next
track or playlist on your Stream or profile. If you are listening to a track or playlist on their
individual page, a recommended track will start playing afterwards.

*See* **Exhibit N** (Screenshot of https://help.soundcloud.com/hc/en-us/articles/115003450747-

Continuous-play).

73.     This definition is consistent with the usage in the art.  Apple, Inc. produces a product

called "Final Cut Pro X" which, among other things, "provides many options for playing back

projects and clips." *See* **Exhibit O** (Screenshot of https://support.apple.com/kb/PH12779).  This

web page explains that "continuous playback" refers to playing programs in a sequence without

interruption or stopping at the end of each program in the sequence:

  ▪ Play clips in the browser without interruption: Choose View > Browser > Continuous Playback.

  When this setting is chosen, all event clips play without interruption (rather than stopping at the end of
  each clip).

*See* **Exhibit O** (Screenshot of https://support.apple.com/kb/PH12779).  In addition to its

"Continuous Playback" functionality, Final Cut Pro X also includes separate "looping"

functionality that allows a project or its clips to be played in a continuous loop.  The product

explicitly distinguishes the "continuous playback" functionality the "continuous loop"

functionality which instead plays the program sequence in an endless loop:

Play back media in a loop
You can turn on looping so that a project or a clip (or any portion of either) plays in a continuous loop.

1. To enable looping, choose View > Playback > Loop Playback (or press Command-L).

2. Do any of the following:

- Loop your entire project: Click the timeline to make it active, then press the Space bar.

- Loop a clip in the browser: Select the clip, then press the Space bar.

- Loop a portion of a clip or project: Select a range in a browser clip or the timeline (or select a timeline clip), then choose View > Playback > Selection, or press the Slash (/) key.

*See* **Exhibit O** (Screenshot of https://support.apple.com/kb/PH12779).  The separate usage of

"continuous playback" and "media in a loop" confirms "continuous playback" does not require

looping of a play list.  One of ordinary skill would understand that the concepts of continuous

playback and looping are distinct and that the "continuously reproducing" (or "continuous

playback") does not require nor imply looping a sequence of program segments.

74.      "Continuous playback" has been consistently used by the art from the invention of the

patent through its life as meaning only playing programs in sequence without interruption at the

end of each program.  There are many examples of the term "continuous playback" being used at

the time of the invention of the Patents-in-Suit that do not imply or suggest the requirement of an

endless loop.  In some cases, the concept of "continuous playback" is explicitly distinguished

from playing in a loop.

75.      For example, product manuals around the time of the invention used the term

"continuous playback" without an endless loop.  The manual for the Hitachi DZMV350E video

camera, date January 2003, describes continuous playback of still image without looping.

38

**Exhibit P** (Screenshot of http://www.hitachi.com.au/documents/product/

DZMV380E_manual.pdf) (hereinafter "Hitachi Manual"):

### SLIDE SHOW (CONTINUOUS PLAYBACK OF STILLS)

If you play back stills recorded on a card, the DVD video camera/recorder will enter the playback pause status after each still is played back.
Setting Slide Show allows you to continuously play back stills.

**1** Press the DISC NAVIGATION button.

**2** Press the MENU button.

**3** Choose "Slide Show", "All" or "DPOF", and then press the ▶/❚❚ button.



All:     To play all stills recorded on card in slide show.

DPOF:    To play only stills to which DPOF has been set in slide show.

Pressing the ▶/❚❚ button will start slide show. When playback is finished, the DVD video camera/recorder will enter the playback pause status at the final still. Pressing the ☐ button will restore the Disc Navigation screen.

Note:
• With slide show, playback starts from the first still on card.
• If you press the ☐ button or turn the DVD video camera/recorder off, Slide Show will be canceled.

*Id.* at 129.  It explains that "when playback is finished the DVD video camera/recorder will enter the playback pause status at the final still." *Id.*  Not only does this fail to require a loop, the Hitachi Manual explicitly states that looping will not occur.  Because the Hitachi Manual describes continuous playback without ever providing the option for a loop, it would indicate to a person of ordinary skill in the art that "continuous playback" does not imply an endless loop.

76.     Similarly, patents at the time of invention used the term "continuous playback" to refer to playing programs in a sequence without interruption between programs and not to playing a sequence in an endless loop.  For example, U.S. Application 2009/0088877 titled "Musical Content Reproducing Device and Musical Content Reproducing Method" and filed April 2005

describes a music player with multiple modes of operation. In the continuous play mode, the

player continuously plays music downloaded from a server:

> A first feature is that when the playback operation is started, a plurality of pieces of music evaluated as being liked by a user with high preference levels are sequentially selected and presented to the user. After a first piece of music is selected, **if the user inputs a continuous playback start command** via the operation unit of the user interface **11**, then the recording/playback apparatus according to the present embodiment determines whether the user shows a preference to the first selected music, on the basis of the biological information acquired from the user (the listener). If the user shows some preference, the recording/playback apparatus selects a piece of music having a music style/structure similar to that of the first selected piece of music, as a candidate for being played next following the current music.

**Exhibit Q** (U.S. Application 2009/0088877) at [0207].  The patent discloses while continuous

playback occurs, the player will fetch additional programs for the user.  However, playback ends

when the player does not receive additional music from the server:

> On the other hand, in the case where it is determined in step S14 that data of the requested music content is not received (that is, the message indicating that there is no data of the requested music content has been received), the control unit of the recording/playback apparatus notifies a user of the recording/playback apparatus that there is no data of the requested music content, by using a display such as an LCD (Liquid Crystal Display) or a light emitting device such as an LED (Light Emitting Diode), or an alarm such as a buzzer, which is disposed on the recording/playback apparatus although not shown in FIG. 1 (step S16), **and the control unit of the recording/playback apparatus ends the process shown in FIG. 5.**

*Id*. at [0152].  By contrast, the application also discloses a separate loop playback mode that

continuously replays a smaller number of already downloaded songs in an endless loop:

> **In the present embodiment, a loop playback mode is provided as one of remixing modes. In the loop playback mode, a small size of music material data with a length of one to few measures or one to few beats is repeatedly played back. The loop playback mode makes it possible to play music for an infinite period by using a small-size music material data.** The loop playback mode is useful, for example, when a rhythm pattern of a drum or the like is repeatedly played.

*Id*. at [0301].  According to the patent, the infinite loop is desirable if only a only a few songs are

downloaded but the user wishes to repeatedly play music.  The presence of two separate

playback functionalities – a continuous playback functionality that continuously provides the user with a series of songs and a separate loop playback functionality that provides the user with an endless loop of songs -- informs one of ordinary skill that the concept of "continuous playback" is explicitly distinguished from playing in a loop.

77.     Another example, U.S. Patent No. 5,974,503 titled "Storage and access of continuous media files indexed as lists of raid stripe sets associated with file names" and filed April 1997 describes a video server that provides a playlist consisting of clips of video.  The patent describes a feature of the invention as providing "continuous play" over multiple clips:

> To solve these problems, CMFAP has been extended to process a set of commands from the client for providing broadcast playback functionality. In particular, the extended protocol and interface easily **provides continuous play over multiple clips for extended periods of time**, allows a playlist to be edited after being given to the video server and during playback of clips in the playlist, allows some notion of "current time" to be used during the streaming of continuous media data, and supports features of the "Louth Automation" video disk communications protocol.
> **Exhibit R** (US Patent No. 5,974,503) at 44:42-51.

Critically, the patent discloses each clip is discarded from the playlist once it has been played:

> The extended protocol and interface permits an external application to create and manipulate a dynamic play-list; **as clips finish playing they are discarded from the play-list** and new clips may be appended to or inserted into the play-list at arbitrary points (subject to server imposed constraints).
> *Id*. at 44:51-56.

Based on these disclosures, one of ordinary skill would understand "continuous play" to mean playing each program in sequence without interruption.  One of ordinary skill would understand endlessly looping through the playlist could not be part of "continuous play" because the programs are discarded after they are played.  One would not be able to endlessly loop through the playlist because the programs are discarded after they are played.

78.     U.S. Patent No. 7,127,155 titled "Information Storage System Capable of Recording and Playing Back a Plurality of Still Pictures", which claims priority to July 7, 1998, uses the

term "continuous" in the context of playback in the same manner as the Patents-in-Suit.  The patent describes playback control information 1021 that contains "a sequence for continuously playing back all recorded cells." In this patent, "continuous playback" simply means without substantial gap between cells and without waiting for additional information (**Exhibit X** (U.S. Patent 7,127,155) at 28:47-54) with any suggestion that there must also be a continuous loop.  Moreover, this patent repeatedly refers to the concept of "executing seamless (continuous) playback," which does not suggest any relationship to repeating a playlist. **Exhibit X** (U.S. Patent 7,127,155) at 19:64, 20:44, 20:50.

79.      Plaintiff's construction is also consistent with the language of the claim. The recited function is "reproducing said program segments *in the order established by said sequence* in the absence of a control command." All that is required by this function is reproducing program segments in order of the sequence in the absence of a control command.  The explicit function language of the function does not require that the sequence to be repeated and this limitation is met if the audio files of the sequence are played in a continuous fashion without a control command regardless of possible repetition.

80.      Indeed, the function explicitly recites that the program segments must be reproduced "*in the order* established by the sequence."  Playback of program segments in a loop necessarily involves reproduction of the audio files in a manner that *departs from the order* of the sequence and therefore is not part of the explicitly recited function.  For example, departing from the order and going from song 100 to song 1, as opposed to reproducing segments in the order of the sequence, *i.e.*, 1→100.  Thus, those parts of the disclosed continuous playback algorithm related to playback in a loop do not perform the explicitly recited function.

81.     The function "continuously reproducing said program segments *in the order established by said sequence"* does not require the endless loop function.  The recited function is not continuously reproducing in an endless loop, but rather only recites continuously reproducing absent a control command.  It is my understanding that it would be improper to read an "endless loop" in the structure when the function merely requires continuous reproduction in the absence of a control command without further specifying continuous reproduction in an endless loop.

82.     My expert opinion is further supported by the language in other claims of the Patents-in-Suit.  For example, dependent claim 4 of the '076 Patent explicitly recites "wherein said sequence established by said data forms an endless circular sequence of program segments." This claim clearly requires the sequence to be an endless loop, and indeed the prosecution history specifically identified this claim as directed to sequencing files that "form[] an endless loop of programming." **Exhibit W** (Response to Office Action in Appl. No. 08/724,813 filed June 21, 1999) at 1.  If both claims 1 and 4 require a sequence that forms an endless loop, then these two claims would have the same scope, which I have been informed is improper.

83.     Finally, as discussed in the next section below, the control algorithm of Fig. 3 discloses logic for continuously playing a sequence absent a control command with no reference to an endless loop. In view of this disclosure it would be improper to view an endless loop as part of the structure of this claim limitation.

>   **2.      Fig. 3 Discloses the Corresponding Structure for "Means for Continuously Reproducing Said Program Segments in the Order Established By Said Sequence in the Absence of a Control Command."**

84.     The explicitly recited function of the "means for continuously reproducing said program segments in the order established by said sequence in the absence of a control command" claim terms is "continuously reproducing said program segments in the order

established by said sequence [of the sequencing file] in the absence of a control command."

Importantly, the recited function has two explicit requirements: (1) playing the program

segments in the order of the sequence provided by the sequencing file and (2) continuously

playing those segments in the absence of a control command.  It is my understanding that the

E.D. Tex. Court identified steps 235, 237, 239, and 261 of Fig. 3 (and the description of these

items in the specification) as corresponding structure to the above recited function.

85.     Steps 235, 237 and 239 of Fig 3 meet the first requirement of the function and describe

the programming for serially playing the audio program in the order of the sequence of the

sequencing file.



As is shown in Fig. 3, the algorithm advances through the specified sequence at step 235

(Continue Playback) and determines if a new segment has started at step 237. The algorithm

proceeds to step 237 (Segment Start?) each time a new segment is reached during playback and

the algorithm then handles the new segment in step 239. It should be noted the claim requires

"reproducing said program segments in the order established by said sequence."  The

specification repeatedly describes the player as playing program segments in the order

determined by the sequencing file:

> According to a further feature of the invention, the audio program player plays
> program segments **in an order determined by a session schedule** which
> identifies an ordered sequence of program segments.

'076 Patent, 2:44-47.

> Thus, although the segments are stored in randomly addressable locations in the
> local mass storage unit, **they are nonetheless played at step 212 in the sequence
> established initially by the server and (optionally) modified by the
> subscriber**, with the player providing the ability to dynamically switch to any
> position in this sequence under the listeners control.

'076 Patent, 8:65-9:4.

> As indicated at 237 in FIG. 3, each time a new program segment is started,
> a new segment handling procedure is executed at 239.  If the user desires to have
> advertising inserted to defray the costs of the subscription, the current actual cost
> per unit time is calculated and compared with the desired cost per unit time. If the
> cost is determined to exceed the desired level, an additional advertising segment
> is started; otherwise **the next program segment in the program sequence 214 is
> played.**

'076 Patent, 13:1-9.  As a result, the Patents-in-Suit make it clear that the algorithm advances

through the specified sequence and does not depart from it during continuous reproduction.

86.     The branch logic of step 261 that returns to step 235 meets the second requirement of

the recited function and insures that the playing of segments in the sequence is done in a

continuous fashion without the need of control commands to initiate playback of the next

segment in the sequence.  The final step of the algorithm is the branch logic at 261 which checks

for whether a control command has been received and corresponds to the "in the absence of a

control command" portion of the recited function.  In the absence of a control command

(indicated by "No" on the left of "Command?"), the algorithm proceeds back to step 235

(Continue Playback). Thus, the recited function of "continuously reproducing said program segments in the order established by said sequence in the absence of a control command" is completely embodied within these steps shown in Fig. 3 without a loop.

### 3.    Defendant's Modifications to the PTO's Construction are Incorrect

87.    Defendant proposes very substantial changes to the PTO's algorithm which include (1) insertion of "received sequencing file" into the control algorithm; (2) scanning for a LocType; and (3) separate programming for recognizing and handling topic and subject manner announcements. The "received sequencing file" modifications are discussed at III(B) and III(C)(1). The "scanning for a LocType" and the separate logic for "topic and subject" matter announcements relate to optional skipping features of the preferred embodiment and do not represent corresponding structure to the explicitly recited functions.

88.    First, performance of the recited function of "continuously reproducing said program segments in the order established by said sequence in the absence of a control command" is completely embodied within steps 235, 237, 239, and 261 shown in Fig. 3. Nowhere in these steps is there any mention of scanning for particular LocTypes or additional logic steps differentiating topic or subject announcements from other program segments. These modifications are not clearly linked in the specification to the performance of the recited function. Since they are not clearly linked in the specification to the performance of the recited function, it my understanding that they are not corresponding structure.

89.    Equally important is the fact that the steps of Fig. 3 identified by the Court that are clearly linked to the function are capable of performing the explicit function without the proposed modifications. Using these steps, one can play a program sequence continuously in a particular order absent a control command. Thus, the additional modifications are not necessary to perform the claimed function.

90.     Similarly, it would be incorrect based on the disclosure in Figure 5 of subject and topic announcements to modify the continuously reproduction algorithm to accommodate such functionality.  As stated above, such modifications are not clearly linked in the specification to the recited function and are not necessary to perform the function.

91.     The specification discloses that subject and topic announcement and subject and topic skipping are optional features used only when the program segments have been subdivided to include subject and topic announcements.  The specification makes clear by using the words "if", "if desired" and "when" that one does not have to subdivide the program segments to include such announcements and such functionality:

> The third command, the SKIP command indicated at 275 in Fig. 3, causes the player to advance to the beginning of the next program segment in the program sequence, recording the start of the next sequence at 267, and resetting the playback position at 269. **If the program segment[sic] has been subdivided** (e.g. into paragraphs), the SKIP command causes the player to skip forward to beginning of the next subdivision within that segment. **If desired, SKIP commands may be subdivided into two types, a SKIP TOPIC command and a SKIP SUBJECT command**. **When** programming material such as news reports are grouped into topics within subject categories, as described later in connection with Fig. 5, a SKIP SUBJECT command allows the user to skip over all program segments within that subject and resume playback at the leading description of the next subject. In contrast, the SKIP TOPIC command always advances to the next topic (program segment or program segment subdivision) in the sequence.

''076 Patent, 15:21-37.

92.     Since the specification makes clear that subdivision of program segments by subject and topic announcements is an optional embodiment, the inclusion of programming to accommodate these announcements and subject/topic skip functions is not necessary to the recited function and should not be included in the corresponding structure.

93.     The inclusion of "scanning forward in the received sequencing file to locate the next Selection_Record containing the appropriate LocType" in Defendant's proposed construction is

also incorrect.  The explicitly recited function requires that the program segments must be reproduced "*in the order* established by the sequence."  Defendants proposed algorithm, however, skips forward in the sequence to play the selection record of program segment of "the appropriate LocType" rather than the next program segment in the sequence, and thus, this step is used to *depart* from playing the segments "*in the order* established by the sequence."  Thus, the "scanning forward" step is not corresponding structure necessary to perform the recited function.

94.     Furthermore, the algorithmic components of topic and subject skipping features Defendant relies upon for its proposed modifications are performed in response to a control command of SKIP SUBJECT or SKIP TOPIC:

> If desired, SKIP commands may be subdivided into two types, a SKIP TOPIC command and a SKIP SUBJECT command. When programming material such as news reports are grouped into topics within subject categories, as described later in connection with Fig. 5, a **SKIP SUBJECT command allows the user to skip over all program segments within that subject and resume playback at the leading description of the next subject**. In contrast, the SKIP TOPIC command always **advances to the next topic** (program segment or program segment subdivision) in the sequence.

'076 Patent, 15:28-38.  The SKIP SUBJECT and SKIP TOPIC commands do not perform the function of "continuously reproducing said program segments in the order established by said sequence in the *absence of a control command*" because they are commands—not the absence of a command. As these features do not perform the recited function, they are not corresponding structure.

### 4.     The "R" LocType is Further Unnecessary Structure

95.     Defendant's proposed construction further seeks to modify the algorithm of the "continuous reproducing" limitation with the rewind "R" LocType.   It is my expert opinion that this would be incorrect. The corresponding structure of steps 235, 237, 239, and 261 of Fig. 3

that is clearly linked to reproduction "absent a control command" makes no mention of the use of any "R" LocType, and, accordingly, discloses an algorithm capable of performing the recited function without such a structure.

96.     Furthermore, the "R" LocType is an implementation of the endless loop and should not be included as corresponding structure of the "continuously reproducing" limitation because the endless loop is not part of the recited function. Even if the limitation required an endless loop, the "R" LocType still would not be corresponding structure because the endless loop could also be implemented using the disclosed hyperlink functionality (*see* '076 patent, 19:60-65("If desired, a hyperlink (to be described) may be placed at the conclusion of each installment which specifies the next installment as the linked program segment.")) or resetting the CurrentPlay variable to 1 as set forth in the current construction. The specification also teaches that the particular formats regarding LocType described in the Selections File 351 also depicted in Fig. 5 are merely "preferable" and not necessary: "[t]o control subject and topic skipping, as well as hyperlink jumps, the selections file seen generally at 301 in FIG. 4 **preferably** takes the form of a sequence of records." '076 patent, 31:63-67.

