**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PERSONAL AUDIO, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 1:17-CV-01751-VAC-CJB |
| GOOGLE, LLC, | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |
| | § | |

**REPLY DECLARATION OF KEVIN C. ALMEROTH, PH.D.**

1. I, Kevin C. Almeroth, make the following declaration based on my personal knowledge, and, if called to testify before the Court, could and would testify as follows:

2. I have reviewed Defendant's Responsive Claim Construction Brief and the Declaration of Dr. Ketan Mayer-Patel dated May 24, 2018. In this declaration, I provide additional analysis of the patents and respond to Defendant's statements in the Responsive Claim Construction Brief and Dr. Mayer-Patel's opinions in his Declaration.

## I.   SEQUENCING FILE DISPUTES

3. It is my understanding that the parties have proposed constructions for terms that relate to a "sequencing file" as follows:

| Term | Plaintiff's Construction | Defendant's Construction |
|------|--------------------------|--------------------------|
| "file of data establishing a sequence" (all asserted claims of '076 patent)<br><br>"sequencing file" ('178 patent claims 1-13)<br><br>"playback session sequencing file" ('178 patent claims 14-21, 28, 29) | a file of data that identifies the order in which audio program segments chosen by or for a user are to be played | a file that is received by the player, stored, and used by the processor to both control playback of each song in the ordered sequence and respond to control commands |

4. I have reviewed Defendant's Responsive Claim Construction Brief and offer the following opinions regarding how its arguments appear to be based on a misunderstanding of the inventions described by the patents-in-suit.  In particular, I offer this expert opinion to explain in

2

detail the compilation of sequencing files on the host and player and the content that is downloaded as described in the patents-in-suit.  In my expert opinion, Defendant's claim that the disclosed Selections File 351 is compiled at the server and then downloaded to the player is incorrect and does not comport with the understanding of a person of ordinary skill in the art.

5. Based on an improper interpretation of the specification and prosecution history, Defendant appears to contend that all sequencing related files disclosed in the specification are (1) downloaded to the player, (2) stored by the player and (3) used by the player to control playback.  Response Br. at 5.  Defendant fails to acknowledge that the specification explicitly discloses at least three different "files that establish a sequence" or "sequencing files"—each of which perform different functions: (1) Requested Table 301/Selection File 470; (2) Recommended Schedule Table 307; and (3) "Selections File 351."  The assignment of different patent drawing identification numbers makes clear that each of these files are separate structures performing different functions.  Only one of the three disclosed sequencing files, Recommended Schedule Table 307, is disclosed as being downloaded to or received from outside the player. Selections File 470 is only disclosed as being uploaded to the server from the player.  This clear description of sequencing files that are not received from outside the player demonstrates that in isolation the terms "a file establishing a sequence" and "sequencing file" do not have the limitations urged by Defendant.

### A.      Requested Table 301/Selections File 470 and Player Selections File Compiler

6. The terms "sequencing file" and "playback session sequencing file" appear in claims 1 and 14 of the '178 patent respectively, while the term "file of data establishing a sequence" is part of the functional description of the means-plus-function element "a means for receiving and storing

a file establishing a sequence of claim 1 the '076 patent (collectively the "sequencing file limitations")." '178 patent, 45:60-64, 48:8-10; '076 patent, 46:18-21.

7. The terms "sequencing file" and "selections file" are used interchangeably to describe multiple files containing a sequence in the patent specification.[1] Requested Table 301 (also referred to as Selections File 301) is identified as being contained in the host system's database in Figure 4 and contains a sequence of program segments selected by the user using the player to be included in the next download.

---

[1] For example, the term selections file is used to describe Requested Table 301 and Selections File 351:

> To control subject and topic skipping, as well as hyperlink jumps, **the selections file seen generally at 301 in FIG. 4** preferably takes the form of a sequence of records, each having the structure defined by the following Pascal record definition:

```
type Selection__Record = record
        LocType: Char;
        Location: Integer;
    end;
```

'178 patent, 31:56-65.



'178 patent, Figure 4.  The specification discloses that this file is combined with additional program selections based upon usage logs and other mechanisms; advertising segments; and announcements to compile Recommended Schedule Table 307.  The specification explicitly states that Requested Table 301 is a "file" establishing a "sequence" or "sequencing file" of program segments:

> The selections made by and uploaded from the subscriber take the form of a **file (sequence) of 32 bit integers**, each integer (ProgramID) designating a particular program segment. This file of integers is placed **in a relational database Requested Table seen at 301 in FIG. 4,** with each row (record) in the Requested Table being an identification number which specifies a corresponding record (row) in a database table **303** called the Programs Table. …The programs, advertising and announcement segments which **are added to the Request Table 301 to form the Schedule Table 307** are determined by a matching procedure **342** which may be better understood by first considering the content of the data structures which provide data utilized to make those selections.

5

'178 patent, 17:15-22; 18:37-42. Nowhere is this sequencing file Requested Table 301 disclosed as being downloaded to the player but rather is used to compile Schedule File 307. As indicated in the quote above, this file is combined with additional selections and used to form Recommended Schedule Table 307 which is then disclosed as being downloaded to the player.

8. Selections File 470 and Requested Table 301 bear a close relationship. Generally, Selections File 470 is a request for a particular sequence uploaded from the player and Requested Table 301 is a database table stored at the server that contains the requested information from multiple uploads contained in each Selections File 370 that is used to create Recommended Table 307.

9. Selections File 470, depicted in Fig. 7, is a requested sequence created on the player CPU by the user in HTML format to be included in the next download. HTML requests such as Selections file 470 are made from the player's CPU:

> To establish a new account, a prospective subscriber may use a conventional web browser program, such as Mosaic, Netscape Navigator or Microsoft's Internet Explorer, **which executes in the client CPU** 105 to establish **a conventional HTTP request/response** dialog with server **101**. The account initialization begins with the transmission of an HTML form from the web page store **141** which is **completed by the user at the keyboard (not shown) of the client CPU 105**.

> \*\*\*

> FIG. 7 shows an example of the content of a portion of an illustrative **HTML text** file indicated generally at **450** used to create an audio file seen at **460** and **a selections file indicated at 470**.



**Fig. 7**

'178 patent, 10:15-20, 43:60-63, Fig. 7.  Once received by the host, Selections File 470 is placed

in a database table format and stored as Requested Table 301 in the host's database:

> The selections made by and uploaded from the subscriber take the form of a **file (sequence)** … This file of integers is placed **in a relational database Requested Table seen at 301 in FIG. 4**.

'178 patent, 17:15-22. Selections File 470 is only described as uploaded to create Table 310.

10.   After a playback session has occurred, the user uses the player to upload future choices as

to what should be included in the next downloaded sequence, as shown in steps 217 and 219 of

Fig. 2:

7

> At the conclusion of a session, subscriber is given the opportunity at **217** to select programming which should be included in the next programming download….
>
> At step **219**, the selections made by the user at **217** as well as the contents of the usage log recorded at **215** are uploaded to the server as a requested file (seen at **301** in FIG. 4).   This upload step may occur at the same time the SLIP/PPP dial-up connection is established by the player…

'178 patent, 9:39-55.  The contents of Selections File 470 is created using user input made on the

player:

> **The HTML forms mechanism may also be used to incorporate requests for user input at predetermined times during the playback of program segments. As described earlier in connection with FIG. 5, user inputs** may take the form of recorded comments and annotations which are analogous to the <INPUT TYPE="text"> and the <TEXTAREA> tagged requests in an HTML form which similarly request the recipient to supply text data. … Similarly, the value choice mechanism using "V" selection records provides a radio-button-style mechanism for **indicating a user's choice from among several options.**
>
> Standard HTML input tags include a Name attribute which can be used as an identifier **for the data entered**. As HTML is translated into an equivalent audio file, the tags in the written HTML **are translated into records in the selections file** ….

'178 patent, 45:4-21.

11. On page 5, Defendant alleges that all compilation of files is done on the server.   As

discussed above, the patent indisputably states that Selections File 470 is uploaded to the server

and that it was created using user inputs on the player.   The patent further states that Selections

File 470 was created by a "selections file compiler":

> A conventional HTML hypertext anchor "<A HREF='target'> full motion video</A>" is processed to produce the three records "A", "B" and "L" at **478** in the selections file which respectively designate the beginning and ending of the anchor text passage and the location of a linked information. The "HREF='target' " portion of the HTML specifies the target location in conventional HTML and that symbolic address is then translated **by the** <u>**selections file compiler**</u> **into the location within the selections file of the selections file record** which refers to that target or, for targets in program segments which are not part of the currently scheduled programming defined by the selections file, by a negative number

8

representing the negative of the ProgramID number of the target program segment.

'178 patent, 44:57-45:3.  Thus, clearly the player has a "selections file compiler" and that the referenced compilation of Selections File 351 from downloaded Schedule Table 307 and player inputted user guidance occurred on the player.

### B.     Recommended Schedule Table 307

12. Recommended Schedule Table 307[2] is a sequencing or selections file which is compiled from Requested Table 301 (see above) and provides an initial recommended or proposed sequence for the user to edit or keep the same.  Unlike the other sequencing files discussed in the specification, Recommended Schedule Table 307 is explicitly disclosed as being compiled on the host system in Fig. 4 and downloaded into the player:

> In accordance with the invention, **the host server receives and supplements the user's initial selection of a sequence of desired programs**, first by adding the program selections specified in failed hypertext requests as indicated by the Usage_Log Table **333** during usage log processing at **350**, and then by adding advertisements, announcements and additional program segments tailored to the subscriber's known preferences as indicated at **340** in FIG. 4, **thereby producing the recommended Schedule Table 307 which is transferred to the subscriber, along with program segments, during the download transfer.**

'178 patent, 18:24-34.  The patent specification makes clear that Schedule Table 307 is a "file" establishing a sequence of audio program segments:

> **[T]he sequence of program segments to be presented to the user is formed into a schedule file (seen at 307 in FIG. 4) consisting of a sequence of program segment identification numbers** which are used to compile a sequencing file, called the selections file, illustrated at **351** in FIG. 5, which contains more detailed information about the sequence of events which occur during playback.

---

[2] Recommended Schedule Table 307 is also referred to as Schedule File 307. *See e.g.*, '178 Patent, 24:54-55.

'178 patent, 12:9-16.   Schedule Table 307 differs from Selections File 351 in that it contains provisional recommendations for playback while Selections File 351 represents the final choices of the listener after the listener has had an opportunity to alter the sequence or add additional programming guidance concerning topics, highlights, bookmarks, and other information guiding playback disclosed in Fig. 5 and in step 211 of Fig. 2.   Accordingly, Schedule Table 307 is referred to as "recommended" or "provisional" while Selections File 351 is never referred to as a "recommended" file.