### E.     "DOWNLOADING" ('178 patent, claims 1 and 14)

97.     I have been informed the parties have proposed constructions for the term "downloading" as follows:

| Term | Plaintiff's Construction | Defendant's Construction |
|------|--------------------------|--------------------------|
| "a communications port for establishing a data communications link for **downloading** a plurality of separate digital compressed audio program files and a separate sequencing file from | "a port for establishing a connection between a player and a network"<br><br>**Downloading**<br><br>"transferring a file from a remote computer to the requesting computer by means of a modem | A port for establishing a connection between the player and a network.<br><br>**"downloading":**<br><br>'178 patent claims 1-13<br>Transferring digital compressed audio program files and a |

| | | |
|---|---|---|
| one or more server computers" ('178 patent, claim 1)<br><br>"a communications port for **downloading** at least some of said audio program files and said playback session sequencing file from said one or more server computers" ('178 patent, claim 14) | or network"<br><br>"transferring a plurality of separate digital compressed audio program files and a separate sequencing file one or more remote server computers via a modem or network to the player upon a request by the player." | separate sequencing file from one or more separate computers to the player over a network<br><br>upon a request by the player identifying said digital compressed audio program files and said separate sequencing file.<br><br>'178 patent claims 14-21, 28, 29 Transferring at least some of said audio program files and said playback session sequencing file from one or more separate computers to the player over a network upon a request by the player identifying said digital compressed audio program files and said playback session sequencing file. |

98.     It is my expert opinion that a person of ordinary skill in the art would understand the term "downloading" as used in claim 1 of the '178 Patent to mean "transferring a file from a remote computer to the requesting computer by means of a modem or network" and as used in claims 14 of the '178 Patent to mean "transferring a plurality of separate digital compressed audio program files and a separate sequencing file one or more remote server computers via a modem or network to the player upon a request by the player."  This is my expert opinion based on the plain and ordinary meaning of this term as would be understood by a person of ordinary skill in the art in view of the specification and prosecution history of the patents-in-suit.

99.     Claims 1 and 14 of the '178 patent recite "a communication port for establishing a data communications link for downloading" and "a communications port for downloading," respectively.  It is my understanding that the Court has previously construed a "communications port" as "a port for establishing a connection between the player and a network." **Exhibit D**

(Order Construing Claim Terms, *Personal Audio LLC v. Apple, Inc.*, No. 9-09-cv-111 (E.D. Tex. 2010)) at 31-42.  It is also my understanding that the parties do not dispute this portion of the construction.  It is my understanding that the parties disagree over the construction of "downloading."

100.    I have been informed that Plaintiff seeks clarification of the Court's previous construction, such that is clear that the connection between a player and a network must be from a remote computer (*i.e.* host) to the player via a modem or network and not just between local disk drives.  In my opinion, such clarification is within the plain and ordinary meaning of the term "downloading" at the time of the invention as it would be understood by a person of ordinary skill in the art.

101.    My opinion is supported by contemporaneous dictionaries. For example, the 1996 edition of Barron's Dictionary of Computer and Internet Terms defines "download" as "to transmit a file or program from a central computer to. . . a computer **at a remote site.**" **Exhibit J** (Barron's Dictionary of Computer and Internet Terms, 5th Ed. (1996)).  Similarly, the fourth edition Computer Dictionary by Charles Sippl defines "download" as "to transfer a copy of a program, file, or other information from a **remote** database or other computer to the user's own terminal **over a communications line.**" **Exhibit L** (Computer Dictionary, 4th Ed. (1985)).  The term "download" was well understood at the time of invention, and, in the context of the claims, requires a transfer of files from a **remote** server to a **local** player **via a modem or network**, as evidenced by Fig. 1.

102.    The plain and ordinary meaning of "download", as proposed by Plaintiff, is further supported by the specification, which includes numerous statements affirming that downloading occurs between a **remote** server (*i.e.* host) and the player. For example, the specification states:

> The download operation preferably occurs at a time established by the player which establishes a **dial up connection** via the SLIP/PPP serial connection 117 **to the local Internet service provider 121 which provides an Internet connection to the host FTP server 125**. The download file or files containing programming and advertising segments as well as subscriber specific data are designate by filenames provided by the requesting client/player 103 and moved from storage unit 145 utilizing the FTP server 125 and the Internet connection into local storage at 107 in the client/player 103.

'076 patent, 8:24-44 (emphasis added).  Accordingly, the specification is clear that the download operation transfers the program files and the sequencing file from a remote host server to local storage via an Internet connection.

103.    Defendant's proposed construction includes the additional limitation that "a request by the player **identif[ies] said digital compressed audio program files** and said separate sequencing file."  However, nothing in the term "download" suggests that a requestor has to identify the <u>files</u> to be downloaded.  Moreover, the term "download" offers no suggestion as to who or what identifies or determines the files for downloading.  In ordinary experience, one can simply press a button to initiate a download without identifying or even knowing the files one will receive.  Indeed, the dictionaries relied upon by Defendant do not specify that the requesting computer must identify the files to be downloaded.  *See* **Exhibit I** (IEEE Stand. Dictionary of Electrical Terms, 5th Ed. (1993)) at 316 ("to transfer some collection of data from a computer memory to another storage location").

104.    Furthermore, key passages of the specification explicitly state that the program files and sequencing file can be identified by the host server. For example:

> As indicated at 203, an interested subscriber invokes programming services by first supplying personal information and initial programming preferences … Based on the information supplied by the user, <u>the server then compiles one or more files for downloading</u> to the subscriber at step 207 which include programming and advertising segments as well as additional data and utility programs needed by the player 103 to begin operation.

'076 patent, 8:12-24 (emphasis added); *see also* '076 patent, 7:24-31, 12:21-28, 19:52-56.

Accordingly, it is my opinion that a person of ordinary skill in the art would not understand the term "downloading" to include the additional limitations proposed by Defendant.

### F.     "MEANS FOR DETECTING A FIRST COMMAND…" ('076 patent, claim 1)

105.     I have been informed the parties have proposed the following construction for the "means for detecting a first command…" term as follows:

| Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "means for detecting a first command indicative of a request to skip forward" ('076 patent claims 1-3, 5, 6, 13) | The function is "detecting a first command indicative of a request to skip forward."<br><br>The structure corresponding to the claimed function is the following structures and equivalents thereof:<br><br>A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 261, 262, and 275.<br><br>Specifically, this algorithm includes the following steps:<br><br>1. determining whether input from the means for accepting control commands is a command using a conditional programming construct; and<br><br>2. if the input is a command, using a "branch" programming construct to select one of the player's available commands, which include a "Skip" command, for execution. | Function<br>Detecting a first command indicative of a request to skip forward.<br><br>Structure<br>A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 261, 262, 275. Specifically, this algorithm includes the following steps:<br><br>(1) determining whether input from the means for accepting control commands is a command using a "if-then-else" programming construct; and<br><br>(2) if the input is a command, using a "branch" programming construct to select one of the player's available commands, which include a "Skip" command, for execution. |

53

106.     For this term, the algorithm disclosed in the patents corresponds to items 261

[Command?], 262 [Branch] and 275 [Skip] or 278 [Back] in Figure 3 and the accompanying

written description of those steps as set forth in Personal Audio's proposed claim construction.

As detailed in the specification, the player receives a command, and then "the character of the

command is evaluated" from among the possible commands. '076 patent, 13:58-61. Figure 3

depicts this evaluation process in two steps including a "Branch" step and a result such as "Skip"

or "Back." A "Branch" is common programming language well understood by a person of

ordinary skill in the art.

107.     In the field of computer science generally, the evaluation process depicted in Fig. 3

indicates a conditional programming construct.  The evaluation process depicted in Fig. 3 can be

implemented with conditional programming constructs, including for example, a series of "if-

then" or "when/then" statements or a "case" test.  For each of the possible options that can be

taken at the "Branch," there are additional steps that will be performed depending upon the result

of the "Branch." In the case of Figure 3, based on the command received, for example, the result

of the evaluation of the command may be "Skip" or "Back." At that point, the program has, in the

words of the claim, "detected" a given command. The command can then be acted upon, and

additional steps performed, in accordance with the "means responsive" to that command. This

series of steps outlined in Figure 3 and further explained in the text of the specification is

sufficient to inform a person of ordinary skill in the art of the bounds of the claims reciting

"means for detecting commands."

108.     The patents do not required the claimed inventions use any particular programming

language(s). As a whole, conditional expressions or constructs are a set of instructions to perform

different computations or actions depending on whether a specified condition occurs.  "If" and

"else" are actual operators used across a number of programming languages. Computer

languages also use slightly different syntax or operators, such as "when/then/else" or a "case"

test (or both), which may be used to accomplish the same operation as if-then-else.   As a result,

a person having ordinary skill in the art would understand that the term "conditional"

programming construct" would encompass these variations and would not be limited to any

particular programming language.

109.     Furthermore, contemporaneous dictionaries support that the term "conditional" is an apt

description for the depiction in Figure 3 of a "Command?" box 261 and both a "Yes" and a "No"

arrow leading away from the box. For example, the Microsoft Press Computer Dictionary, 3rd.

Ed. (1997) defines "conditional" as "[o]f, pertaining to, or characteristic of an action or operation

that takes place based on whether or not a certain condition is true." **Exhibit K** (Microsoft Press

Computer Dictionary (1997)).  The Dictionary of Computer and Internet Terms, 5th. Ed. (1996)

defines conditional as "an instruction that causes the computer to jump to another location in the

program only if a specified condition is true." **Exhibit J** (Barron's Dictionary of Computer and

Internet Terms, 5th Ed. (1996)).  The programming construct shown in Fig. 3 is consistent with

these dictionary definitions.  In short, the term "conditional" accurately describes the

programming construct depicted by items 261, 262, 275 and 278.

###     G.     "EDITING MEANS FOR MODIFYING SAID DATA ESTABLISHING SAID SEQUENCE" ('076 patent, claim 5)

110.     I have been informed the parties have proposed constructions for the term "editing

means for modifying said data establishing said sequence" as follows:

| Term | Plaintiff's Construction | Defendant's Construction |
| --- | --- | --- |
| "editing means for modifying said data establishing said sequence" ('076 | The function is "modifying said data establishing said sequence." <br><br> The structure corresponding to | Function <br> Modifying said data establishing said sequence. |

| patent claims 5, 6) | the claimed function is the following structures and equivalents thereof:<br><br>A player client programmed to:<br><br>1. Add a program segment; and/or<br><br>2. Delete a program segment; and/or<br><br>3. Assign a new or different order to a given program segment; and update the order for the program segments in the serialized sequence. | <u>Structure</u><br>No disclosure of corresponding structure in the patent specification. |
| --- | --- | --- |

111.    For claim 5, I have been asked whether Personal Audio's statements of the corresponding structure set forth the algorithm necessary to perform the function, and whether the algorithms recited place a limitation on the claims. They do. In each case, the corresponding structure is specifically the portion of the flowchart of Figure 2, and the explanatory narrative for editing step 211 described in the specification. As detailed in the specification, "the segments… are [] played are at step 212 in the sequence established initially by the server and (optionally) modified by the subscriber… As indicated at 213 in FIG. 2, the listener may at any time return to the sequence editing step 211 to manually reorder the playing sequence if desired." '076 patent, 8:65-9:6.  The specification details editing means by way of modification, addition, deletion and re-sequencing… as discussed earlier in connection with step 211 in Fig. 2. '076 patent, 8:45-51.

112.    The specification repeatedly refers to the flow chart shown in Figure 2 as describing an editing step 211 (modification and/or reordering) data establishing a sequence. *See, e.g.,* '076 patent, 8:65-9:6 ("the segments… are [] played are at step 212 in the sequence established initially by the server and (optionally) modified by the subscriber… As indicated at 213 in FIG.

2, the listener may at any time return to the sequence editing step 211 to manually reorder the playing sequence if desired."); *id.* at 12:21-27 ("The playback operation itself continues from the designated playback point in the selections file (seen at 351 in FIG. 5) which follows a program sequence initially created by the host server and downloaded with the program segments themselves, and then (optionally) modified by the addition, deletion and re-sequencing of segment identifiers as discussed earlier in connection with step 211 in FIG. 2."); *id.* at 8:45-51 (Before a playback session begins, as indicated at 211, the subscriber has the opportunity to review and alter the provisional program selections and sequence established as a default by the downloaded information from the server. Utilizing the programming data and a utility program previously supplied by the server, the subscriber may alter the selection and sequence of program materials to be played…").

113.     Steps 211 and 213 providing the necessary algorithmic corresponding structure for performance of the recited functions.  Importantly, steps 213 and 212 of Fig. 3 not only describes the performance of the function, it describes the technical means for implementation by one of ordinary skill in the art:



Fig. 2

57

114.      Step 213 identifies and allows the user to access the necessary data structure for

controlling the sequence (i.e., selections file 351).  Step 211 provides the technical method of

modifying or sequencing the selections schedule:

> The playback operation itself continues from the designated playback point in the
> selections file (seen at 351 in FIG. 5) which follows a program sequence initially
> created by the host server and downloaded with the program segments themselves, and
> then (optionally) **modified by the addition, deletion and re-sequencing of <u>segment</u>
> <u>identifiers</u> as discussed earlier in connection with step 211 in FIG. 2.**
> '076 patent, 12:21-27.

By adding or deleting the "segment identifiers" in selections file 351 shown in Fig. 5, the

playback session can be modified or resequenced.

115.      I understand that Personal Audio proposes the construction adopted by the PTAB as

follows:

> A player client programmed to:
>
> 1.   Add a program segment; and/or
>
> 2.   Delete a program segment; and/or
>
> 3.   Assign a new or different order to a given program segment; and update
>
>       the order for the program segments in the serialized sequence.

Alternatively, proposes the following construction:

> A player client programmed to:
>
> 1.      Access selections file 351; and
>
> 2.      Alter identifiers of program segments within the selections file, including
>
> the following operations:
>
> a.   Add a program segment; and/or
>
> b.   Delete a program segment; and/or

     c.    Assign a new or different order to a given program segment; and update the order for the program segments in the serialized sequence.

116.    This structure reflects the basic steps taught in the patent - namely, to add and/or delete a program, assign a new or different order to a given program segment, and update the order for the program segments in the serialized segments.

117.    In this case, a person of ordinary skill in the art reading the specification would be informed with reasonable certainty as to the corresponding algorithmic structure.

**H.    "PLAYER," "AUDIO PROGRAM PLAYER," "PROGRAMMED DIGITAL COMPUTER" (all claims)**

118.    I have been informed the Parties have proposed constructions for the terms "player", "audio program player", and "programmed digital computer" as follows:

| Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "player" ('076 patent claims 1-3, 5, 6, 13)<br><br>"audio program player" ('178 patent claims 1-21, 28, 29)<br><br>"programmed digital computer" ('076 patent claims 14, 15) | A device or program that reproduces sound including from digital audio content. | Plain and ordinary meaning. |

119.    It is my expert opinion that a person of ordinary skill in the art would understand the term "player" to mean "a device <u>or program</u> that reproduces sound including from digital audio content." It is also my expert opinion that a person of ordinary skill in the art would understand that an "audio program player" is a species of "player" for audio programs requiring a player, while a "programmed digital computer" is a general purpose computer programmed with the

recited functions.  It is also my opinion that each of these terms is a structural term reflecting the different embodiments in the specification and as such should be limiting.

120.     The preambles at issue here meet recite essential structure and are necessary to give meaning to the claim.  Each of these terms recites an essential structure that limits the scope of the body of the claim.  My opinion is supported by the numerous, repeated, and explicit statements of the patent that describe the player as an essential component of the invention. *See, e.g.*, '076 patent, 2:6-10, 4:28-31; 8:9-44, 13:49-14:19 & Fig. 1 (describing the host and player client device architecture as a key feature of the invention that allows interactive user selection of program segments by use of the player client device).

### I.     "SELECTED AUDIO PROGRAM SEGMENTS," "AUDIO PROGRAM SEGMENTS," "PROGRAM SEGMENTS" (all claims)

121.     I have been informed the Parties have proposed the following constructions for the terms "selected audio program segments," audio program segments," and "program segments" as follows:

| Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "audio program segment(s)" /"program segment(s)"('076 claims 1-3, 5, 6, 13-15) | audio program segments that have been chosen by or for a user | Plain and ordinary meaning |

122.     With respect to "selected audio program segments," Plaintiff proposes the same construction as it does for "audio program segments" and "program segments." It is my understanding that Defendants argue that the preamble is not limiting.

123.     It is my expert opinion that a person of ordinary skill in the art would understand the term "selected audio program segments" to mean "audio program segments that have been

chosen by or for a user."  Although this term appears in the preamble of claim 1, I have been

informed that a preamble is limiting if it recites essential structure or steps, or is necessary to

give life, meaning, and vitality to the claim.  One skilled in the art would understand that the

term "program segments" in the body of the claim refers to the "selected audio program

segments" in the preamble.  For example, claim 1 of the '076 patent recites:

> 1. A player for reproducing **selected audio program segments** comprising, in combination:
>
> 1.a) means for storing a plurality of **program segments**, each of said **program segments** having a beginning and an end,
>
> 1.b) means for receiving and storing a file of data establishing a sequence in which said **program segments** are scheduled to be reproduced by said player,
>
> 1.c) means for accepting control commands from a user of said player,
>
> 1.d) means for continuously reproducing said **program segments** in the order established by said sequence in the absence of a control command,
>
> 1.e) means for detecting a first command indicative of a request to skip forward, and
>
> 1.f) means responsive to said first command for discontinuing the reproduction of the currently playing **program segment** and instead continuing the reproduction at the beginning of a **program segment** which follows said currently playing program in said sequence.

'076 patent, claim 1 (emphasis added).  Here, the preamble recites the fundamental teaching of

the invention—a player for reproducing selected audio program segments—and each element of

the claim that follows teaches how the device handles such program segments.

124.    A contrary conclusion would mean that the "program segments" in the claim body

would be far broader that contemplated by the invention or even contemplated by the Court or

Defendants. For example, the ordinary meaning of program segments could be video segment

(without audio), and then the claim would embrace methods that having nothing do with the

disclosures of the patents-in-suit.  Of course, in this situation, under Defendant's view of the preamble, the method of reproducing selected audio program segments could be met by things that have nothing to do with audio or selected program segments.  One could then perform the steps in the body of the claim and never reproduce any "selected audio program segment"—the identified purpose of the method in the claim.  Given the explicit words of the claim and that the entirety of the specification is directed to an audio player, this is not how one skilled in the art would interpret the claim.

125.     Both the prior construction adopted by the Eastern District of Texas and Defendant's proposed construction of "file of data establishing a sequence" acknowledge this limitation from the preamble. The Eastern District of Texas previously construed "file of data establishing a sequence" as "a file of data that identifies the order in which **audio program segments** are to be played and that may contain information about the sequence of events that occurred during playback" – a construction that necessarily requires the preamble's **audio** program segment limitation. **Exhibit D** (Order Construing Claim Terms, Personal Audio LLC v. Apple, Inc., No. 9-09-cv-111 (E.D. Tex. 2010) at 18.  Similarly, Defendant proposes that "file of data establishing a sequence" is "a file that is received by the player, stored, and used by the processor to both control playback of each **song** in the recommended order and respond to control commands" – which again necessarily requires that the selected audio program segments of the preamble limit the scope of the invention.

126.     Finally, I have been informed that the Eastern District of Texas previously found that the preamble is "necessary to give life, meaning, and vitality to the claim" when it construed this term in previous litigation. **Exhibit D** (Order Construing Claim Terms, Personal Audio LLC v. Apple, Inc., No. 9-09-cv-111 (E.D. Tex. 2010) at 9-13.  I have been further informed that the

Eastern District of Texas concluded that "[t]hroughout the description of the preferred

embodiment of the invention, the patent's specification repeatedly discusses downloading to the

player programming that either has been selected by the user, or has been selected for the user

based on data about the user and his or her preferences … The court is cognizant that it should

avoid restricting the claims to the preferred embodiments described in the specification.

However, ***claims should also be interpreted with an eye toward giving full meaning to every***

***word of the entire claim***." *Id*. at 42-43.  "The use of the word 'selected' [provide reference to the

program segments in the body of the claim and] implies that the audio program segments

reproduced by the player are not just any audio segments, but rather segments that have been

picked or chosen for reproduction." *Id*. at 44.