13. Schedule Table 307 differs from the Requested Table 301 in that it includes program selections, announcements, advertisements and other information not explicitly requested by the user but generated by the host server as discussed above

### C.      Selections File 351

14. Selections File 351 contains the final sequence and is disclosed as being scanned by the control algorithms of the player during actual playback:

> If the user issues a skip command during or shortly after the time when subject announcement is played, the player executes a skip to the next subject, which is accomplished **by scanning the selection file 351** until the next subject Selection_Record seen at **360** is located, and then performing a jump . . . .

'178 patent, 34:26-31.

> At the request of the user, the sequence of programming defined by the program sequence file (the selections file illustrated at **351** in FIG. 5) is then reproduced for the listener.

'178 patent, 8:63-65.

15. Selections File 351 is "compiled" on the player using the recommended sequence obtained from the downloaded Recommended Schedule Table 307:

> [T]he sequence of program segments to be presented to the user is formed into a schedule file (seen at 307 in FIG. 4) consisting of a sequence of program segment

identification numbers **which are used to compile a sequencing file, called the selections file, illustrated at 351 in FIG. 5,** which contains more detailed information about the sequence of events which occur during playback.

'178 patent, 12:10-16. After recommended Schedule Table **307** is downloaded, the listener may alter the downloaded sequence of Table **307** by preferences to form the final Selections File **351**:

> Before a playback session begins, as indicated at **211, the subscriber has the opportunity to review and alter the provisional program selections and sequence established as a default <u>by the downloaded information</u> from the server.** Utilizing the programming data and a utility program previously supplied by the server, <u>**the subscriber may alter the selection and sequence**</u> of program materials to be played, including altering the extent to which advertising will be played along with the selected programming.
>
> \*\*\*
>
> The playback operation itself continues from the designated playback point in the selections file (seen at 351 in FIG. 5) **which follows a program sequence initially created by the host server [i.e., recommended schedule table 307] and downloaded with the program segments themselves, and then (optionally) modified by the addition, deletion and re-sequencing of segment identifiers as discussed earlier in connection with step 211 in FIG. 2.**

'178 patent, 8:54-62; 12:27-33. Importantly, the above passage does not state that Selections File 351 is downloaded to the player but rather that it "follows" a "program sequence initially created by the host server and downloaded"—thereby making it clear that Selections File 351 is created on the player from the sequence of downloaded Schedule Table 307 and subscriber edited information on the player and itself not downloaded from the host.

### D.   Utility Programs

16. The player of one of the embodiments of the invention interacts with the host server using "utility programs." The client programing consisting of utility programs is downloaded to the player from the host server:

> After the account has been established, utility programs and data may be downloaded from the FTP server **125** to the client/player **103**. These utility programs advantageously include programs which perform functions including (a)

program decompression, playback and navigation; (b) recording of a usage log file identifying the program and advertising segments played and the start time, ending time, volume level and playing speed for each such segment; and (c) the selection and updating of programming preferences and selections for future downloading.

'178 patent, 10:27-37. The listener or subscriber (as opposed to the host server) can use the utility programs on the player to alter the sequence of playback found in Schedule Table 307:

> The data downloaded includes a recommended program sequence file which provisionally identifies the order in which downloaded program segments are to be played, with the initial selection and sequence being established based on user preference data by the download compilation processing mechanism seen at 151 at the server. Before a playback session begins, as indicated at 211, **the subscriber** has the opportunity to review and alter the provisional program selections and sequence established as a default by the downloaded information from the server. **Utilizing the programming data and a utility program previously supplied by the server, the subscriber** may alter the selection and sequence of program materials to be played, including altering the extent to which advertising will be played along with the selected programming.
>
> ***
>
> Thus, although the segments are stored in randomly addressable locations in the local mass storage unit, they are nonetheless played at Step 212 in the sequence established initially by the server and (optionally) modified **by the subscriber**, with the player providing the ability to dynamically switch to any position in this sequence under the listeners control. As indicated at 213 in FIG. 2, **the listener** may at any time return to the sequence editing Step 211 **to manually** reorder the playing sequence if desired

'178 patent, 8:48-53, 9:6-15.

17. The listener or subscriber can use the utility programs to add additional programming guidance to the sequence found in recommended Schedule Table 307.  The listener or subscriber can use the player to create "bookmarks" or "annotations" embedded in Selections File 351, which in one embodiment, is indicated by LocTypes "M", "B", and "L" respectively (*see* Fig. 5 and '178 patent 33:25-31).

> As contemplated by still another aspect of the invention, **the player subsystem** includes means for identifying a program segment, or a particular passage within

> a program segment, as a bookmarked item for ease of reference later. In addition**,
> the player system** incorporates means for accepting a dictated annotation from
> the user which associated with any bookmarked passage.

'178 patent, 3:50-56. The listener or subscriber can use the utility programs on the player to

create "comments" embedded in Selections File 351 and indicated by LocType "C" in Selections

File 351. '178 patent, 41:31-47.

> As discussed previously in connection with FIG. 3 and **263-264**, the embodiment
> which described also includes **the capability of accepting comments <u>from a
> subscriber</u> at any time during the course of program playback**.

'178 patent, 42:1-4.  The listener or subscriber can use the utility programs on the player to

create "subjects of interest" and "topics" designations of audio segments embedded in Selections

File 351 and indicated by LocTypes "S" and "T", respectively.

> The Program_Segment record further includes a Subjects field which is an array
> of 16 integers, each of which may be a non-zero code value indicating a
> predetermined subject matter categories, allowing each programming segment to
> be matched against like codes specified as **being subjects of interest by the
> subscriber**, as well as codes indicating subjects to which advertised goods and
> services may relate.
>
> ***
>
> Similarly, the music selections **("topics")** within each of the two music subjects,
> "country music" and "classical music," are preceded with a brief announcement
> identifying the musical selection which follows, allowing the user to quickly skip
> from announcement to announcement until a desired selection is found... To
> simplify the player controls, **the subscriber is preferably selects the extent to
> which narrative music identification announcements are to be played at
> step 211 seen in FIG. 2, at the same time the user is given the opportunity to
> edit the downloaded program sequence.**

'178 patent, 20:39-46, 30:39-54.

    **E.**    **Server Compilation and Download Processing**

18. The difference disclosed in the patents between Recommended Schedule Table 307 and

Selections File 351 is that Schedule Table 307 contains an initial "recommended" sequence

made by the host and Selections File 351 contains final choices concerning the sequence and other programming choices by the user.  The specification states that these above sequencing files follow the format illustrated in Fig. 5. '178 patent, 31:56-32:25 (discussing format of the Selections File), 18:24-42 (discussing format of Schedule Table).  The only disclosed purpose of compiling another sequencing file (i.e., Selections File 351) from recommended Schedule Table 307 would be to include the information concerning altering the sequence and other programing guidance inputted by the user using the utility programs in Step 211 of Fig. 2 after the download.

> As described in more detail later in connection with FIGS. 4 and 5, the **sequence of program segments to be presented to the user is formed into a schedule file** (seen at 307 in FIG. 4) consisting of a sequence of program segment identification numbers which are **used to compile a sequencing file, called the selections file, illustrated at 351 in FIG. 5**, which contains more detailed information about the sequence of events which occur during playback.

'178 patent, 12:9-16.



Fig. 4

'178 patent, Fig. 4.



**Fig. 2**

'178 patent, Fig. 2.

19. One skilled in the art would understand that Selections File 351 was compiled on the player to accommodate this information rather than downloading two identical files containing the same content[3]—especially in light of the fact that the specification only states that one sequencing file is downloaded and that file is recommended Schedule Table 307. '178 patent,

---

[3] The inputted information is made after the download in step 211 of Fig. 2. Thus, the two alleged downloaded files would have to be identical in that they could only contain the same recommended sequence made by the host.

8:48-53 ("The data downloaded includes a recommended program sequence file which provisionally identifies the order in which downloaded program segments are to be played…").

20. Defendant's contention that Selections File 351 is compiled on the server and then downloaded along with Recommended Schedule Table 307 is unsupported and contradictory to numerous disclosures in the specification.  Fig. 4 and the accompanying text ('178 patent, 17:1-19:38) describe in detail the various data structures created or contained in the host server.  Fig. 4 explicitly discloses both sequencing files Requested Table 301 and Recommended Schedule Table 307 as being compiled on the server and only Selections File 307 is disclosed as being downloaded. As seen in Figure 4 above, Selections File 351 is not listed among the data structures created on the server or identified as being downloaded.

21. Furthermore, the specification elsewhere repeatedly (no less than 5 times) and explicitly describes the content downloaded during the download transfer process.  Selections File 351 is never listed among the data structures that are downloaded, nor is there any mention of multiple sequencing files being downloaded.  Indeed, the patents describe only a single sequencing file as being downloaded and that that file is described either explicitly as Schedule File 307 or as a "recommended" file which refers only to recommended Schedule Table 307:

> The data downloaded includes **a recommended** program sequence file which provisionally identifies the order in which downloaded program segments are to be played, with the initial selection and sequence being established based on user preference data by the download compilation processing mechanism seen at **151** at the server.
>
> \*\*\*
>
> In accordance with the invention, the host server receives and supplements the user's initial selection of a sequence of desired programs, first by adding the program selections specified in failed hypertext requests as indicated by the Usage_Log Table **333** during usage log processing at **350**, and then by adding advertisements, announcements and additional program segments tailored to the

subscriber's known preferences as indicated at **340** in FIG. 4, thereby producing **the recommended Schedule Table 307 which is transferred to the subscriber, along with program segments, during the download transfer.**

\*\*\*

Each compilation record describes the download requirements for a specific day of the week and contains fields specifying the earliest and latest times of day when download can be begun, with the latest download time being at least a predetermined time in advance of the session start. In this regard, it should be noted that playback and download can occur concurrently, with **the Schedule Table being downloaded first**, the NewCatalog Table being downloaded second, program segments specified in the Schedule Table which have not previously been downloaded being transferred third (in the order of the expected presentation as stated in the Sequence Table), with program segments selected by the subscriber for future sessions being downloaded last as download time permits.

\*\*\*\*

**The Schedule 307 downloaded to the player, and the associated programming, announcement and advertising segments** sufficient to provide a complete program sequence with adequate advertising to meet the preference of the subscriber, **creates total program content** longer than the expected playing time indicated by the PlayMinutes variable of the days compilation record.

\*\*\*

As described in more detail later in connection with FIGS. 4 and 5, the sequence of program segments **to be presented to the user** is formed into **a schedule file (seen at 307 in FIG. 4)** consisting of a sequence of program segment identification numbers which are used to compile a sequencing file, called the selections file, illustrated at **351** in FIG. 5…

'178 patent, 8:48-53, 18:24-31, 23:48-60, 27:13-19; 12:9-14.  Still further, if final Selections File 351 was compiled on the server and downloaded to the player, there would be no reason to also download recommended Schedule File 307, for which the only disclosed purpose is to provide an initial recommended sequence for compiled Selections File 351. One skilled in the art would not interpret the specification to have meaningless and redundant operations.