### J.    "MEANS FOR TRANSLATING SAID VOICE SIGNALS INTO SAID CONTROL COMMANDS" ('076 patent, claim 13)

127.    Plaintiff has proposed the following construction for the term "means for translating

said voice signals into said control commands," which I understand Defendant contends cannot

be construed by reason of indefiniteness:

| Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "means for translating said voice signals into said control commands" ('076 patent claim 13) | Function<br><br>"translating said voice signals into said control commands"<br><br>Structure<br><br>The structure corresponding to the claimed function is the following structure and equivalents thereof:<br><br>A microphone and voice recognition software | Function<br>Translating said voice signals into said control commands.<br><br>Structure<br>No disclosure of corresponding structure in the patent specification. |

128.  It is my expert opinion that the term "means for translating said voice signals into said control commands" would be understood by a person of ordinary skill in the art to perform the function of "translating said voice signals into said control commands".  The structure discloses in the specification for performing this function is the speech recognition of portion of the described voice command system.  '076 Patent, 16:50.  In my expert opinion, Defendant's contention that no corresponding structure is disclosed in the patent is incorrect.

129.  This specification identifies a "voice command system" as corresponding structure for this function is described in the following passages:

> Using a hands-free **voice command system**, the player may reproduce a menu program segment in which a sequence of options are enunciated on the system's audio output speaker with short pauses between the recited options.

'076 Patent, 16:50-54 (emphasis added).

> The player **103** further includes a sound card **110** which receives audio input from a microphone input device **111** for accepting voice dictation and commands from a user and which delivers audio output to a speaker **113** in order to supply audio information to the user.

'076 Patent, 4:41-46.  A person of ordinary skill in the art would understand that the term "voice command system" connotes specific structure and would recognize this term describes specific software that performs the function of translating voice signals into commands.

130.  My expert opinion is supported by the following references that illustrate the way the term "voice command system" was used as a term of art and its meaning around the time of the invention.

131.  The Ultimate Multimedia Handbook by Jessica Keyes (hereinafter "Handbook"), published in 1997 explains that:

> In the voice-recognition area, applications may be divided into two categories: *voice command* and *voice dictation*.  Voice command systems allow a user to rune computer via voice, either in conjunction with or as a replacement of the keyboard

and/or mouse.  The entire system can be operated by voice command, customized voice-driven application can be built, or both options can be supported."

**Exhibit S** (Ultimate Multimedia Handbook (1997)) at 35.11-35.12.

132.    The Handbook also details how to build a voice command system (**Exhibit S** (Ultimate Multimedia Handbook (1997)) at 35.15-35.17) and even provides a list of commercially available voice command systems, including:

- IN³ (pronounced *in-cube*) by Command Corp (designed to run on Sun Sparcstations and Microsoft Windows

- Voice Pilot by Microsoft (designed to run on Microsoft Windows)

- Listen for Windows by Verbex (designed to run on Microsoft Windows)

**Exhibit S** (Ultimate Multimedia Handbook (1997)) at 35.22-.23.  As illustrated by the Handbook, the term "voice command system" was understood at the time of the invention to describe specific structure.  It is also worth noting that the same software that is used for voice dictation (i.e., converting voice signals into text) can often be used in a voice command system:

> One note to be made before discussing Dragon Systems' and IBM's offerings is that, while their larger vocabulary systems clearly are targeted to the voice-dictation market, they both also offer configurations that are usable as voice-command systems.  All of their products are discussed under this single heading [("voice-dictation systems)] for simplicity, but they also should be considered when evaluating voice-command systems.

**Exhibit S** (Ultimate Multimedia Handbook (1997)) at 35.23.  For at least this reason, the disclosures of speech recognition in the Patents-in-Suit would be generally understood by a person of ordinary skill in the art as implicitly including a voice command system.  *See, e.g.*, ''076 Patent, 36:63-67, 40, 56-60, 43:53-56.  The difference between voice dictation and voice command is how the voice signals are used—not their content.  For example, depending on configuration translating voice signals into the word "Go" could be interpreted as a command or simply as the word "Go" with no special significance.  The Handbook clearly shows that a

person of ordinary skill in the art would understand the term "voice command system" as describing specific structure.

133. U.S. Patent No. 5,950,167, which was filed Jan. 216, 1998, is titled "Screen-Less Remote Voice or Tone Controlled Computer Program Operations via Telephone Set" and describes the use of a "voice command system" ("VCS" for short). **Exhibit T** (US Patent 5,950,167) at 4:8-11. With reference to its Figure 2, the patent states that "VCS 16 includes an incoming voice-recognition unit ("VRU") 17 and a converter 18 that provides voice-to-text file and text file-to-voice conversion capability." *Id*. at 4:14-18.



**Exhibit T** (US Patent 5,950,167) at Figure 2 (emphasis added). As shown in the above figure, the voice command system generally includes the ability to recognize voice signals as shown by VRU. Moreover, the patent specifically identifies a commercially available voice command system, "INTUITY™ CONVERSANT® current version 6.0, which was a software package

made by Lucent Technologies, Inc.  *Id*. at 4:31-43.  As shown by this patent, a person of ordinary skill in the art would understand the term "voice command system" connotes a specific type of structure and would readily know how to obtain a suitable one.

134.     Another example is U.S. Patent No. 5,127,043 which discloses a speech recognition system, and was filed May 15, 1990.  Although this patent does not refer to itself as a "voice command system", it is recognized as a voice command system by a co-owned patent application:

> A **voice command system** of this type is described in co-pending application Ser. No. 07/523,486 [(U.S. Pat. No. 5,659,597)], filed May 15, 1990, to Hunt et al., titled "Simultaneous Speaker-Independent Voice Recognition And Verification Over A Telephone Network," assigned to the assignee of the present invention and incorporated herein by reference.

**Exhibit V** (U.S. Patent 5,881,134) at 2:19-25 (emphasis added).



**Exhibit U** (US Patent 5,127,043), Figure 2 (showing voice recognition algorithm 48).  As confirmed by the '134 Patent, the term "voice command system" describes specific structure to a person of ordinary skill in the art.

135.  The above references clearly establish that the term "voice command system" was a term of art at the time of the invention which described software that performed two functions:

translate voice signals into commands and translate any responses of those commands into audio signals.

136.  As noted in the specification, the recited "voice command system" is clearly linked to the function of accepting voice commands.

> The player mechanism seen at 103 includes both a keyboard and a microphone for accepting keyed or voice commands respectively which control the playback mechanism.

'076 Patent, 13:49-52.

> As described later in connection with FIGS. 5 and 7, the mechanism seen at 263 and 264 for introducing a pause in the session playback while a voice response or comment from the user is recorded can also be employed to produce program generated prompts which request information followed by automatic response recordings, thereby enabling the system to be used to collect data, program evaluations, and other information from the user.

'076 Patent, 14:11-19.

> For example, the spoken voice command "FIVE" can indicate a request to go to a predetermined numbered program segment while the spoken command "NEWS" could switch to the subject announcement segment for news programs

'076 Patent, 14:22-25.

> When a cue signal indicates a hyperlink passage, a simple "Go" voice command causes the player to reset to a new location from which playing continues until a "Return" command, seen at 266, causes the player to return to the original sequence.

'076 Patent, 14:48-52

> In addition to having means for accepting a user command to execute a jump to the hypertext material, the player also advantageously includes a mechanism (special key or voice command response) which, when activated, causes a "return" to be made to the playing sequence at the point of the original anchor from which the hyperlink was performed.

'076 Patent, 31:47-54.

137.   In my expert opinion, this disclosure of the patents-in-suit more than inform a person of ordinary skill in the art reading the specification as to the corresponding structure.

Executed this 18th day of April, 2018 in Santa Barbara, CA.


_____
Kevin C. Almeroth, Ph.D.

ATTACHMENT A

# Kevin C. Almeroth

Professor, Department of Computer Science
University of California
Santa Barbara, CA 93106-5110
(805)636-1123 (office)
(805)893-8553 (fax)
almeroth@cs.ucsb.edu (email)
http://www.cs.ucsb.edu/~almeroth (WWW URL)

## Education

**Ph.D.**        June 1997 *Georgia Institute of Technology*  Computer Science

   *Dissertation Title*: Networking and System Support for the Efficient, Scalable Delivery of Services in Interactive Multimedia Systems

   *Minor*: Telecommunications Public Policy

**M.S.**        June 1994 *Georgia Institute of Technology*  Computer Science

   *Specialization*: Networking and Systems

**B.S.**        June 1992 *Georgia Institute of Technology*  Information and Computer Science

**(high honors)**        *Minors*: Economics, Technical Communication, American Literature

## Employment History

| | | |
|---|---|---|
| Professor | Department of Computer Science<br>University of California<br>Santa Barbara, CA | Jul 2005 -- present |
| Associate Dean | College of Engineering<br>University of California<br>Santa Barbara, CA | Mar 2007 -- Aug 2009 |
| Vice Chair | Department of Computer Science<br>University of California<br>Santa Barbara, CA | Jul 2000 -- Nov 2005 |
| Associate Professor | Department of Computer Science<br>University of California | Jul 2001 -- Jun 2005 |

|  |  |  |
|---|---|---|
|  | Santa Barbara, CA |  |
| Assistant Professor | Department of Computer Science University of California Santa Barbara, CA | Jul 1997 -- Jun 2001 |
| Graduate Researcher | Broadband Telecommunications Center Georgia Center for Adv Telecom Tech Atlanta, GA | Sep 1996--Jun 1997 |
| Graduate Intern | IBM T.J. Watson Research Labs Hawthorne, NY | Jun 1995--Sep 1995 |
| Support Specialist | Office of Information Technology Georgia Institute of Technology Atlanta, GA | Sep 1995--Jun 1997 |
| Research Assistant | College of Computing Georgia Institute of Technology Atlanta, GA | Jan 1994--Mar 1994 |
| Graduate Intern | Hitachi Telecommunications Norcross, GA | Jun 1992--Sep 1992 |
| Undergraduate Intern | IBM Research Triangle Park, NC | Jun 1989--Sep 1989 Jun 1990--Sep 1990 Mar 1991--Sep 1991 |

## Industry Technical Advising

|  |  |  |
|---|---|---|
| Board of Directors | The New Media Studio Santa Barbara, CA | Nov 2006 -- present |
| Co-Founder & Chairman of the Board | Santa Barbara Labs, LLC Santa Barbara, CA | Sep 2007 -- Dec 2009 |
| Board of Advisors | Techknowledge Point Santa Barbara, CA | May 2001 -- Dec 2007 |
| Technical Advisory Board | Occam Networks, Inc. Santa Barbara, CA | May 2000 -- Dec 2010 |
| Board of Advisors | Airplay Inc. San Francisco, CA | Jun 2005 -- Aug 2009 |
| Consultant | Lockheed Martin Corporation San Jose, CA | Nov 1999 -- Jun 2009 |

| Board of Advisors | Santa Barbara Technology Group<br>Santa Barbara, CA | Sep 2000 --<br>Dec 2004 |
| Board of Directors | Virtual Bandwidth, Inc.<br>Santa Barbara, CA | Nov 2000 --<br>Jun 2001 |
| Board of Advisors &<br>Affiliated Scientist | Digital Fountain<br>San Francisco, CA | Jan 2000 --<br>Dec 2001 |
| Senior Technologist | IP Multicast Initiative, Stardust Forums<br>Campbell, CA | Jun 1998 --<br>Dec 2000 |

# I. Teaching

## A. Courses Taught

| CS 176A | Intro to Computer Communication Networks | Fall 1997, Fall 1998, Fall 2002, Fall 2003, Fall 2004, Spring 2005, Spring 2006, Spring 2007, Spring 2008, Fall 2008, Fall 2009, Fall 2010, Fall 2011, Fall 2012, Fall 2013, Fall 2014, Spring 2017 |
| CS 176B | Network Computing | Winter 2000, Winter 2001, Winter 2002, Winter 2012, Winter 2014, Winter 2015, Winter 2018 |
| MAT 201B | Media Networks and Services | Fall 1999, Fall 2000, Fall 2001, Fall 2003 |
| CS 276 | Distributed Computing and Computer Networks | Winter 1999, Spring 2000, Fall 2002, Fall 2005 |
| CS 290I | Networking for Multimedia Systems | Winter 1998, Spring 1999, Fall 2004, Winter 2010 |
| CS 595N | Technology and Society | Winter 2005, Fall 2005, Spring 2006, Fall 2006, Spring 2007, Fall 2007, Spring 2008, Fall 2008, Spring 2009 |
| CS 595N | Economic Systems Seminar | Winter 2004, Spring 2004, Winter 2005, Spring 2005 |
| CS 595N | Networking Seminar | Winter 1999, Fall 1999, Winter 2003 |
| CS 595N | Wireless Networking & Multimedia Seminar | Fall 2000 |
| CS 595I | Systems Design and Implementation Seminar | Fall 1999, Fall 2000, Winter 2001, Spring 2001, Winter 2002, Spring 2002 |

## B. Other Teaching Experience

- *The Evolution of Advanced Networking Services: From the ARPAnet to Internet2*, Instructor, Summer

2001. Short course taught at Escuela de Ciencias Informatica (ECI) sponsored by the Universidad de Buenos Aires.

- *Johns Hopkins Center for Talented Youth*, Instructor, Summer 1994. CTY is a program to teach gifted high school students the fundamentals of computer science.

- *Georgia Institute of Technology*, Graduate Teaching Assistant, Sep 1994--Sep 1996. Worked as a TA for 12 quarters teaching 7 different courses (4 undergraduate and 3 graduate).


## C. Ph.D. Students Advised [14 graduated]

14. Daniel Havey
    Research Area: *Throughput and Delay on the Packet Switched Internet*
    Date Graduated: Winter 2015
    First Position: Microsoft
13. Lara Deek (co-advised with E. Belding)
    Research Area: *Resource-Efficient Wireless Systems for Emerging Wireless Networks*
    Date Graduated: Summer 2014
    First Position: Post Doc, UIUC
12. Mike Wittie
    Research Area: *Towards Sustained Scalability of Communication Networks*
    Date Graduated: Summer 2011
    First Position: Assistant Professor, Montana State University
11. Allan Knight
    Research Area: *Supporting Integration of Educational Technologies and Research of Their Effects on Learning*
    Date Graduated: Summer 2009
    First Position: Research Scientist, Citrix Online
10. Hangjin Zhang
    Research Area: *Towards Blended Learning: Educational Technology to Improve and Assess Teaching and Learning*
    Date Graduated: Spring 2009
    First Position: Microsoft
9. Gayatri Swamynathan
    Dissertation Title: *Towards Reliable Reputations for Distributed Applications*
    Date Graduated: Spring 2008
    First Position: Zynga
8. Amit Jardosh (co-advised with E. Belding)
    Dissertation Title: *Adaptive Large-Scale Wireles Networks: Measurements, Protocol Designs, and Simulation Studies*
    Date Graduated: Fall 2007
    First Position: Yahoo!
7. Khaled Harras
    Dissertation Title: *Protocol and Architectural Challenges in Delay and Disruption Tolerant Networks*
    Date Graduated: Summer 2007

First Position: Assistant Professor, Carnegie Mellon University

6. Krishna Ramachandran (co-advised with E. Belding)

Dissertation Title: *Design, Deployment, and Management of High-Capacity Wireless Mesh Networks*

Date Graduated: Winter 2006

First Position: Research Scientist, Citrix Online

5. Robert Chalmers

Dissertation Title: *Improving Device Mobility with Intelligence at the Network Edge*

Date Graduated: Summer 2004

First Position: President and CEO, Limbo.net

4. Prashant Rajvaidya

Dissertation Title: *Achieving Robust and Secure Deployment of Multicast*

Date Graduated: Spring 2004

First Position: President and CTO, Mosaic Networking

3. Sami Rollins

Dissertation Title: *Overcoming Resource Constraints to Enable Content Exchange Applications in Next-Generation Environments*

Date Graduated: Spring 2003

First Position: Assistant Professor, Mount Holyoke College

2. Srinivasan Jagannathan

Dissertation Title: *Multicast Tree-Based Congestion Control and Topology Management*

Date Graduated: Spring 2003

First Position: Consultant, Kelly & Associates

1. Kamil Sarac

Dissertation Title: *Supporting a Robust Multicast Service in the Global Infrastructure*

Date Graduated: Spring 2002

First Position: Assistant Professor, UT-Dallas

## D. M.S. Students Advised (Thesis/Project Option) [19 graduated and 1 current]

20. Greg Parsons

Research Area: *Drone-Based Mesh Networks*

Date Started: Fall 2014

19. Neer Shey

Research Area: *Analyzing Content Distribution Through Opportunistic Contact for Smart Cellular Phones*

Date Graduated: Spring 2010

18. Camilla Fiorese

Research Area: *Analysis of a Pure Rate-Based Congestion Control Algorithm*

Date Graduated: Summer 2009

17. Brian Weiner

Research Area: *Multi-Socket TCP: A Simple Approach to Improve Performance of Real-Time Applications over TCP*

Date Graduated: Fall 2007

16. Avijit Sen Mazumder

Research Area: *Facilitating Robust Multicast Group Management*

Date Graduated: Fall 2005

15. Rishi Matthew

    Thesis Title: *Providing Seamless Access to Multimedia Content on Heterogeneous Platforms*

    Date Graduated: Summer 2004

14. Camden Ho

    Research Area: *Tools and Techniques for Wireless Network Management*

    Date Graduated: Spring 2004

13. Amit Jardosh (co-advised with E. Belding)

    Research Area: *Realistic Environment Models for Mobile Network Evaluation*

    Date Graduated: Spring 2004

12. Nitin Solanki

    Research Area: *SongWand: A Wireless Barcode Scanner Using Bluetooth Technology*

    Date Graduated: Winter 2004

11. Vrishali Wagle (co-advised with E. Belding)

    Research Area: *An Ontology-Based Service Discovery Mechanism*

    Date Graduated: Winter 2004

10. Uday Mohan

    Thesis Title: *Scalable Service Discovery in Mobile Ad hoc Networks*

    Date Graduated: Spring 2003

9. Krishna Ramachandran

    Thesis Title: *Ubiquitous Multicast*

    Date Graduated: Spring 2003

8. John Slonaker

    Thesis Title: *Inductive Loop Signature Acquisition Techniques*

    Date Graduated: Spring 2002

7. Mohammad Battah

    Thesis Title: *Dedicated Short-Range Communications Intelligent Transportation Systems Protocol (DSRC-ITS)*

    Date Graduated: Spring 2002

6. Kevin Vogel

    Thesis Title: *Integrating E-Commerce Applications into Existing Business Infrastructures*

    Date Graduated: Spring 2001

5. Sami Rollins

    Thesis Title: *Audio XmL: Aural Interaction with XML Documents*

    Date Graduated: Winter 2000

4. Andy Davis

    Thesis Title: *Stream Scheduling for Data Servers in a Scalable Interactive TV System*

    Date Graduated: Spring 1999

3. David Makofske

    Thesis Title: *MHealth: A Real-Time Graphical Multicast Monitoring Tool*

    Date Graduated: Winter 1999

2. Prashant Rajvaidya

    Thesis Title: *MANTRA: Router-Based Monitoring and Analysis of Multicast Traffic*

    Date Graduated: Winter 1999

1. Alex DeCastro (co-advised with Yuan-Fang Wang)

    Thesis Title: *Web-Based Collaborative 3D Modeling*

    Date Graduated: Winter 1998

## E. Teaching Awards

2006-2007 UCSB Academic Senate Distinguished Teaching Award
2004-2005 Computer Science Outstanding Faculty Member
2000-2001 UCSB Spotlight on Excellence Award
1999-2000 Computer Science Outstanding Faculty Member (co-recipient)
1998-1999 Computer Science Outstanding Faculty Member (co-recipient)
1997-1998 Computer Science Outstanding Faculty Member

# II. Research

## A. Journal Papers, Magazine Articles, Books, and Book Chapters

62. L. Deek, E. Garcia-Villegas, E. Belding, S.J. Lee, and K. Almeroth, "A Practical Framework for 802.11 MIMO Rate Adaptation," Computer Networks, vol. 83, num. 6, pp. 332-348, June 2015.

61. L. Deek, E. Garcia-Villegas, E. Belding, S.J. Lee, and K. Almeroth, "Intelligent Channel Bonding in 802.11n WLANs," IEEE Transactions on Mobile Computing, vol. 13, num. 6, pp. 1242-1255, June 2014.

60. H. Zhang and K. Almeroth, "Alternatives for Monitoring and Limiting Network Access to Students in Network-Connected Classrooms," Journal of Interactive Learning Research (JILR), vol. 24, num. 3, pp. 237-265, July 2013.