22. Furthermore, Selections File 351 is disclosed as containing content and programming choices that was added by the utility programs of the player by the listener/subscriber.  As

discussed above with respect to the utility programs, Selections File 351 contains a final sequence which is disclosed as being edited after the download processing based on the contents of Schedule File 307. *See* Fig. 2.   Selections File 351 may also contains comments and annotations ('178 patent, 33:32-46); bookmarks (33:16-31), topic partitions (32:44-54), subjects of interest (29:52-65), programming to not play advertisements (32:35-40) and other programming guidance inputted by the listener using utility programs residing on the player at step 211.   Thus, the contents of Fig. 5 demonstrate that Selections File 351 was compiled on the player after the download using listener inputs from the utility programs.

### F.    Prosecution History Statements

23. Defendant incorrectly rely on statements in the prosecution history to support its proposed constructions.   Defendant appears to contend that during prosecution, Patent Owner defined the naked term "sequencing file" to inherently require -- independent from any other explicit limitation -- that such file is: (1) received by the player; (2) stored in persistent memory; and (3) used by the processor to control playback and respond to commands.   It seems Defendant's purpose is to create a general definition of the term "sequencing file" as a means to import these limitations into other claims that are not so limited, particularly the data structures used by the control algorithms.

24. At the outset, I understand that the prosecution history relied upon by the Defendant contains an explicit definition by the PTO adopted by the PTAB in the IPR of the naked term "sequencing file" that contains none of the limitations now sought by the Defendant:  "A file of data that identifies the order in which audio program segments chosen by or for a user are to be played." D.I. 147-5, Exhibit E, IPR2015-00845 Inst. Dec. at 8-9.   This explicit claim

construction indicates to one skilled in the art that the term "sequencing file" alone does not contain the additional limitations sought by Defendant.

25. Defendant's argument appears to conflate arguments characterizing a particular use of the term "sequencing file" as dictated by the explicit limitations of claims 1 and 14 of the '178 patent with a proffer of a lexicographic definition of the naked term "sequencing file."  In my expert opinion, in *each and every instance cited* by Defendant**,** the language relied upon does not purport to provide a definition of the naked language term "sequencing file."  Rather, one skilled in the art would understand the relied upon statements merely characterize how a particular claimed sequencing file is used in the context of the explicit limitations of a particular claim when read in light of the specification.

26. The statements cited by Defendant do not purport to describe what a "sequencing file" is, which would be expected if one was offering a general definition of the term, but rather they are directed to how a file is used which is specified in the claim.  For example, these statements fail to describe the most important aspect of the term "sequencing file," i.e. that it provides a "sequence."  Moreover, these statements do not use common definitional phrases like "a sequencing file is defined as…" which would inform a reader that a general definition for all "sequencing files" was being provided.  Rather, the relied upon statements explicitly state that the term sequencing file is "not a term of art" (see ¶ 29 *infra*) and make no reference to the patent providing a lexicographic definition that would depart from its ordinary meaning as understood by a person of skill in the art.

27. The statements come from documents submitted during the reexamination and the IPR initiated by Defendant and Appendix A sets forth the statements relied upon by Defendant in their entirety (marked in bolded red) along with the context they were made in the order that they

were made in the documents.  The Appendix also marks with underline the quotes relied upon here to demonstrate the statements were not directed to a general definition of sequencing file.

28. I understand from my attorneys for purposes of determining a disclaimer, the law provides prosecution history statements distinguishing the claimed invention over the prior art "must be read in the context of [the] overall argument distinguishing the claimed method from the method disclosed [by the prior art]". *Lucent Tech., Inc. v. Gateway, Inc.*, 525 F. 3d 1200, 1211-12 (Fed. Cir. 2008). Importantly, all of these statements are contained within arguments directed to distinguishing features of the sequencing file that are *explicitly* claimed. *See* ¶ 32.

29. Defendant's argument in context and its relied upon statements repeatedly use language like the "the 178 claims … are… directed to," "178 claimed sequencing file" or "the sequencing file of claim 1" or "the claimed sequencing file," no less than 15 times.  Words like "***claimed*** sequencing file" or the "sequencing file ***of claim 1***" refer to a term *as used in the claim* and make clear that the statement is to be understood to include the use of the term as specified by the explicit limitations in that claim (and not a general definition of the naked term).  For example, excerpts from the July 16, 2010 Reexamination Response marking the Defendant's relied upon statement in red is set forth (and underlines indicate the portions I rely upon in this example):

> **The '178 patent claims** are thus directed to **combinations** including **downloading** from one or more server computers and persistently **storing** in an audio program player local digital memory unit: (1) a plurality of separate digital compressed audio program files, and **(2) a separate sequencing file, the downloaded locally-stored sequencing file containing data specifying an ordered sequence of a collection** of the downloaded (and thus now locally stored) digital compressed audio program files.
>
> <span style="color:red">**As discussed below, the term "sequencing file" of independent claim 1 and the term "playback session sequencing file" of independent claim 14, when interpreted in light of the '178 patent specification and file history, should be interpreted to mean "a file that is received by the player and used by the processor to both control playback of each song in the ordered sequence and**</span>

respond to control commands." **The claimed sequencing file is received by the player and used by the processor to both control playback of each song in the ordered sequence and respond to control commands.**  <<Response Br. at 6-7>> [12:16-19; 34:17-23].  **The claimed sequencing file** established two significant advantages over the state of the art.

E. The '178 Specification Emphasizes the **Combination of Three Claimed Features Discussed Above**

****

**The sequencing file "provisionally identifies the order in which downloaded program segments are to be played**," << Response Br. at 8>> [8:48-53] and is a file that is downloaded and used to control the playback session and navigation within the playback session.

****

The '178 specification describes in detail how the exemplary preferred embodiment personal audio player implementation uses the sequencing file's ordered sequence of program segment identifiers. **Figure 5 shows an example non-limiting preferred embodiment** sequencing file **and how the personal audio player processor dynamically uses the sequencing file to both control playback of each song in the ordered sequence and to change selections in response to listener-inputted control commands.**  << Response Br. at 7>>.  For example, the '178 specification beginning at column 34, line 14 describes how the audio player uses the downloaded sequencing file **format** and associated player processor to permit the listener to skip forward, backward, etc.

****

F. The '178 Prosecution History Emphasizes **The Three Claimed Features In Combination**

The PTO previously found that **in combination with the other claimed** features, downloading from one or more server computers and persistently storing in an audio program player digital memory unit: (1) a plurality of separate digital compressed audio program files, and (2) a separate sequencing file, the downloaded locally-stored sequencing file containing data specifying an ordered sequence of a collection of the downloaded (and thus now locally stored) digital compressed audio program files, distinguished **the claimed combinations** over the prior art. . . .

**All of the claims** set forth an audio program player that downloads and stores a plurality of audio program files and a sequencing file that specifies an ordered sequence of a collection of the stored audio program files. **The claimed player**

further includes a communications port for downloading the sequencing file and at least some of the audio program files from one or more server computers. **The claimed player** continuously reproduces the audio programs in the collection for a listener in the order specified by the sequencing file. . . .

**The file history makes it unmistakable that the sequencing file is used to respond to control commands like jump, skip, and skip backwards. The PTO relied on these distinctions in granting the '178 patent:** << Response Br. at 7>>

\*\*\*\*

**In light of the specification and file history excerpts quoted above, the claim term "sequencing file" (which appears in all '178 patent claims and was <u>not a term of art</u> in 1996) is readily understandable to one of skill in the art as a file that is received by the player, stored, and used by the processor to both control playback of each song in the ordered sequence and respond to control commands.** [12:16-19; 12:27-28; 34:17-19]. It is used to determine, for instance, what song is to be played next if the user wishes to skip forward or back or select a specific song. It is not simply a playlist, but rather a file of data that the player references when the player is deciding what audio segment to play in response to the presence or absence of a control command. << Response Br. at 6>> *See Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ("The Patent and Trademark Office ("PTO") determines the <u>scope of claims</u> in patent applications not solely on the basis of the claim language, but upon giving <u>claims</u> their broadest reasonable construction "in light of the specification as it would be interpreted by one of ordinary skill in the art," citing *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359,1364 (Fed. Cir. 2004); MPEP §2111).

\*\*\*\*

**<u>The '178 claimed audio program player</u> uses a sequencing file that was received from an external server.** << Response Br. at 5 n.5>>

Appendix A at 7-11, 22.

30.   The section of the prosecution history relied on by Defendant begins with "*The '178 patent claims* are thus directed to *combinations*" including a downloaded, stored, and received sequencing file, which is followed by, "*As discussed below*, the term 'sequencing file' *of independent claim 1* and the term 'playback session sequencing file' *of independent claim 14...*" The language "combinations" and "of independent claim [1 or 14]" makes clear that the

statements to follow (which *all* of the relied upon statements do) are discussing the term "sequencing file" as used in the "combinations" limitations "of claim 1 or 14" as a whole— rather than a general definition of the naked term "sequencing file." The subheadings above the relied upon statements explicitly refer to the "Combination of Three Claimed Features Discussed Above" again making it clear that these statements were directed to the using the sequencing file in "combination" with the explicit claim limitations of claims 1 and 14 pertaining to a sequencing file, rather than setting forth a general definition of the term in isolation.

31.  The statement "the claim term "sequencing file" (which appears in all '178 patent claims and was <u>not a term of art</u> in 1996) is readily understandable to one of skill in the art" refers to the claimed sequencing file as claimed in the "'178 patent claims"—the statement is explicit that the term "sequencing file" was not a term of art. The explicit "processor for" means plus function limitations of claims 1 and 14 of the '178 patent are directed to how the received sequencing file [i.e. recommended schedule 307] is to be used for playback and to respond to commands and is defined by the embodiment in the specification (which provides that Schedule Table 307 is used to provide the sequence that controls playback and responds to commands) that is ultimately compiled into Selections File 351. This statement is not announcing a general definition of all sequencing files in isolation and apart from the other explicit limitations of the claim.

32.  Indeed, in each instance, the language of the statements pertaining to receipt, storage and "use by the processor" to control playback track almost verbatim the explicit limitations found in the '178 claims, thereby making clear that these statements are discussing the claimed sequencing file in the context of the claim as a whole rather than offering a definition of the naked claim term:

1. An audio program player comprising:  a communications port for … for **downloading** a plurality of separate digital compressed audio program files and **a separate sequencing file** from one or more server computers, **[i.e. received by the player]**

\*\*\*

a digital memory unit … for persistently **storing** …**said separate sequencing file**, said sequencing file containing data specifying an ordered sequence of a collection of said separate digital compressed audio program files, **[i.e., stored]**

\*\*\*

**a processor for continuously delivering a succession of said audio program files in said collection** to said audio output unit **in said ordered sequence specified by said sequencing file** … and for discontinuing the reproduction of the currently playing audio program file …**in response to a program selection command** from said listener.  **[i.e. used by the processor to control playback and to respond to control commands]**.