59. M. Tavakolifard and K. Almeroth, "A Taxonomy to Express Open Challenges in Trust and Reputation Systems," Journal of Communications, vol. 7, num. 7, pp. 538-551, July 2012.

58. M. Tavakolifard and K. Almeroth, "Social Computing: An Intersection of Recommender Systems, Trust/Reputation Systems, and Social Networks," IEEE Network, vol. 26, num. 4, pp. 53-58, July/August 2012.

57. M. Tavakolifard, K. Almeroth, and P. Ozturk, "Subjectivity Handling of Ratings for Trust and Reputation Systems: An Abductive Reasoning Approach," International Journal of Digital Content Technology and its Applications (JDCTA), vol. 5, num. 11, pp. 359-377, November 2011.

56. R. Raghavendra, P. Acharya, E. Belding and K. Almeroth, "MeshMon: A Multi-Tiered Framework for Wireless Mesh Network Monitoring," Wireless Communications and Mobile Computing (WCMC) Journal, vol. 11, num. 8, pp. 1182-1196, August 2011.

55. A. Knight and K. Almeroth, "Automatic Plagiarism Detection with PAIRwise 2.0," Journal of Interactive Learning Research (JILR), vol. 22, num. 3, pp. 379-400, July 2011.

54. V. Kone, M. Zheleva, M. Wittie, B. Zhao, E. Belding, H. Zheng, and K. Almeroth, "AirLab:

Consistency, Fidelity and Privacy in Wireless Measurements," ACM Computer Communications Review, vol. 41, num. 1, pp. 60-65, January 2011.

53. G. Swamynathan, K. Almeroth, and B. Zhao, "The Design of a Reliable Reputation System," Electronic Commerce Research Journal, vol. 10, num. 3-4, pp. 239-270, December 2010.

52. P. Acharya, A. Sharma, E. Belding, K. Almeroth and K. Papagiannaki, "Rate Adaptation in Congested Wireless Networks through Real-Time Measurements," IEEE Transactions on Mobile Computing, vol. 9, num. 11, pp. 1535-1550, November 2010.

51. R. Raghavendra, E. Belding, K. Papagiannaki, and K. Almeroth, "Unwanted Link Layer Traffic in Large IEEE 802.11 Wireless Networks," IEEE Transactions on Mobile Computing, vol. 9, num. 9, pp. 1212-1225, September 2010.

50. H. Zhang and K. Almeroth, "Moodog: Tracking Student Activity in Online Course Management Systems," Journal of Interactive Learning Research (JILR), vol. 21, num. 3, pp. 407-429, July 2010.

49. R. Chertov and K. Almeroth, "Qualitative Comparison of Link Shaping Techniques," International Journal of Communication Networks and Distributed Systems, vol. 5, num. 1/2, pp. 109-129, July 2010.

48. A. Knight and K. Almeroth, "Fast Caption Alignment for Automatic Indexing of Audio," International Journal of Multimedia Data Engineering and Management, vol. 1, num. 2, pp. 1-17, April-June 2010.

47. K. Harras and K. Almeroth, "Scheduling Messengers in Disconnected Clustered Mobile Networks," Ad Hoc & Sensor Wireless Networks, vol. 9, num. 3-4, pp. 275-304, March-April 2010.

46. A. Jardosh, K. Papagiannaki, E. Belding, K. Almeroth, G. Iannaccone, and B. Vinnakota, "Green WLANs: On-Demand WLAN Infrastructures," ACM Journal on Mobile Networks and Applications (MONET), vol. 14, num. 6, pp. 798-814, December 2009.

45. M. Wittie, K. Harras, K. Almeroth, and E. Belding, "On the Implications of Routing Metric Staleness in Delay Tolerant Networks," Computer Communications Special Issue on Delay and Disruption Tolerant Networking, vol. 32, num. 16, pp. 1699-1709, October 2009.

44. K. Harras, L. Deek, C. Holman, and K. Almeroth, "DBS-IC: An Adaptive Data Bundling System for Intermittent Connectivity," Computer Communications Special Issue on Delay and Disruption Tolerant Networking, vol. 32, num. 16, pp. 1687-1698, October 2009.

43. S. Karpinski, E. Belding, K. Almeroth, and J. Gilbert, "Linear Representations of Network Traffic," ACM Journal on Mobile Networks and Applications (MONET), vol. 14, num. 4, pp. 368-386, August 2009.

42. K. Harras and K. Almeroth, "Controlled Flooding in Disconnected Sparse Mobile Networks," Wireless Communications and Mobile Computing (WCMC) Journal, vol. 9, num. 1, pp. 21-33, January 2009.

41. R. Mayer, A. Stull, K. DeLeeuw, K. Almeroth, B. Bimber, D. Chun, M. Bulger, J. Campbell, A. Knight, and H. Zhang, "Clickers in College Classrooms: Fostering Learning with Questioning Methods in Large Lecture Classes," Contemporary Educational Psychology, vol. 34, num. 1, pp. 51-57, January 2009.

40. A. Knight, K. Almeroth, and B. Bimber, "Design, Implementation and Deployment of PAIRwise," Journal of Interactive Learning Research (JILR), vol. 19, num. 3, pp. 489-508, July 2008.

39. A. Garyfalos and K. Almeroth, "Coupons: A Multilevel Incentive Scheme for Information Dissemination in Mobile Networks," IEEE Transactions on Mobile Computing, vol. 7, num. 6, pp. 792-804, June 2008.

38. I. Sheriff, K. Ramachandran, E. Belding, and K. Almeroth, "A Multi-Radio 802.11 Mesh Network Architecture," ACM Journal on Mobile Networks and Applications (MONET), vol. 13, num. 1-2, pp. 132-146, April 2008.

37. M. Bulger, R. Mayer, K. Almeroth, and S. Blau, "Measuring Learner Engagement in Computer-Equipped College Classrooms," Journal of Educational Multimedia and Hypermedia, vol. 17, num. 2, pp. 129-143, April 2008.

36. G. Swamynathan, B. Zhao, and K. Almeroth, "Exploring the Feasibility of Proactive Reputations," Concurrency and Computation: Practice and Experience, vol. 20, num. 2, pp. 155-166, February 2008.

35. G. Swamynathan, B. Zhao, K. Almeroth, and H. Zheng, "Globally Decoupled Reputations for Large Distributed Networks," Advances in Multimedia, vol. 2007, pp. 1-14, 2007.

34. R. Mayer, A. Stull, J. Campbell, K. Almeroth, B. Bimber, D. Chun and A. Knight, "Overestimation Bias in Self-reported SAT Scores," Educational Psychology Review, vol. 19, num. 4, pp. 443-454, December 2007.

33. P. Namburi, K. Sarac and K. Almeroth, "Practical Utilities for Monitoring Multicast Service Availability," Computer Communications Special Issue on Monitoring and Measurement of IP Networks, vol. 29, num. 10, pp. 1675-1686, June 2006.

32. R. Chalmers, G. Krishnamurthi and K. Almeroth, "Enabling Intelligent Handovers in Heterogeneous Wireless Networks," ACM Journal on Mobile Networks and Applications (MONET), vol. 11, num. 2, pp. 215-227, April 2006.

31. H. Lundgren, K. Ramachandran, E. Belding, K. Almeroth, M. Benny, A. Hewatt, A. Touma and A. Jardosh, "Experience from the Design, Deployment and Usage of the UCSB MeshNet Testbed," IEEE Wireless Communications, vol. 13, num. 2, pp. 18-29, April 2006.

30. R. Mayer, K. Almeroth, B. Bimber, D. Chun, A. Knight and A. Campbell, "Technology Comes to College: Understanding the Cognitive Consequences of Infusing Technology in College Classrooms," Educational Technology, vol. 46, num. 2, pp. 48-53, March-April 2006.

29. A. Garyfalos and K. Almeroth, "A Flexible Overlay Architecture for Mobile IPv6 Multicast," Journal on Selected Areas in Communications (JSAC) Special Issue on Wireless Overlay Networks Based on Mobile IPv6, vol. 23, num. 11, pp. 2194-2205, November 2005.

28. K. Sarac and K. Almeroth, "Monitoring IP Multicast in the Internet: Recent Advances and Ongoing Challenges," IEEE Communications, vol. 43, num. 10, pp. 85-91, October 2005.

27. K. Sarac and K. Almeroth, "Application Layer Reachability Monitoring for IP Multicast," Computer Networks, vol. 48, num. 2, pp. 195-213, June 2005.

26. A. Jardosh, E. Belding, K. Almeroth and S. Suri, "Real-world Environment Models for Mobile Network Evaluation," Journal on Selected Areas in Communications Special Issue on Wireless Ad hoc Networks, vol. 23, num. 3, pp. 622-632, March 2005.

25. S. Rollins and K. Almeroth, "Evaluating Performance Tradeoffs in a One-to-Many Peer Content Distribution Architecture," Journal of Internet Technology, vol. 5, num. 4, pp. 373-387, Fall 2004.

24. K. Sarac and K. Almeroth, "Tracetree: A Scalable Mechanism to Discover Multicast Tree Topologies in the Network," IEEE/ACM Transactions on Networking, vol. 12, num. 5, pp. 795-808, October 2004.

23. K. Sarac and K. Almeroth, "A Distributed Approach for Monitoring Multicast Service Availability," Journal of Network and Systems Management, vol. 12, num. 3, pp. 327-348, September 2004.

22. P. Rajvaidya, K. Ramachandran and K. Almeroth, "Managing and Securing the Global Multicast Infrastructure," Journal of Network and Systems Management, vol. 12, num. 3, pp. 297-326, September 2004.

21. P. Rajvaidya and K. Almeroth, "Multicast Routing Instabilities," IEEE Internet Computing, vol. 8, num. 5, pp. 42-49, September/October 2004.

20. D. Johnson, R. Patton, B. Bimber, K. Almeroth and G. Michaels, "Technology and Plagiarism in the University: Brief Report of a Trial in Detecting Cheating," Association for the Advancement of Computing in Education (AACE) Journal, vol. 12, num. 3, pp. 281-299, Summer 2004.

19. R. Chalmers and K. Almeroth, "A Security Architecture for Mobility-Related Services," Journal of Wireless Personal Communications, vol 29, num. 3, pp. 247-261, June 2004.

18. B. Stiller, K. Almeroth, J. Altmann, L. McKnight, and M. Ott, "Pricing for Content in the Internet," Computer Communications, vol. 27, num. 6, pp. 522-528, April 2004.

17. S. Rollins and K. Almeroth, "Lessons Learned Deploying a Digital Classroom," Journal of Interactive Learning Research (JILR), vol. 15, num. 2, pp. 169-185, April 2004.

16. S. Jagannathan and K. Almeroth, "A Dynamic Pricing Scheme for E-Content at Multiple Levels-of-Service," Computer Communications, vol. 27, num. 4, pp. 374-385, March 2004.

15. K. Almeroth, "Using Satellite Links in the Delivery of Terrestrial Multicast Traffic," Internetworking and Computing over Satellites, Kluwer Academic Publishers, 2003.

14. R. Chalmers and K. Almeroth, "On the Topology of Multicast Trees," IEEE/ACM Transactions on Networking, vol. 11, num. 1, pp. 153-165, January 2003.

13. S. Jagannathan, J. Nayak, K. Almeroth, and M. Hofmann, "On Pricing Algorithms for Batched Content Delivery Systems," Electronic Commerce Research and Applications Journal, vol. 1, num. 3-4, pp. 264-280, Fall 2002.

12. D. Makofske and K. Almeroth, "Multicast Sockets: Practical Guide for Programmers," *Morgan Kaufmann Publishers*, November 2002.

11. S. Jagannathan and K. Almeroth, "Price Issues in Delivering E-Content On-Demand," ACM Sigecom Exchanges, vol. 3, num. 2, pp. 18-27, May 2002.

10. D. Makofske and K. Almeroth, "From Television to Internet Video-on-Demand: Techniques and Tools for VCR-Style Interactivity," Software: Practice and Experience, vol. 31, num. 8, pp. 781-801, July 2001.

9. K. Sarac and K. Almeroth, "Supporting Multicast Deployment Efforts: A Survey of Tools for Multicast Monitoring," Journal on High Speed Networking, Special Issue on Management of Multimedia Networking, vol. 9, num. 3/4, pp. 191-211, March 2001.

8. K. Almeroth, "Adaptive, Workload-Dependent Scheduling for Large-Scale Content Delivery Systems," Transactions on Circuits and Systems for Video Technology, *Special Issue on Streaming Video*, vol. 11, num. 3, pp. 426-439, March 2001.

7. D. Makofske and K. Almeroth, "Real-Time Multicast Tree Visualization and Monitoring," Software: Practice and Experience, vol. 30, num. 9, pp. 1047-1065, July 2000.

6. M. Ammar, K. Almeroth, R. Clark and Z. Fei, "Multicast Delivery of WWW Pages," Electronic Commerce Technology Trends: Challenges and Opportunities, IBM Press, February 2000.

5. K. Almeroth, "The Evolution of Multicast: From the MBone to Inter-Domain Multicast to Internet2 Deployment," IEEE Network Special Issue on Multicasting, vol. 10, num. 1, pp. 10-20, January/February 2000.

4. K. Almeroth and M. Ammar, "An Alternative Paradigm for Scalable On-Demand Applications: Evaluating and Deploying the Interactive Multimedia Jukebox," IEEE Transactions on Knowledge and Data Engineering Special Issue on Web Technologies, vol. 11, num. 4, pp 658-672, July/August 1999.

3. K. Almeroth and M. Ammar, "The Interactive Multimedia Jukebox (IMJ): A New Paradigm for the On-Demand Delivery of Audio/Video," Computer Networks and ISDN Systems, vol. 30, no. 1, April 1998.

2. K. Almeroth and M. Ammar, "Multicast Group Behavior in the Internet's Multicast Backbone (MBone)," IEEE Communications, vol. 35, no. 6, pp. 124-129, June 1997.

1. K. Almeroth and M. Ammar, "On the Use of Multicast Delivery to Provide a Scalable and Interactive Video-on-Demand Service," Journal on Selected Areas of Communication (JSAC), vol. 14, no. 6, pp. 1110-1122, August 1996.


## B. Conference Papers with Proceedings (refereed)

89. D. Havey and K. Almeroth, "Active Sense Queue Management (ASQM)," *IFIP Networking Conference*, Toulouse, FRANCE, May 2015.

88. L. Deek, E. Garcia-Villegas, E. Belding, S.J. Lee, and K. Almeroth, "Joint Rate and Channel Width Adaptation in 802.11 MIMO Wireless Networks," IEEE Conference on Sensor, Mesh and Ad Hoc Communications and Networks (SECON), New Orleans, LA, USA, June 2013.

87. D. Havey and K. Almeroth, "Fast Wireless Protocol: A Network Stack Design for Wireless Transmission," *IFIP Networking Conference*, Brooklyn, New York, USA, May 2013.

86. M. Tavakolifard, J. Gulla, K. Almeroth, J. Ingvaldsen, G. Nygreen, and E. Berg, "Tailored News in the Palm of Your HAND: A Multi-Perspective Transparent Approach to News Recommendation," *Demo Track at the International World Wide Web Conference (WWW)*, Rio de Janeiro, BRAZIL, May 2013.

85. S. Patterson, M. Wittie, K. Almeroth, and B. Bamieh, "Network Optimization with Dynamic Demands and Link Prices," *Allerton Conference*, Monticello, Illinois, USA, October 2012.

84. D. Havey, R. Chertov, and K. Almeroth, "Receiver Driven Rate Adaptation," *ACM Multimedia Systems Conference (MMSys)*, Chapel Hill, North Carolina, USA, February 2012.

83. M. Tavakolifard and K. Almeroth, "Trust 2.0: Who to Believe in the Flood of Online Data?" *International Conference on Computing, Networking and Communications (ICNC)*, Maui, Hawaii, USA, January 2012.

82. L. Deek, E. Garcia-Villegas, E. Belding, S.J. Lee, and K. Almeroth, "The Impact of Channel Bonding on 802.11n Network Management," *ACM CoNEXT*, Tokyo, JAPAN, December 2011.

81. L. Deek, X. Zhou, K. Almeroth, and H. Zheng, "To Preempt or Not: Tackling Bid and Time-based Cheating in Online Spectrum Auctions," *IEEE Infocom*, Shanghai, CHINA, April 2011.

80. M. Wittie, V. Pejovic, L. Deek, K. Almeroth, and B. Zhao, "Exploiting Locality of Interest in Online Social Networks," *ACM CoNEXT*, Philadelphia, Pennsylvania, USA, November 2010.

79. R. Chertov and K. Almeroth, "Using BGP in a Satellite-Based Challenged Network Environment," *IEEE Conference on Sensor, Mesh and Ad Hoc Communications and Networks (SECON)*, Boston, Massachusetts, USA, June 2010.

78. R. Chertov, D. Havey and K. Almeroth, "MSET: A Mobility Satellite Emulation Testbed," *IEEE Infocom*, San Diego, California, USA, March 2010.

77. B. Stone-Gross, A. Moser, C. Kruegel, E. Kirda, and K. Almeroth, "FIRE: FInding Rogue nEtworks," *Annual Computer Security Applications Conference (ACSAC)*, Honolulu, Hawaii, USA, December 2009.

76. M. Wittie, K. Almeroth, E. Belding, I. Rimac, and V. Hilt, "Internet Service in Developing Regions Through Network Coding," *IEEE Conference on Sensor, Mesh and Ad Hoc Communications and Networks (SECON)*, Rome, ITALY, June 2009.

75. R. Chertov and K. Almeroth, "High-Fidelity Link Shaping," *International Conference on Testbeds and Research Infrastructures for the Development of Networks and Communities (TRIDENTCOM)*, Washington DC, USA, April 2009.

74. L. Deek, K. Almeroth, M. Wittie, and K. Harras, "Exploiting Parallel Networks Using Dynamic Channel Scheduling," *International Wireless Internet Conference (WICON)*, Maui, Hawaii, USA, November 2008.

73. D. Havey, E. Barlas, R. Chertov, K. Almeroth, and E. Belding, "A Satellite Mobility Model for QUALNET Network Simulations," *IEEE Military Communications Conference (MILCOM)*, San Diego, California, USA, November 2008.

72. J. Kayfetz and K. Almeroth, "Creating Innovative Writing Instruction for Computer Science Graduate Students," *ASEE/IEEE Frontiers in Education (FIE) Conference*, Saratoga Springs, New York, USA, October 2008.

71. G. Swamynathan, B. Zhao, K. Almeroth, and S. Rao, "Towards Reliable Reputations for Dynamic Networked Systems," *IEEE International Symposium on Reliable Distributed Systems (SRDS)*, Napoli, ITALY, October 2008.

70. B. Stone-Gross, D. Sigal, R. Cohn, J. Morse, K. Almeroth, and C. Krugel, "VeriKey: A Dynamic Certificate Verification System for Public Key Exchanges," *Conference on Detection of Intrusions and Malware & Vulnerability Assessment (DIMVA)*, Paris, FRANCE, July 2008.

69. P. Acharya, A. Sharma, E. Belding, K. Almeroth, K. Papagiannaki, "Congestion-Aware Rate Adaptation in Wireless Networks: A Measurement-Driven Approach," *IEEE Conference on Sensor, Mesh and Ad Hoc Communications and Networks (SECON)*, San Francisco, California, USA, June 2008.

68. A. Jardosh, P. Suwannapat, T. Hollerer, E. Belding, and K. Almeroth, "SCUBA: Focus and Context for Real-time Mesh Network Health Diagnosis," *Passive and Active Measurement Conference (PAM)*, Cleveland, Ohio, USA, April 2008.

67. B. Stone-Gross, C. Wilson, K. Almeroth, E. Belding, H. Zheng, K. Papagiannaki, "Malware in IEEE 802.11 Wireless Networks," *Passive and Active Measurement Conference (PAM)*, Cleveland, Ohio, USA, April 2008.