'178 patent, claim 1.

33. Claim 14 of the '178 patent also has explicit limitations of receiving, storing, and using the sequencing file to control playback and respond to controls by providing the sequence for playback. *See* Appendix B.  One would not set forth these explicit limitations if the naked term sequencing file inherently was defined to contain these limitations.  The Eastern District rejected the exact construction for "sequencing file" now being offered by Defendant because it "incorporates limitations that appear elsewhere in the claim language." D.I. 147-4, Exhibit D, Claim Construction Order at 18.

34. Similarly, the remaining prosecution history statements proffered by Defendant are all directed to how the prior art fails to teach explicitly recited claim elements and do not purport to offer a definition of the naked term "sequencing file" or express any limitation of "sequencing file" beyond that explicitly imposed by the discussed claim limitation at issue.  For example,

Defendant relies upon the following statement distinguishing the DAD Manual from the claimed

invention:

> The DAD Manual does not disclose an audio program player that **contains all of the limitations of these claim elements arranged or combined in the same way**. As the discussion below will show, the DAD Manual is entirely missing certain features the claims require, and does not arrange or combine features in the same way **as claimed**. For example, the Examiner relies (ACP at 28) on three passages from the DAD Manual he alleges disclose "downloading a play list": (1) the IMPORT PLAYLIST function at DAD Manual 7-19); (2) the serial command at 10-4; and (3) the "UTILIZE" configuration command at 8-23. A careful review of the technical teachings of the DAD Manual demonstrate that the DAD Manual does not disclose that the same "play list" the Examiner equates with the claimed "sequencing file" is downloaded, persistently stored and **used** to playback similarly downloaded and persistently stored audio files **in the way claim 1 requires**.

Appendix A at 25-26.  This statement is clearly directed to the specific limitations of '178 patent

claim 1 discussed above and argues that the prior art fails to teach that a sequencing file is

received, stored, and used "in the way claim 1 [of the '178 patent] requires."  This argument is

directed to the explicit limitations of claim 1 and not to sequencing files generally. Nothing in

this statement purports to be a general definition of the naked term "sequencing file."

35. Defendant relies upon the following statement made in the IPR:

> It is not good enough just to have a sequence. That sequencing file has to be on user preferences. The second aspect of it, that sequencing file based on user preferences has to be received from outside the player or downloaded from an outside source.

Appendix A at 27.  This statement does not even purport to state that the downloaded file is used

to control playback, as Defendant's proposed construction requires. It merely states that the

claimed invention requires a file to be received from an outside source, as explicitly claimed.

The IPR prosecution history is clear that it is the sequence data from the received file that is

used:

The claims require receiving or downloading a sequencing file to specify a sequence of audio files. The sequencing file must be used for playback by referencing the sequencing information within the file to determine the order that the audio files are to be played.

36. Defendant relies upon my statement submitted to the PTO in the reexamination:

At paragraphs 13-16 of my July 2010 declaration, I describe how a person of ordinary skill in the art would interpret the DAD Manual's disclosure of the "import" function. Mr. Novacek, at paragraphs 13-16 of his declaration, offers responsive remarks regarding how the "import" function works in the DAD System. Preliminarily, I note that **Mr. Novacek's declaration testimony** does not state that the "import function" in the DAD Manual discloses **downloading a sequencing file and then using that file for playback** by the DAD system. The declaration testimony is careful not to fully describe operation of the "import" function.

Appendix A at 28.

This statement however is a characterization of declaration testimony and points out that the testimony does not fully describe the operation of the prior art or how a purported sequencing file is used by the prior art. Nothing in this statement purports to offer a general definition of the term "sequencing file." This features of receipt and use of the file (i.e., provides a sequence acted on by controls when incorporated into file 351) for playback

37. I understand from the lawyers representing Personal Audio that a prosecution history disclaimer requires the high bar of a "clear" and "unambiguous" disavowal of claim scope. *Tech. Properties v. Huawei Tech.*, 849 F.3d 1349, 1357-58 (Fed. Cir. 2017). There must be a "clear intention" to surrender subject matter. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). Neither a "loose remark" nor a "factually inaccurate" description of the invention gives rise to prosecution disclaimer. *Rambus Inc. v. Infineon Tech. AG*, 318 F.3d 1081, 1090 (Fed. Cir. 2003).

38. "If the challenged statements are ambiguous or amenable to multiple reasonable interpretations, prosecution disclaimer is not established." *Huawei*, 849 F.3d at 1358. Here, one

26

skilled in the art could reasonably understand that the relied upon statements repeated reference to a "claimed sequencing file" and claimed "combinations" and the like were not announcing a general definition for all "sequencing files," but rather were characterizing the "sequencing file" as claimed in context of the explicit limitations of the '178 patent.  The (1) ordinary and plain language of the claim term, (2) the statements repeated reference to a "claimed" sequencing file and "combinations," (3) the repeated references to explicit limitations of the claims, (4) specification's explicit disclosure of sequencing files that do not have the characteristics of the statements (e.g. Requested Table 301, Selections file 351 and Selections File 470)); (5) and the fact that the PTO, which had the prosecution history and directly received some of the statements, explicitly defined the naked claim term "sequencing file" without the limitations urged by Defendant, all support the reasonable understanding that the Patent Owner has not proffered a general definition for all sequencing files containing Defendant's limitations.  With this reasonable understanding, there is no clear and unambiguous disavowal of claim scope.

39. Finally, none of the statements relied upon by Defendant alleged to be definitions make any mention of "persistent storage" or storing in "non-volatile memory" on the player. Defendant's construction also requests that "file establishing a sequence" be so defined–a different term in a different patent.  I see no mention of the term "file establishing a sequence" in any of the statements and this term is in a separate patent.

### G.      The Prosecution History Statements Do not Support Limiting the Control Algorithms to "Scanning a Received Sequencing File to Locate the Next Selection Record for a LocType"

40. The prosecution history statements cannot justify limiting sequencing file algorithms in the manner requested by Defendant in the control algorithms.   Defendant's proposed constructions with respect to the control algorithms discussed here go beyond simply requiring a

player to use a received sequencing file for playback.  Rather, Defendant seeks to specify the particular "use" of a received sequencing file to perform a particularized algorithmic step: "scanning… to locate the next Selection_Record of the appropriate LocType."  The above section addresses why there is no prosecution history disclaimer that all sequencing files must be defined as being received, stored, and used to control playback.  Even if there was a surrender of claim scope that required a claimed sequencing file to be received and "used by the processor to both control playback and respond to control commands" – which is not the case – none of the statements relied upon by Defendant come close to specifying the specific steps of Defendant's modification to the control algorithm.

41. Even assuming that the prosecution history statements were intended to provide a general definition for sequencing file—which they clearly were not—the statements cited by Defendant at best only suggest that there must be a received sequencing file "used by the processor to control playback and to respond to control commands," but do not specify any particular type of "use" (i.e., specific algorithmic step) for that file.  Nor do they purport to state that every file that contains a sequence used by the player must satisfy these conditions and foreclose the use of copies of that file during playback, as would be necessary in any real application and understood by one skilled in the art in interpreting the specification and these statements.  As such, it cannot be said that there was a clear and unambiguous surrender of claim scope as to the particular algorithmic step requested by Defendant.

42. These statements do not purport to specify that the control algorithms must include the particularized use of "scanning the received file to locate the Selection_Record of the appropriate LocType" in the context required by Defendant's modification.  A processor can "use" the received sequencing file to "control playback and respond to commands" by referencing it to

obtain the "sequence" used for playback and control commands (i.e., using the data of sequencing file to control playback and to respond to commands" rather than always scanning the same received file to locate the next selection record of the appropriate LocType and no other data structure. Indeed, that is exactly how the disclosed embodiment uses sequencing file Schedule Table 307, the *only* received sequencing file described in the specification, to control playback and respond to commands. Schedule Table 307 is referenced once to obtain the sequence used by scanned Selections File 351 but itself is not continually scanned by the processor to "locate the next Selection_Record of the appropriate LocType." *See* Section I(C) *supra*. The same prosecution history cited by Defendant contemplates this type of "use" which does not require the specific algorithmic step urged by Defendant:

> The applicant stated in the reexamination "The '178 specification describes in detail **how** the exemplary preferred embodiment personal audio player implementation **uses** the sequencing file's **ordered sequence** of program segment identifiers to sequence events which occur during playback and to control the playback session and navigation within the playback session…. 34:14 et seq. describes how the audio player **uses** the downloaded sequencing file **format** and associated player processor to permit the listener to skip forward, backward, etc. cite.
>
> The claims require receiving or downloading a sequencing file to specify a sequence of audio files. The sequencing file must be **used** for playback by referencing the sequencing information within the file to determine the order that the audio files are to be played.

The statement above states that the player "**uses** the sequencing file's **ordered sequence** … to control the playback session—not always scanning the received file. The statement "34:14 et seq. describes how the audio player **uses** the downloaded sequencing file **format** and associated player processor to permit the listener to skip forward, backward, etc." indicates that use of the sequencing file to respond to controls is achieved by using the "format" [i.e. sequence] to skip forward.

Appendix A at 8-9.  One skilled would understand that the statements of using a received sequencing file to control playback and respond to controls referred to this type of use—and not necessarily to always scanning the same received sequencing file.  Indeed, the explicit language of the claims only requires that the "sequence" from the received sequencing file be "used to respond to control commands" rather than require continually scanning or referencing the received sequencing file exclusively to locate the next selection record:

> 1. A player for reproducing selected audio program segments comprising, in combination:
>
> means for storing a plurality of program segments, each of said program segments having a beginning and an end,
>
> means for receiving and storing a file of data **establishing a sequenc**e in which said program segments are scheduled to be reproduced by said player,
>
> means for accepting control commands from a user of said player,
>
> means for continuously reproducing said program segments in the **order established by <u>said sequence</u>** in the absence of a control command,
>
> means for detecting a first command indicative of a request to skip forward, and
>
> means responsive to said first command for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which follows said currently playing program in **said sequence**.

43. The Eastern District of Texas has already addressed the issue of whether the received and stored sequencing file must be continuously scanned during playback and concluded that "nothing in the language of the means responsive limitations or in the Court's construction of those limitations requires that… the [received and stored] sequencing file must always be accessed… during playback." D.I. 147-3, Exhibit C, Order Re Motions for JMOL at 10.  In other words, the claims do not require that the claimed algorithms always scan the exact same stored file but may use other data structures containing the downloaded sequence obtained from the

received file to control playback as disclosed in the specification with respect to recommended Schedule Table 307.