66. R. Raghavendra, E. Belding, K. Papagiannaki, and K. Almeroth, "Understanding Handoffs in Large IEEE 802.11 Wireless Networks," *Internet Measurement Conference (IMC)*, San Diego, California, USA, October 2007.

65. M. Wittie, B. Stone-Gross, K. Almeroth and E. Belding, "MIST: Cellular Data Network Measurement for Mobile Applications," *IEEE International Conference on Broadband Communications, Networks, and Systems (BroadNets)*, Raleigh, North Carolina, USA, September 2007.

64. S. Karpinski, E. Belding, K. Almeroth, "Wireless Traffic: The Failure of CBR Modeling," *IEEE International Conference on Broadband Communications, Networks, and Systems (BroadNets)*, Raleigh, North Carolina, USA, September 2007.

63. A. Knight, K. Almeroth, H. Zhang, R. Mayer, and K. DeLeeuw, "Data Cafe: A Dining Car Approach to Educational Research Data Management and Distribution," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Vancouver, CANADA, June 2007.

62. H. Zhang, K. Almeroth, A. Knight, M. Bulger, and R. Mayer, "Moodog: Tracking Students' Online Learning Activities," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Vancouver, CANADA, June 2007.

61. M. Bulger, K. Almeroth, R. Mayer, D. Chun, A. Knight, H. Collins, "Effects of Instructor Engagement on Student Use of a Course Management System," Assocation for Psychological Science (APS) Annual Conference, Washington DC, USA, May 2007.

60. R. Mayer, A. Stull, K. Almeroth, B. Bimber, D. Chun, M. Bulger, J. Campbell, Allan Knight, and H.

Zhang, "Using Technology-Based Methods to Foster Learning in Large Lecture Classes: Evidence for the Pedagogic Value of Clickers," *American Educational Research Association (AERA) Annual Conference*, Chicago, Illinois, USA, April 2007.

59. K. Ramachandran, I. Sheriff, E. Belding, and K. Almeroth, "Routing Stability in Static Wireless Mesh Networks," *Passive and Active Measurement Conference (PAM)*, Louvain-la-neuve, BELGIUM, April 2007.

58. G. Swamynathan, T. Close, S. Banerjee, R. McGeer, B. Zhao, and K. Almeroth, "Scalable Access Control For Web Services," *International Conference on Creating, Connecting and Collaborating through Computing (C5)*, Kyoto, JAPAN, January 2007.

57. A. Knight, M. Bulger, K. Almeroth, and H. Zhang, "Is Learning Really a Phone Call Away? Knowledge Transfer in Mobile Learning," *World Conference on Mobile Learning (mLearn)*, Banff, Alberta, CANADA, October 2006.

56. J. Kurian, K. Sarac, and K. Almeroth, "Defending Network-Based Services Against Denial of Service Attacks," *International Conference on Computer Communication and Networks (IC3N)*, Arlington, Virginia, USA, October 2006.

55. A. Jardosh, K. Sanzgiri, E. Belding and K. Almeroth, "IQU: Practical Queue-Based User Association Management for WLANs--Case Studies, Architecture, and Implementation," ACM Mobicom, Marina del Rey, California, USA, September 2006.

54. C. Holman, K. Harras, and K. Almeroth, "A Proactive Data Bundling System for Intermittent Mobile Connections," IEEE International Conference on Sensor and Ad Hoc Communications and Networks (SECON), Reston, Virginia, USA, September 2006.

53. G. Banks, M. Cova, V. Felmetsger, K. Almeroth, R. Kemmerer and G. Vigna, "SNOOZE: toward a Stateful NetwOrk prOtocol fuzZEr," *Information Security Conference (ISC)*, Samos Island, GREECE, September 2006.

52. K. Harras and K. Almeroth, "Inter-Regional Messenger Scheduling in Delay Tolerant Mobile Networks," *IEEE International Symposium on a World of Wireless, Mobile and Multimedia Networks (WoWMoM)*, Niagara Falls, New York, USA, June 2006.

51. M. Bulger, R. Mayer, and K. Almeroth, "Engaged By Design: Using Simulation to Promote Active Learning," **Outstanding Paper** at the *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Orlando, Florida, USA, June 2006.

50. A. Knight, K. Almeroth, R. Mayer, D. Chun, and B. Bimber, "Observations and Recommendations for Using Technology to Extend Interaction," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Orlando, Florida, USA, June 2006.

49. H. Zhang, and K. Almeroth, "A Simple Classroom Network Access Control System," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Orlando, Florida, USA, June 2006.

48. K. Harras and K. Almeroth, "Transport Layer Issues in Delay Tolerant Mobile Networks," *IFIP Networking Conference*, Coimbra, PORTUGAL, May 2006.

47. R. Mayer, A. Stull, J. Campbell, K. Almeroth, B. Bimber, D. Chun and A. Knight, "Some Shortcomings of Soliciting Students' Self-Reported SAT Scores," *American Educational Research Association (AERA) Annual Conference*, San Francisco, California, USA, April 2006.

46. K. Ramachandran, E. Belding, K. Almeroth, and M. Buddhikot, "Interference-Aware Channel Assignment in Multi-Radio Wireless Mesh Networks," *IEEE Infocom*, Barcelona, SPAIN, April 2006.

45. A. Jardosh, K. Ramachandran, K. Almeroth, and E. Belding, "Understanding Congestion in IEEE 802.11b Wireless Networks," *ACM/USENIX Internet Measurement Conference (IMC)*, Berkeley, California, USA, October 2005.

44. H. Zhang, K. Almeroth and M. Bulger, "An Activity Monitoring System to Support Classroom Research," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Montreal, Quebec, CANADA, pp. 1444-1449, June 2005.

43. Z. Xiang, H. Zhang, J. Huang, S. Song and K. Almeroth, "A Hidden Environment Model for Constructing Indoor Radio Maps," *IEEE International Symposium on a World of Wireless, Mobile and Multimedia Networks (WoWMoM)*, Taormina, ITALY, June 2005.

42. K. Harras, K. Almeroth and E. Belding, "Delay Tolerant Mobile Networks (DTMNs): Controlled Flooding in Sparse Mobile Networks," *IFIP Networking Conference*, Waterloo, Ontario, CANADA, May 2005.

41. A. Garyfalos and K. Almeroth, "Coupons: Wide Scale Information Distribution for Wireless Ad Hoc Networks," *IEEE Global Telecommunications Conference (Globecom) Global Internet and Next Generation Networks Symposium*, Dallas, Texas, USA, pp. 1655-1659, December 2004.

40. A. Knight and K. Almeroth, "DeCAF: A Digital Classroom Application Framework," *IASTED International Conference on Communications, Internet and Information Technology (CIIT)*, St. Thomas, US Virgin Islands, November 2004.

39. P. Namburi, K. Sarac and K. Almeroth, "SSM-Ping: A Ping Utility for Source Specific Multicast," *IASTED International Conference on Communications, Internet and Information Technology (CIIT)*, St. Thomas, US Virgin Islands, November 2004.

38. K. Ramachandran, E. Belding and K. Almeroth, "DAMON: A Distributed Architecture for Monitoring Multi-hop Mobile Networks," *IEEE International Conference on Sensor and Ad Hoc Communications and Networks (SECON)*, Santa Clara, California, USA, October 2004.

37. A. Garyfalos and K. Almeroth, "Coupon Based Incentive Systems and the Implications of Equilibrium Theory," *IEEE Conference on Electronic Commerce (CEC)*, San Diego, California, USA, pp. 213-220, July 2004.

36. A. Knight, K. Almeroth and B. Bimber, "An Automated System for Plagiarism Detection Using the Internet," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Lugano, Switzerland, pp. 3619-3625, June 2004.

35. H. Zhang and K. Almeroth, "Supplement to Distance Learning: Design for a Remote TA Support System," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Lugano, Switzerland, pp. 2821-2830, June 2004.

34. U. Mohan, K. Almeroth and E. Belding, "Scalable Service Discovery in Mobile Ad hoc Networks," *IFIP Networking Conference*, Athens, Greece, pp. 137-149, May 2004.

33. V. Thanedar, K. Almeroth and E. Belding, "A Lightweight Content Replication Scheme for Mobile Ad hoc Environments," *IFIP Networking Conference*, Athens, Greece, pp. 125-136, May 2004.

32. R. Chalmers and K. Almeroth, "A Mobility Gateway for Small-Device Networks," *IEEE International Conference on Pervasive Computing and Communications (PerCom)*, Orlando, Florida, USA, March 2004.

31. A. Jardosh, E. Belding, K. Almeroth and S. Suri, "Towards Realistic Mobility Models For Mobile Ad hoc Networks," *ACM Mobicom*, San Diego, California, USA, September 2003.

30. K. Sarac, P. Namburi and K. Almeroth, "SSM Extensions: Network Layer Support for Multiple Senders in SSM," *International Conference on Computer Communication and Networks (IC3N)*, Dallas, Texas, USA, October 2003.

29. K. Ramachandran and K. Almeroth, "MAFIA: A Multicast Management Solution for Access Control and Traffic Filtering," *IEEE/IFIP Conference on Management of Multimedia Networks and Services (MMNS)*, Belfast, Northern Ireland, September 2003.

28. J. Humfrey, S. Rollins, K. Almeroth, and B. Bimber, "Managing Complexity in a Networked Learning Environment," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Honolulu, Hawaii, USA, pp. 60-63, June 2003.

27. K. Almeroth, S. Rollins, Z. Shen, and B. Bimber, "Creating a Demarcation Point Between Content Production and Encoding in a Digital Classroom," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Honolulu, Hawaii, USA, pp. 2-5, June 2003.

26. M. Kolsch, K. Kvilekval, and K. Almeroth, "Improving Speaker Training with Interactive Lectures," *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Honolulu, Hawaii, USA, June 2003.

25. P. Rajvaidya and K. Almeroth, "Analysis of Routing Characteristics in the Multicast Infrastructure," *IEEE Infocom*, San Francisco, California, USA, April 2003.

24. S. Rollins and K. Almeroth, "Pixie: A Jukebox Architecture to Support Efficient Peer Content Exchange," *ACM Multimedia*, Juan Les Pins, FRANCE, December 2002.

23. S. Rollins, R. Chalmers, J. Blanquer, and K. Almeroth, "The Active Information System(AIS): A Model for Developing Scalable Web Services," *IASTED International Conference on Internet and Multimedia Systems and Applications (IMSA)*, Kauai, Hawaii, USA, August 2002.

22. S. Rollins and K. Almeroth, "Seminal: Additive Semantic Content for Multimedia Streams," *IASTED International Conference on Internet and Multimedia Systems and Applications (IMSA)*, Kauai, Hawaii, USA, August 2002.

21. B. Stiller, K. Almeroth, J. Altmann, L. McKnight, and M. Ott, "Content Pricing in the Internet," *SPIE ITCom Conference on Internet Performance and Control of Network Systems (IPCNS)*, Boston, Massachusetts, USA, July 2002.

20. S. Jagannathan, J. Nayek, K. Almeroth and M. Hofmann, "A Model for Discovering Customer Value for E-Content," *ACM International Conference on Knowledge Discovery and Data Mining (SIGKDD)*, Edmonton, Alberta, CANADA, July 2002.

19. S. Rollins and K. Almeroth, "Deploying and Infrastructure for Technologically Enhanced Learning," **Outstanding Paper** at the *World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA)*, Denver, Colorado, USA, pp. 1651-1656, June 2002.

18. P. Rajvaidya and K. Almeroth, "Building the Case for Distributed Global Multicast Monitoring," *Multimedia Computing and Networking (MMCN)*, San Jose, California, USA, January 2002.

17. S. Jagannathan and K. Almeroth, "An Adaptive Pricing Scheme for Content Delivery Systems," *IEEE Global Internet*, San Antonio, Texas, USA, November 2001.

16. K. Sarac and K. Almeroth, "Providing Scalable Many-to-One Feedback in Multicast Reachability Monitoring Systems," *IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS)*, Chicago, Illinois, USA, October 2001.

15. S. Jagannathan and K. Almeroth, "The Dynamics of Price, Revenue and System Utilization," *IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS)*, Chicago, Illinois, USA, October 2001.

14. A. Kanwar, K. Almeroth, S. Bhattacharyya, and M. Davy, "Enabling End-User Network Monitoring via the Multicast Consolidated Proxy Monitor," *SPIE ITCom Conference on Scalability and Traffic Control in IP Networks (STCIPN)*, Denver, Colorado, USA, August 2001.

13. S. Jagannathan and K. Almeroth, "Using Tree Topology for Multicast Congestion Control," *International Conference on Parallel Processing (ICPP)*, Valencia, SPAIN, September 2001.

12. P. Rajvaidya and K. Almeroth, "A Router-Based Technique for Monitoring the Next-Generation of Internet Multicast Protocols," *International Conference on Parallel Processing (ICPP)*, Valencia, SPAIN, September 2001.

11. R. Chalmers and K. Almeroth, "Modeling the Branching Characteristics and Efficiency Gains of Global Multicast Trees," *IEEE Infocom*, Anchorage, Alaska, USA, April 2001.

10. R. Chalmers and K. Almeroth, "Developing a Multicast Metric," *Global Internet*, San Francisco, California, USA, December 2000.

9. K. Sarac and K. Almeroth, "Monitoring Reachability in the Global Multicast Infrastructure," *IEEE International Conference on Network Protocols (ICNP)*, Osaka, JAPAN, November 2000.

8. K. Almeroth, "A Long-Term Analysis of Growth and Usage Patterns in the Multicast Backbone (MBone)," *IEEE INFOCOM*, Tel Aviv, ISRAEL, March 2000.

7. K. Almeroth, K. Obraczka and D. De Lucia, "A Lightweight Protocol for Interconnecting Heterogeneous Devices in Dynamic Environments," *IEEE International Conference on Multimedia Computing and Systems (ICMCS)*, Florence, ITALY, June 1999.

6. K. Almeroth and M. Ammar, "The Interactive Multimedia Jukebox (IMJ): A New Paradigm for the

On-Demand Delivery of Audio/Video," **Best Paper** at *the Seventh International World Wide Web Conference (WWW)*, Brisbane, AUSTRALIA, April 1998.

5. K. Almeroth, M. Ammar and Z. Fei, "Scalable Delivery of Web Pages Using Cyclic Best-Effort (UDP) Multicast," *IEEE INFOCOM*, San Francisco, California, USA, June 1998.

4. K. Almeroth and M. Ammar, "Delivering Popular Web Pages Using Cyclic Unreliable Multicast (Extended Abstract)," *SPIE Conference on Voice, Video and Data Communications*, Dallas, Texas, USA, November 1997.

3. K. Almeroth, A. Dan, D. Sitaram and W. Tetzlaff, "Long Term Resource Allocation in Video Delivery Systems," *IEEE INFOCOM*,Kobe, JAPAN, April 1997.

2. K. Almeroth and M. Ammar, "On the Performance of a Multicast Delivery Video-On-Demand Service with Discontinuous VCR Actions," *International Conference on Communications (ICC)*, Seattle, Washington, USA, June 1995.

1. K. Almeroth and M. Ammar, "A Scalable, Interactive Video-On-Demand Service Using Multicast Communication," *International Conference on Computer Communication and Networks (IC3N)*, San Francisco, California, USA, September 1994.


## C. Workshop Papers (refereed)

34. M. Tavakolifard, J. Gulla, K. Almeroth, F. Hopfgartner, B. Kille, T. Plumbaum, A. Lommatzsch, T. Brodt, A. Bucko, and T. Heintz, "Workshop and Challenge on News Recommender Systems," *ACM RecSys News Recommender Systems (NRS) Workshop and Challange*, Hong Kong, CHINA, October 2013.

33. M. Tavakolifard, K. Almeroth, and J. Gulla, "Does Social Contact Matter? Modelling the Hidden Web of Trust Underlying Twitter," *ACM International Workshop on Social Recommender Systems (SRS)*, Rio de Janeiro, BRAZIL, May 2013.

32. D. Johnson, E. Belding, K. Almeroth and G. van Stam, "Internet Usage and Performance Analysis of a Rural Wireless Network in Macha, Zambia," *ACM Networked Systems for Developing Regions (NSDR) Workshop*, San Francisco, California, USA, June 2010.

31. D. Havey, R. Chertov, and K. Almeroth, "Wired Wireless Broadcast Emulation," *International Workshop on Wireless Network Measurement (WiNMee)*, Seoul, Korea, June 2009.

30. R. Raghavendra, P. Acharya, E. Belding, and K. Almeroth, "MeshMon: A Multi-Tiered Framework for Wireless Mesh Network Monitoring," *ACM Mobihoc Wireless of the Students, by the Students, for the Students Workshop (S3)*, New Orleans, Louisiana, USA, May 2009.

29. G. Swamynathan, C. Wilson, B. Boe, B. Zhao, and K. Almeroth, "Do Social Networks Improve e-Commerce: A Study on Social Marketplaces," *ACM Sigcomm Workshop on Online Social Networks (WOSN)*, Seattle, Washington, USA, August 2008.

28. R. Raghavendra, E. Belding, and K. Almeroth, "Antler: A Multi-Tiered Approach to Automated

Wireless Network Management," *IEEE Workshop on Automated Network Management (ANM)*, Phoenix, Arizona, USA, April 2008.

27. S. Karpinski, E. Belding, and K. Almeroth, "Towards Realistic Models of Wireless Workload," *International Workshop on Wireless Network Measurement (WiNMee)*, Limassol, CYPRUS, April 2007.

26. K. Harras, M. Wittie, K. Almeroth, and E. Belding, "ParaNets: A Parallel Network Architecture for Challenged Networks," *IEEE Workshop on Mobile Computing Systems and Applications (HotMobile)*, Tucson, Arizona, USA, February 2007.

25. H. Caituiro-Monge, K. Almeroth, M. del Mar Alvarez-Rohena, "Friend Relay: A Resource Sharing Framework for Mobile Wireless Devices," *ACM International Workshop on Wireless Mobile Applications and Services on WLAN Hotspots (WMASH)*, Los Angeles, California, September 2006.

24. G. Swamynathan, Ben Y. Zhao and K. Almeroth, "Exploring the Feasibility of Proactive Reputations," *International Workshop on Peer-to-Peer Systems (IPTPS)*, Santa Barbara, California, USA, February 2006.

23. G. Swamynathan, Ben Y. Zhao and K. Almeroth, "Decoupling Service and Feedback Trust in a Peer-to-Peer Reputation System," *International Workshop on Applications and Economics of Peer-to-Peer Systems (AEPP)*, Nanjing, CHINA, November 2005.

22. K. Ramachandran, M. Buddhikot, G. Chandranmenon, S. Miller, E. Belding, and K. Almeroth, "On the Design and Implementation of Infrastructure Mesh Networks," *IEEE Workshop on Wireless Mesh Networks (WiMesh)*, Santa Clara, California, USA, September 2005.

21. A. Jardosh, K. Ramachandran, K. Almeroth and E. Belding, "Understanding Link-Layer Behavior in Highly Congested IEEE 802.11b Wireless Networks," Sigcomm Workshop on Experimental Approaches to Wireless Network Design and Analysis (EWIND), Philadelphia, Pennsylvania, USA, August 2005.

20. A. Sen Mazumder, K. Almeroth and K. Sarac, "Facilitating Robust Multicast Group Management," *Network and Operating System Support for Digital Audio and Video (NOSSDAV)* , Skamania, Washington, USA, June 2005.

19. Y. Sun, I. Sheriff, E. Belding and K. Almeroth, "An Experimental Study of Multimedia Traffic Performance in Mesh Networks," MobiSys International Workshop on Wireless Traffic Measurements and Modeling (WitMeMo), Seattle, Washington, USA, June 2005.

18. K. Ramachandran, K. Almeroth and E. Belding, "A Framework for the Management of Large-Scale Wireless Network Testbeds," International Workshop on Wireless Network Measurement (WiNMee), Trentino, ITALY, April 2005.

17. A. Garyfalos, K. Almeroth and K. Sanzgiri, "Deployment Complexity Versus Performance Efficiency in Mobile Multicast," *International Workshop on Broadband Wireless Multimedia: Algorithms, Architectures and Applications (BroadWiM)*, San Jose, California, USA, October 2004.