44. Finally, Defendant affirmatively relied upon, and the PTO adopted in the *inter partes* review, a construction that did not contain scanning the "received" sequencing file limitation now proposed when invalidating claim 1 of the '178 patent.  One of ordinary skill in view of this prosecution history would understand no specific algorithmic step requires scanning the "received" sequencing file.  Indeed, to invalidate claim 1 of the '178 patent the PTO credited Defendant's theory that a received file is used to create the actual data structure used to control playback:

Dr. Walker testified that a playlist.txt file is used to initialize a TreeNode data structure…

D.I. 147-7, Exhibit G, Final Written Dec. at 31-32.

Specifically, Defendant relied upon the prior art's teaching of a "playlist" file that was received by the player to create on the player a "TreeNode data structure" that was scanned by the player for the skip function:

THE WITNESS:  Reading the -- reading the disclosure in Chase, one would -- one of ordinary skill in the art would understand that Chase uses the information in the .txt file to populate the data structure pointed to by the ST variable on page 403 of -- for example, on page 403 of Exhibit 1015 and -- and the -- and the contents of that structure are described in -- in the source code, including the mapping of the various elements in the data structure to the elements in the source -- in the -- various elements in the file to the various elements in the data structure, so I think of that as a -- as a pretty -- as an explicit disclosure but at the very least, it renders the process obvious.

    A    That information is copied -- that's the information on disk.  The information -- that information from that playlist is copied -- is used to initialize something that the -- the source code refers to as a tree structure.

    A    The use of the -- the use of the code -- the use of the initialized structures is -- is -- is defined in, for instance, the FindNextElement function.  That's just an example of the structure.

32

Exhibit 2 at 42:24-49:24.

45. The received playlist file was not continually scanned to locate selections records of the appropriate LocType but rather it was used to create a tree node structure on the player that was scanned.   In this case, the received file was used by the processor to respond to control commands by being referenced once to obtain the sequence for skipping to be used in the tree node structure.

## II.   **"FILE" ('076 patent, claims 1 & 14 and '178 patent, claim 1)**

46. It is my understanding that the parties have proposed constructions for the term "file" as follows:

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "file" (all asserted claims of both patents) | any collection of data that is stored and manipulated as a unit <u>by a file management system or database system.</u> | a collection of data that is stored and manipulated as a named unit by a file-management system. |

It is my understanding that as a concession to Defendant, Plaintiff has proposed the above modification shown by underline.

47. It appears Defendant's primary dispute with Plaintiff's construction is that Plaintiff's construction allegedly does not distinguish between a "file" and "any collection of data" and therefore reads out "file" entirely.   Response Br. at 10.   This argument is premised on a misunderstanding of Plaintiff's construction and the relationship between a file and the data it might contain.   Plaintiff's construction recognizes that the distinction between unstructured raw data and data that constitutes a file is whether the data is "stored and manipulated as a unit."   In this way data within a file can be distinguished from data without.

48. In my opinion, Defendant's construction is improper because it seeks to limit the term "file" to only those contemplated by "file management systems." However, as highlighted by the 5 contemporaneous dictionary definitions discussed in my April 10, 2018 declaration, this is not an inherent limitation of the term "file". Defendant's apparent suggestion that the "relational database" system used by the host system is unrelated to the downloaded Schedule Table 307 is inconsistent with the specification of the patents-in-suit. *Compare* Response Br. at 11 *with* '178 patent, 17:14-22, 18:34-42. Schedule Table 307 (which is the only sequencing file disclosed as being downloaded) is in fact stored as a database table:

> The selections made by and uploaded from the subscriber take the form of **a file (sequence) of 32 bit integers**, each integer (ProgramID) designating a particular program segment. This file of integers is placed **in a relational database Requested Table seen at 301 in FIG. 4**, with each row (record) in the Requested Table being an identification number which specifies a corresponding record (row) in a database table 303 called the Programs Table. …The programs, advertising and announcement segments which are added to the Request Table 301 to form the **Schedule Table 307** are determined by a matching procedure 342 which may be better understood by first considering the content of the data structures which provide data utilized to make those selections.

'178 patent, 17:14-22, 18:34-42. Request Table 301 and Schedule Table 307 are disclosed as being created by the same relational database system. *See* Fig. 4.

49. Although, it is my opinion that no additional limitation is necessary, it is my understanding that Plaintiff would accept the following construction:

> a collection of data that is stored and manipulated as a unit by a file-management system or database system,

which tracks nearly verbatim Defendant's construction but excludes the "named" requirement and explicitly includes "database systems" as an option.

50. While the meaning of the term "file" does not necessarily require a file management system nor a database system, it is my understanding that the dual inclusion of both is acceptable

to Plaintiff.  Without expressing an opinion as to acceptability, I do note that a database system is explicitly disclosed in the specification as way of managing files in contrast to a "file management system", which is not disclosed.

## III.  "MEANS FOR CONTINUOUSLY REPRODUCING..." ('076 patent, claim 1)

51. It is my understanding that the parties have proposed constructions for the term "means for continuously reproducing…" as follows:

| Claim Term | Plaintiff's Construction | Defendant's Construction |
| --- | --- | --- |
| "means for continuously reproducing said program segments in the order established by said sequence in the absence of a control command" ('076 patent, claim 1) | This term is governed by 35 U.S.C. § 112(6).<br><br>The function is "continuously reproducing said program segments in the order established by said sequence in the absence of a control command."<br><br>The structure corresponding to the claimed function is the following structures and equivalents thereof:<br><br>A sound card that includes a digital to analog converter; headphones or one or more speakers; and a general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 233, 235, 237, 239, and 261 and more fully described at column 12, line 16 to column 13, line 11 and column 34, line 28 to column 35, line 44. Specifically, this algorithm includes the following steps:<br><br>1. beginning playback with the program segment identified by | Governed by 35 U.S.C. § 112(6).<br><br>Function<br>Continuously reproducing said program segments in the order established by said sequence in the absence of a control command.<br><br>Structure<br>A sound card that includes a digital to analog converter; headphones or one or more speakers; and a general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 233, 235, 237, 239, and 261 and described at column 12, line 16 to column 13, line 11 and column 34, line 28 to column 35, line 44. Specifically, this algorithm includes the following steps:<br><br>(1) beginning playback with the program segment identified by the ProgramID contained in the Selection_Record specified by the CurrentPlay variable;<br><br>(2) when the currently playing |

35

| | |
|---|---|
| the ProgramID contained in the Selection_Record specified by the CurrentPlay variable;<br><br>2. when the currently playing program segment concludes, incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the ProgramID contained in the next Selection_Record in the sequencing file;<br><br>3. repeating step (2) until a command is issued or that the sequence is completed. | program segment concludes,<br><br>(a) if the concluded segment is a topic or subject announcement, incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the ProgramID contained in the next Selection_Record in the received sequencing file, and<br>(b) if the concluded segment is a program segment,<br><br>(i) scanning forward in the received sequencing file to locate the next Selection_Record containing the appropriate LocType;<br><br>(ii) resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>(iii) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record;<br><br>(3) repeating step (2) until a rewind Selection_Record (LocType: R) in the received sequencing file is reached, which resets the CurrentPlay variable to the location value contained in the rewind Selection_Record which is set to "1" to begin the playing sequence again with the first Selection_Record in the received sequencing file. |

52. Paragraphs 72-82 of my April 18, 2018 Declaration included multiple contemporaneous sources from the relevant time period showing that the term "continuously reproducing" as it appears in "continuously reproducing said audio program segments in the order established by said sequence" is a term of art that merely requires playing successive audio segments in order of the sequence without requiring that they be played in a loop.

53. This understanding is reinforced by the usage in the claims and the specification.  Not only does dependent claim 4 of the '076 patent separately claim reproduction of the sequence in a loop, the usage of the language in claim 1 of '178 patent also supports this interpretation:

> a processor for … discontinuing the reproduction of the currently playing audio program file and **instead <u>continuing the reproduction</u> at the beginning of a listener-selected one of said audio program files in said collection in response to a program selection command from said listener**

As indicated by the usage in '178 claim 1 above, one can "continue[] the reproduction" of an "audio file" by merely advancing to another audio segment in the sequence without repeating the sequence in a loop—showing that continuously reproducing merely means playing a successive audio file rather than repeated the whole sequence in a loop.  This interpretation is further supported by the "continue playback" description of step 235 in Fig. 3 which states that "continue playback" is performed merely by advancing to the next program segment in the sequence irrespective of whether the entire sequence repeated or the presence of a loop.

54. Defendant's Response does not contradict the above understanding of this term of art or usage with any evidence (expert or otherwise) or even argues to the contrary. As such, I understand that the function specified in the claim does not require that the segments be played in a loop and the recited function can be performed by playing successive segments of a sequence without repeating the sequence.

55. It is my expert opinion that the corresponding structure to the recited function is met by the algorithm established in steps 235, 237, 239, and 261 without reference to a LocType R or a loop. This algorithm is generally discussed at '178 patent, column 12, line 16 to column 13, line 11 and does not reference any LocType R nor does it require an endless loop or a LocType R to perform the recited function of playing successive program segments without additional control commands. Plaintiff's construction without LocType R accurately reflects the algorithm.

56. I understand page 22 of Defendant's Response argues the following disclosure is the sole embodiment of the invention and therefore mandates use of the "R" Selection_Record to create an endless loop:

> The end of the selections file 351 is marked with an "R" Selection Record 380 which contains the location value 1. When the player encounters this record, it resets the CurrentPlay register to 1, and the playing sequence begins again. This arrangement creates, in effect, an endless loop, allowing the user to skip forward in circular fashion through the entire program selection to locate desired programming, regardless of where the CurrentPlay register is set. When the player is given a further back command after the beginning of the file is reached, the backward scanning process finds the record 382, another "R" rewind record which contains the location of the last "S" subject Selection_Record. In this way, the selection file 351 behaves as a bi-directional endless loop.

'178 patent, 35:28-42.   This is incorrect. First, the patent explicitly states that the particular configuration in Fig. 5 using a LocType R is only "illustrative." '178 patent, 34:15. One skilled would understand the patent specification as disclosing that the particular configuration of a sequencing file to vary depending upon the desire of the listener and that the disclosure as a whole contemplates that one could choose to use a LocType R to implement a loop or not. Moreover, Fig. 7 describes a sequencing file "selections file 470" directed to a sequence of audio program segments (denoted by the LocType pairs "H"-"E" and "A"-"B", and ProgramID) and

38

images (denoted by "I"-"J").[4]   It does not contain a LocType R or a loop—clearly and indisputably contradicting Defendant's claim of only one disclosed embodiment using a loop and affirmatively showing implementation without an R LocType:



**Fig. 7**

57. Accordingly, regardless of whether the disclosed embodiment discloses optional use of LocType R or not, LocType R structure is not required to perform the explicitly recited function

---

[4] Fig. 7 as a whole shows how the sequence in selections file 470 is used to create a compressed audio file to be uploaded from the player to the database.

which does not require a loop.  The endless loop is instead separately claimed in dependent claim 4.