16. C. Ho, K. Ramachandran, K. Almeroth and E. Belding, "A Scalable Framework for Wireless Network Monitoring," *ACM International Workshop on Wireless Mobile Applications and Services on WLAN*

*Hotspots (WMASH)*, Philadelphia, Pennsylvania, USA, October 2004.

15. A. Garyfalos, K. Almeroth and J. Finney, "A Hybrid of Network and Application Layer Multicast for Mobile IPv6 Networks," *International Workshop on Large-Scale Group Communication (LSGC)*, Florence, ITALY, October 2003.

14. A. Garyfalos, K. Almeroth and J. Finney, "A Comparison of Network and Application Layer Multicast for Mobile IPv6 Networks," *ACM Workshop on Modeling, Analysis and Simulation of Wireless and Mobile Systems (MSWiM)*, San Diego, California, USA, September 2003.

13. S. Jagannathan, and K. Almeroth, "Pricing and Resource Provisioning for Delivering E-Content On-Demand with Multiple Levels-of-Service," *International Workshop on Internet Charging and QoS Technologies (ICQT)*, Zurich, SWITZERLAND, October 2002.

12. S. Rollins, K. Almeroth, D. Milojicic, and K. Nagaraja, "Power-Aware Data Management for Small Devices," *Workshop on Wireless Mobile Multimedia (WoWMoM)*, Atlanta, GA, USA, September 2002.

11. K. Almeroth, S. Bhattacharyya, and C. Diot, "Challenges of Integrating ASM and SSM IP Multicast Protocol Architectures," *International Workshop on Digital Communications: Evolutionary Trends of the Internet (IWDC)*, Taormina, ITALY, September 2001.

10. K. Sarac and K. Almeroth, "Scalable Techniques for Discovering Multicast Tree Topology," *Network and Operating System Support for Digital Audio and Video (NOSSDAV)* , Port Jefferson, New York, USA, June 2001.

9. P. Rajvaidya, K. Almeroth and K. Claffy, "A Scalable Architecture for Monitoring and Visualizing Multicast Statistics," *IFIP/IEEE International Workshop on Distributed Systems: Operations & Management (DSOM)*, Austin, Texas, USA, December 2000.

8. S. Jagannathan, K. Almeroth and A. Acharya, "Topology Sensitive Congestion Control for Real-Time Multicast," *Network and Operating System Support for Digital Audio and Video (NOSSDAV)* , Chapel Hill, North Carolina, USA, June 2000.

7. K. Sarac and K. Almeroth, "Supporting the Need for Inter-Domain Multicast Reachability," *Network and Operating System Support for Digital Audio and Video (NOSSDAV)* , Chapel Hill , North Carolina, USA, June 2000.

6. D. Makofske and K. Almeroth, "MHealth: A Real-Time Multicast Tree Visualization and Monitoring Tool," *Network and Operating System Support for Digital Audio and Video (NOSSDAV)* , Basking Ridge New Jersey, USA, June 1999.

5. K. Almeroth and Y. Zhang, "Using Satellite Links as Delivery Paths in the Multicast Backbone (MBone)," *ACM/IEEE International Workshop on Satellite-Based Information Services (WOSBIS)*, Dallas, Texas, USA, October 1998.

4. M. Ammar, K. Almeroth, R. Clark and Z. Fei, "Multicast Delivery of Web Pages OR How to Make Web Servers Pushy," *Workshop on Internet Server Performance (WISP)*, Madison, Wisconsin, USA, June 1998.

3. K. Almeroth and M. Ammar, "Prototyping the Interactive Multimedia Jukebox," *Mini-conference on*

*Multimedia Appliances, Interfaces, and Trials--International Conference on Communications (ICC)*, Montreal, Quebec, CANADA, June 1997.

2. K. Almeroth and M. Ammar, "Collection and Modeling of the Join/Leave Behavior of Multicast Group Members in the MBone," *High Performance Distributed Computing Focus Workshop (HPDC)*, Syracuse, New York, USA, August 1996.

1. K. Almeroth and M. Ammar, "The Role of Multicast Communication in the Provision of Scalable and Interactive Video-On-Demand Service," *Network and Operating System Support for Digital Audio and Video (NOSSDAV)* , Durham, New Hampshire, USA, April 1995.

## D. Non-Refereed Publications

8. K. Almeroth, E. Belding, M. Buddhikot, G. Chandranmenon, S. Miller, and K. Ramachandran, "Infrastructure Mesh Networks," *U.S. Patent Application US20070070959 A1*, September 2005.

7. K. Almeroth, R. Caceres, A. Clark, R. Cole, N. Duffield, T. Friedman, K. Hedayat, K. Sarac, M. Westerlund, "RTP Control Protocol Extended Reports (RTCP XR)," *Internet Engineering Task Force (IETF) Request for Comments (RFC) 3611*, November 2003.

6. Z. Albanna, K. Almeroth, D. Meyer, and M. Schipper, "IANA Guidelines for IPv4 Multicast Address Allocation," *Internet Engineering Task Force (IETF) Request for Comments (RFC) 3171*, August 2001.

5. B. Quinn and K. Almeroth, "IP Multicast Applications: Challenges and Solutions," *Internet Engineering Task Force (IETF), Request for Comments (RFC) 3170*, September 2001.

4. K. Almeroth, L. Wei and D. Farinacci, "Multicast Reachability Monitor (MRM) Protocol," *Internet Engineering Task Force Internet Draft*, July 2000.

3. K. Almeroth and L. Wei, "Justification for and use of the Multicast Reachability Monitor (MRM) Protocol," *Internet Engineering Task Force Internet Draft*, March 1999.

2. K. Almeroth, "Managing IP Multicast Traffic: A First Look at the Issues, Tools, and Challenges," IP Multicast Initiative White Paper, San Jose, California, USA, February 1999.

1. K. Almeroth, K. Obraczka and D. De Lucia, "Pseudo-IP: Providing a Thin Network Protocol for Semi-Intelligent Wireless Devices," *DARPA/NIST Smart Spaces Workshop*, Gaithersburg, Maryland, USA, July 1998.

## E. Released Software Systems

19. ***A Multi-radio Wireless Mesh Network Architecture -- http://moment.cs.ucsb.edu/tic/.*** Released December 1, 2006 (with K. Ramachandran, I. Sheriff, and E. Belding). The software as part of a multi-radio wireless mesh network that includes a Split Wireless Router that alleviates the interference that can occur between commodity radios within a single piece of hardware. The second is server software to perform channel assignment and communicate the assignments throughout the mesh network.

18. ***AODV-Spanning Tree (AODV-ST) -- http://www.cs.ucsb.edu/~krishna/aodv-st/.*** Released September 1, 2006 (with K. Ramachandran and E. Belding). AODV-ST is an extension of the well-known AODV protocol specifically designed for wireless mesh networks. The advantages of AODV-ST over AODV include support for high throughput routing metrics, automatic route maintenance for common-case traffic, and low route discovery latency.

17. ***The Multicast Detective -- http://www.nmsl.cs.ucsb.edu/mcast_detective/.*** Released September 1, 2005 (with A. Sen Mazumder). The multicast detective is a robust solution to determine the existence and nature of multicast service for a particular user. By performing a series of tests, a user can determine whether there is network support for multicast, and consequently, whether a multicast group join is likely to succeed.

16. ***AutoCap: Automatic and Accurate Captioning -- http://www.nmsl.cs.ucsb.edu/autocap/.*** Released August 1, 2005 (with A. Knight). AutoCap is a software system that takes as input an audio/video file and a text transcript. AutoCap creates captions by aligning the utterances in the audio/video file to the transcript. For those words that are not recognized, AutoCap estimates when the words were spoken along with an error bound that gives the content creator an idea of caption accuracy. The result is a collection of accurately time-stamped captions that can be displayed with the video.

15. ***PAIRwise Plagiarism Detection System -- http://cits.ucsb.edu/pair/.*** Released July 1, 2005 (with A. Knight). PAIRwise is a plagiarism detection system with: (1) an easy-to-use interface for submitting papers, (2) a flexible comparison engine that allows intra-class, inter-class, and Internet-based comparisons, and (3) an intuitive graphical presentation of results.

14. ***DAMON Multi-Hop Wireless Network Monitoring -- http://moment.cs.ucsb.edu/damon/.*** Released October 1, 2004 (with K. Ramachandran and E. Belding). DAMON is a distributed system for monitoring multi-hop mobile networks. DAMON uses agents within the network to monitor network behavior and send collected measurements to data repositories. DAMON's generic architecture supports the monitoring of a wide range of protocol, device, or network parameters.

13. ***Multicast Firewall -- http://www.nmsl.cs.ucsb.edu/mafia/.*** Released June 1, 2004 (with K. Ramachandran). MAFIA, a multicast firewall and traffic management solution, has the specific aim of strengthening multicast security through multicast access control, multicast traffic filtering, and DoS attack prevention.

12. ***AODV@IETF Peer Routing Software-- http://moment.cs.ucsb.edu/aodv-ietf/.*** Released November 1, 2003 (with K. Ramachandran and E. Belding). One of the first large-scale efforts to run the Ad hoc On demand Distance Vector (AODV) routing protocol in a public space (at the Internet Engineering Task Force (IETF)). The implementation includes a daemon that runs on both the Linux and Windows operating systems.

11. ***Mobility Obstacles -- http://moment.cs.ucsb.edu/mobility/.*** Released September 1, 2003 (with A. Jardosh, E. Belding, and S. Suri). The topology and movement of nodes in ad hoc protocol simulation are key factors in protocol performance. In this project, we have developed ns-2 simulation plug-ins that create more realistic movement models through the incorporation of obstacles. These obstacles are utilized to restrict both node movement and wireless transmissions.

10. ***mwalk -- http://www.nmsl.cs.ucsb.edu/mwalk/.*** Released December 1, 2000 (with R. Chalmers). Mwalk is a collection of Java applications and Perl scripts which re-create a global view of a multicast

session from mtrace and RTCP logs. Users to the site can download mwalk, examine the results of our analysis, or download data sets for use in simulations dependent on multicast tree characteristics.

9. ***MANTRA2 -- http://www.nmsl.cs.ucsb.edu/mantra/.*** Released December 1, 1999 (with P. Rajvaidya). This new version of MANTRA focuses on the visualization of inter-domain routing statistics. Working in conjunction with the Cooperative Association for Internet Data Analysis (CAIDA) we have developed advanced collection and visualization techniques.

8. ***MRM -- http://www.nmsl.cs.ucsb.edu/mrm/.*** Released October 1, 1999 (with K. Sarac). MRM is the Multicast Reachability Protocol. We have implemented an end-host agent that responds to MRM Manager commands. Our end-host agent works in conjunction with Cisco routers to detect and isolate multicast faults.

7. ***MANTRA -- http://www.nmsl.cs.ucsb.edu/mantra/.*** Released January 1, 1999 (with P. Rajvaidya). MANTRA is the Monitoring and Analysis of Traffic in Multicast Routers. It uses scripts to collect and display data from backbone multicast routers.

6. ***SDR Monitor -- http://www.nmsl.cs.ucsb.edu/sdr-monitor/.*** Released January 1, 1999 (with K. Sarac). The SDR Monitor receives e-mail updates from participants containing information about observed sessions in the MBone. A global view of multicast reachability is then constructed.

5. ***The MHealth tool -- http://www.nmsl.cs.ucsb.edu/mhealth/.*** Released September 1, 1998 (with D. Makofske). The mhealth tool graphically visualizes MBone multicast group trees and provides `health' information including end-to-end losses per receiver and losses on a per hop basis. The implementation required expertise in Java, the MBone tools, and Unix.

4. ***The MControl tool -- http://www.nmsl.cs.ucsb.edu/mcontrol/.*** Released August 1, 1998 (with D. Makofske). Mcontrol is a tool to provide VCR-based interactivity for live MBone sessions. The implementation required expertise in Java, the MBone tools, and Unix.

3. ***Interactive Multimedia Jukebox (IMJ) -- http://imj.ucsb.edu/.*** Released October 1, 1996. The IMJ combines the WWW and the MBone conferencing tools to provide a multi-channel video jukebox offering both instructional and entertainment programming on a wide scale. The implementation required expertise in HTML, Perl, C, the MBone tools, and Unix.

2. ***Mlisten -- http://www.cc.gatech.edu/computing/Telecomm/mbone/.*** Released September 1, 1995. A tool to continuously collect MBone multicast group membership information including number and location of members, membership duration, and inter-arrival time for all audio and video sessions. The implementation required expertise in C, Tcl/Tk, the MBone tools, and UNIX socket programming.

1. ***Audio-on-Demand (AoD).*** March 1, 1995. A server/client prototype to demonstrate interactivity in near VoD systems. The AoD server provides songs-on-demand and VCR-like functions via multicast IP over Ethernet. The implementation required expertise in C, OpenWindows programming, UNIX socket programming, and network programming.

## F. Tutorials, Panels and Invited Talks

- "25th Anniversary Panel," Network and Operating System Support for Digital Audio and Video (NOSSDAV), Portland, Oregon, USA, March 2015.

- "Sensing and Opportunistic Delivery of Ubiquitous Video in Health Monitoring, On-Campus and Social Network Applications," Workshop on Mobile Video Delivery (MoViD), Chapel Hill North Carolina, USA, February 2012.

- "Medium Access in New Contexts: Reinventing the Wheel?," USC Invited Workshop on Theory and Practice in Wireless Networks, Los Angeles, California, USA, May 2008.

- "The Wild, Wild West: Wireless Networks Need a New Sheriff," University of Florida CISE Department Lecture Series, Gainesville, Florida, USA, February 2008.

- "Distinguishing Between Connectivity, Intermittent Connectivity, and Intermittent Disconnectivity," Keynote at the ACM MobiCom Workshop on Challenged Networks (CHANTS), Montreal, CANADA, September 2007.

- "The Three Ghosts of Multicast: Past, Present, and Future," Keynote at the Trans-European Research and Education Networking Association (TERENA) Networking Conference, Lynby, DENMARK, May 2007.

- "Multicast Help Wanted: From Where and How Much?," Keynote at the Workshop on Peer-to-Peer Multicasting (P2PM), Las Vegas, Nevada, USA, January 2007.

- "The Confluence of Wi-Fi and Apps: What to Expect Next," Engineering Insights, UC-Santa Barbara, Santa Barbara, California, USA, October 2006.

- "Challenges, Opportunities, and Implications for the Future Internet," University of Minnesota Digital Technology Center, Minneapolis, Minnesota, USA, September 2006.

- "Wireless Technology as a Catalyst: Possibilities for Next-Generation Interaction," Santa Barbara Forum on Digital Transitions, Santa Barbara, California, USA, April 2006.

- "Challenges and Opportunities in an Internet with Pervasive Wireless Access," University of Texas--Dallas Computer Science Colloquium, Dallas, Texas, USA, March 2006.

- "Challenges and Opportunities with Pervasive Wireless in the Internet," Duke University Computer Science Colloquium, Durham, North Carolina, USA, February 2006.

- "The Span From Wireless Protocols to Social Applications," Intel Research Labs, Cambridge, United Kingdom, December 2005.

- "The Internet Dot.Com Bomb and Beyond the Dot.Com Calm," CSE IGERT and Cal Poly Lecture Series, San Luis Obispo, California, USA, October 2005.

- "Panel: Directions in Networking Research," IEEE Computer Communications Workshop (CCW), Irvine, California, USA, October 2005.

- "Economic Incentives for Ad Hoc Networks," KAIST New Applications Seminar, Seoul, South Korea, March 2004.

- "New Applications for the Next Generation Internet," Citrix Systems, Santa Barbara, California, USA, March 2004.

- "PI: The Imperfect Pursuit of Pure Pattern," CITS Visions in Technology Series, Santa Barbara, California, USA, January 2004.

- "Panel: Core Networking Issues and Protocols for the Internet," National Science Foundation (NSF) Division of Advanced Networking Infrastructure and Research (ANIR) Principal Investigators Workshop, Washington DC, USA, March 2003.

- "Panel: Pricing for Content in the Internet," SPIE ITCom Internet Performance and Control of Network Systems, Boston, Massachusetts, USA, July 2002.

- "The Technology Behind Wireless LANs," Central Coast MIT Enterprise Forum, Santa Barbara, California, USA, March 2002.

- "Lessons Learned in the Digital Classroom," Center for Information and Technology Brown Bag Symposium, Santa Barbara, California, USA, March 2002.

- "The Evolution of Advanced Networking Services: From the ARPAnet to Internet2," California State University--San Luis Obispo CS Centennial Colloquium Series, San Luis Obispo, California, USA, February 2002.

- "Deployment of IP Multicast in Campus Infrastructures," Internet2 Campus Deployment Workshop, Atlanta, Georgia, USA, May 2001.

- "Multicast: Is There Anything Else to Do?," Sprint Research Retreat, Miami, Florida, USA, May 2001.

- "The Evolution of Next-Generation Internet Services and Applications," Government Technology Conference 2001 (GTC) for the Western Region, Sacramento, California, USA, May 2001.

- "I2 Multicast: Not WIDE-scale Deployment, FULL-scale Deployment," Closing Plenary, Internet2 Member Meetings, Washington, D.C., USA, March 2001.

- "Panel: Beyond IP Multicast," Content Delivery Networks (CDN), New York, New York, USA, February 2001.

- "Viable Multicast Pricing & Business Models for Wider-Scale Deployment," Content Delivery Networks (CDN), New York, New York, USA, February 2001.

- "IP Multicast: Modern Protocols, Deployment, and Management," Content Delivery Networks (CDN), New York, New York, USA, February 2001 & San Jose, California, USA, December 2001.

- "Under the Hood of the Internet," Technology 101: Technology for Investors, Center for Entrepreneurship & Engineering Management, November 2000.

- "Understanding Multicast Traffic in the Internet," (1) University of Virginia, (2) University of Maryland, and (3) Columbia University, September 2000.

- "The Bad, The Ugly, and The Good: The Past, Present, and Future of Multicast," Digital Fountain, San Francisco, California, USA, August 2000.

- "Implications of Source-Specific Multicast (SSM) on the Future of Internet Content Delivery," Occam Networks, Santa Barbara, California, USA, August 2000.

- "Introduction to Multicast Routing Protocols," UC-Berkeley Open Mash Multicast Workshop, Berkeley, California, USA, July 2000.

- "Efforts to Understand Traffic and Tree Characteristics," University of Massachusetts--Amherst Colloquia, Amherst, Massachusetts, USA, May 2000.

- "Monitoring Multicast Traffic," Sprint Research Retreat, Half Moon Bay, California, USA, April 2000.

- "What is the Next Generation of Multicast in the Internet?," HRL Laboratories, Malibu, California, USA, January 2000.

- "Mission and Status of the Center for Information Technology and Society (CITS)," Intel Research Council, Portland, Oregon, USA, September 1999.

- "Multicast at a Crossroads," IP Multicast Initiative Summits and Bandwidth Management Workshops, San Francisco, CA, USA, (1) October 1999; (2) February 2000; and (3) June 2000.

- "IP Multicast: Modern Protocols, Deployment, and Management," Networld+Interop: (1) Las Vegas, Nevada, USA--May 2000; (2) Tokyo, JAPAN--June 2000; (3) Atlanta, Georgia, USA--September 2000; (4) Las Vegas, Nevada, USA--May 2001; (5) Las Vegas, Nevada, USA--May 2002.

- "IP Multicast: Practice and Theory" (w/ Steve Deering), Networld+Interop: (1) Las Vegas, Nevada, USA--May 1999; (2) Tokyo, JAPAN--June 1999; and (3) Atlanta, Georgia, USA--September 1999.

- "Internet2 Multicast Testbeds and Applications," Workshop on Protocols for High Speed Networks (PfHSN), Salem, Massachusetts, USA, August 1999.

- "IP Multicast: Protocols for the Intra- and Inter-Domain," Lucent Technologies, Westford, Massachusetts, USA, August 1999.