58. I understand Defendant suggests LocType is required structure because the only selections files disclosed by the specification contains both playable program segments and other items and LocType is necessary to differentiate between the playable program segments and the other items. Response Br. at 26 ("Plaintiff further contends that the sequencing file disclosed in Figure 5 is "optional," and that the "continuously reproducing" algorithm is "completely embodied … in Fig. 3." As discussed above, LocType is the only structure disclosed for identifying a program segment to reproduce in sequence and to differentiate between "program segments" and other items in the selection file. Plaintiff also suggests that the sequencing file could be composed entirely of just program files such that the next entry would always be the correct one. This hypothetical sequencing file, however, is not disclosed anywhere in the specification."). This is incorrect.  First, the claimed function is "continuously reproducing said program segments in the order established by said sequence."  The corresponding structure must reproduce audio program segments, including topic and subject audio announcements, highlighted passages, and other program segments in the specified order and does not allow for skipping..  Defendant's proposal requires scanning the sequence to skip certain LocTypes and therefore depart from the order of the sequence.  Since the explicitly recited function requires playing *"in the order* established by said sequence," this step is not corresponding structure. Further, the specification discloses the additional LocTypes relied upon by Defendant are merely optional embodiments.  For example, the specification discloses topic and subject are only used for the optional topic and subject skip feature.  A basic skip command (i.e., SKIP) causes the player to advance to the beginning of the next program segment in the sequence irrespective of

topic and subject matter, and two further optional modified skip commands (SKIP TOPIC and

SKIP SUBJECT) allow the user to skip by topic or subject LocTypes "if desired":

> The third command, **the SKIP command** indicated at 275 in Fig. 3, **causes the player to advance to the beginning of the next program segment in the program sequence**, recording the start of the next sequence at 267, and resetting the playback position at 269. **If** the program segement[sic] has been subdivided (e.g. into paragraphs), the SKIP command causes the player to skip forward to beginning of the next subdivision within that segment. **If desired, SKIP commands may be subdivided into two types, a SKIP TOPIC command and a SKIP SUBJECT command**. When programming material such as news reports are grouped into topics within subject categories, as described later in connection with Fig. 5, a SKIP SUBJECT command allows the user to skip over all program segments within that subject and resume playback at the leading description of the next subject. In contrast, the SKIP TOPIC command always advances to the next topic (program segment or program segment subdivision) in the sequence.

'178 patent, 15:25-46. The Back commands are described as operating similarly but in reverse.

'178 patent, 15:47-48.  The above clearly states that the skip subject and skip topic commands

that use LocType are only used when program segments (audio files) are subdivided into

paragraphs and/or topics: (1) **"If** the program segement[sic] has been subdivided (e.g. into

paragraphs)" and "**when** programming material such as news reports are grouped into topics

within subject categories." Without such division one uses a regular skip command without these

additional LocTypes.  Further, the SKIP TOPIC and SUBJECT commands (and BACK TOPIC

and SUBJECT commands) are described merely as optional features that are used "if desired" or

if program segments are subdivided. LocTypes are used when one performs a SKIP SUBJECT

or SKIP TOPIC command.  A person who wants to skip to the next segment of a TOPIC will use

the disclosed 'T' LocType and one that wants to skip to the next segment of a SUBJECT will use

the 'S' LocType.  However, the patent makes clear that one does not have to advance to the next

program of a particular Subject or Topic, but may do so "if desired" or when the program

segment is "subdivided"—thus indicating the embodiment does not have to be subdivided. The

patent similarly describes BACK TOPIC and SUBJECT commands as optional features that "may be" used. Thus, skips and backs implemented using LocTypes are only an optional feature used to depart from the regular order of the program sequence and use of a LocType is not needed or necessary to perform the claimed function.

## IV.   "MEANS RESPONSIVE TO [A SINGLE ONE/TWO CONSECUTIVE] SECOND COMMANDS" ('076 patent, claims 3 and 4) and "PROCESSOR RESPONDS TO A SKIP BACKWARD SELECTION COMMAND..." ('178 patent, claims 5 and 6)

59. It is my understanding that the parties have proposed constructions for the term "said processor responds to a skip backward selection command..." as follows:

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "said processor responds to a skip backward program selection command accepted from said listener at a time when said currently playing audio program file has not yet played for said predetermined amount of time for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which precedes the currently playing program segment in said ordered sequence specified by said sequencing file" ('178 patent, claim 6) | The function is "in response to two consecutive 'Back' commands, discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which precedes the currently playing program segment." <br><br> The structure corresponding to the claimed function is the following structures and equivalents thereof: <br><br> A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269, 235, 261, 262, and 278 and more fully described at column 15, lines 49 to 59 and column 34, | Governed by 35 U.S.C. § 112(6). <br><br> Function <br> In response to a ['Skip'/single 'Back'/two consecutive 'Back'/'Back'] command[s], discontinuing the [reproduction/translation] of the currently playing program segment and instead continuing the [reproduction/translation] at the beginning of [a program segment which follows said currently playing program in said sequence/said currently playing program/a program segment which precedes the currently playing program segment/the next program segment in said sequence]. <br><br> Structure <br> A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 267, 269, 235, 261, 262, and 278 |

| | |
|---|---|
| line 28 to column 35, line 53. Specifically, this algorithm includes the following steps:<br><br>1. in response to a first 'Back' command, if the currently playing program segment has played for a predetermined amount of time, resetting the playback position to the<br><br>beginning of the program segment and playing the program segment from its beginning;<br><br>2. in response to a second 'Back' command, if the currently playing program segment has not yet played for said predetermined amount of time, scanning backward in the sequence established by the file to locate the previous Selection_Record of the appropriate LocType;<br><br>3. resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>4. fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record.<br><br>**A LocType is an identifier that indicates a characteristic of a selection record, for example, a** | and described at column 15, lines 49 to 59 and column 34, line 28 to column 35, line 53. Specifically, this algorithm includes the following steps:<br><br>(1) in response to a first "Back" command, if the currently playing program segment has played for a predetermined amount of time **after the start time recorded in a usage log file**, resetting the playback position to the beginning of the program segment, and playing the program segment from its beginning;<br><br>(2) in response to a second "Back" command, if the currently playing program segment **is near its beginning**, scanning backward in the **received** sequencing file to locate the previous Selection_Record of the appropriate LocType;<br><br>(3) resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>(4) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record. |

| | **playable content selection record.** | |
|---|---|---|

60. Defendant's proposed construction for claims 5 and 6 of the '178 patent is erroneous because it replaces "a predetermined time" with "near the beginning" to suggest that the pre-determined time interval must be a short time interval, *i.e.*, "near the beginning." This is a result of a misinterpretation of the specification.

61. I understand Defendant argues "near the beginning" should replace a "predetermined time" in the corresponding structure based on the only disclosed embodiment. Defendant points to the following passage:

> The BACK command indicated at 278 operates like the SKIP command but in the reverse ("rewind') direction. Similarly, the BACK command may be subdivided into two commands, a BACK SEGMENT and a BACK SUBJECT command, which respectively reset the playback point to the beginning of the prior segment or the beginning of the prior subject description. **Note that, after any given segment has played for a predetermined amount of time, the BACK command should reset the playback to be beginning of the current 55 segment or topic respectively, allowing the user to start the current segment or topic from the beginning unless the play back point is already near the beginning, in which case the transition is made to the prior segment**. The system responds to BACK commands by resetting the playback point to the 60 desired point in the sequence and recording the start time, Volume setting and new program segment ID in the log file as indicated at 267.

Response Br. at 19 (*citing* '178 patent, 15:47-63). This passage's reference to "near the beginning" does not mean that the time interval has to be short as implied by Defendant's construction. Rather the passage set forth two time intervals involving a predetermined time (an interval between the beginning of the audio segment and the pre-determined and after the pre-determined time to the end of the audio segment.



These intervals dictate whether the reset point will be at the beginning of the current playing program segment or the previous program segment.

62. If the audio segment has played for more than the amount set as the predetermined amount of time (time interval B), the player will reset at the begging of the current playing audio segment:

> Note that, after any given segment **has played for a predetermined amount of time**, the BACK command should reset the playback to be beginning of the current segment or topic respectively, allowing the user to start the current segment or topic from the beginning unless the play back point is already **near the beginning**, in which case the transition is made to the prior segment.

'178 patent, 15:53-59.   If the segment has played for less than the amount set for the predetermined time (time interval A), the player will reset at the previous audio segment.

45

63. The statement "near the beginning" is directed to identifying the time interval that resets to the prior audio segment (i.e., the interval "near the beginning") as opposed the interval after the predetermined time.   It does not modify the "predetermined amount of time" and is not intended to describe an additional limitation that the time interval has to be a short period near the beginning.   Claim 5 and 6 language confirms this understanding of the two time intervals that control the reset point:

> Claim 5:  "said processor responds to a skip backward program selection command accepted from said listener at a time when said currently playing audio program file has played for at least a predetermined amount of time by discontinuing the reproduction of said currently playing audio program file and instead continuing the reproduction at the beginning of said currently playing audio program file.

> Claim 6.  "said processor responds to a skip backward program selection command accepted from said listener at a time when said currently playing audio program file has not yet played for said predetermined amount of time for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which precedes the currently playing program segment in said ordered sequence specified by said sequencing file"

Thus, Plaintiff's construction and the one adopted by the Court and the PTO is correct.

64.   Even if the specification's disclosure discussed above does state that the predetermined amount of time was near the beginning, this should not be incorporated as a limitation.   The claim only recites the function of skipping back after a "predetermined amount of time," not "after a predetermined amount of time *near the beginning*."   The particular setting of the length of time interval of predetermined time used in the example relied upon by Defendant is not necessary structure to perform the function (any length of time interval meets the explicit function) and should not be incorporated as a limitation.   Such incorporation erroneously rewrites the recited function based upon an embodiment and incorporates descriptive details unnecessary to the explicitly claimed function.

65. One skilled in the art would understand that the hypothetical disclosure of a setting the "predetermined time" for a short period "near the beginning" relied upon by Defendant is merely an illustrative example of one setting. The specification states that there is a control mechanism that can skip program segments[5] at "any time":

> As contemplated by the invention, the player subsystem includes a control mechanism... More specifically, the player may advantageously incorporate means for skipping the remaining content of any program being played *at any time*...

'178 patent, 2:59-65.

66. This indicates that the predetermined time could be set by the control mechanism at any time period and not just a short interval "near the beginning."  The specification in other parts also discusses skipping back while the segment is playing at any point that the segment is playing:

> If the player issues a Back command *during the playing* of a programming segment, the player returns to the beginning of the prior subdivision (if any) or the prior topic announcement for the current program segment, thus enabling the user to easily "replay" a current segment from the beginning if desired.