- "Internet2 Multicast Testbeds and Applications," NASA Workshop: Bridging the Gap, Moffett Field, California, USA, August 1999.

- "The Evolution of Next-Generation Services and Applications in the Internet," Tektronix Distinguished Lecture Series, Portland, Oregon, USA, May 1999.

- "Multicast Applications and Infrastructure in the Next Generation Internet," CENIC 99 Workshop on Achieving Critical Mass for Advanced Applications, Monterey, California, USA, May 1999.

- "Multicast Traffic Monitoring and Analysis Work at UCSB" (w/ P. Rajvaidya), Workshop on Internet Statistics and Metrics Analysis (ISMA), San Diego, California, USA, April 1999.

- "How the Internet Works: Following Bits Around the World," Science Lite, Santa Barbara General Affiliates and Office of Community Relations, California, USA, February 1999.

- "Managing Multicast: Challenges, Tools, and the Future," IP Multicast Initiative Summit, San Jose, California, USA, February 1999.

- "The Future of Multicast Communication and Protocols," Internet Bandwidth Management Summit (iBAND), San Jose, California, USA, November 1998.

- "An Overview of IP Multicast: Applications and Deployment," (1) Workshop on Evaluating IP Multicast as the Solution for Webcasting Real-Time Networked Multimedia Applications, New York, New York, USA, July 1998; and (2) Satellites and the Internet Conference, Washington, D.C., USA, July 1998.

- "IETF Developments in IP Multicast," IP Multicast Initiative Summit, San Jose, California, USA, February 1998.

- "An Introduction to IP Multicast and the Multicast Backbone (MBone)" vBNS Technical Meeting sponsored by the National Center for Network Engineering (NLANR), San Diego, California, USA, February 1998.

- "Using Multicast Communication to Deliver WWW Pages" Computer Communications Workshop (CCW '97), Phoenix, Arizona, USA, September 1997.


## G. Research Funding

- K. Almeroth, "Packet Scheduling Using IP Embedded Transport Instrumentation," Cisco Systems Inc., $100,000, 3/1/13-8/31/14.

- K. Almeroth, E. Belding and S.J. Lee, "GOALI: Maximizing Available Bandwidth in Next Generation WLANs", National Science Foundation (NSF), $101,088, 10/1/13-9/30/14.

- K. Almeroth and E. Belding, "GOALI: Intelligent Channel Management in 802.11n Networks," National Science Foundation (NSF), $51,000, 10/1/10-9/30/11.

- B. Zhao, K. Almeroth, H. Zheng, and E. Belding, "NeTS: Medium: Airlab: Distributed Infrastructure for Wireless Measurements," National Science Foundation (NSF), $700,000, 9/1/09-8/13/13.

- K. Almeroth, E. Belding and T. Hollerer, "NeTS-WN: Wireless Network Health: Real-Time Diagnosis, Adaptation, and Management," National Science Foundation (NSF), $600,000, 10/1/07-9/30/10.

- K. Almeroth, "Next-Generation Service Engineering in Internet2," University Consortium for Advanced Internet Development (UCAID), $1,254,000, 7/1/04-6/30/09 (reviewed and renewed each year).

- B. Manjunath, K. Almeroth, F. Bullo, J. Hespanha, T. Hollerer, C. Krintz, U. Madhow, K. Rose, A. Singh, and M. Turk, "Large-Scale Multimodal Wireless Sensor Network," Office of Naval Research Defense University Research Instrumentation Program (DURIP), $655,174, 4/14/08-4/14/09.

- K. Almeroth and E. Belding, "Improving Robustness in Evolving Wireless Infrastructures," Intel Corporation, $135,000, 7/1/06-6/30/09 (reviewed and renewed for second and third year).

- K. Almeroth and K. Sarac, "Bridging Support in Mixed Deployment Multicast Environments," Cisco Systems Inc., $100,000, 9/1/07-8/31/08.

- K. Sarac and K. Almeroth, "Building the Final Piece in One-to-Many Content Distribution," Cisco Systems Inc., $95,000, 9/1/06-8/31/07.

- E. Belding, K. Almeroth and J. Gibson, "Real-Time Communication Support in a Ubiquitous Next-Generation Internet," National Science Foundation (NSF), $900,000, 10/1/04-9/30/07.

- K. Almeroth and K. Sarac, "Improving the Robustness of Multicast in the Internet," Cisco Systems Inc., $80,000, 9/1/04-8/31/05.

- R. Mayer, B. Bimber, K. Almeroth and D. Chun, "Assessing the Pedagogical Implications of Technology in College Courses," Mellon Foundation, $350,000, 7/1/04-6/30/07.

- B. Bimber, A. Flanagin and C. Stol, "Technological Change and Collective Association: Changing Relationships Among Technology, Organizations, Society and the Citizenry," National Science Foundation (NSF), $329,175, 7/1/04-6/30/07.

- K. Almeroth and B. Bimber, "Plagiarism Detection Techniques and Software," UCSB Instructional Development, $22,000, 7/1/04-6/30/05.

- K. Almeroth, "Student Travel Support for the 14th International Workshop on Network and Operating Systems Support for Digital Audio and Video (NOSSDAV)," National Science Foundation (NSF), $10,000, 5/1/04-8/31/04.

- K. Almeroth, "An Automated Indexing System for Remote, Archived Presentations," QAD Inc., $25,000, 5/1/04-6/30/05.

- K. Almeroth and M. Turk, "A Remote Teaching Assistant Support System," Microsoft, $40,000, 1/1/04-6/30/05.

- K. Almeroth, "Supporting Multicast Service Functionality in Helix," Real Networks, $30,000, 9/1/03-6/30/04.

- K. Almeroth and E. Belding, "Service Discovery in Mobile Networks," Nokia Summer Research Grant (U. Mohan), $10,240, 7/1/03-9/30/03.

- K. Almeroth, D. Zappala, "Building a Global Multicast Service," Cisco Systems Inc., $100,000, 1/1/03-indefinite.

- K. Almeroth, "Developing A Dynamic Protocol for Candidate Access Router Discovery," Nokia Graduate Student Fellowship (R. Chalmers), $26,110, 9/01/02-6/30/03.

- B. Bimber and K. Almeroth, "The Role of Collaborative Groupware in Organizations," Toole Family Foundation, $182,500 ($20,000 cash plus $162,500 in software), 9/1/02-indefinite.

- B. Manjunath, et al., "Digital Multimedia: Graduate Training Program in Interactive Digital Multimedia," National Science Foundation (NSF), $2,629,373, 4/1/02-3/31/07.

- J. Green, K. Almeroth, et al., "Inquiry in the Online Context: Learning from the Past, Informing the Future," UCSB Research Across Disciplines, $10,000, 9/1/01-8/31/02.

- K. Almeroth, "Monitoring and Maintaining the Global Multicast Infrastructure," Cisco Systems Inc.,

$54,600, 7/1/01-indefinite.

- R. Kemmerer, K. Almeroth, et al., "Hi-DRA High-speed, Wide-area Network Detection, Response, and Analysis," Department of Defense (DoD), $4,283,500, 5/1/01-4/30/06.

- A. Singh, K. Almeroth, et al., "Digital Campus: Scalable Information Services on a Campus-wide Wireless Network," National Science Foundation (NSF), 1,450,000, 9/15/00-12/31/04.

- K. Almeroth, "Visualizing the Global Multicast Infrastructure," UC MICRO w/ Cisco Systems Inc., $85,438, 7/1/00-6/30/02.

- H. Lee, K. Almeroth, et al., "Dynamic Sensing Systems," International Telemetering Foundation, $260,000, 07/01/00-06/30/04.

- B. Bimber and K. Almeroth, "Funding for the Center on Information Technology and Society," $250,000 from Dialogic (an Intel Company) and $250,000 from Canadian Pacific.

- K. Almeroth, "CAREER: From Protocol Support to Applications: Elevating Multicast to a Ubiquitous Network Service," National Science Foundation (NSF), $200,000, 9/1/00-8/31/04.

- K. Almeroth, "Characterizing Multicast Use and Efficiency in the Inter-Domain," Sprint Advanced Technology Laboratories, $62,500, 3/1/00-indefinite.

- K. Almeroth, "Producing the Next Generation of Multicast Monitoring and Management Protocols and Tools," UC MICRO w/ Cisco Systems Inc., $124,500, 7/1/99 - 6/30/01.

- K. Almeroth, "Utilizing Satellite Links in the Provision of an Inter-Wide Multicast Service," HRL Laboratories, $20,000, 7/1/99 - indefinite.

- T. Smith, K. Almeroth, et al., "Alexandria Digital Earth Prototype," National Science Foundation, $5,400,000, 4/1/99-3/31/04.

- V. Vesna, K. Almeroth, et al., "Online Public Spaces: Multidisciplinary Explorations in Multi-User Environments (OPS:MEME), Phase II," UCSB Research Across Disciplines, $50,000, 9/1/98-8/31/99.

- K. Almeroth, "Techniques and Analysis for the Provision of Multicast Route Management," UC MICRO w/ Cisco Systems Inc., $97,610, 7/1/98 - 6/30/00.

- K. Almeroth, "Capturing and Modeling Multicast Group Membership in the Multicast Backbone (MBone)," UC MICRO w/ Hughes Research Labs, $19,146, 7/1/98 - 12/31/99.

- K. Almeroth, "Building a Content Server for the Next Generation Digital Classroom," UCSB Faculty Research Grant, $5,000, 7/1/98-6/31/99.

## H. Research Honors and Awards

- IEEE Fellow Status, 2013
- Finalist for Best Paper Award, IEEE Conference on Sensor and Ad Hoc Communications and

Networks (SECON), June 2008
- Best Paper Award, Passive and Active Measurement (PAM) Conference, April 2007
- Outstanding Paper Award, World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA), June 2006
- IEEE Senior Member Status, 2003
- Finalist for Best Student Paper Award, ACM Multimedia, December 2002
- Outstanding Paper Award, World Conference on Educational Multimedia, Hypermedia & Telecommunications (ED MEDIA), June 2002
- Computing Research Association (CRA) Digital Government Fellowship, 2001
- National Science Foundation CAREER Award, 2000
- Best Paper Award, 7th International World Wide Web Conference, April 1998

# III. Service

## A. Professional Activities

### 1. Society Memberships

Member, Association for Computing Machinery (ACM): 1993-present
Member, ACM Special Interest Group on Communications (SIGComm): 1993-present
Fellow, Institute of Electrical and Electronics Engineers (IEEE): 1993-present
Member, IEEE Communications Society (IEEE ComSoc): 1993-present
Member, American Society for Engineering Education (ASEE): 2003-2006

### 2. Review Work for Technical Journals and Publishers

NSF CISE research proposals, IEEE/ACM Transactions on Networking, IEEE/ACM Transactions on Computers, IEEE/ACM Transactions on Communications, IEEE Transactions on Circuits and Systems for Video Technology, IEEE Transactions on Parallel and Distributed Systems, IEEE Transactions on Multimedia, IEEE Communications, IEEE Communications Letters, IEEE Network, IEEE Internet Computing, IEEE Multimedia, IEEE Aerospace & Electronics Systems Magazine, ACM Transactions on Internet Technology, ACM Transactions on Multimedia Computing, Communications and Applications, ACM Computing Surveys, ACM Computer Communications Review, ACM Computeres in Entertainment, ACM/Springer Multimedia Systems Journal, AACE Journal of Interactive Learning (JILR), International Journal of Computer Mathematics, Journal of Communications and Networks, Journal of Parallel and Distributed Computing, Journal of Network and Systems Management, Journal of High Speed Networking, Journal of Communications and Networks, Journal on Selected Areas in Communications, Journal of Wireless Personal Communications, Personal Mobile Communications, Annals of Telecommunications, International Journal of Wireless and Mobile Computing, Pervasive and Mobile Computing (PMC), Wireless Networks Journal, Computer

Networks Journal, Cluster Computing, Computer Communications, Mobile Computing and Communications Review, Performance Evaluation, Software--Practice & Experience, Information Processing Letters, ACM Sigcomm, ACM Multimedia, ACM Network and System Support for Digital Audio and Video Workshop (NOSSDAV), ACM Sigcomm Workshop on the Economics of Peer-to-Peer Systems (P2PEcon), ACM Sigcomm Workshop on Challenged Networks (CHANTS), IEEE Infocom, IEEE Globecom, IEEE Global Internet (GI) Symposium, IEEE Globecom Automatic Internet Symposium, IEEE Globecom Internet Services and Enabling Technologies (IS&ET) Symposium, IEEE International Symposium on a World of Wireless, Mobile and Multimedia Networks (WoWMoM), IEEE International Conference on Network Protocols (ICNP), IEEE Conference on Sensor and Ad Hoc Communications and Networks (SECON), IEEE International Conference on Multimedia and Exposition (ICME), IEEE International Conference on Communications (ICC), IEEE International Conference on Parallel and Distributed Systems (ICPADS) IEEE International Symposium on High-Performance Distributed Computing (HPDC), IEEE International Conference on Distributed Computing Systems (ICDCS), IEEE International Workshop on Quality of Service (IWQoS), IEEE/IFIP Network Operations and Management Symposium (NOMS), IFIP/IEEE International Symposium on Integrated Network Management (IM), IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS), IEEE Aerospace & Electronics Systems Magazine, SPIE Conference on Multimedia Computing and Networking (MMCN), IFIP Networking, IASTED International Conference on Information Systems and Databases (ISD), IASTED International Conference on Communications, Internet, and Information Technology, IASTED International Conference on Internet and Multimedia Systems and Applications (IMSA), IASTED International Conference on European Internet and Multimedia Systems and Applications (EuroIMSA), IASTED International Conference on Communications and Computer Networks (CCN), IASTED International Conference on Software Engineering and Applications (SEA), International Conference on Computer and Information Science (ICIS), International Association for Development of the Information Society (IADIS) International Conference on the WWW/Internet, Workshop on Network Group Communication (NGC), International Conference on Next Generation Communication (CoNEXT), International Conference on Parallel Processing (ICPP), International Conference on Computer Communications and Networks (IC3N), International Workshop on Hot Topics in Peer-to-Peer Systems (Hot-P2P), International Workshop on Wireless Network Measurements (WiNMee), International Workshop on Incentive-Based Computing (IBC), International Workshop on Multi-hop Ad Hoc Networks (REALMAN), International Workshop on Broadband Wireless Multimedia: Algorithms, Architectures and Applications (BroadWIM), International Packet Video (PV) Workshop, High Performance Networking Conference (HPN), International Parallel Processing Symposium (IPPS), International Symposium on Innovation in Information & Communication Technology (ISIICT), Workshop on Coordinated Quality of Service in Distributed Systems (COQODS), Pearson Education (Cisco Press) Publishers, Macmillan Technical Publishing, and Prentice Hall Publishers.

**3. Conference Committee Activities**

**Journal/Magazine Editorial Board**
IEEE Transactions on Mobile Computing (TMC): 2006-2011, 2017-present (Associate Editor-in-Chief)

IEEE Transactions on Network and Service Management (TNSM): 2015-present
Journal of Network and Systems Management (JNSM): 2011-present
IEEE/ACM Transactions on Networking (ToN): 2003-2009, 2013-2017
ACM Computers in Entertainment: 2002-2015
IEEE Network: 1999-2012
AACE Journal of Interactive Learning Research (JILR): 2003-2012
IEEE Transactions on Mobile Computing (TMC): 2006-2011
ACM Computer Communications Review (CCR): 2006-2010

## Journal/Magazine Guest Editorship

IEEE Journal on Selected Areas in Communications (JSAC) Special Issue on "Delay and Disruption Tolerant Wireless Communication", June 2008
Computer Communications Special Issue on "Monitoring and Measuring IP Networks", Summer 2005
Computer Communications Special Issue on "Integrating Multicast into the Internet", March 2001

## Conference/Workshop Steering Committee

IEEE International Conference on Network Protocols (ICNP): 2007-present
ACM Sigcomm Workshop on Challenged Networks (CHANTS): 2006-present
International Workshop on Network and Operating System Support for Digital Audio and Video (NOSSDAV): 2001-present, 2005-2011 (chair), 2012-present (co-chair)
IEEE Global Internet (GI) Symposium: 2005-2013
IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS): 2005-2009

## Conference/Workshop Chair

International Conference on Communication Systems and Networks (COMSNETS): 2014 (co-chair)
ACM International Conference on Next Generation Communication (CoNext): 2013 (co-chair)
ACM RecSys News Recommender Systems (NRS) Workshop and Challange: 2013 (co-chair)
ACM Sigcomm Workshop on Challenged Networks (CHANTS): 2006 (co-chair)
IEEE International Conference on Network Protocols (ICNP): 2003 (co-chair), 2006
International Workshop on Wireless Network Measurements (WiNMee): 2006 (co-chair)
IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS): 2002 (co-chair)
International Workshop on Network and Operating System Support for Digital Audio and Video (NOSSDAV): 2002 (co-chair), 2003 (co-chair)
IEEE Global Internet (GI) Symposium: 2001 (co-chair)
International Workshop on Networked Group Communication (NGC): 2000 (co-chair)

## Program Chair

International Conference on Computer Communication and Networks (ICCCN): 2015 (Track co-chair) International Conference on Communication Systems and Networks

(COMSNETS): 2010
IEEE International Conference on Network Protocols (ICNP): 2008 (co-chair)
IEEE Conference on Sensor and Ad Hoc Communications and Networks (SECON): 2007 (co-chair)
IFIP Networking: 2005 (co-chair)

### Posters/Demonstrations Chair

ACM Sigcomm: 2012 (co-chair)

### Student Travel Grants Chair

ACM Sigcomm: 2010 (co-chair)

### Publicity Chair

IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS): 2004 (co-chair)

### Keynote Chair

IEEE Infocom: 2005 (co-chair)

### Local Arrangements Chair

Internet2 "Field of Dreams" Workshop: 2000

### Tutorial Chair

ACM Multimedia: 2000
IEEE International Conference on Network Protocols (ICNP): 1999

### Panel/Session Organizer

NSF ANIR PI 2003 Panel on "Core Networking Issues and Protocols for the Internet"
CCW 2001 Session on "Multicast/Peer-to-Peer Networking"
NOSSDAV 2001 Panel on "Multimedia After a Decade of Research"
NGC 2000 Panel on "Multicast Pricing"

### Technical Program Committee

IEEE International Conference on Network Protocols (ICNP): 1999, 2000, 2001, 2003, 2004, 2005, 2006, 2007, 2008, 2009 (Area Chair), 2010 (Area Chair), 2011 (Area Chair), 2012 (Area Chair), 2013, 2014 (Area Chair), 2015 (Area Chair), 2016 (Area Chair), 2017 (Area Chair)
International Workshop on Network and Operating System Support for Digital Audio and Video (NOSSDAV): 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017
ACM Multimedia (MM): 2001, 2003, 2004, 2005 (short paper), 2006, 2007, 2008, 2008 (short paper), 2010, 2011, 2012, 2013, 2015, 2016, 2017
IEEE Conference on Sensor and Ad Hoc Communications and Networks (SECON): 2004,

2005, 2006, 2007, 2008, 2009, 2010, 2011 (Area Chair), 2012 (Area Chair), 2013, 2014 (Area Chair), 2015, 2016 (Area Chair), 2017

IEEE/IFIP Network Operations and Management Symposium (NOMS): 2004, 2006, 2010

IEEE Infocom: 2004, 2005, 2006, 2008, 2009, 2010 (Area Chair), 2011 (Area Chair), 2012 (Area Chair)

IFIP Networking: 2004, 2005, 2006, 2007, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017

ACM Workshop on Mobile Video (MoVid): 2014, 2015, 2016, 2017

ACM Student Research Competition (SRC) Grand Finals: 2014

Mobile and Social Computing for Collaborative Interactions (MSC): 2014

IEEE Conference on Communications and Network Security (CNS): 2013

IEEE International Symposium on a World of Wireless, Mobile and Multimedia Networks (WoWMoM): 2005, 2006, 2007, 2008, 2009, 2010

ACM Sigcomm Workshop on Challenged Networks (CHANTS): 2006, 2008, 2009, 2010, 2011, 2012, 2016, 2017