'178 patent, 35: 1-7.  The specification further indicates that the "predetermine time" could be set to be coextensive with the portion of a program segment that has been designated as a subject subdivision:

> When the user issues a SKIP or BACK command while the player is playing a subject or topic announcement, the player skips the entire subject or topic being announced and moves to the next subject or topic announcement respectively, automatically bypassing the intervening program segments which comprise the skipped subject or topic.

'178 patent, 16:4-10.

---

[5] The specification states that the skip back button functions the same as the skip forward commands but in "rewind."  '178 patent, 15:47-50.

67. The length of a subject subdivision of a program segment does not have to be a short interval (i.e., near the beginning) and could in theory be majority of the program segment. Finally, Defendant's own construction of this term submitted to the PTO that was adopted without this modification was not limited to near the beginning. Thus, one skilled in the art would under that the relied upon disclosure of the defendant is an illustrative example of one setting and that the player could set the "predetermined time" at any time interval while a segment is playing and not a short interval.

68. The specification discloses that the usage logs are a feature for accounting and program generation   *see* '178 patent, 27:37-42 ("The preferred embodiment of the invention processes the usage log data created during the playback session as described in connection with FIG. 3 to produce a variety of accounting and analysis reports and billing functions.")). Defendant argues "determining whether playback is near the beginning… can ***only*** be done by using the start time in the usage log." Response Br. at 20.   This is incorrect. The usage log is not disclosed as being used to determine the amount of elapsed time a song is playing for purposes of the skip function but rather is a specific data structure used to store session lengths determined by other means for purposes of creating importance values in the recommendations algorithm for creating future recommendations in schedule 307:

> Download processing, as described in more detail later, extracts from the library 130 data defining compressed program, advertising, and glue segments, and/or associated text program data, based on selections and preferences made by (or inferred for) the user as specified in the subscriber data and usage log database 143.
>
> A weighting value may be calculated to indicate the extent to which the subscriber's stated interests match a given program or category of programs. Programs to which high weighting values are assigned are placed in the Schedule Table if the usage log data does not indicate the subscriber has already played that program, whereas the remaining programs having a weighting value greater than a predetermined threshold are placed in the Catalog Table 308. The duration of the programs specified in the Schedule file 307 is

governed by the scheduled session lengths, communications throughput, and client storage capacity values contained in the DataRate, Capacity and WeekDays fields of the Subscriber record.

'178 patent, 7:3-9, 24-46:59, step 239 of Fig. 3.  The usage logs may record skips for purposes of determining whether a song should be in the next recommended download, however the specification does not disclose using it to determine the elapsed time for determining the reset point of a skip.  Nowhere does the specification link a usage log to the determination of the elapsed time for purposes of skip function.

69.  The specification states "[a]s playing progresses, the current playback position may be advantageously indicated by a variety of means."  The patent also discloses a visual indicator that determines the amount of time that has elapsed:

> The scheduled duration of each program segment may be displayed, along with **the elapsed time remaining to be played in the currently playing segment, to enable the user to more easily determine when to skip the remainder of the currently playing segment**.

'178 patent, 12:43-58.  Such indicators were common in 1996.  The algorithm step of determining the amount of time an audio file has played in the PTO's algorithm is well within the normal programming abilities of one skilled in the art and does not need further elaboration, much less a usage log.  Furthermore, in 1996, audio files contained time sequence information within the file itself that could be used for determining the amount of lapsed time.  There is no merit to Defendant's argument that the usage log is required for the skip functionality.

## V.  "PROCESSOR FOR [REPRODUCING] LISTENER SELECTED... AUDIO PROGRAM FILES" ('076 patent, claims 1-3, 5, 6, 13-15)

70. It is my understanding that the parties have proposed constructions for the term "processor… for discontinuing the reproduction of the currently playing audio program file and instead continuing the reproduction at the beginning of a listener-selected one of said audio

program files…" which corresponds to the "Go" command disclosed by the specification as follows:

| Term | Plaintiff's Construction | Defendant's Construction |
|------|--------------------------|--------------------------|
| "a processor … for discontinuing the reproduction of the currently playing audio program file and instead continuing the reproduction at the beginning of a listener selected one of said audio program files in said collection in response to a program selection command from said listener" ('178 patent, claim 1) | This term is governed by 35 U.S.C. § 112(6). The function is "in response to a 'Go' command, discontinuing the reproduction of the currently playing audio program file and instead continuing the reproduction at the beginning of a listener-selected one of said audio program files in said collection." The structure corresponding to the claimed function can be the following structures and equivalents thereof: A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269, 235, 265, and 267 and more fully described at column 14, lines 25 to 29; column 14, lines 35 to 39; column 33, line 3 to line 8; and 34, line 19 to column 35, line 52. Specifically, this algorithm includes the following steps: 1. resetting the CurrentPlay variable to the record number of the listener-selected Selection_Record; and 2. fetching and playing the audio program file identified by the ProgramID contained in the new Selection_Record. | Governed by 35 U.S.C. § 112(6). Function In response to a 'Go' command, discontinuing the reproduction of the currently playing audio program file and instead continuing the reproduction at the beginning of a listener-selected one of said audio program files in said collection. Structure A general purpose computer programmed to perform the algorithm in the flow chart of Figure 3 at items 269, 235 and described at column 14, lines 25 to 26; column 14, lines 35 to 39; column 33, line 11 to line 16; column 34, line 19 to column 35, line 52; and column 35, line 54 to column 36, line 9. Specifically, the algorithm includes the following steps: (1) identifying the listener-selected Selection_Record identified by the offset within the "L" Selection_Record of the hyperlink passage in the received sequencing file; (2) resetting the CurrentPlay variable to the record number of the listener-selected Selection_Record; and (3) fetching and playing the audio |

| | | program file identified by the ProgramID contained in the new Selection_Record. |
| --- | --- | --- |

71. Defendant argues its proposed structure for responding to the recited function matches the only disclosure in the specification. Response Br. at 15. This is simply not the case. As explained by Plaintiff's Opening Brief at 15, the specification discloses an embodiment of the "Go" command simply as receiving the identification of the segment from the listener using a "menu" on a visible display or a "hand controller" and then playing that segment (as indicated at step 265 of Fig. 3:

> In a player implemented by a personal computer provided with a screen display, the current playback position may be advantageously indicated by dis playing the program segment topic descriptions in a scrolling listing, with the description of the program currently being displayed being highlighted. The scheduled duration of each program segment may be displayed, along with the elapsed time remaining to be played in the currently playing segment, to enable the user to more easily determine when to skip the remainder of the currently playing segment. When such a concurrent visual display is available, means may also be included to respond to the users selection of a given program on the scrollable listing by means of a mouse or the like, and then automatically continue the play at the beginning of the program segment thus selected.

'178 patent, 12:49-63.

There is no mention of "linked passages," a voice prompt, or a selection record "L" in this passage.

72. This display uses step 265 identified by the E.D. Tex. as part corresponding structure, again with no mention of linked passages or a selection LocType "L":

> Alternatively, a mouse click on a screen-displayed menu of items, or a push-button on a hand controller connected by an infrared link to the player computer, could similarly be processed as a command to go to a predetermined program segment associated with that command signal. In such cases, the system records the start of the new segment on the log file (seen at 215 in FIG. 2) at 267 and switches the current playback position in the program sequence file 214 to the new setting at 269, and the playback continues at 235.

'178 patent, 14:30-39.

73.   Defendant argues the phrase "whenever the user issues 'Go' command, (seen at 265 in

Fig. 3), the player will execute a hyperlink jump to the location indicated by the last 'L' record"

indicates that a L Selection_Record is required for all "Go" commands:

> Hyperlinks are implemented by means of anchor passage identifiers, the 'A' and "B" Selection records which respectively identify the anchor passage, and a "L" link identifier which holds the location of a subject, topic or highlight Selection Record. The 'A' and "B" selection records enable the player to add an audio cue (such as a tone, low-level chime, or the like) to the beginning, end, or during any passage in any program selection. **Whenever the user issues a "Go' command (seen at 265 in FIG. 3), the player will execute a hyper link jump to the location indicated by the last "L' record in the selection file.** When the jump is made, the location in the "L" record is inserted into the CurrentPlay register 353 after the previous contents of the CurrentPlay register are saved in (pushed into) a zero-based stack 390 at the stack cell location specified by the contents of a StackPtr register 392, which is then incremented. Whenever the listener issues a "Return' command, the previously pushed selection file record location is popped from the stack 390 and returned to the CurrentPlay register 353, and the StackPtr register 392 is decremented. A "Return' command issued when StackPtr-Zero (indicating an empty stack) produces no effect.

'178 patent, 35:61-66.  When this quote is seen in full context above, the "whenever" remark is

clearly discussing an alternative use of the "Go" command in the special case of fetching linked

passages.  When an anchor passage (LocType "A" or "B") is encountered in the sequencing file,

a voice prompt is made asking whether to fetch a corresponding linked passage.  If a "Go"

command is indicated in response to this prompt, the player will then jump to the linked passage

denoted with by the "L" Selection_Record that corresponds to the anchor passage.

74.   The above passage is not directed to "Go" commands issued on the visual menu.  "Go"

commands using the visual menu respond to the "user" selection of an item on the menu using a

visual display—not a LocType "A" in the sequencing file:

> When such a concurrent visual display is available, means may also be included to respond to the users selection of a given program on the scrollable listing by means of a

> mouse or the like, and then automatically continue the play at the beginning of the program segment thus selected

'178 patent, 12:58-64.  In contrast, Defendant's passage corresponds to the response when a selection record (LocType "A") is encountered in the sequencing file indicating a linked passage to a given anchor passage:

> **Hyperlinks are implemented by means of anchor passage identifiers, the 'A' and "B" Selection records which respectively identify the anchor passage, and a "L" link identifier which holds the location of a subject, topic or highlight Selection Record.** The 'A' and "B" selection records enable the player to add an audio cue (such as a tone, low-level chime, or the like) to the beginning, end, or during any passage in any program selection. Whenever the user issues a "Go' command (seen at 265 in FIG. 3), the player will execute a hyper link jump to the location indicated by the last "L' record in the selection file...

'178 patent, 35:42-53.  Thus, this statement does not modify the menu embodiment using user selections described above and the claim should not be so limited.