IEEE International Conference on Distributed Computing Systems (ICDCS): 2006, 2010, 2011, 2012, 2013

International Workshop on Wireless Network Measurements (WiNMee): 2006, 2008, 2010

ACM Sigcomm: 2008 (poster), 2010

IEEE International Conference on Computer Communication and Networks (IC3N): 2008, 2009, 2010, 2011, 2012

International Conference on Communication Systems and Networks (COMSNETS): 2009, 2010, 2011, 2012, 2013

International Conference on Sensor Networks (SENSORNETS): 2012

International Workshop on Social and Mobile Computing for Collaborative Environments (SOMOCO): 2012

Workshop on Scenarios for Network Evaluation Studies (SCENES): 2009, 2010, 2011

ACM Multimedia Systems (MMSys): 2010, 2011, 2012, 2015, 2016, 2017

IEEE Internation Symposium on Multimedia (ISM): 2016

IEEE International Conference on Pervasive Computing and Communications (PerCom): 2010

IEEE Wireless Communications and Networking Conference (WCNC): 2010, 2011

ACM International Symposium on Mobility Management and Wireless Access (MobiWac): 2010, 2011

International Conference on Computing, Networking and Communications, Internet Services and Applications Symposium (ICNC-ISA): 2012, 2013

IEEE WoWMoM Workshop on Hot Topics in Mesh Networking (HotMesh): 2010, 2011, 2012, 2013

IEEE Workshop on Pervasive Group Communication (PerGroup): 2010

ACM International Conference on Next Generation Communication (CoNEXT): 2005, 2006, 2007, 2009, 2012

IEEE International Conference on Broadband Communications, Networks, and Systems (BroadNets) Wireless Communications, Networks and Systems Symposium: 2007, 2008, 2009

IEEE International Conference on Broadband Communications, Networks, and Systems (BroadNets) Internet Technologies Symposium: 2007, 2008, 2009

International Workshop on Mobile and Networking Technologies for Social Applications (MONET): 2008, 2009

Extreme Workshop on Communication-The Midnight Sun Expedition (ExtremeCom): 2009

IEEE International Workshop on Cooperation in Pervasive Environments (CoPE): 2009

International Workshop on the Network of the Future (FutureNet): 2009, 2010, 2011, 2012

IEEE International Conference on Multimedia and Exposition (ICME): 2010

SPIE Conference on Multimedia Computing and Networking (MMCN): 2004, 2008

ACM Sigcomm Workshop on the Economics of Networks, Systems, and Computation (NetEcon): 2008

IEEE International Conference on Communications (ICC): 2008

IEEE International Conference on Mobile Ad-hoc and Sensor Systems (MASS): 2008

IFIP/IEEE International Symposium on Integrated Network Management (IM): 2005, 2007

Global Internet (GI) Symposium: 2001, 2002, 2004, 2006, 2007

IEEE/ACM International Conference on High Performance Computing (HiPC): 2007

ACM International Symposium on Mobile Ad Hoc Networking and Computing (MobiHoc): 2007

IEEE Workshop on Embedded Systems for Real-Time Multimedia (ESTIMedia): 2007

IEEE/IFIP Wireless On Demand Network Systems and Services (WONS): 2007

IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS): 2001, 2002, 2003, 2004, 2005, 2006

IASTED International Conference on European Internet and Multimedia Systems and Applications (EuroIMSA): 2004, 2006

IEEE International Conference on Parallel and Distributed Systems (ICPADS): 2005, 2006

IEEE Globecom Internet Services and Enabling Technologies (IS&ET) Symposium: 2006

International Workshop on Incentive-Based Computing (IBC): 2006

IEEE International Workshop on Quality of Service (IWQoS): 2006, 2014, 2015

International Workshop on Multi-hop Ad Hoc Networks (REALMAN): 2006

IEEE Globecom Automatic Internet Symposium: 2005

ACM Sigcomm Workshop on the Economics of Peer-to-Peer Systems (P2PEcon): 2005

International Conference on Parallel Processing (ICPP): 2001, 2003, 2004

International Packet Video (PV) Workshop: 2002, 2003, 2004

IEEE International Symposium on High-Performance Distributed Computing (HPDC): 2004

ACM Sigcomm: 2004 (poster)

International Workshop on Broadband Wireless Multimedia: Algorithms, Architectures and Applications (BroadWIM): 2004

International Symposium on Innovation in Information & Communication Technology (ISIICT): 2004

Workshop on Coordinated Quality of Service in Distributed Systems (COQODS): 2004

IASTED International Conference on Networks and Communication Systems (NCS): 2004

IASTED International Conference on Communications, Internet, and Information Technology (CIIT): 2004

IASTED International Conference on Internet and Multimedia Systems and Applications (IMSA): 2003, 2004

International Workshop on Networked Group Communication (NGC): 1999, 2000, 2001, 2002, 2003

International Association for Development of the Information Society (IADIS)

International Conference on the WWW/Internet: 2003
International Conference on Computer and Information Science (ICIS): 2003
Human.Society@Internet: 2003
IASTED International Conference on Communications and Computer Networks (CCN): 2002
The Content Delivery Networks (CDN) Event: 2001
IP Multicast Initiative Summit: 1998, 1999, 2000
Corporation for Education Network Initiatives in California (CENIC): 1999
Internet Bandwidth Management Summit (iBAND): 1998, 1999

## B. Technical Activities

### 1. Working Groups

Internet2 Working Group on Multicast, Chair: 1998-2005
IEEE Communications Society Internet Technical Committee (ITC), Conference Coordinator: 2000-2004
IETF Multicast Directorate (MADDOGS), Member: 1999-2001
IASTED Technical Committee on the Web, Internet and Multimedia, Member: 2002-2005
Internet Engineering Task Force (IETF), various working groups: 1995-present

### 2. Meeting Support Work

Internet Engineering Task Force MBone broadcasts: 1995-2005
Conference MBone broadcasts: Sigcomm '99, and '00
Interop+Networld Network Operations Center (NOC) Team Member: 1995-1997
ACM Multimedia technical staff: 1994

## C. University of California Committees

### 1. Department of Computer Science Committees

Public Relations: 2005-2006 (chair 2005-2006), 2009-2011 (chair 2009-2011)
Strategic Planning: 2000-2002, 2003-2006, 2009-2011
Undergraduate Advising and Affairs: 2006-2007, 2014-2015
Vice Chair: 2000-2005
Graduate Admissions: 2000-2005 (chair 2000-2005), 2011-2012
Graduate Affairs: 2000-2005 (co-chair 2000-2005)
Teaching Administration: 2000-2005
Facilities: 1997-2001 (chair 1999-2000), 2006-2007
External Relations: 1999-2002
Computer Engineering Public Relations: 2011-2012

Computer Engineering Awards: 2011-2012
Computer Engineering Administration/Recruiting: 1998-2001
Computer Engineering Lab and Computer Support: 1998-2001
Faculty Recruiting: 1999-2002
Graduate Advising: 1998-1999, 2000-2005

**2. University Committees**

Member, Campus Budget and Planning: 2013-2015
Faculty, Cognitive Science Program: 2006-present
Faculty, Technology Management Program (TMP): 2003-2014
Faculty, Media Arts and Technology (MAT) Program: 1998-2014
Faculty, Computer Engineering Degree Program: 1998-present
Steering Committee, Center for Information Technology and Society (CITS): 2012-present
Associate Director, Center for Information Technology and Society (CITS): 1999-2012
Member, Campus Committee on Committees: 2010-2013
Member, Campus Income and Recharge Committee: 2010-2013
Member, College of Engineering Executive Committee: 2010-2012 (chair 2011-2012), 2014-2015 (chair 2014-2015)
Member, Distinguished Teaching Award Committee: 2009, 2010, 2011
Member, Campus Classroom Design and Renovation Committee: 2003-2010
Member, ISBER Advisory Committee: 2008-2011
Member, Fulbright Campus Review Committee: 2007
Member, Faculty Outreach Grant Program Review Committee: 2007
Executive Vice Chancellor's Information Technology Fee Committee: 2005-2006
Council on Research and Instructional Resources: 2003-2006
Executive Vice Chancellor's Working Group on Graduate Diversity: 2004-2005
Member, Engineering Pavillion Planning Committee: 2003-2005
Information Technology Board: 2001-2004
Executive Committee, Center for Entrepreneurship & Engineering Management (CEEM): 2001-2004

**3. System Wide Committees**

UCSB Representative to the Committee on Information Technology and Telecommunications Policy (ITTP): 2003-2005
UCSB Representative to the Executive Committee, Digital Media Innovation (DiMI): 1998-2003

# D. Georgia Tech Committees and Service (while a graduate student)

Graduate Student Body President: 1994-1995
Georgia Tech Executive Board: 1994-1995
Georgia Tech Alumni Association Executive Committee: 1994-1995

Dean of Students National Search Committee: 1995

Institute Strategic Planning Committee: 1994-1996

Cases in last 5 years I have been deposed or testified:

➢ Depositions in <u>British Telecommunications PLC</u> v. CoxCom, Inc., Cox Communications, Inc., & Cable One, Inc. (10-658-SLR, D. Del.).  Finished 01/14.

➢ A deposition and trial testimony in Certain Digital Media Devices, Including Televisions, Blu-Ray Disc Players, Home Theater Systems, Tablets and Mobile Phones, Components Thereof and Associated Software (ITC Inv. No. 337-TA-882) [Black Hills Media v. <u>Samsung</u>].  Finished 02/14.

➢ A deposition in Inter Partes Review of U.S. Patent No. 7,107,612 (IPR2013-00369) [Palo Alto Networks, Inc. v. <u>Juniper Networks, Inc.</u>].  Finished 05/14.

➢ A deposition and trial testimony in EON Corp Holdings, LCC. v. <u>Landis+Gyr, Inc, et al.</u> (6:11-CV-317-LED-JDL, E.D. Tex.).  Finished 06/14.

➢ Depositions in <u>Straight Path IP Group, Inc.</u> v. Bandwidth.com, Inc., Telesphere Networks Ltd., and Vocalocity, Inc. (1:13-CV-932, E.D. Va.).  Finished 06/14.

➢ Depositions and trial testimony in <u>Beneficial Innovations, Inc.</u> v. Advanced Publications, Inc. et al. (2:11-CV-229-JRG-RSP, E.D. Tex.).  Finished 07/14.

➢ Depositions in <u>Robocast Inc.</u> v. Apple Inc. (11-235-RGA, D. Del.) and <u>Robocast Inc</u>. v. Microsoft Corp. (10-1055-RGA, D. Del.).  Finished 08/14.

➢ A deposition in <u>PersonalWeb Technologies, LCC</u> v. Yahoo! Inc. (6:12-CV-658-LED, E.D. Tex.). Finished 08/14.

➢ Depositions and trial testimony in <u>Personal Audio LLC</u> v. Togi Entertainment, Inc. et al. (2:13-CV-13-JRG-RSP, E.D. Tex.).  Finished 09/14.

➢ A deposition in Inter Partes Review of U.S. Patent Nos. 8,326,924 and 8.239,451 (CBM2014-00001 and CBM2014-00050, respectively) [American Express Co. et al. v. <u>Metasearch Systems, LLC</u>]. Finished 09/14.

➢ Depositions in Inter Partes Review of U.S. Patent Nos. 6,044,062 (IPR2013-00482) and 6,249,516 (IPR2014-00147) [ABB Technology LTD v. <u>IPCO, LLC</u>].  Finished 10/14.

➢ A deposition in Inter Partes Review of U.S. Patent No. 5,995,091 (IPR2014-00153 and IPR2014-00154) [Adobe Systems Inc & Level3 Communications, LLC v. <u>Afluo, LLC</u>].  Finished 10/14.

➢ Depositions in Inter Partes Review of U.S. Patent Nos 8,145,268; 8,224,381; 8,135,398; 7,899,492; 8,050,711; and 8,712,471 (IPR2013-00569, IPR2013-00570, IPR2013-00571, IPR2013-00572, IPR2013-00573 and IPR2015-00054, respectively) [<u>Samsung Electronics Co., LTD</u> v. Virginia Innovation Sciences, Inc.].  Finished 11/14.

➢ A deposition in Black Hills Media, LLC v. <u>Sonos, Inc.</u> (14-cv-00486-SJC-PJWx, C.D. Cal.). Finished 02/15.

➢ Markman testimony in <u>Personal Audio, LLC</u> v. Apollo Brands et al. (1:14-CV-8-RC, E.D. Tex.). Finished 06/15.

➢ Depositions in Inter Partes Review of U.S. Patent Nos. 8,028,323; 8,230,099; 8,214,873; 6,108,686; 7,835,689; and 7,917,082 (IPR2014-00709, IPR2014-00711, IPR2014-00723, IPR2014-00717, IPR2014-00718, and IPR2014-00721, respectively) [<u>Samsung Electronics Co., LTD</u> v. Black Hills Media, LLC].  Finished 06/15.

➢ A deposition in Inter Partes Review of U.S. Patent No. 7,548,875 (IPR2014-01236) [MindGeek et al. v. <u>Skky, Inc.</u>].  Finished 06/15.

➢ A deposition in Inter Partes Review of U.S. Patent Nos. 7,468,661 (IPR2014-00751) [Hart Communication Foundation v. <u>SIPCO, LLC</u>]. Finished 07/15.

➢ Depositions in Inter Partes Review of U.S. Patent No. 6,754,195 (IPR2014-00552 and IPR2014-00553) [<u>Marvell Semiconductor, Inc.</u> v. Intellectual Ventures I LLC]. Finished 07/15.

➢ A deposition in Inter Partes Review of U.S. Patent Nos. 6,286,045 (IPR2015-00657 and IPR2015-00660) and 6,014,698 (IPR2015-00662 and IPR2015-00666) [Google, Inc. v. <u>At Home Bondholders Liquidated Trust</u>]. Finished 12/15.

➢ A deposition in Inter Partes Review of U.S. Patent Nos. 6,199,076 (IPR2015-00845) and 7,509,178 (IPR2015-00846) [Google, Inc. v. <u>Personal Audio, LLC</u>]. Finished 03/16.

➢ A deposition in Certain Activity Tracking Devices, Systems, and Components Thereof (US ITC Inv. No. 337-TA-963) [<u>Jawbone</u> v. Fitbit]. Finished 04/16.

➢ A deposition in Certain Wearable Activity Tracking Devices, Systems, and Components Thereof (US ITC Inv. No. 337-TA-973) [Fitbit v. <u>Jawbone</u>]. Finished 07/16.

➢ Depositions in <u>Videoshare, LLC</u> V. Google, Inc. and YouTube, LLC (13-cv-990 (GMS), D. Del.). Finished 07/16.

➢ Depositions and trial testimony in <u>Cisco Systems, Inc.</u> v. Arista Networks, Inc. (5:14-cv-5344-BLF, N.D. Cal.). Finished 12/16.

➢ A deposition and trial testimony in Sprint Communications Company LP v. <u>Time Warner Cable, Inc.</u> (11-2686-JWL, D. Kan.). Finished 02/17.

➢ Depositions in Inter Partes Review of U.S. Patent Nos. 8,000,314 (IPR2015-01901), 8,013,732 (IPR2015-01973), and 8,754,780 (IPR2016-00984) [Emerson Electric Co. v. <u>IPCO, LLC</u>]. Finished 03/17.

➢ Depositions in Inter Partes Review of U.S. Patent Nos. 6,377,577; 7,023,853; 7,162,537; and 7,224,668 (IPR2016-00303, IPR2016-00306, IPR2016-00308, and IPR2016-0309, respectively) [Arista Networks, Inc. v. <u>Cisco Systems, Inc.</u>]. Finished 01/17.

➢ A deposition in Intellectual Ventures v. <u>AT&T, CenturyLink, and Windstream</u> (1:13-cv-00116-LY, 1:13-cv-00118-LY, 1:13-cv-00119-LY; W.D. Tex.). Finished 03/17.

➢ Depositions in Inter Partes Review of U.S. Patent Nos. 7,715,324 and 8,122,102 (IPR2016-01011 and IPR2016-01631, respectively) [Limelight Networks, Inc. v. Akamai Technologies, Inc.]. Finished 03/17.

➢ Depositions and trial testimony in Certain Network Devices, Related Software and Components Thereof (US ITC Inv. Nos. 337-TA-944 and 337-TA-944E) [<u>Cisco Systems, Inc.</u> v. Arista Networks, Inc.]. Finished 04/17.

➢ A declaration and Markman testimony in <u>Affinity Labs of Texas, LLC</u> v. Netflix, Inc. (1:15-cv-00849-RP, W.D. Tex.). Finished 04/17.

➢ A deposition in Inter Partes Review of U.S. Patent No. 7,516,177 (IPR2016-01434) [<u>Oracle America, Inc. and Oracle Corporation and HCC Insurance Holdings, Inc</u>. v. Intellectual Ventures II]. Finished 07/17.

➢ A deposition in Comcast Cable Communications, LLC v. <u>OpenTV, Inc. and Nagravision SA</u> (3:16-CV-6180-WHA, N.D. Cal.). Finished 07/17.

➢ Depositions in <u>Thomas C. Sisoian</u> v. International Business Machines Corporation (A-14-CA-565-SS, W.D. Tex.). Finished 07/17.

➢ Depositions and trial testimony in <u>Packet Intelligence, LLC</u> v. NetScout Systems, Inc. and Sandvine Corporation (2:16-CV-00230, 2:16-CV-00147, E.D. Tex).  Finished 11/17.

➢ A deposition in in Certain Two-Way Radio Equipment and Systems, Related Software and Components Thereof (US ITC Inv. Nos. 337-TA-1053) [<u>Motorola</u> v. Hytera].  Finished 11/17.

➢ A deposition in Sprint Communications Company LP v. <u>Cox Communications, Inc.</u> (12-487-SLR, 11-2686-JWL, D. Del.).  Finished 12/17.

➢ A deposition and trial testimony in <u>Sonos, Inc.</u> v. D&M Holding, et al. (14-1330-RGA, D. Del.).  Finished 12/17.

➢ Depositions and trial testimony in Certain Network Devices, Related Software and Components Thereof (II) (US ITC Inv. Nos. 337-TA-945 and 337-TA-945M) [<u>Cisco Systems, Inc.</u> v. Arista Networks, Inc.].  Finished 01/18.

➢ A deposition in <u>Limelight Networks, Inc.</u> v. XO Communication, LLC, Akamai Technologies, Inc., and MIT (3:15cv720-JAG, E.D. Va.)

➢ A deposition in Inter Partes Review of U.S. Patent Nos. 6,895,449 and 6,470,399 (IPR2017-00713 and IPR2017-00714, respectively) [<u>ZTE (USA) Inc.</u> v. Papst Licensing GmbH & Co. KG.]

➢ A deposition in <u>Twilio, Inc.</u> v. Telesign Corporation (5:16-CV-06925-LHK-SVK, N.D. Cal)

➢ A deposition in Inter Partes Review of U.S. Patent Nos. 8,233,471 (IPR2017-00007 and IPR2017-00008) and 8,625,496 (IPR2017-00213) [Emerson Electric Co. v. <u>IPCO, LLC</u>]

➢ A deposition in <u>Sound View Innovations, LLC</u> v. Facebook, Inc. (16-116-RGA, D. Del)

➢ Depositions in  <u>Alacritech, Inc.</u> v. Centurylink Communications LLC; Winstron Corporation, Dell, Inc. (2:16-cv-693-RWS, 2:16-cv-692-RWS, 2:16-cv-695-RWS, E.D. Tex)

➢ Depositions in Inter Partes Review of U.S. Patent Nos. 7,899,492; 8,050,711; 9,355,611; 8,712,471; 9,286,853; 8,903,451; 8,948,814 and 9,118,794 (IPR2017-00870 through IPR2017-00879) [<u>HTC America, Inc.</u> v. Virginia Innovation Sciences, Inc.]

➢ A depositions in Arista Networks, Inc. v. <u>Cisco Systems, Inc.</u> (5:16-cv-00923-BLF, N.D. Cal.).