75. Moreover, the special case of fetching linked passages discussed in Defendant's passage does not even correspond to the claimed function. Claim 1 reads in part:

> in response to a first one of said input commands designating a selected audio program file described on said visual menu listing for causing said audio playback unit to discontinue the reproduction of the currently playing audio program file in said ordered sequence and to instead continue the reproduction at the beginning of said selected audio program file

The recited function requires (1) "discontinuing" the current playing file in response to a command and (2) jumping to a user *selected* file on a *visual menu display*.  The relied upon fetching passage refers to issuing a "Go" command in response to a voice prompt with no discussion of a visual menu.  Furthermore, the fetching of hyperlinks only discusses jumping to a predetermined linked passage denoted by a L Selection_Record in the sequencing file and not a "selected audio program segment" that was selected by "input commands designating a selected audio program file described on said visual menu listing..." as explicitly required. *Id*.  Finally,

the fetching quote occurs when the player advances to a selection record "A" or "B" in the sequencing file and a voice prompt is made, which means that playback of the previous selection record has completed and therefore, there is no "discontinuing" of a currently playing audio file when the "Go" command was issued, as required by the explicit function. '178 patent, 35:42-53.

76.    Finally it should be noted that the construction urged by Google and adopted by the PTO in the IPR makes no mention of an L Selection_Record. D.I. 147-7, Exhibit G, IPR2015-00845 Final Written Dec. at 17; D.I. 147-6, Exhibit F, IPR2015-00846 Final Written Dec. at 13. Equally important, the prior art relied upon in the IPR merely disclosed a skip to the next segment element (a basic skip button) that had no mention of a linked passage or a selection record L for this limitation:

> Chase discloses that the affiliate terminal's remote control terminal allows a user to override the normal sequence of the audio segments by selecting audio programs out of sequence... **The disclosed software code teaches a function rPlayer:FindNextElement that scans through in the play list to find the next playable element, including advancing the element pointer until it finds the first playable object** (a track, play list, or cart) and then returns that pointer to the Event function. Ex. 1007 at CJICJI 0001-0002 and 0004, incorporating by reference Ex. 1018 at 402-403 and 409. The Event function then passes to the function SetCurrentElement the returned pointer (tp) to the next segment. The SetCurrentElement sets the element corresponding to the returned pointer (tp) as the current element ("CurElement") and invokes the CueElement function. The CueElement function configures the player to start playing as detailed above with respect to claim portion [le], thereby fetching and playing the audio file identified by the file name for the next segment.

Exhibit 1, IPR2015-00845 Pet. at 35-37 (internal citations omitted).   Since the specification shows an algorithm and menu capable of performing the recited function without an L LocType, the L LocType is not necessary corresponding structure and the claim should not be so limited.

## VI.    <u>**"MEANS FOR DETECTING..."** ('076 patent, claims 1 & 2)</u>

77. It is my understanding that the parties have proposed constructions for the term "means for detecting…" as follows:

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "means for detecting a first command indicative of a request to skip forward" ('076 patent, claim 1) | This term is governed by 35 U.S.C. § 112(6).<br><br>The function is "detecting a first command indicative of a request to skip forward."<br><br>The structure corresponding to the claimed function is the following structures and equivalents thereof:<br><br>A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 261, 262, and 275. Specifically, this algorithm includes the following steps:<br><br>1. determining whether input from the means for accepting control  commands is a command using a conditional programming construct; and<br><br>2. if the input is a command, using a "branch" programming construct to select one of the player's available commands, which include a "Skip" command, for execution. | Governed by 35 U.S.C. § 112(6).<br><br>Function<br>Detecting a first command indicative of a request to skip forward.<br><br>Structure<br>A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 261, 262, 275. Specifically, this algorithm includes the following steps:<br><br>(1) determining whether input from the means for accepting control commands is a command using a "if-then-else" programming construct; and<br><br>(2) if the input is a command, using a "branch" programming construct to select one of the player's available commands, which include a "Skip" command, for execution. |

78. I understand the Parties' disagreement is whether a person skilled in the art would understand a diamond shaped box to correspond to an "if-then-else" programming construct or a "conditional" programming construct. *Compare* Response Br. at 27 with Opening Br. at 28. However, the PTO has already found that one skilled would understand the diamond box to

correspond to a "conditional" programming construct. D.I. 147-5, Exhibit E, IPR2015-00845 Inst. Dec. at 21-23. This finding forms part of the prosecution history and is persuasive evidence for Plaintiff's position. Moreover, I disagree with Defendant's statement that Plaintiff's requested modification would render the claim indefinite. The corresponding algorithm includes two separate steps: a first step that determines that determines an input, and a second step that responds to the input using a "branch" programming construct. *Id*. The claimed algorithm is not merely *any* conditional programming construct, but only those that use a "branch" construct to select a player command for execution. Thus, regardless of how one interprets the first step, it is my opinion that the second step provides a further substantive limitation that renders the claim definite.

## VII. "EDITING MEANS" TERMS ('076 patent, claims 5 & 6)

79. It is my understanding that the parties have proposed constructions for the term "editing means…" as follows:

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "editing means for modifying said data establishing said sequence" ('076 patent, claim 5) | The function is "modifying said data establishing said sequence."<br><br>The structure corresponding to the claimed function is the following structures and equivalents thereof:<br>A player client programmed to:<br><br>1. Add a program segment; and/or<br><br>2. Delete a program segment; and/or<br><br>3. Assign a new or different order to a given program segment; and update the order for the program | Governed by 35 U.S.C. § 112(6); Indefinite.<br><br>Function<br>Modifying said data establishing said sequence.<br><br>Structure<br>No disclosure of corresponding structure in the patent specification. |

| | | |
|---|---|---|
| | segments in the serialized sequence.<br><br>Alternatively, the structure corresponding to the claimed function is the following structures and equivalents thereof:<br>A player client programmed to:<br><br>1. Access selections file 351; and<br><br>2. Alter identifiers of program segments within the selections file, including the following operations:<br><br>a. Add a program segment; and/or<br><br>b. Delete a program segment; and/or<br><br>c. Assign a new or different order to a given program segment; and update the order for the program segments in the serialized sequence. | |

80. It is my opinion that the specification does not merely recite functional language. The specification describes specific table data structures (i.e., Selections File 351) with "segment identifiers" that are modifiable such that changing any segment identifier changes the sequence for playback and allows the sequence to be edited. '178 patent, 12:31-33. The specification further describes four operational steps (access file, add identifiers, delete identifiers, and resequence identifiers) using a "utility program" downloaded to the player that when performed on the disclosed table data structures allow for modification or editing of the sequencing file. '178 patent, 12:21-27. Step 211 of Fig. 2 further discloses the algorithm that sets forth the timing of when editing takes place.

## VIII.   "MEANS FOR TRANSLATING SAID VOICE SIGNALS INTO SAID CONTROL COMMANDS" ('076 patent, claim 13)

81. It is my understanding that the parties have proposed constructions for the term "means for translating…" as follows:

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "means for translating said voice signals into said voice control commands" ('076 patent, claim 13) | The structure corresponding to the claimed function is the following structure and equivalents thereof:<br><br>A microphone and voice recognition software | Governed by 35 U.S.C. § 112(6); Indefinite.<br><br>Function<br>Translating said voice signals into said control commands.<br><br>Structure<br>No disclosure of corresponding structure in the patent specification. |

82. I understand during the IPR proceeding for the '076 Patent, the PTAB explicitly found that one of the corresponding structures for the "means for accepting control commands," included "a microphone, sound card, and conventions speech recognition software." D.I. 147-7, Exhibit G, IPR2015-00845 Final Written Dec. at 20-21.   Claim 13 adds the limitation wherein the "means for accepting control commands for a user includes... means for translating said voice signals into said control commands."   Therefore, it would be readily apparent to a person of ordinary skill in the art that the corresponding structure for the "means for translating" could include "voice recognition software."

83. Defendant does not appear to dispute that a "voice command system" is clearly linked to the recited function of the "means for translating said voice signals into said control commands." Response Br. at 29-30.   Defendant contends that this recitation is insufficient because "it does not describe how such 'voice command/recognition system' performs the claimed function of

translating voice signals into voice control commands." *Id.* As shown by the examples in my previous declaration and by the PTO's construction, voice command systems and voice recognition systems were known in the art to perform the recited function and were connotative of specific software that performs the function.

## IX.  "PLAYER" ('076 patent, claims 1-10, 13-17, 28-29 and '178 patent, claims 14 & 15) AND "SELECTED AUDIO PROGRAM SEGMENTS" ('076 patent, claims 1, 14 & 15 and '178 patent, claims 6 & 14)

84. It is my understanding that the parties have proposed constructions for the terms "player" and "selected audio program segments" as follows:

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "[audio program] player" (all asserted claims) | A device or program that reproduces sound including from digital audio content. | Plain and ordinary meaning. |
| "[selected] audio program segments" (all asserted claims) | Audio program segments that have been chosen by or for a user.<br><br>Preamble is limiting. | Plain and ordinary meaning.<br><br>Preamble is not limiting. |

85. The term "player" clearly includes small electronic devices with programming installed on them. '178 patent, 8:6-8 (players include "a portable computer or simplified player for mobile use").

86. Further, while the naked term "audio program segments" may be construed generically, the term chosen by the parties for construction is "<u>selected</u> audio program segments." Both the E.D. Tex. and the PTO concluded the word "selected" before "audio program segments" in the context of '076 claim 1 (among other claims) requires that the segments be selected (i.e., chosen by or for a user). This is supported by the following statements in the specification:

The data downloaded includes **a recommended program sequence file which provisionally identifies the order in which downloaded program segments are to be played, with the initial selection and sequence being established based on user preference data** by the download compilation processing mechanism seen at 151 at the server.

\*\*\*

As noted earlier, the program segments which are available in a master library are described in a catalog and associated with descriptors of various kinds, **allowing the content of the compilation to be tailored to the preferences of the subscriber, both through express selections made by the subscriber and by selections (or suggestions) made automatically by matching the subscribers known preferences and interests against descriptors which characterize the programs segments**, as previously described.

'178 patent, 8:48-53, 29:22-30.  I understand that the issue as to whether the preamble is limiting is not joined here because the full language of the preamble or the body has not been selected as a claim term—only the naked term "selected audio program segments."

87. Defendant's suggestion at 11 that the "relational database" system used by the host system is unrelated to the sequencing file is incorrect. The specification describes the sequencing files as database tables:

> The selections made by and uploaded from the subscriber take the form of **a file (sequence) of 32 bit integers**, each integer (ProgramID) designating a particular program segment. This file of integers is placed **in a relational database Requested Table seen at 301 in FIG. 4**, with each row (record) in the Requested Table being an identification number which specifies a corresponding record (row) in a database table 303 called the Programs Table. …The programs, advertising and announcement segments which are added to the Request Table 301 to form the **Schedule Table 307** are determined by a matching procedure 342 which may be better understood by first considering the content of the data structures which provide data utilized to make those selections.

'178 patent, 17:15-22.  Request Table 301 and Schedule Table 307 are disclosed as being created by the same relational database system. *See* Fig. 4.

Executed this 25th of June, 2018 in Palo Alto, CA.

Kevin C. Almeroth, Ph.D.