# *PERSONAL AUDIO, LLC V. GOOGLE, LLC*

## PLAINTIFF'S CLAIM CONSTRUCTION

Civil Action No. 1:17-CV-01751;

in the United States District Court for the District of Delaware

August 1, 2018

1

"FILE"

## *"File"*

| E.D. Tex.'s Construction | PTAB's Construction | Personal Audio's Construction (same as PTAB's) | Defendants' Construction |
|---|---|---|---|
| n/a | n/a | Any collection of data that is stored and manipulated as a unit.<br><br>Alternatively, A collection of data that is stored and manipulated as a unit by a file management **or database** system. | A collection of data that is stored and manipulated as a named unit **by a file-management system**. |

3

# *Multiple Proffered Definitions from the Time of Invention Show the Term Does Not Require a File Management System*

<u>IEEE Stand. Dictionary of Electrical Terms, 5th Ed. (1993) and 6th Ed. (1997)</u> (information transfer) "One named collection of data"; (microprocessor operating systems) "A set of related records usually treated as a named unit of storage." D.I. 147, Exhibit I.

<u>Barron's Dictionary of Computer and Internet Terms 5th Ed. (1996)</u> "a block of information stored on a disk, tape or similar media. A file may contain a program, a document or a collection of data (such as a mailing list)." D.I. 147, Exhibit J.

<u>Microsoft Press Computer Dictionary (1997)</u> "A complete, named collection of information, such as a program, a set of data used by a program, or a user-created document. A file is the basic unit of storage that enables a computer to distinguish one set of information from another. A file is the "glue" that binds a conglomeration of instructions, numbers, words, or images into a coherent unit that a user can retrieve, change, delete, save or send to an output device." D.I. 147, Exhibit K.

<u>Computer Dictionary, 4th Ed. (1985)</u> "A collection of related records treated as a unit." D.I. 147, Exhibit L.

4

# *The Specification Confirms Requested Table 301 is a Relational Database File*

"The selections made by and uploaded from the subscriber take the form of a **file** (sequence) of 32 bit integers, each integer (ProgramID) designating a particular program segment. This **file of integers** is placed in a **relational database Requested Table seen at 301** in FIG.4… The Program Segment records in the Programs Table 303 are **relationally linked** using the ProgramID key to **other tables** including:

      the **Requested Table 301** discussed above"

                                                  '178 patent, 17:15-61.

\*\*\*

"At step 219. the selections made by the user at 217 as well as the contents of the usage log recorded at 215 are uploaded to the server as **a requested file (seen at 301** in FIG. 4)."

                                                  '178 patent, 9:50-52.

5

# *The Specification Confirms Schedule Table 307 is a Relational Database File*

"The selections made by and uploaded from the subscriber take the form of a file (sequence) of 32 bit integers, each integer (ProgramID) designating a particular program segment. This file of integers is placed in **a relational database** Requested Table seen at 301 in FIG.4… The Program Segment records in the Programs Table 303 are **relationally linked** using the ProgramID key to **other tables** including:

> …
>
> **Schedule Table 307** which contains the recommended sequence of program segments for the next playback session,"

'178 patent, 17:15-64.

\*\*\*

**"As described in more detail later in connection with FIGS. 4 and 5**, the sequence of program segments to be presented to the user is formed into a **schedule file (seen at 307 in FIG. 4)** consisting of a sequence of program segment identification numbers which are used to compile a sequencing file, called the selections file, illustrated at 351 in FIG. 5, which contains more detailed information about the sequence of events which occur during playback."

'178 patent, 12:9-16.

\*\*\*

**"Schedule Table 307** which contains the **recommended** sequence of program segments for the next playback **session**,"

'178 patent, 17:62-64.

6

# *Defendant Argues Plaintiff's Prosecution History Statements Distinguished 'File' from Raw Data*

According to Defendant:

> "Plaintiff argued in reexamination that the claimed sequencing file "**is not simply a playlist, but rather a file of data**," i.e., not simply a collection of data stored and manipulated as a unit, but a named file that is received and stored by a file management system [and] that **"'file of data' is different from the plurality of program segments"** and that prior art does not disclose "the use of such a received and stored file of data."

> D.I. 159 (Responsive Br.) at 10-11.

7

# *The Quote Defendant Seizes Does Not Characterize the Art But Rather the Patent*

"[The sequencing file] is used to determine, for instance what song is to be played next if the user wishes to skip forward or back or select a specific song. **It is not simply a playlist**, but rather a file of data that the player references when the player is deciding what audio segment to play…"

D.I. 177, Exhibit 3 at 8.

### Plaintiff Never Contested Whether the DAD Playlist Database File Was a File According to the Patent But Rather Contested It Was not Downloaded

**"Plaintiff distinguished a playlist in the form of a collection of audio segments from the claimed sequencing file.** Plaintiff argued that the sequence must be received in the form of a file and it is insufficient to obtain the sequence merely by streaming the program segments in the sequence (as the prior art taught):

**DAD did not send a separate sequencing file to a listener's player…** but instead used a playlist to orchestrate the product of the final broadcast transmitted over the air to potentially thousands of radio listeners none of whom could control the DAD workstation or control the content or timing of the content they listened to. DAD's playlist database file automated the broadcasting operation and broadcast audio content of the broadcaster's choosing and in an order chosen by the broadcaster to the listener's conventional radio receiver, but **the playlist database <u>file</u> was not downloaded…"** D.I. 177, Exhibit 3 at 15.

\*\*\*

"[C]ompressed audio files are stored on the file server and are "streamed" to the workstations on demand. [DAD] **plays back audio cuts directly from a file server**…"

D.I. 177, Exhibit 3 at 13.

# *Defendant Misrepresents Plaintiff's Prosecution History Arguments*

**Plaintiff merely pointed out that the sequencing file is separately claimed from the collection of stored program segments:**

"Claim 1 makes it clear that **the stored "program segments" are different from the "file of data** " which is received and stored and **which establishes a sequence in which the separately claimed program segments are scheduled to be reproduced**. Just as claim 1 makes it clear that the "file of data" is different from the plurality of program segments which that file schedules, it is also clear that Fisch et al. discloses no means for ''**"receiving" such a file of data**."

D.I. 160, Exhibit 9 at 3.

**Not that a database file cannot be a file.**

# The Prior Art Only Downloaded Program Segments

The prior art only downloaded the audio program segments. Plaintiff argued that there is not a separate received sequencing file used in the manner claimed from the collection of audio program segments which are downloaded in the art:

> "Just as claim 1 makes it clear that the "file of data" is different from the plurality of program segments which that file schedules, it is also clear that **Fisch et al. discloses no means for "receiving" such a file of data.**"

> D.I. 160, Exhibit 9 at 3.

**Thus, the issue was not whether a database table could be a file but whether such database file was downloaded apart from the audio program segments.**

11

# SEQUENCING FILE TERMS

# *"Sequencing File" Terms*

| E.D. Tex.'s Construction | PTAB's Construction | Personal Audio's Construction (same as PTAB's) | Defendants' Construction |
|---|---|---|---|
| A file of data that identifies the order in which audio program segments are to be played and that may contain information about the sequence of events that occur during playback. | A file of data that identifies the order in which audio program segments chosen by or for a user are to be played. | A file of data that identifies the order in which audio program segments chosen by or for a user are to be played. | A file that is [1] received by the player, [2] stored, and [3] used by the processor to both control playback of each [4] song in the ordered sequence and respond to control commands. |

13

Defendant seeks to define the naked term "sequencing file" as a "file that is [1] received by the player, [2] stored, and [3] used by the processor to both control playback of each [4] song in the ordered sequence and respond to control commands."

14

The specification however clearly disclose "sequencing files" that do not have these characteristics.

# The Patents Disclose Multiple Sequencing Files Each With a Different Function

- Request Table 301 / Selections File 470

  "The selections [of Selection File 470] made by and uploaded from the subscriber take the **form of a file (sequence)** of 32 bit integers, each integer (ProgramID) designating a particular program segment. This file of integers is placed in a relational database **Requested Table seen at 301** in FIG.4, with each row (record) in the Requested Table being an identification number which specifies a corresponding record (row) in a database table 303 called the Programs Table." '178 patent, 17:15-22.

  "**FIG. 7 shows [a sequence** and an] example of the content of a portion of an illustrative HTML text file indicated generally at 450 used to create an audio file seen at 460 and **a selections file indicated at 470**." '178 patent, 43:60-63.

- Recommended Schedule Table 307

  "As described in more detail later in connection with FIGS. 4 and 5, the **sequence of program segments** to be presented to the user is **formed** into **a schedule file (seen at 307** in FIG. 4)." '178 patent, 12:9-11.

- Selections File 351

  "At the request of the user, the **sequence** of programming defined by the program sequence file (**the selections file illustrated at 351** in FIG. 5) is then reproduced for the listener." '178 patent, 8:63-65.

16

**Sequencing file "Request Table 301" is <span style="color:red">not downloaded</span> but used to compile sequencing file "Recommended Schedule Table 307" on the host server:**

"At step 219, the selections made by the user at 217 as well as the contents of the usage log recorded at 215 are **uploaded to the server as a requested file (seen at 301** in FIG. 4)." '178 Patent, 9:50-52

"The programs, advertising and announcement segments which **are added to the Request Table 301 to form the Schedule Table 307**[.]" '178 Patent, 18:37-39

**Sequencing file "Recommended Schedule Table 307" <span style="color:red">is downloaded</span> to the player:**

"In accordance with the invention, the host server receives and supplements the user's initial selection of a sequence of desired programs … thereby producing **the recommended Schedule Table 307 which is transferred to the subscriber**, along with program segments, **during the download transfer**." '178 Patent, 9:50-52

**"Selections File 351" is <span style="color:red">not downloaded</span> but compiled from "Recommended Schedule Table 307":**

"As described in more detail later in connection with FIGS. 4 and 5, the sequence of program segments to be presented to the user is formed into **a schedule file (seen at 307** in FIG. 4) consisting of a sequence of program segment identification numbers which are **used to compile a sequencing file, called the selections file, illustrated at 351** in FIG.5[.]" '178 Patent,12:9-14

**Sequencing file "Selections File 470" is <span style="color:red">not downloaded</span> but contains user input made on the player and is uploaded to the host:**

"**The selections made by and uploaded from the subscriber [of Selections File 470]** take the form of a file (sequence) of 32 bit integers, each integer (ProgramID) designating a particular program segment." '178 Patent, 17:15-18

17

# Selections File 351 is Scanned by the Player for Playback

"If the user issues a skip command during or shortly after the time when subject announcement is played, the player executes a skip to the next subject, which is accomplished by **scanning the selection file 351** until the next subject Selection Record seen at 360 is located, and then performing a jump by inserting the location of Selection Record 360 into the CurrentPlay register 353, causing the intervening material to be skipped as indicated by the dashed line 362."

'178 patent, 34:26-31.



Fig. 5

18

# Defendant's construction is contrary to the usage in the specification

The patents disclose that the downloaded recommended sequencing file (i.e., Schedule Table 307) containing the initial playback sequence is used to create another sequencing file (i.e., Selection File 351) with additional features added for control:

> "[T]he sequence of program segments to be presented to the user is formed into a **schedule file (seen at 307 in FIG. 4)** consisting of a sequence of program segment identification numbers which **are <u>used to compile</u> a sequencing file, called the selections file, illustrated at 351 in FIG. 5,** which contains more detailed information about the sequence of events which occur during playback."

> '178 Patent, 12:10-16.

19

# Fig. 4 Discloses Request Table 301 and Schedule Table 307 as Being Stored on the Host – Not Selections File 351



# Defendant's construction is contrary to the usage in the specification

- **Nowhere do the patents disclose Selections File 351 as being downloaded.**

- **Nowhere do the patents describe multiple sequencing files downloaded.**

# The Patent Only Discloses a <u>Single</u> Sequencing File is Downloaded and That File is Recommended Schedule Table 307

"The data downloaded includes **a recommended** program sequence file which provisionally identifies the order in which downloaded program segments are to be played, with the initial selection and sequence being established based on user preference data by the download compilation processing mechanism…" '178 patent, 8:48-53.

"[T]he host server receives and supplements the user's initial selection of a sequence of desired programs, first by adding the program selections …and then by adding advertisements, announcements and additional program segments tailored to the subscriber's known preferences as indicated at **340** in FIG. 4, thereby producing **the recommended Schedule Table 307 which is transferred to the subscriber, along with program segments, during the download transfer.**" '178 patent, 18:24-34.

# The Patent Only Discloses a <u>Single</u> Sequencing File is Downloaded and That File is Recommended Schedule Table 307

"Each Compilation record describes the download requirements for a specific day of the week . . . . In this regard, it should be noted that playback and download can occur concurrently, with **the Schedule Table being downloaded first**, the NewCatalog Table being downloaded second, program segments specified in the Schedule Table which have not previously been downloaded being transferred third (in the order of the expected presentation as stated in the Sequence Table), with program segments selected by the subscriber for future sessions being downloaded last as download time permits." '178 patent, 23:47-60.

**"<u>The</u> Schedule 307 downloaded to the player, and the associated programming, announcement and advertising segments** sufficient to provide a complete program sequence…" '178 patent, 27:13-15.

"As described in more detail later in connection with FIGS. 4 and 5, **the** sequence of program segments **to be presented to the user** is formed into **a schedule file (seen at 307 in FIG. 4)** consisting of a sequence of program segment identification numbers which are used to compile a sequencing file, called the selections file, illustrated at **351** in FIG. 5…" '178 patent, 12:9-14.

23

# The Specification Discloses Schedule Table 307 is Downloaded



Fig. 2

"The playback operation itself continues from the designated playback point in the **selections file (seen at 351 in FIG. 5)** which **follows** a **program sequence [schedule table 307]  initially created by the host server and downloaded** with the program segments themselves, and **then** (optionally) **modified** by the addition, deletion and re-sequencing of segment identifiers as discussed earlier in connection with step 211 in FIG. 2." '178 patent, 12:27-49.

\* \* \*

"As described in more detail later in connection with FIGS. 4 and 5, **the sequence of program segments to be presented to the user** is formed into a **schedule file (seen at 307** in FIG. 4) consisting of a sequence of program segment identification numbers which are **used to compile a sequencing file, called the selections file, illustrated at 351** in **FIG. 5**, which contains more detailed information about the sequence of events which occur during playback." '178 patent, 12:9-21.

24

# The Contents of Fig. 5 Having User Inputs From the Player Demonstrates Selections File 351 Was Created on the Player

"**FIG. 5 shows an illustrative sequence of Selection_ Records making up a selection file indicated generally at 351** which illustrates the manner in which the user may navigate the playback session between playback positions designated by the selection file. …If the user issues a skip command during or shortly after the time when subject announcement is played, the player executes a skip to the next subject, which is accomplished by **scanning the selection file 351** until the next subject Selection_Record seen at 360 is located, and then performing a jump…"
'178 patent, 34:15-34.



*See* D.I. 177 (Almeroth Reply Decl.) at §§I(A)-I(D).

25

# The Patents Disclose a Selections File Compiler on the Player That Accepts User Input to be Uploaded to the Server

"A conventional HTML hypertext anchor "<A HREF='target'> full motion video</A>" is processed to produce the three records "A", "B" and "L" at **478** in the selections file which respectively designate the beginning and ending of the anchor text passage and the location of a linked information. The "HREF='target' " portion of the HTML specifies the target location in conventional HTML and that symbolic address is then translated **by the <u>selections file compiler</u> into the location within the selections file of the selections file record** which refers to that target or, for targets in program segments which are not part of the currently scheduled programming defined by the selections file, by a negative number representing the negative of the ProgramID number of the target program segment." '178 patent, 44:53-45:3.

\* \* \*

"The selections made **by and uploaded from the subscriber** take the form of a **file (sequence) of 32 bit integers**, each integer (ProgramID) designating a particular program segment." '178 patent, 17:15-21.

# The Patent Discloses Using HTML Forms

The request sent to the server use HTML forms:

"To establish a new account, a prospective subscriber may use a conventional web browser program, such as Mosaic, Netscape Navigator or Microsoft's Internet Explorer, **which executes in the client CPU 105 to establish a conventional HTTP request/response dialog with server 101**. The account initialization begins with the transmission of an **HTML form** from the web page store 141 **which is completed by the user at the keyboard** (not shown) of the client CPU 105." '178 patent, 10:15-25.

Selections File 470 is disclosed as implemented using HTML forms:

"A conventional **HTML** hypertext anchor "<A HREF="targets full motion videoz/Ac' is processed to produce the three records "A", "B" and "L" at **478** in the **selections file** which respectively designate the beginning and ending of the anchor text passage and the location of a linked information." '178 patent, 44:53-63.

# Selections File 470 is Uploaded to the Server

"The selections made **by and uploaded from the subscriber** take the form of a **file (sequence) of 32 bit integers** (i.e. Selections File 470), each integer (ProgramID) designating a particular program segment." '178 patent, 17:15-19.

The **sequence** and additional **player inputs** are uploaded to the server in the usage log:

"The HTML forms mechanism may also be used to incorporate requests for user input at predetermined times during the playback of program segments... **Standard HTML input tags include a Name attribute which can be used as an identifier for the data entered. As HTML is translated into an equivalent audio file, the tags in the written HTML are** <u>translated into records in the selections file [i.e., 470]</u> **which contain byte location values specifying when the player should pause the playback and accept the user response. The resulting** <u>uploaded usage log file</u> **(containing responses to radio and checkbox input tags)** <u>contains</u> **the response value together with the original byte location** <u>value from the selections file</u> **[470] which serves the tag identifier.**" '178 patent, 45:4-17.

28

# Defendant Argues the Specification Discloses Only One Sequencing File – Selections File 351

PA acknowledges that the Recommended Schedule Table 307 is compiled into "Selections File 351 used during playback" but asserts that compilation occurs on the player, not the server, and that the server instead downloads Table 307 to the player.[5]   (Reply 3.)  PA further asserts that the Selections File 351 is not "described as being downloaded." (*Id.* 2.)  The specification makes clear that PA is wrong:

- "*the selections file (seen at 351 in FIG. 5)* which follows a program sequence initially created by the host server and *downloaded* with the program segments themselves";

- "the recommended order and the identification of the program files making up an individual playback session are stored in a *session schedule file* (to be described in detail in connection with *FIG. 5*) which contains program identifiers of the program segments to be played during an upcoming session. *The player 103 downloads the session schedule file*…"

D.I. 186 (Sur-reply Br.) at 3.

## The Specification Does Not Say Selections File 351 is Downloaded But Rather Says 351 <span style="color:orange">Follows</span> a <u>Sequence</u> That is Downloaded and Edited on the Player

"The playback operation itself continues from the designated playback point in <span style="color:red">the selections file (seen at 351 in FIG. 5) which **follows** a program sequence <u>**initially**</u> created by the host server [i.e., recommended Schedule Table 307] and downloaded with the program segments themselves</span>, and **<u>then</u>** (optionally**) <u>modified by the addition, deletion and re-sequencing of segment identifiers</u>** as discussed earlier in connection with step 211 in FIG. 2." '178 patent, 12:27-40.

Compare:

"As described in more detail later in connection with FIGS. 4 and 5, **<u>the sequence of program segments to be presented to the user</u>** is formed into a **schedule file (seen at 307** in FIG. 4) consisting of a sequence of program segment identification numbers which are **used to <u>compile</u> a sequencing file, called the selections file, illustrated at 351** in **<u>FIG. 5</u>**, which contains more detailed information about the sequence of events which occur during playback." '178 patent, 12:9-21.

30

# The Recommended Schedule File That is Downloaded is 307 Not 351

"By way of example, **the <u>recommended order</u>** and the identification of the program files making up an individual playback session are stored in a **session schedule file** (to be described in detail in connection with **FIG. 5**) which contains program identifiers of the program segments to be played during an upcoming session. **The player 103 downloads the <u>session schedule file</u>** and then issues download requests for those identified program segment files which are not already available in the player's local storage unit 107." '178 patent, 7:13-21.

\*\*\*\*

"**<u>Schedule</u> Table 307** which contains the **<u>recommended sequence</u>** of program segments for the next playback **session**…" '178 patent, 17:62-64.

\*\*\*\*

"**As described in more detail later in connection with <u>FIGS. 4 and 5</u>**, the sequence of program segments to be presented to the user is formed into a **<u>schedule file</u> (seen at 307** in FIG. 4) consisting of a sequence of program segment identification numbers which are used to compile a sequencing file, called the selections file, illustrated at 351 in FIG. 5, which contains more detailed information about the sequence of events which occur during playback." '178 patent, 12:9-21.

31

# The Recommended Schedule File That is Downloaded is 307 Not 351

"Immediately thereafter, the phrase "Television and motion pictures" is identified as a highlighted passage by the tag pair <EM> and </EM> seen in the text 450. These tags are translated into the "H" and "E" record pairs at 475 in the **selections file 470** which identify the beginning and ending of the phrase in the audio file. **As discussed earlier in conjunction with FIG. 5**, the highlight markers in the selections file enable the player to play only the highlighted passages when in the highlight mode. A second "H" and "E" record pair seen at 476 is produced by the HTML text "-EM> bandwidth.</EM>""… '178 patent, 44:47-54.

The Selections File 351 was not downloaded but rather compiled on the player.

# Defendant Relies on the Prosecution History for Its Definition of "Sequencing File"

The primary issue is whether Plaintiff intended to create a definition of the naked term "sequencing file" that can be imported into all sequencing file limitations, including sequencing file limitations of other patents, or whether Plaintiff was merely charactering the explicit limitations of the claims of the '178 patent before the examiner and how these limitations applied to the "sequencing file" of these claims.

**The features of the (1) receipt by the player; (2) storage; and (3) use by a processor for playback and to respond to control commands are elements explicitly provided for by the elements of the claim 14—not by an inherent definition of the term "sequencing file":**

14. An audio program player for automatically playing a collection of audio program files selected by a listener, said player comprising, in combination:

**a memory unit for storing**:…

> **(c) at least one separately stored playback session sequencing file which specifies an ordered sequence of a collection of said plurality of audio program files**,

**a communications port for downloading** at least some of said audio program files and **said playback session sequencing file**…

**an audio playback unit for automatically and continuously reproducing said audio program files** in said collection **in the ordered sequence specified by said playback session sequencing file** in the absence of a control command from said listener, and

a processor for executing one or more utility programs to perform control functions in response to said input commands from a user, said functions including:

> …

> (b) **in response to a second one of said control commands** for discontinuing the reproduction of said currently playing audio program file and instead **continuing the reproduction at the beginning of that audio program file which follows said currently playing audio program file in said ordered sequence** specified by said playback session sequencing file,

> …

> (d) **in response to said third one of said control commands** accepted from said listener at a time when said currently playing audio program file has not yet played for said predetermined amount of time for discontinuing the reproduction of the currently playing program file and instead **continuing the reproduction at the beginning of that audio program file which precedes the currently playing program segment in said ordered sequence specified by said playback session sequencing file**.

35

# '178 Patent, Claim 1

The features of the (1) **receipt by the player**; (2) **storage**; and (3) **use by a processor** to **respond to control commands** are elements **explicitly** provided for by the elements of the **claim 1 —not by an inherent definition** of the term "sequencing file":

1. An audio program player comprising:

**a communications port** for establishing a data communications link **for downloading** a plurality of separate digital compressed audio program files and **a separate sequencing file** from one or more server computers,

**a digital memory unit** coupled to said communications port **for persistently storing** said separate digital compressed audio program files and **said separate sequencing file**, said sequencing file containing data specifying an ordered sequence of a collection of said separate digital compressed audio program files,

an audio output unit including at least one speaker or headset for reproducing said audio program files in audible form perceptible to a listener,

one or more manual controls for accepting commands from said listener, and

**a processor for continuously delivering** a succession of said audio program files in said collection to said audio output unit **in said ordered sequence specified by said sequencing file** in the absence of a program selection command from said listener, and for discontinuing the reproduction of the currently playing audio program file and instead **continuing the reproduction at the beginning of a listener-selected one of said audio program files** in said collection in response to a program selection command from said listener.

36

"For purposes of determining a disclaimer, statements distinguishing the claimed invention over the prior art "**must be read in the context of [the] overall argument distinguishing the claimed method from the method disclosed** [by the prior art.]"

*Lucent Tech., Inc. v. Gateway, Inc.*, 525 F. 3d 1200, 1211-12 (Fed. Cir. 2008)

# Prosecution History

**The '178 patent claims** are thus directed to **combinations** including **downloading** from one or more server computers and persistently **storing** in an audio program player local digital memory unit: (1) a plurality of separate digital compressed audio program files, and **(2) a separate sequencing file, the downloaded locally-stored sequencing file containing data specifying an ordered sequence of a collection** of the downloaded (and thus now locally stored) digital compressed audio program files.

As discussed below, the term "sequencing file" of independent claim 1 and the term "playback session sequencing file" of independent claim 14, when interpreted in light of the '178 patent specification and file history, should be interpreted to mean "a file that is received by the player and used by the processor to both control playback of each song in the ordered sequence and respond to control commands." The claimed sequencing file is received by the player and used by the processor to both control playback of each song in the ordered sequence and respond to control commands. <<Response Br. at 6-7>> [12:16-19; 34:17-23]. The claimed sequencing file established two significant advantages over the state of the art.

D.I. 177, Exhibit 3 (Patent Owner's Response Filed Jan. 14, 2010).

38

# Prosecution History

**E.  The  '178  Specification  Emphasizes  the  <u>Combination</u>  of  <u>Three</u> <u>Claimed Features Discussed Above</u>**

\* \* \* \*

<span style="color:red">The  sequencing  file  "provisionally  identifies  the  order  in  which downloaded program segments are to be played,</span>" << Response Br. at 8>> [8:48-53] and is a file that is downloaded and used to control the playback session and navigation within the playback session.

\* \* \* \*

The '178 specification describes in detail how the exemplary preferred embodiment personal audio player implementation uses the sequencing file's ordered sequence of program segment identifiers. <span style="color:red">Figure 5 shows <u>an example non-limiting preferred embodiment</u></span> sequencing file <span style="color:red">and how  the  personal  audio  player  processor  dynamically  uses  the sequencing file to both control playback of each song in the ordered sequence  and  to  change  selections  in  response  to  listener-inputted control commands</span>.  << Response Br. at 7>>.  For example, the '178 specification beginning at column 34, line 14 describes how the audio player  uses  the  downloaded  sequencing  file  **<u>format</u>**  and  associated player processor to permit the listener to skip forward, backward, etc.

\* \* \* \*

D.I. 177, Exhibit 3 (Patent Owner's Response
Filed Jan. 14, 2010).

# Prosecution History

**F. The '178 Prosecution History Emphasizes <u>The Three Claimed Features In Combination</u>**

The PTO previously found that **in combination with the other claimed** features, downloading from one or more server computers and persistently storing in an audio program player digital memory unit: (1) a plurality of separate digital compressed audio program files, and (2) a separate sequencing file, the downloaded locally-stored sequencing file containing data specifying an ordered sequence of a collection of the downloaded (and thus now locally stored) digital compressed audio program files, distinguished **the claimed combinations** over the prior art. . . .

**All of the claims** set forth an audio program player that downloads and stores a plurality of audio program files and a sequencing file that specifies an ordered sequence of a collection of the stored audio program files. **The claimed player** further includes a communications port for downloading the sequencing file and at least some of the audio program files from one or more server computers.  **The claimed player** continuously reproduces the audio programs in the collection for a listener in the order specified by the sequencing file. . . .

<span style="color:red">The file history makes it unmistakable that the sequencing file is used to respond to control commands like jump, skip, and skip backwards.  The PTO relied on these distinctions in granting the '178 patent:</span> << Response Br. at 7>>

D.I. 177, Exhibit 3 (Patent Owner's Response Filed Jan. 14, 2010).

# Prosecution History

In light of the specification and file history excerpts quoted above, the claim term "sequencing file" (which appears in all '178 patent claims and was <u>not a term of art</u> in 1996) is readily understandable to one of skill in the art as a file that is received by the player, stored, and used by the processor to both control playback of each song in the ordered sequence and respond to control commands. [12:16-19; 12:27-28; 34:17-19]. It is used to determine, for instance, what song is to be played next if the user wishes to skip forward or back or select a specific song. It is not simply a playlist, but rather a file of data that the player references when the player is deciding what audio segment to play in response to the presence or absence of a control command. << Response Br. at 6>> *See Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ("The Patent and Trademark Office ("PTO") determines the <u>scope of claims</u> in patent applications not solely on the basis of the claim language, but upon giving <u>claims</u> their broadest reasonable construction "in light of the specification as it would be interpreted by one of ordinary skill in the art," citing *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359,1364 (Fed. Cir. 2004); MPEP §2111).
****

<u>The '178 claimed audio program player</u> uses a sequencing file that was received from an external server. << Response Br. at 5 n.5>>

D.I. 177, Exhibit 3 (Patent Owner's Response Filed Jan. 14, 2010).

# Prosecution History

**Indeed, the very passage relied upon by the defendants makes explicitly clear that the naked term "sequencing file" is not a term of art that would significantly depart from its the ordinary meaning :**

"In light of the specification and file history excerpts quoted above, **the claim term "sequencing file"** (which appears in all '178 patent claims and **was not a term of art in 1996**) is readily understandable to one of skill in the art as a file that is received by the player, stored, and used by the processor to both control playback of each song in the ordered sequence and respond to control commands. … It is not simply a playlist, but rather a file of data that the player references when the player is deciding what audio segment to play in response to the presence or absence of a control command."

D.I. 177, Exhibit 3 (PA's July 16, 2010 Response) at 8 (emphasis added).

**Since these are "means plus function" limitations, one must look to the specification and the prosecution history to explain the meaning of the claim term.**

42

# Merely distinguishing the art on the recited elements does not support a claim disavowal

**Claim disavowal requires a clear and unmistakable disclaimer:**

The Federal Circuit "indulge[s] a '**heavy presumption**' that claim terms carry their full ordinary and customary meaning, unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution. … [It has] required the alleged disavowing statements to be both **so clear as to show reasonable clarity and deliberateness**, and **so unmistakable as to be unambiguous evidence of disclaimer**. … [F]or prosecution disclaimer to attach, … the alleged disavowing actions or statements made during prosecution [must] be **both clear and unmistakable**."

*Omega Eng'g v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).

# Plaintiff's Statements are Not a General Definition of the Term "Sequencing File"

- The statements do not describe what a "file" is but rather how a file is used.

- Ordinary language does not support use limitations.

- Defendant's general definition is contrary to the specification's use of sequencing files.

- Nor does the prosecution statements explicitly purport to set a definition for the naked term.

- All of the statements can be understood as characterizations of the explicit limitations of the claims at issue before the examiner rather than a proffered definition of the naked term.

**Even if the Court Finds the Remarks Suggested a Definition for the Naked Term "Sequencing File", There is Still No Prosecution Disclaimer to Support Defendant's Proffered Construction**

In *Rambus*, the Federal Circuit reversed the district court's construction of "integrated circuit device" which appended new limitations concerning a registry and circuitry unsupported by the naked term based upon remarks in prosecution. In reversing, the Federal Circuit stated:

"The district court's construction did not merely clarify or construe the actual words of the claim. Without any claim language addressing comparison circuitry or a device identification register, the court's construction reads into the claim two new limitations not required by the claim language.

The district court erred by placing too much emphasis on a single introductory comment in the prosecution history… This incorrect statement in the prosecution history does not govern the meaning of the claims… [T]he imprecise statement in the prosecution history does not limit claim 26. The claim language itself controls the bounds of the claim, **not a facially inaccurate remark during prosecution.**"

*Rambus Inc. v. Infineon Techs*, 318 F.3d 1081, 1090 (Fed. Cir. 2003).

45

# Merely distinguishing the art on the recited elements does not support a claim disavowal

In *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F. 3d 1327, 1332 (Fed. Cir. 2004), the Defendant relied on the following statement from the prosecution history as a disavowal that defined the term "rotating" to require 360 degree rotation:

> "The pivotal movement in Lipman is through a restricted angle and not rotation in the true sense of the word. In this relation, the claims in issue have been amended to **recite rotation through at least 360 degrees** and avoid an incidental disclosure of rotation which could be imputed to Lipman."

46

# Merely distinguishing the art on the recited elements does not support a claim disavowal

The Federal Circuit disagreed:

"We find no clear or express statement by the patentees giving 'rotating' a special meaning. The statements in the prosecution history relied upon by Wal-Mart, **while arguably subject to the interpretation Wal-Mart gives them**, can also be reasonably understood as applying to only those claims that explicitly recite that rotation must be  'through greater than 360 degrees'. [The claim at issue] is not one of those claims … In other words, the patentee's statements about Lipman's inability to rotate through 360 degrees were made to distinguish only those claims that explicitly recite a 360 degree limitation. [The claim at issue] has no such limitation. **These statements therefore do not rise to the level of a clear disavowal of scope with respect to [the claim at issue].**"

*Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F. 3d 1327, 1332-33 (Fed. Cir. 2004).

Thus, arguments made with respect to a term in one context with one set of limitations is not a general statement of prosecution disavowal and cannot be applied in a different context.

47

## Defendant Proffered a Definition of "Sequencing File" Without these Limitations and Invalidated Claims of the Patents

Petition for *Inter Partes* Review of U.S. Patent No. 6,199,076

The BRI of the term "file of data establishing a sequence" is "a file of data that identifies the order in which audio program segments are to be played and that may contain information about the sequence of events that occur during playback." Ex. 1009 at 18-20, which quotes the '076 patent (Ex. 1001) at 8:39-41, 8:54-55, and 12:7-10.

D.I. 177, Exhibit 1 (Google's IPR Petition) at 8.

# BRI Does Not Justify a Differing Construction Because the Standards for Disclaimer are the Same

In an appeal from an IPR under the broadest reasonable interpretation standard, "a disclaimer must be **clear and unmistakable.**" *Arendi S.A.R.L. v. Google LLC,* 882 F.3d 1132, 1135 (Fed. Cir. 2018).

In an appeal from a District Court decision, "[t]o constitute disclaimer, there must be a **clear and unmistakable** disclaimer." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F. 3d 1362, 1366-67 (Fed. Cir. 2012).

49

- None of the statements pertain to "a file establishing a sequence," a term of the '076 patent – not the '178 patent.

- None of the statements say that the sequencing file must be stored in persistent memory or non-volatile memory as urged by Defendant's construction.

## "MEANS RESPONSIVE TO SAID FIRST COMMAND…" – SKIP COMMAND

# *"Means Responsive to Said First Command…"*

| E.D. Tex.'s Construction | PTAB's Construction | Personal Audio's Construction | Defendants' Construction |
|---|---|---|---|
| A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269 and 235 and more fully described at column 15, lines 21 to 25 and column 34, line 28 to column 35, line 48. Specifically, this algorithm includes the following steps:<br><br>(1) scanning forward in the sequencing file to locate the next Selection_Record of the appropriate LocType;<br><br>(2) resetting the CurrentPlay variable to the record number of that Selection_Record ; and<br><br>(3) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record. | A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269 and 235 and more fully described at column 15, lines 21 to 25 and column 34, line 28 to column 35, line 48. Specifically, this algorithm includes the following steps:<br><br>(1) scanning forward in the sequencing file to locate the next Selection_Record of the appropriate LocType;<br><br>(2) resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>(3) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record. | A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269 and 235 and more fully described at column 15, lines 21 to 25 and column 34, line 28 to column 35, line 48. Specifically, this algorithm includes the following steps:<br><br>1. scanning forward in the sequence established by the file [alternatively, scanning forward in a sequencing file] to locate the next Selection_Record of the appropriate LocType;<br><br>2. resetting the CurrentPlay variable to the record number of that  Selection_Record; and<br><br>3. fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record.<br><br>**A LocType is an identifier that indicates a characteristic of a selection record, for example, a playable content selection record.** | A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269 and 235 and described at column 15, lines 21 to 25 and column 34, line 28 to column 35, line 48. Specifically, this algorithm includes the following steps:<br><br>(1) scanning forward in the <span style="color:red">**received sequencing file**</span> to locate the next Selection_Record of the appropriate LocType;<br><br>(2) resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>(3) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record. |

52

# This is a Means Limitation and the Parties Agree That Selections File 351 is Scanned to Locate the Next Selection Record

**This is a Means Limitation and the Parties Agree That Selections File 351 is Scanned to Locate the Next Selection Record**

"If the user issues a skip command during or shortly after the time when subject announcement is played, the player executes a skip to the next subject, which is accomplished by **scanning the selection file 351** until the next subject Selection_Record seen at 360 is located, and then performing a jump…" '178 patent, 34:24-34.



Fig. 5

**The scanned sequencing file "Selections File 351" is not received by the player but rather compiled from "Schedule file 307":**

"As described in more detail later in connection with FIGS. 4 and 5, the sequence of program segments to be presented to the user is formed into **a schedule file** (seen at **307** in FIG. 4) consisting of a sequence of program segment identification numbers **which are used to compile a sequencing file, called the selections file, illustrated at 351** in FIG. 5, which contains more detailed information about the sequence of events which occur during playback. **The player obtains information from the selections file** which identifies the individual program segments to be fetched from mass storage and played for the user, as well as the segment identification information which is recorded in a usage logging file in the manner illustrated in FIG. 3…"

'076 patent, 12:3-15.

54

**Even if Selections File 351 was received by the player, the "received" sequencing file modification should not be read in as a limitation to the corresponding structure.**

- The non-structural preprocessing steps of how and where Selection File 351 was created are completely irrelevant to the performance of the recited functions of "continuously reproducing" and skipping back.

- Nor does the receipt of the sequencing file represent "acts or materials" that are "necessary to perform the claimed function."

- The hypothetical act of downloading file 351 would not be necessary or even correspond to performing the recited functions of the claim.

35 U.S.C. 112 par. 6 requires the claim to cover "structure, material, or acts" that "correspond[]" to the recited function.

The receipt of the sequencing file is not a "act" that corresponds to the skip back or continuous reproduction functions.

## Section 112, Par. 6 Requires the Claim to Cover "Structure, Material, or Acts" that Correspond to the Recited Function

**"Nor does the statute permit incorporation of structure from the written description beyond that necessary to perform the claimed function.** In this case, the district court erred both by incorporating structure beyond that necessary to perform the claimed functions and by incorporating unrecited functional limitations into the claims."

*Micro Chem., Inc. v. Great Plains Chem. Co.,* 194 F.3d 1250, 1257-58 (Fed. Cir. 1999)

The act of receiving the sequencing file is not necessary to perform the recited function.

# "Structural Aspects" That are Not Necessary to the Function are Not Limitations

"The specification clearly identifies the structure performing that function as the skid plate, which is the only embodiment of the "support surface" disclosed in the specification… The specification of the '499 patent elaborates on the details of the preferred skid plate, more particularly defining the structure in ways unrelated to the recited function. **These additional structural aspects are not what the statute contemplates as structure *corresponding* to the recited function.** For example, in the preferred embodiment, the skid plate runs beyond the leading edge and continues down the entire length of the saw blade in order to reduce wobbling of the cutting blade. Additionally, the skid plate of the preferred embodiment is sized such that it helps support the weight of the saw. **<u>These structural aspects are thus not the means by which the saw "supports the surface of the concrete" and accordingly are not to be read as limiting the scope of the means clause</u>**. The corresponding disclosed physical structure is the skid plate, a generally flat hard plate that straddles the leading edge of the cutting blade. The district court's conclusion that the term "support surface" sufficiently identifies the structure is therefore erroneous."

*Chiumatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1308 (Fed. Cir. 1998).

**Likewise, the receipt of the sequencing file is not a structural detail corresponding to the recited function of continuous reproduction or skipping.**

59

**Even if one finds a disclaimer, prosecution history statements pertaining to receipt, storage, and use for playback and response to control commands do not amount to a clear and unmistakable disclaimer as to the "scanning forward in the <u>received</u> sequence established by the file to locate the next Selection_Record of the appropriate LocType" step as proposed by Defendant.**

# *"Means Responsive to Said First Command…"*

- The "scanning forward in the **received** sequencing file to locate the next Selection_Record of the appropriate LocType" is a **particular use** of the sequencing file in a particular algorithmic step of a particular claim limitation.
- **None of the statements made in the prosecution history specify this particular use.**

| Prosecution History Statement | Defendant's Corresponding Structure |
|---|---|
| In light of the specification and file history excerpts quoted above, the claim term "sequencing file" (which appears in all '178 patent claims and was <u>not a term of art</u> in 1996) is readily understandable to one of skill in the art as a file that is **received by the player**, **stored**, and **used by the processor to both control playback of each song in the ordered sequence and respond to control commands**. | 1. scanning forward in the **received** sequencing file to locate the next Selection_Record of the appropriate LocType;<br><br>2. resetting the CurrentPlay variable to the record number of that  Selection_Record; and<br><br>3. fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record. |

**The statements cited by Defendant at best only suggest that there must be a received sequencing file "used by the processor to control playback and to respond to control commands," but do not specify any particular type of "use" (i.e., specific algorithmic step) for that file.**

These statements do not purport to specify that the control algorithms must include the particularized use of "scanning the received file to locate the Selection_Record of the appropriate LocType" in the context required by Defendant's modification.

A processor can "use" the received sequencing file to "control playback and respond to control commands" by referencing the file to obtain the "sequence" used for playback and control commands (i.e., using the data of the sequencing file to control playback and respond to control commands" rather than always scanning the same received file and no other data structure to locate the next Selection_Record of the appropriate LocType.

63

**This is Exactly How the Disclosed Embodiment "Uses" Sequencing File Schedule Table 307, the <u>Only Received and Stored</u> Sequencing File Described in the Specification, to Control Playback and Respond to Commands.**

"As described in more detail later in connection with FIGS. 4 and 5, the sequence of program segments to be presented to the user is formed into **a schedule file (seen at 307** in FIG. 4) consisting of a sequence of program segment identification numbers which are **used to compile a sequencing file, called the selections file, illustrated at 351** in FIG. 5, which contains more detailed information about the sequence of events which occur during playback." '178 patent, 12:9-21.

**The Same Prosecution History Cited by Defendant Contemplates This Type of "Use" Which Does Not Require the Specific Algorithmic Steps Urged by Defendant**

The applicant stated in the reexamination "[t]he '178 specification describes in detail **how** the exemplary preferred embodiment personal audio player implementation **uses** the sequencing file's **ordered sequence** of program segment identifiers to sequence events which occur during playback and to control the playback session and navigation within the playback session… 3:14 et seq. describes how the audio player **uses** the downloaded sequencing file **format** and associated player processor to permit the listener to skip forward, backward, etc." D.I. 177, Exhibit 3 (Patent Owner's Response Filed Jan. 14, 2010) at 8.

"The claims require receiving and downloading a sequencing file to specify a sequence of audio files. The sequencing file must be **used** for playback **by referencing the sequencing information within the file** to determine the order that the audio files are to be played." D.I. 177 (Almeroth Decl.) at ¶42.

65

# *"File Establishing a Sequence"*
## ( '076 Patent, claim 1)

1. A player for reproducing selected audio program segments comprising, in combination:

   means for storing a plurality of program segments, each of said program segments having a beginning and an end,

   means for receiving and storing a file of data **establishing a sequence** in which said program segments are scheduled to be reproduced by said player,

   means for accepting control commands from a user of said player,

   means for continuously reproducing said program segments in the **order established by <u>said sequence</u>** in the absence of a control command,

   means for detecting a first command indicative of a request to skip forward, and

   means responsive to said first command for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which follows said currently playing program in **said sequence**.

## The Received Sequencing File is Used to Control Playback by Providing the Sequence for Playback and Not by Being Continually Scanned

"The playback operation itself continues from the designated playback point in the selections file (seen at 351 in FIG. 5) which follows a program sequence initially created by the host server and downloaded with the program segments themselves, and then (optionally) modified by the addition, deletion and re-sequencing of segment identifiers as discussed earlier in connection with step 211 in FIG. 2." '178 patent, 12:27-33.

"The data downloaded includes a recommended program sequence file which provisionally identifies the order in which downloaded program segments are to be played, with the initial selection and sequence being established based on user preference data by the download compilation processing mechanism seen at 151 at the server." '178 patent, 8:48-53.

**Nor do the statements purport to state that every file that contains a sequence used by the player must satisfy these conditions and foreclose the use of copies of that file during playback, as would be necessary in any real application and understood by one skilled in the art in interpreting the specification and these statements.**

# Defendant Did Not Include a "Received" Sequencing File in Its Constructions Submitted to the PTAB

Defendant submitted this construction to the PTAB:

A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269 and 235 and more fully described at column 15, lines 21 to 25 and column 34, line 28 to column 35, line 48. Specifically, this algorithm includes the following steps:

(1) scanning forward in the sequencing file to locate the next Selection_Record of the appropriate LocType;

(2) resetting the CurrentPlay variable to the record number of that Selection_Record; and

(3) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record.

Ex. 1010 at 28-31, modified by Ex. 1011 at 11-13.

D.I. 177, Exhibit 1 (Google's IPR Petition) at 13-14.

69

# Defendant Relied on a Playlist.Txt of the Prior Art as the Claimed Sequencing File

Defendant argued to the PTAB:

| 1.b | means for receiving and storing a file of data establishing a sequence in which said program segments are scheduled to be reproduced by said player, | The envelope may include a **play list**. **The play list identifies the order in which the audio segments are to be played**. Ex. 1005 at ¶ 0201 ("Normally the Affiliate terminal will play sequences of audio under the control of a play list. Play lists are ordered sequence of audio events" and ¶ 0184 ("Generally… the playback of audio segments from within a program are sequential based on the playlist.") |
|---|---|---|

D.I. 177, Exhibit 1 (Google's IPR Petition) at 30.

The PTAB agreed and relied on the playlist.txt file:

"[A] play list is represented by a directory," and **"[i]n the directory is a file which is always named with the same name as the directory but has the extension 'TXT'. This is an ASCII representation of the play list."**

D.I. 23-1 (Final Written Decision) at 28.

70

# Defendant Relied Upon the FindNext Function to Meet the Skip Forward Command

"The disclosed software code teaches a function **rPlayer:FindNextElement that scans forward in the play list to find the next playable element including advancing the element pointer forward until it finds the first playable object (a track, play list, or cart)** … **A POSITA would have recognized that the application of this code** (using common programming techniques) **for a player to advance to the next song in the playlist, as taught by Chase, to implement the functionality of stopping the reproduction of a currently playing song and beginning playback of the next song in response to a command**, as taught by Chase and Loeb, would have the predictable result of allowing a user to skip to the next song in a list of selected songs."

D.I. 177, Exhibit 1 (Google's IPR Petition) at 41-42.

71

**The FindNext Command Scans the ST Structure to Find the Next Playable Element – Not the Playlist.txt "Sequencing File"**

Defendant's expert testified in the IPR:

THE WITNESS: So this -- the code, the While statement on page 403 cycles through, looks at the next – **next elements in the ST structure until it finds a playable element**. If it doesn't find a playable element; that is, if it goes off to the end of the structure, reaches the end of the structure without finding a playable element, it -- the effect is that it cycles back to the beginning and starts playing at the beginning.

D.I. 177, Exhibit 2 (Walker Deposition Transcript) at 83:18-84:1.

## The Playlist.txt File is Not Scanned But Rather Used to Initialize [i.e., compile] the Scanned ST Structure

Defendant's expert testified in the IPR:

QUESTION: And where is it disclosed what the data in the structure pointed to by ST is?

…

THE WITNESS: **ST is a structure of type TreeNode**, and the particular structure, I think, as I recall, is defined in the file called Nodes.H, **[playlist].txt file is used to initialize the treenode structure that the source code discloses that the playlist.txt file is used to initialize the structure**. That is, one reading the source code would understand that the -- would understand that the source code discloses that the information in the playlist.txt file is used to initialize the structure pointed to by ST. D.I. 177, Exhibit 2 (Walker Deposition Transcript) at 85:16-87:4.

73

**Thus, the Board Invalidated '178 Claim 1 Based on a Prior Art Algorithm that Scanned a TreeNode Structure Created From a .Txt File – Not the .Txt File Itself**

The PTAB stated:

> "Patent Owner argues that Dr. Walker was unable, during his deposition, to identify where in Chase's source code appendix the code reads or uses the sequence of a text file. We have reviewed this testimony and find no such admission. Rather, **Dr. Walker testified that a playlist.txt file is used to initialize a TreeNode data structure [of ST]** but was unable to identify, to Patent Owner's satisfaction, the precise lines of code that did so."

D.I. 23-1 (Final Written Decision) at 32.

In other words, the control algorithms did not directly scan the received sequencing file but rather scanned data structures derived from the received sequencing file.

# BRI Does Not Justify a Differing Construction Because the Standards for Disclaimer are the Same

In an appeal from an IPR under the broadest reasonable interpretation standard, "a disclaimer must be **clear and unmistakable.**" *Arendi S.A.R.L. v. Google LLC,* 882 F.3d 1132, 1135 (Fed. Cir. 2018).

In an appeal from a District Court decision, "[t]o constitute disclaimer, there must be a **clear and unmistakable** disclaimer." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F. 3d 1362, 1366-67 (Fed. Cir. 2012).

# The PTAB's Decision Shows There is No Disclaimer

The fact the PTAB neither construed nor understood the claim as being subject to a disclaimer shows there is no disclaimer:

> The Examiner did not himself construe "bonding" to be limited to soldering, brazing, and adhesive joints. Nor did the Board of Appeal. Therefore, there can be no estoppel effect.

*Lam Research Corp. v. Schunk Semiconductor*, 2014 WL 1364980 at *12 (N.D. Cal. April 7, 2014).

Thus, Defendant successfully invalidated claims of the patents using prior art that did not "scan the received sequencing file."

# "MEANS RESPONSIVE TO A SINGLE ONE OF SAID SECOND COMMANDS…" – SINGLE SKIP BACK

# *"Means Responsive to a Single One of Said Second Commands…"*

| E.D. Tex.'s Construction | PTAB's Construction | Personal Audio's Construction | Defendants' Construction |
|---|---|---|---|
| A general purpose computer programmed to perform the… following steps:<br><br>(1) if the currently playing program segment has played for a predetermined amount of time, resetting the playback position to the beginning of the program segment; and<br><br>(2) playing the program segment from its beginning. | A general purpose computer programmed to perform… following steps:<br><br>(1) if the currently playing program segment has played for a predetermined amount of time, resetting the playback position to the beginning of the program segment; and<br><br>(2) playing the program segment from its beginning. | A general purpose computer programmed to perform the… following steps:<br><br>1. if the currently playing program segment has played for a predetermined amount of time, resetting the playback position to the beginning of the program segment; and<br><br>2. playing the program segment from its beginning.<br><br>**A LocType is an identifier that indicates a characteristic of a selection record, for example, a playable content selection record.** | A general purpose computer programmed to perform the… following steps:<br><br>(1) if the currently playing program segment has played for a predetermined amount of time **after the start time recorded in a usage log file**, resetting the playback position to the beginning of the program segment; and<br><br>(2) playing the program segment from its beginning. |

79

# Defendant Modifies the Construction It Submitted to and Adopted by the PTAB by Inserting the "Start Time Recorded in a Usage Log File"

| PTAB's Construction | Defendants' Construction |
|---|---|
| A general purpose computer programmed to perform… following steps:<br><br>(1) if the currently playing **program segment has played for a predetermined amount** of time, resetting the playback position to the beginning of the program segment; and<br><br>(2) playing the program segment from its beginning. | A general purpose computer programmed to perform the… following steps:<br><br>(1) if the currently playing **program segment has played for a predetermined amount of time** <u>**after the start time recorded in a usage log file**</u>, resetting the playback position to the beginning of the program segment; and<br><br>(2) playing the program segment from its beginning. |

The prior art did not disclose a start time recorded in a usage log.

# *"Means Responsive to a Single One of Said Second Commands"*

**Claim 2:** A player as set forth in claim 1 further comprising means for detecting a second command indicative of a request to skip backward, and **means responsive to a single one of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the <u>beginning</u> of said <u>currently</u> playing program.**

*'076 patent, claim 2*

# *The Following Passage is Identified as Corresponding Structure to the Single Skip Back Command*

"The BACK command indicated at 278 operates like the SKIP command but in the reverse ("rewind') direction… Note that, <span style="color:red">after ***any given segment has played for a predetermined amount of time***, the BACK command should reset the playback to be **beginning** of the **current** segment or topic respectively</span>, allowing the user to start the current segment or topic from the beginning unless the play back point is already near the beginning, in which case the transition is made to the prior segment. The system responds to BACK commands by resetting the playback point to the desired point in the sequence…"

'178 patent, 15:46-53.

82

# Defendant Argues the Usage Log is Necessary Structure

Defendant argues:

"The specification also describes only one algorithm for determining whether the playback point is near the beginning of the currently playing segment:

The system responds **to BACK commands** by resetting the playback point to the desired point in the sequence ***and recording the start time***, volume setting and new program segment ID in the log file as indicated at 267.

…the sole algorithm for determining whether a Skip Back should restart the currently playing segment or transition to the beginning of the prior segment requires determining whether the playback point is near the beginning of the current segment, which can only be done by using the start time in the usage log according to the specification."

D.I. 159 (Responsive Br.) at 20.

83

# Fed. Cir.: *Invensys Systems*

"A structure is corresponding 'only if the specification or prosecution history <u>clearly links</u> or associates that structure to the function recited in the claim.' … Moreover, the focus of the corresponding structure inquiry is <u>not merely whether a structure is capable</u> of performing the recited function, but rather whether the corresponding structure is '<u>clearly linked</u> or associated with the [recited] function.'"

*Invensys Sys., Inc. v. Emerson Elec. Co.*, No. 6:12-CV-799, 2014 WL 3976371, at *3 (E.D. Tex. Aug. 6, 2014) (quoting *Medtronic, Inc. v. Adv. Cardiovascular Sys.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001))

# Step 267 and the Usage Log are not Clearly Linked to the Recited Function

**Nowhere** in the specification is there any disclosure of **using step 267** (recording the start time in a usage log file) to **determine** an amount of time a program segment **has played** for resetting the playback point as required by the claim.

Defendant's statement describes the start time as a separate action from resetting the playback point:

> "The system responds *to BACK commands* **by resetting the playback point** to the desired point in the sequence *and recording the start time*, volume setting and new program segment ID in the log file as indicated at 267."

'178 patent, 15:59-64.

85

# The Usage Log Feature is Only Disclosed for the Accounting and Program Recommendation Features – Not Player Controls

"In accordance with the invention, **each UsageRecord** may also be posted into the Content Providers Table 315 which **maintains royalty payment records for amounts due to content providers. As in the case of Subscriber billing, the processing of UsageRecords allows the embodiment shown in FIG. 4 to provide detailed information to content providers**, identifying the extent each provided program segment was actually performed… **Similarly, advertisers can obtain detailed billing records indicating the precise extent to which advertising was actually presented, and paying only for advertising known to have been effectively delivered."**

'178 patent, 28:41-54.

"A weighting value may be calculated to indicate the extent to which the subscriber's stated interests match a given program or category of programs. **Programs to which high weighting values are assigned are placed in the Schedule Table <u>if the usage log data </u>does not indicate the subscriber has already played that program**, whereas the remaining programs having a weighting value greater than a predetermined threshold are placed in the Catalog Table 308."

'178 patent, 24:46-59.

**The Start Times Recorded at Steps 237 and 267 in the Usage Log Cannot Be Used to Determine the Amount of Time a Program Has Played for Skip Back**

"**As indicated at 237** in FIG. 3, each time a new program segment is started, a new segment handling procedure is executed at 239 [and] the segment id of the newly starting segment is recorded in the log file along with the start time for that segment. **Note that it is unnecessary to record the end time for the prior segment since it is the same value as the start time for the next segment**. When play is concluded, a terminating record indicating the time of turnoff is recorded to enable the duration of the last segment to be calculated."

'178 patent, 13:-21.

Because the start time of the next segment is recorded as the end time of the prior segment, the predetermined time cannot be calculated from the usage log because the end time is not recorded until the next program segment begins. Therefore, the usage log cannot be used to determine the predetermined time.

87

# The Federal Circuit Confirmed the Usage Log is Not Used to Calculate the Time Played

"Google's argument is predicated on the theory that box 267 designates when the timer starts for the 'predetermined amount' of playback. However, the specification does not draw any connection between the "Record Segment End and New Start" function and the playback timer function… The "Record Segment End and New Start" function[] refers to entries made in a log file that records the start time and various other settings; the specification contains nothing to suggest that the period of playback time is based on the time of those entries in the log file, rather than when the playback actually resumes at box 235, 'Continue Playback.'"

*Google LLC v. Personal Audio, LLC*, No. 2017-1162 at *7-8 (Fed. Cir. August 1, 2018).

# *The Federal Circuit Does Not Require that Every Detail Must Be Disclosed*

The Federal Circuit stated:

> "Algorithms in the specification need **only disclose adequate** defining structure to render the bounds of the claim understandable to one of ordinary skill in the art." AllVoice, 504 F. 2d at 1245. **A patentee is __not__ required to disclose** a listing of source code or **a highly detailed description of the algorithm** to be used to achieve the claimed function in order to satisfy 35 USC § 112 ¶ 6."

*Aristocrat Tech. v. Intern. Game,* , 521 F. 3d 1328, 1338 (Fed. Cir. 2008), *see also Finisar Corp. v. DirecTV Group, Inc.*, 523 F. 3d 1323, 1341 (Fed. Cir. 2008)."

# Defendants' Additions Are Improper

It is well established that "it is not necessary to claim in a patent every device required to enable the invention to be used." <u>Hughes Aircraft Co. v. United States</u>, 640 F. 2d 1193, 1197 (Ct. Cl. 1980).

# The Patent Discloses a Visual Indicator That Determines the Elapsed Time

**"The scheduled duration of each program segment may be displayed, along with the elapsed time remaining to be played in the currently playing segment**, to enable the user to more easily determine when to skip the remainder of the currently playing segment."

'178 patent, 12:54-58.

# The Patent Discloses a Visual Indicator That Determines the Elapsed Time

Plaintiff's expert testified:

"[Visual indicators] were common 1996. The algorithm step of determining the amount of time an audio file has played in the PTO's algorithm is well within the normal programming abilities of one skilled in the art and does not need further elaboration, much less a usage log.

Furthermore, in 1996, audio files contained time sequence information within the file itself that could be used for determining the amount of lapsed time."

D.I. 177 (Almeroth Reply Dec.) at ¶69.

91

# *"LocType"*

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| An identifier that indicates a characteristic of a selection record, for example, a playable content selection record. | No construction necessary.<br><br>Alternatively, a single byte character.<br><br>*See* D.I. 186 (Sur-reply Br.) at 12. |

# *What is LocType?*

**LocTypes are identifiers that indicate characteristics of a particular selection record in the sequencing file.**

## '076 patent, col. 31 & 32

```
      type Selection__Record = record
                  LocType: Char;  ←
 5                Location: Integer;
            end;
```

where LocType is a single byte character having the values and meanings shown in the following table:

10

93

# *What is LocType?*

These identifiers indicate a particular characteristic
of the selection record in the sequencing file

### '076 patent, col. 31 & 32

| | LocType | Meaning |
|---|---|---|
| 15 | "S","s" | Subject Announcement |
| | "T","t" | Topic Announcement |
| | "P","p" | Programming content segment |
| | "Q","q" | Advertising segment |
| | "G","g" | Glue (announcement) segment |
| 20 | "H" | Highlight start offset |
| | "E" | Highlight end offset |
| | "A" | Anchor start offset |
| | "M" | Bookmarked anchor start |
| | "B" | Anchor end offset |

94

**The identifier should not be limited to a single byte character.**

# *Defendant Argued in the IPR a LocType is an Identifier for the Next Playable Object*

Defendant relied upon the following teaching of the prior art as identifying the Selection_Record of the appropriate LocType:

> "The disclosed software code teaches a function rPlayer:FindNextElement that scans forward in the play list to find the next playable element including advancing the element pointer forward **until it finds the first playable object (a track, play list, or cart)** and then returns that pointer to the Event function. The Event function then passes to the function SetCurrentElement the returned pointer (tp) to the next segment."

> D.I. 177, Exhibit 1 (IPR Pet.) at 35-37.

The Board agreed that identifying a track, play list, or cart sufficiently discloses identifying playable segments of the appropriate LocType, even if a different variable name is used:

> "[W]e agree with Petitioner that the source code example in Chase of **scanning forward in a play list to find a next playable element is a teaching of scanning forward in a sequencing file to locate a next selection record**. Although Chase's source code does not use the same variable names as the Specification, we are persuaded, on this record, that an ordinarily skilled artisan would have understood Chase to teach the steps of the algorithm…"

> D.I. 147, Exhibit E (Inst. Dec.) at 30.

# *The IPR Prior Art Uses Titles to Determine the Sequence of Playable Songs*

In the IPR prior art, a cart uses a "title" to determine the next playable object to play.

Record:    CART <type><title><start><signal><fadeout>
<type> How the cart is used in this track of the show (e.g., commercial, program).
<title> English title for the cart. A cart file in the play list directory must match this title of the cart to be found.
<start> How the cart is to be started. The options are:
MANUAL - The cart is started either by a Jock Box button press or by the start optical input.
PREV - The cart is started at the end of the previous cart.
MARK1 - The cart is started by the previous cart's mark 1. The end of the previous cart and the start of this cart are mixed.
MARK2 - The cart is started by the previous cart's mark 2. The end of the previous cart and the start of this cart are mixed.
<signal> Specifies the signal that the system should generate. The signal is a pulse on the "signal relay". Valid values for the <signal> field are:
NONE No signal is generated for the cart.
END Generate a signal at the end of the cart.
MARK1 - Generate a signal at the mark 1 location.
MARK2 - Generate a signal at the mark 2 location.
<fadeout> Number of the fade pattern to use at the end of the cart. The fade patterns are to be determined.

Function:    This record defines an element of audio and determines how the audio is to be played in the show.

*See* D.I. 177, Exhibit 1.

97

# *The Prosecution History Shows Identifiers Greater Than a Single Byte as Meeting a Playable Element*

The IPR prior art database record indicates that the relied upon "title" data field is an identifier that is not a single byte character:

Record:        TRACK <title>
               <title> Title associated with the track. This is
               usually something like "Seg 1" but can be as
               imaginative as required.

Function:      Marks the start of a group of elements which
               constitute a track. Note that the system
               automatically calculates the play time for the
               track.

**Title Record is "Seg 1"**

In view of the prosecution history indicating that LocTypes can be identifiers of more than a single byte, Defendant's single byte modification should be rejected.

*See* D.I. 177, Exhibit 1.

98

# *Clearly the Structural Aspect of a Single Byte Character is Not Necessary to the Recited Function*

The Federal Circuit **refused to incorporate details** of the skid plate that it deemed unnecessary to perform the function, explaining:

> "***The specification of the '499 patent elaborates on the details of the preferred skid plate***, more particularly defining the structure in ways unrelated to the recited function. *These additional structural aspects are not what the statute contemplates as structure corresponding to the recited function.* For example, in the preferred embodiment, the skid plate runs beyond the leading edge and continues down the entire length of the saw blade in order to reduce wobbling of the cutting blade. Additionally, the skid plate of the preferred embodiment is sized such that it helps support the weight of the saw. *These structural aspects are thus not the means by which the saw 'supports the surface of the concrete' and accordingly are not to be read as limiting the scope of the means clause.*"

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1308 (Fed. Cir. 1998)

99

# "MEANS RESPONSIVE TO THE DETECTION OF TWO CONSECUTIVE ONES OF SAID SECOND COMMANDS" – DOUBLE SKIP BACK

100

# *"Means Responsive to the Detection of Two Consecutive Ones of Said Second Commands…"*

| E.D. Tex.'s Construction | PTAB's Construction | Personal Audio's Construction | Defendants' Construction |
|---|---|---|---|
| A general purpose computer programmed to perform… following steps:<br><br>(1) in response to a first "Back" command, if the currently playing program segment **has played for a predetermined amount of time**, resetting the playback position to the beginning of the program segment and playing the program segment from its beginning;<br><br>(2) in response to a second "Back" command, if the currently playing program segment **has not yet played for said predetermined amount of time**, scanning backward in the sequencing file to locate the previous Selection_Record of the appropriate LocType;<br><br>(3) resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>(4) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record. | A general purpose computer programmed to perform the… following steps:<br><br>(1) in response to a first "Back" command, if the currently playing program segment **has played for a predetermined amount of time**, resetting the playback position to the beginning of the program segment and playing the program segment from its beginning;<br><br>(2) in response to a second "Back" command, if the currently playing program segment **has not yet played for said predetermined amount of time**, scanning backward in the sequencing file to locate the previous Selection_Record of the appropriate LocType;<br><br>(3) resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>(4) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record. | A general purpose computer programmed to perform the… following steps:<br><br>1. in response to a first 'Back' command, if the currently playing program segment **has played for a predetermined amount of time**, resetting the playback position to the beginning of the program segment and playing the program segment from its beginning;<br><br>2. in response to a second 'Back' command, if the currently playing program segment **has not yet played for said predetermined amount of time**, scanning backward in the sequence established by the file to locate the previous Selection_Record of the appropriate LocType;<br><br>3. resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>4. fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record.<br><br>**A LocType is an identifier that indicates a characteristic of a selection record, for example, a playable content selection record.** | A general purpose computer programmed to perform the… following steps:<br><br>(1) in response to a first "Back" command, if the currently playing program segment **has played for a predetermined amount of time** *after the start time recorded in a usage log file*, resetting the playback position to the beginning of the program segment, and playing the program segment from its beginning;<br><br>(2) in response to a second "Back" command, if the currently playing program segment *is near its beginning*, scanning backward in the *received* sequencing file to locate the previous Selection_Record of the appropriate LocType;<br><br>(3) resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>(4) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record. |

101

# *Defendant Modifies the Construction It submitted to and Adopted by the PTAB by Inserting the "Start Time Recorded in a Usage Log File," "Received," and "Near Its Beginning"*

| PTAB's Construction | Defendants' Construction |
|---|---|
| A general purpose computer programmed to perform the… following steps:<br><br>(1) in response to a first "Back" command, if the currently playing program segment **has played for a predetermined amount of time**, resetting the playback position to the beginning of the program segment and playing the program segment from its beginning;<br><br>(2) in response to a second "Back" command, if the currently playing program segment has not yet played for said predetermined amount of time, scanning backward in the sequencing file to locate the previous Selection_Record of the appropriate LocType;<br><br>(3) resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>(4) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record. | A general purpose computer programmed to perform the… following steps:<br><br>(1) in response to a first "Back" command, if the currently playing program segment **has played for a predetermined amount of time** **after the start time recorded in a usage log file**, resetting the playback position to the beginning of the program segment, and playing the program segment from its beginning;<br><br>(2) in response to a second "Back" command, if the currently playing program segment **is near its beginning**, scanning backward in the **received** sequencing file to locate the previous Selection_Record of the appropriate LocType;<br><br>(3) resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>(4) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record. |

# Defendant's "Near Its Beginning" Construction is Erroneous

- It removes the "predetermined amount of time" the "currently playing audio program file has played" from the corresponding structure.

- It erroneously implies that the predetermined amount of time must be short.

- **Defendant seeks a broader construction here than it did in the IPR. The District Court *Phillips* standard however does not allow a broader construction than the <u>broadest</u> reasonable standard.**

# The E.D. Tex. and the PTO Identified the Following as Corresponding to the Recited Function

"The BACK command indicated at 278 operates like the SKIP command but in the reverse ("rewind') direction.... Note that, after any given segment has played for a predetermined amount of time, the BACK command should reset the playback to be beginning of the current segment or topic respectively, allowing the user to start the current segment or topic from the beginning unless the play back point is already near the beginning, in which case the transition is made to the prior segment. The system responds to BACK commands by resetting the playback point to the 60 desired point in the sequence..."



'178 patent, 15:47-59; D.I. 144, Exhibit C (Claim Construction Order) at 5.

104

## There is No Justification for Removing a "Predetermined Amount of Time" the "Audio Program File Has Played" From the Corresponding Structure

"The BACK command indicated at 278 operates like the SKIP command but in the reverse ("rewind') direction. Similarly, the BACK command may be subdivided into two commands, a BACK SEGMENT and a BACK SUBJECT command, which respectively reset the playback point to the beginning of the prior segment or the beginning of the prior subject description. **Note that, after any given segment has played for a predetermined amount of time, the BACK command should reset the playback to be beginning of the current segment or topic respectively, allowing the user to start the current segment or topic from the beginning unless the play back point is already near the beginning, in which case the transition is made to the prior segment.** The system responds to BACK commands by resetting the playback point to the desired point in the sequence…"

'178 patent, 15:47:63.

# Defendant Argues "Near the Beginning" Should Replace a "Predetermined Time" Because It is Found in the Only Disclosed Embodiment

The passage's reference to "near the beginning" does not mean the time interval is short. Rather, the passage set forth two intervals involving a predetermined time (an interval between the beginning of the audio segment and the predetermined time and an interval after the predetermined time to the end of the program segment:



D.I. 177 (Almeroth Reply Dec.) at ¶61.

106

# Both the E.D. Tex. and the PTAB Construed the Double Skip Back Function as the Following Algorithm

(1) in response to a first "Back" command, if the currently playing program segment has played for a predetermined amount of time, resetting the playback position to the beginning of the program segment and playing the program segment from its beginning;

(2) in response to a second "Back" command, if the currently playing program segment **<u>has not yet played for said predetermined amount of time</u>**, scanning backward in the sequencing file to locate the previous Selection_Record of the appropriate LocType;

(3) resetting the CurrentPlay variable to the record number of that Selection_Record; and

(4) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record.

D.I. 144, Exhibit C at 5; D.I. 147, Exhibit H at 12-13.

# The Federal Circuit Confirmed This Understanding of the Eastern District and the PTAB

"If the current program has played for at least a predetermined period of time, the "back" command will cause the system to reset to the beginning of the currently playing program. **If the current program has not played for a predetermined amount of time, the "back" command will cause the system to begin playback of the immediately preceding segment in the playlist. For example**, if the predetermined time is set at three seconds, and track 5 has been playing for three seconds or less, a "back" command would begin playback of track 4; if track 5 has been playing for more than three seconds, a "back" command would restart track 5."

*Google LLC v. Personal Audio, LLC*, No. 2017-1162 at *3 (Fed. Cir. August 1, 2018).

## *"Means Responsive to the Detection of Two Consecutive Ones of Said Second Commands"*

The recited function of '178 patent, claim 14, is "in response to said third one of said control commands accepted from said listener at a time when said currently playing audio program file **has not yet played for said predetermined amount of time** for discontinuing the reproduction of the currently playing program file and instead continuing the reproduction at the beginning of that audio program file **which precedes the currently playing program segment** in said ordered sequence specified by said playback session sequencing file.."

Both Defendant and the PTAB identified this function as being met by the same disclosure as '076 patent, claim 3.

## *"Means Responsive to the Detection of Two Consecutive Ones of Said Second Commands"*

One skilled in the art would understand that the hypothetical disclosure of a setting the "predetermined time" for a short period "near the beginning" relied upon by Defendant is **merely an illustrative example of one setting**. The specification states that there is a control mechanism that can skip program segments at "any time":

> "As contemplated by the invention, the player subsystem includes a control mechanism… More specifically, the player may advantageously incorporate means for skipping the remaining content of any program being played *at any time*…"

'178 patent, 2:59-65.

# *"Means Responsive to the Detection of Two Consecutive Ones of Said Second Commands"*

**The specification in other parts also discusses skipping back while the segment is playing at any point that the segment is playing:**

> "If the player issues a Back command **during the playing** of a programming segment, the player returns to the beginning of the prior subdivision (if any) or the prior topic announcement for the current program segment, thus enabling the user to easily "replay" a current segment from the beginning if desired."

'178 patent, 35: 1-7.

**The specification further indicates that the "predetermine time" could be set to be coextensive with the portion of a program segment that has been designated as a subject subdivision:**

> "When the user issues a SKIP or BACK command while the player is playing a subject or topic announcement, the player skips the entire subject or topic being announced and moves to the next subject or topic announcement respectively, automatically bypassing the intervening program segments which comprise the skipped subject or topic."

'178 patent, 16:4-10.

110

# Unnecessary Structure Is Not Corresponding Structure

In *Micro Chemical,* the specification disclosed a system that "sequentially and cumulatively weigh the microingredients" and discussed the disadvantages of a system that weighed separately.

Construing "weighing means": "[t]he district court ... limited the 'weighing means' elements [to structures and equivalents] which sequentially and cumulatively weigh the microingredients."

The Federal Circuit reversed:

"The district court erroneously restricted the functions of these means-plus-function elements. Although the district court initially identified 'weighing' as the recited function, it then proceeded to limit that function to 'sequential and cumulative weighing'. ... The claim, however, does not limit the function of the 'weighing means' to cumulative weighing. Rather, the claim language identified the function of the 'weighing means' in each claim as simply weighing the microingredients."

*Micro Chem., Inc. v. Great Plains Chem. Co.,* 194 F.3d 1250, 1257-58 (Fed. Cir. 1999)

111

# "MEANS FOR CONTINUOUSLY REPRODUCING"

# *"Means for Continuously Reproducing…"*

| E.D. Tex.'s Construction | PTAB's Construction | Personal Audio's Construction | Defendants' Construction |
|---|---|---|---|
| A sound card … [and a processor programming to perform an algorithm having] the following steps:<br><br>(1) beginning playback with the program segment identified by the ProgramID contained in the Selection_Record specified by the CurrentPlay variable;<br><br>(2) when the currently playing program segment concludes, incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the ProgramID contained in the next Selection_Record in the sequencing file;<br><br>(3) repeating step (2) until the last Selection_Record in the sequencing file is reached, which resets the CurrentPlay variable to "1" to begin the playing sequence again with the first Selection_Record in the sequencing file. | A sound card … [and a processor programming to perform an algorithm having] the following steps:<br><br>(1) beginning playback with the program segment identified by the ProgramID contained in the Selection_Record specified by the CurrentPlay variable;<br><br>(2) when the currently playing program segment concludes, incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the ProgramID contained in the next Selection_Record in the sequencing file;<br><br>(3) repeating step (2) until the last Selection_Record in the sequencing file is reached, which resets the CurrentPlay variable to "1" to begin the playing sequence again with the first Selection_Record in the sequencing file. | A sound card … [and a processor programming to perform an algorithm having] the following steps:<br><br>1. beginning playback with the program segment identified by the ProgramID contained in the Selection_Record specified by the CurrentPlay variable;<br><br>2. when the currently playing program segment concludes, incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the ProgramID contained in the next Selection_Record in the sequencing file;<br><br>3. repeating step (2) **until a command is issued or that the sequence is completed**. | A sound card … [and a processor programming to perform an algorithm having] the following steps:<br><br>(1) beginning playback with the program segment identified by the ProgramID contained in the Selection_Record specified by the CurrentPlay variable;<br><br>(2) when the currently playing program segment concludes,<br><br>**(a) if the concluded segment is a topic or subject announcement, incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the ProgramID contained in the next Selection_Record in the received sequencing file, and (b) if the concluded segment is a program segment,**<br><br>**(i) scanning forward in the received sequencing file to locate the next Selection_Record containing the appropriate LocType;**<br><br>**(ii) resetting the CurrentPlay variable to the record number of that Selection_Record; and**<br><br>**(iii) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record;**<br><br>(3) repeating step (2) **until a rewind Selection_Record (LocType: R) in the received sequencing file is reached, which resets the CurrentPlay variable to the location value contained in the rewind Selection_Record which is set to "1" to begin the playing sequence again with the first Selection_Record in the received sequencing file.** |

113

# *"Means for Continuously Reproducing"*

'076 claim 1 requires:

> 1. A player for reproducing selected audio program segments comprising, in combination:
>
> …
>
> **means for <u>continuously reproducing</u> said program segments <u>in the order established by said sequence</u> in the absence of a control command**,

This function has two requirements:

**(1)  "continuously reproducing"**

**(2)  "in the order established by said sequence"**

114

The parties dispute whether this claim limitation requires the sequence to be repeated in a loop:

- Defendant seeks to introduce a requirement for the Rewind "R" LocType

- E.D. Tex.'s prior construction requires the CurrentPlay variable to create a loop

# *"Continuously Reproducing" is a Term of Art*

The term "continuously reproducing" is a term of art that does not require a loop, but merely requires playing successive tracks without the need to issue a play command for each track.

# *"Continuously Reproducing" is a Term of Art*

"Continuously reproducing" is a term of art which SoundCloud defines as playing the next track or playlist at the conclusion of the currently playing track or playlist:

## Continuous play

Once your track or playlist finishes, you'll continue your listening experience with the next track or playlist on your Stream or profile. If you are listening to a track or playlist on their individual page, a recommended track will start playing afterwards.

D.I. 147, Exhibit N.

117

# *"Continuously Reproducing" is a Term of Art*

"Continuously reproducing" is a term of art that only requires playing without interruption and does not require or imply an endless loop:

Apple's Final Cut Pro X plays clips without interruption using the "Continuous Playback" feature:

> ■ Play clips in the browser without interruption: Choose View > Browser > Continuous Playback.
>
> When this setting is chosen, all event clips play without interruption (rather than stopping at the end of each clip).

**not a loop**

D.I. 147, Exhibit O.

Final Cut Pro X includes separate "looping" functionality that plays in a continuous loop:

> Play back media in a loop
> You can turn on looping so that a project or a clip (or any portion of either) plays in a continuous loop.
>
> 1. To enable looping, choose View > Playback > Loop Playback (or press Command-L).
>
> 2. Do any of the following:
>
> ■ Loop your entire project: Click the timeline to make it active, then press the Space bar.
>
> ■ Loop a clip in the browser: Select the clip, then press the Space bar.
>
> ■ Loop a portion of a clip or project: Select a range in a browser clip or the timeline (or select a timeline clip), then choose View > Playback > Selection, or press the Slash (/) key.

 **loop**

D.I. 147, Exhibit O.

The use of "Continuous Playback" and "Loop" separately confirm the different meanings for these terms.

118

# *"Continuously Reproducing" is a Term of Art*

Similarly, the Hitachi DZMV350E video camera describes continuous playback without looping. At the end of continuous playback, the "recorder will enter the playback pause mode" – confirming "continuous playback" alone does not loop:

### SLIDE SHOW (CONTINUOUS PLAYBACK OF STILLS)

If you play back stills recorded on a card, the DVD video camera/recorder will enter the playback pause status after each still is played back.
Setting Slide Show allows you to continuously play back stills.

**1** Press the DISC NAVIGATION button.

**2** Press the MENU button.

**3** Choose "Slide Show", "All" or "DPOF", and then press the ▶/Ⅱ button.



All:    To play all stills recorded on card in slide show.

DPOF:   To play only stills to which DPOF has been set in slide show.

**Note:**
• With slide show, playback starts from the first still on card.
• If you press the ☐ button or turn the DVD video camera/recorder off, Slide Show will be canceled.

Pressing the ▶/Ⅱ button will start slide show.
When playback is finished, the DVD video camera/recorder will enter the playback pause status at the final still.
Pressing the ☐ button will restore the Disc Navigation screen.



D.I. 147, Exhibit P.

# *"Continuously Reproducing" is a Term of Art*

"Means for continuously reproducing" is an element of '076, claim 1. Looping is claimed separately by '076 claim 4 which depends from claim 1:

> 1. A player for reproducing selected audio program segments comprising, in combination:
>
> …
>
> **means for continuously reproducing said program segments in the order established by said sequence in the absence of a control command**,
>
> …
>
> 4.  A player as set forth in claim **1** wherein **said sequence** established by said data **forms an endless circular sequence of program segments**.

120

# *"Means for Continuously Reproducing"*

Defendant's construction requires a loop using the "R" LocType:

**(3) repeating step (2) <u>until <span style="color:red">a rewind Selection_Record (LocType: R)</span> in the received sequencing file is reached, which resets the CurrentPlay variable to the location value contained in the rewind Selection_Record which is set to "1" to begin the playing sequence again with the first Selection_Record in the received sequencing file</u>.**

# The E.D. Tex. Previously Identified the Correct Structure For the "Continuously Reproducing" Claim Term

The E.D. Tex.'s Previous Order identified Fig. 3 (along with the associated text) as well as the disclosure on col. 34 ln. 28-47 as **sufficient** to perform the recited function and **clearly linked** to perform the recited function.

D.I. 147, Exhibit C (JMOL Order) at 11.

**The identified disclosure contains no mention of LocType R or a loop.**



# *"Means for Continuously Reproducing"*

Defendant argues the "R" LocType is required by the sequencing file embodiment disclosed by Fig. 5:



**Fig. 5**

123

## *"Means for Continuously Reproducing"*

The Patent states that the particular configuration of Fig. 5 is only "illustrative":

> "FIG. 5 shows an **illustrative sequence** of Selection_Records making up a selection file indicated generally at 351 which illustrates the manner in which the user may navigate the playback session between playback positions designated by the selection file…"

'178 patent, 34:15-19.

124

# *"Means for Continuously Reproducing"*

Fig. 5 however is merely one disclosed embodiment of a sequencing file. Fig. 7 discloses another sequencing file embodiment which does not use the "R" LocType:



# Defendant's Sur Reply Brief Misquotes the Patent

The portion language refers to a portion of the text file – not a portion of the selections file:

> "Narrative text to be presented in the interactive, multimedia format made possible by the present invention may be advantageously expressed in the first instance using essentially conventional hypertext markup language, HTML. FIG 7 shows an example of the content of a **portion of an illustrative HTML text file** indicated generally at 450 used to create an audio file seen at 460 and a **selections file** indicated at 470."

> *Compare* D.I. 186 (Sur-reply Br.) at 8 *with* '178 patent, 43:57-63.

Figure 7 is described as depicting a sequencing file:

> "FIG. 7 is an information structure diagram illustrating the manner in which a narrative text file expressed in hypertext markup language (HTML) may be translated in to the combination of an audio speech file, a text file transcript, and **a sequencing file used by the player** to create a multimedia presentation."

> '178 patent, 4:27-32.

126

# "R" LocType from "means responsive" is unnecessary to the claimed function

**Corresponding structure must be strictly construed to exclude those elements that are not necessary to perform the claimed function**:

"§ 112, ¶ 6 … does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim. **Nor does the statute permit incorporation of structure from the written description beyond that necessary to perform the claimed function.**"

*Micro Chem., Inc. v. Great Plains Chem. Co.,* 194 F.3d 1250, 1257-58 (Fed.Cir.1999)

127

# "R" LocType is Unnecessary Structure

The Federal Circuit **refused to incorporate details** of the skid plate that it deemed unnecessary to perform the function, explaining:

> "***The specification of the '499 patent elaborates on the details of the preferred skid plate***, more particularly defining the structure in ways unrelated to the recited function. *These additional structural aspects are not what the statute contemplates as structure corresponding to the recited function.* For example, in the preferred embodiment, the skid plate runs beyond the leading edge and continues down the entire length of the saw blade in order to reduce wobbling of the cutting blade. Additionally, the skid plate of the preferred embodiment is sized such that it helps support the weight of the saw. *These structural aspects are thus not the means by which the saw 'supports the surface of the concrete' and accordingly are not to be read as limiting the scope of the means clause.*"

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1308 (Fed. Cir. 1998)

128

# *"Means for Continuously Reproducing"*

**Defendant's logic does not continuously reproduce the program segments "in the order established by said sequence":**



LocType "R"

**Fig. 5**

129

# *"Means for Continuously Reproducing"*

Defendant's proposed corresponding structure attempts to import the subject and topic skipping functionalities disclosed by the patents:

(2) when the currently playing program segment concludes,

**(a) if the concluded segment is a topic or subject announcement, incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the ProgramID contained in the next Selection_Record in the received sequencing file, and**

# *"Means for Continuously Reproducing"*

Defendant's proposed corresponding structure inserts scanning the received sequencing file:

(2) when the currently playing program segment concludes, …

**(b) if the concluded segment is a program segment,**

**(i) scanning forward in the received sequencing file to locate the next Selection_Record containing the appropriate LocType;** 

**(ii) resetting the CurrentPlay variable to the record number of that Selection_Record; and**

**(iii) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record;**

# Fed. Cir.: *Invensys Systems*

"A structure is corresponding 'only if the specification or prosecution history <u>clearly links</u> or associates that structure to the function recited in the claim.' … Moreover, the focus of the corresponding structure inquiry is <u>not merely whether a structure is capable</u> of performing the recited function, but rather whether the corresponding structure is '<u>clearly linked</u> or associated with the [recited] function.'"

*Invensys Sys., Inc. v. Emerson Elec. Co.*, No. 6:12-CV-799, 2014 WL 3976371, at *3 (E.D. Tex. Aug. 6, 2014) (quoting *Medtronic, Inc. v. Adv. Cardiovascular Sys.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001))

# Defendants' Additions Are Improper

Notably, **the algorithm proposed by Defendant is not disclosed anywhere** in the specification. Rather, the Defendant has inserted implementation details and logic that it believes is necessary to make the algorithm work properly according to Defendant's failed interpretation.

# Defendants' Additions Are Improper

Fig. 3 and col. 34 ln. 28-47 clearly linked to the recited function makes no mention of the topic "T", subject "S", or any other LocTypes.

Since the specification does not **clearly link** the LocTypes to the recited "means for continuously reproducing…" it is not corresponding structure regardless of defendants' argument that such details would be necessary for the device to work.

134

# *"Means for Continuously Reproducing"*

**Nowhere** in the diagrams or steps associated with Fig. 3 is there **any mention of topic or subject partitions.**



135

# *"Means for Continuously Reproducing"*

**Nowhere** in Fig. 3 is there any mention of logic for **scanning forward for the appropriate LocType.**



# The Specification Describing the Algorithm Makes No Mention of Topic, Subject, or Even Searching for an Appropriate LocType

"As indicated at 237 in FIG. 3, each time a new program segment is started, **a new segment handling procedure is executed at 239**... the next program segment in the sequence is played..."

'178 patent, 13:6-14.



Fig. 3

137

# *The Federal Circuit Does Not Require that Every Detail Must Be Disclosed*

The Federal Circuit stated:

> "Algorithms in the specification need **only disclose adequate** defining structure to render the bounds of the claim understandable to one of ordinary skill in the art." AllVoice, 504 F. 2d at 1245. **A patentee is <u>not</u> required to disclose** a listing of source code or **a highly detailed description of the algorithm** to be used to achieve the claimed function in order to satisfy 35 USC § 112 ¶ 6."

*Aristocrat Tech. v. Intern. Game,* , 521 F. 3d 1328, 1338 (Fed. Cir. 2008), *see also Finisar Corp. v. DirecTV Group, Inc.*, 523 F. 3d 1323, 1341 (Fed. Cir. 2008)."

# Defendants' Additions Are Improper

It is well established that "it is not necessary to claim in a patent  every device required to enable the invention to be used." <u>Hughes Aircraft Co. v. United States</u>, 640 F. 2d 1193, 1197 (Ct. Cl. 1980).

# LocTypes "S", "T", and "R" Do Not Perform the Recited Function

**The topic and skip partitions are explicitly disclosed as being used to dynamically alter the playback sequence, not to play the program segments "in the order established by said sequence":**

"As contemplated by the invention, the player subsystem includes a control mechanism responsive to commands received from a listener to **dynamically alter the sequence** and content of the programming material **actually presented**. More specifically, the player may advantageously incorporate means for skipping the remaining content of any program being played at any time, or returning to the beginning of a particular subject to replay its content. Each given program segment is preferably preceded by a **topic description** segment, and the program skipping mechanism is the player is preferably adapted to automatically skip to the next topic description, bypassing the intervening program content, whenever a skip command is receive when a topic description is being played."

'178 patent, 2:59-3:5.

140

# Defendants' Additions Are Improper

The Patents disclose topic and subject skipping is an optional feature:

> "The third command, the SKIP command indicated at 275 in Fig. 3, causes the player to advance to the beginning of the next program segment in the program sequence... **If the program segement[sic] has been subdivided** (e.g. into paragraphs), the SKIP command causes the player to skip forward to beginning of the next subdivision within that segment. **If desired, SKIP commands may be subdivided into two types, a SKIP TOPIC command and a SKIP SUBJECT command."**

'178 patent, 15:25-34.

141

**This is particularly the case when the patent specification states the particular format of the LocType is merely preferable.**



"The programs which reside in the program database 303 seen in FIG. 4 are **preferably formatted** in accordance with a standard structure **to facilitate 'skimming' the sequence of program segments defined by the selections file 351, and to make it possible to perform jumps** to different predetermined locations in the program sequence."

'076 patent, 29:9-14

142

# LocType Is Unnecessary

If, as the specification acknowledges, the selection file only consists of an ordered list of program segments (i.e., not subdivided with all LocTypes) then none of defendants' inoperability arguments are valid.

The disclosed algorithm works fine.

# LocType Is Unnecessary

Identifying the next playable program segment in the sequence could be implemented by using a ProgramID or LocType P to designate a playable object.

There is no need for logic for LocTypes "R", "S", or "T" or other LocTypes at all.

144

# LocType Is Unnecessary

Defendant relied upon the following teaching of the prior art as identifying the next playable program segment:

"The disclosed software code teaches a function rPlayer:FindNextElement that scans forward in the play list to find the next playable element including advancing the element pointer forward **until it finds the first playable object (a track, play list, or cart)** and then returns that pointer to the Event function. The Event function then passes to the function SetCurrentElement the returned pointer (tp) to the next segment."

D.I. 177, Exhibit 1 (Google's IPR Petition) at 41-42.

The Board agreed that identifying a track, play list, or cart sufficiently discloses identifying playable segments, even if a different variable name is used:

"[W]e agree with Petitioner that the source code example in Chase of **scanning forward in a play list to find a next playable element is a teaching of scanning forward in a sequencing file to locate a next selection record**. Although Chase's source code does not use the same variable names as the Specification, we are persuaded, on this record, that an ordinarily skilled artisan would have understood Chase to teach the steps of the algorithm…"

D.I. 147, Exhibit E (Inst. Dec.) at 30.

145

# Defendant Relied Upon a Construction that Did Not Include the "R", "S", or "T" LocTypes to Invalidate Claims in the IPR

## Defendant submitted this construction to the PTAB:

A sound card that includes a digital to analog converter; headphones or one or more speakers; and a general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 233, 235, 237, 239, and 261 and more fully described at column 12, line 16 to column 13, line 11 and column 34, line 28 to column 35, line 44.

Specifically, this algorithm includes the following steps:

> (1) beginning playback with the program segment identified by the ProgramID contained in the Selection_Record specified by the CurrentPlay variable;
>
> (2) when the currently playing program segment concludes, incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the ProgramID contained in the next Selection_Record in the sequencing file;
>
> (3) repeating step (2) until the last Selection_Record in the sequencing file is reached, which resets the CurrentPlay variable to "1" to begin the playing sequence again with the first Selection_Record in the sequencing file.

Ex. 1012 at 66-67. *See also,* Ex. 1010 at 16-22, modified by Ex. 1011 at 11-12.

D.I. 177, Exhibit 1 (Google's IPR Petition) at 11-12.

146

# Nor Did the Prior Art that Invalidated '076 Claim 1 Make Any Mention of "R", "S", or "T" LocTypes

Defendant argued to the PTAB:

| 1.d | means for continuously reproducing said program segments in the order established by said sequence in the absence of a control command, | Chase discloses software code that continuously plays the segments in the play list based on the order in the play list and meets the construed 112 6 structure of this limitation… **Chase discloses that when an audio segment completes playing, the next segment plays. [The] Event function finds the next element to play using the FindNextElement** function and passes the parameter FORWARD to the FindNextElement function. **This causes the FindNextElement function to return the next audio segment on the list… When at the end of the list, the FindNextElement function is not able to find the next element. Accordingly, the FindNextElement function returns null to the Event method.** The null return is detected by the Event method [and] instead the pointer [is reset to the start location]. |

D.I. 177, Exhibit 1 (Google's IPR Petition) at 41-42.

147

# Defendant Argues LocTypes are not Program Segments



Fig. 5

Defendants argue **the 'H', 'A', and 'L' LocTypes do not correspond to program segments** and therefore the algorithm must skip over these LocTypes when a Selection_Record of that LocType is encountered in the Selections File:

As shown in the Fig. 5 fragments reproduced below, these highlights, hyperlinks, and rewind records do not reference an audio program file or contain a ProgramID of any such file and thus cannot be used for 'fetching and playing the audio program file identified by the ProgramID contained in the next Selection_Record' as required by the structure.

148

# Defendants Have Improperly Concluded "H" is Not a Program Segment

## H is clearly a program segment:

| LocType | Meaning |
|---------|---------|
| "S", "s" | Subject Announcement |
| "T", "t" | Topic Announcement |
| "P", "p" | Programming content segment |
| "Q", "q" | Advertising segment |
| "G", "g" | Glue (announcement) segment |
| "H" | Highlight start offset |
| "E" | Highlight end offset |
| "A" | Anchor start offset |
| "M" | Bookmarked anchor start |
| "B" | Anchor end offset |
| "L" | Linked segment |
| "R" | Rewind to identified location |
| "I" | Image identification |
| "J" | Image display start offset |
| "K" | Image display end offset |
| "C" | Accept comment |
| "V" | Accept value designation |
| "X" | Accept list termination |
| "Y" | Accept "Yes"/"No" |

As seen in the table, highlight passages are specified by two Selection_Records, an "H" marking the beginning and an "E" record marking the end of the highlight passage… **In the "play highlights" mode, the player scans the selections file** and plays the **program segments** for each subject and topic announcements **but plays only those portions of an identified program segment which are specified as highlight passages or as anchor passages for hyperlinks**.

149

# "PROCESSOR FOR… DISCONTINUING" – GO COMMAND

# 'Go' Command

| E.D. Tex.'s Construction | PTAB's Construction | Personal Audio's Construction | Defendants' Construction |
|---|---|---|---|
| A general purpose computer programmed to perform… the following steps:<br><br>(1) resetting the CurrentPlay variable to the record number of the listener-selected Selection_Record; and<br><br>(2) fetching and playing the audio program file identified by the ProgramID contained in the new Selection_Record. | A general purpose computer programmed to perform… the following steps:<br><br>(1) resetting the CurrentPlay variable to the record number of the listener-selected Selection_Record; and<br><br>(2) fetching and playing the audio program file identified by the ProgramID contained in the new Selection_Record. | A general purpose computer programmed to perform… the following steps:<br><br>1. resetting the CurrentPlay variable to the record number of the listener-selected Selection_Record; and<br><br>2. fetching and playing the audio program file identified by the ProgramID contained in the new Selection_Record. | A general purpose computer programmed to perform… the following steps:<br><br>**(1) identifying the listener-selected Selection_Record identified by the offset within the "L" Selection_Record of the hyperlink passage in the received sequencing file;**<br><br>(2) resetting the CurrentPlay variable to the record number of the listener-selected Selection_Record; and<br><br>(3) fetching and playing the audio program file identified by the ProgramID contained in the new Selection_Record. |

151

# *'Go' Command*

Defendant's construction inserts the additional step of identifying an "L" Selection_Record within the received sequencing file:

**(1) identifying the listener-selected Selection_Record identified by the offset within the <span style="color:red">"L" Selection_Record</span> of the hyperlink passage in the received sequencing file;**

# Defendant's Relied Upon Alternative Embodiment of the 'Go' Command Does Not Perform the Recited Function

'178 claim 1 requires:

> 1. An audio program player comprising:
>
> …
>
> **a processor for continuously delivering a succession of said audio program files in said collection to said audio output unit in said ordered sequence specified by said sequencing file in the absence of a program selection command from said listener, and for <u>discontinuing the reproduction</u> of the currently playing audio program file and instead continuing the reproduction at the beginning of a <u>listener-selected one</u> of said audio program files in said collection in response to a <u>program selection command from said listener</u>.**

The recited function is (1) **"discontinuing" the current playing file in response to a command** and (2) **reproducing a listener-selected program file in response to a <u>program selection command</u> from the listener**.

153

# 'Go' Command

'178 claim 14 requires:

14. An audio program player for automatically playing a collection of audio program files selected by a listener, said player comprising, in combination:

…

**a processor for** executing one or more utility programs to perform control functions in response to said input commands from a user, said functions including:

(a) **in response to a first one of said input commands** <u>**designating a selected audio program file described on said visual menu listing**</u> **for causing said audio playback unit to** <u>discontinue the reproduction</u> **of the currently playing audio program file in said ordered sequence and to instead** continue the reproduction at the beginning of said selected audio program file…

The recited function is (1) "discontinue" the current playing file in response to a command and (2) continue a program file displayed <u>on a visual menu</u> in response to a command designating the displayed program.

154

# 'Go' Command

Steps 269, 235, and 265 of Fig. 3 meet the requirement of the function and describe the programming for advancing to a listener selected program segment:



155

# *'Go' Command*

**The recited function requires in response to a command:**

1) **discontinuing the currently playing program segment**

2) **reproducing a listener selected program segment in response to a program selection command from the listener**

### *Defendant's Proposal Improperly Reads in a Limitation Not Necessary to Perform the Claimed Function of Reproducing a Listener Selected Audio Program*

The E.D. Tex. found the following disclosure as corresponding to the 'Go' command. There is no mention of "linked passages" or a selection record "L" in this passage:

"A first command, "Go" indicated at 265, causes the player to make an **immediate shift** to a different program segment. **For example, the spoken voice command "FIVE" can indicate a request to go to a predetermined numbered program segment [i.e., segment number 5]** while the spoken command "NEWS" could switch to the subject announcement segment for news programs. Alternatively, a mouse click on a **screen-displayed menu of items, or a push-button on a hand controller** connected by an infrared link to the player computer, could similarly be processed as a command to go to a predetermined program segment associated with that command signal. **In such cases, the system records the start of the new segment on the log file (seen at 215 in FIG. 2) at 267 and switches the current playback position in the program sequence file 214 to the new setting at 269, and the playback continues at 235**."

D.I. 147, Exhibit C (MSJ Order) at 10; '076 Patent, 14:20-34.

157

**Defendant's Proposal Improperly Reads in a Limitation Not Necessary to Perform the Claimed Function of Reproducing a Listener Selected Audio Program**

The specification discloses an embodiment of the "Go" command simply as receiving the identification of the segment from the listener using a "menu" on a visible display or a "hand controller" and then playing that segment (as indicated at step 265 of Fig. 3):

"In a player implemented by a personal computer provided with a screen display, the current playback position may be advantageously indicated by displaying the program segment topic descriptions in a scrolling listing, with the description of the program currently being displayed being highlighted. The scheduled duration of each program segment may be displayed, along with the elapsed time remaining to be played in the currently playing segment, to enable the user to more easily determine when to **skip** the **remainder of the currently playing segment**. **When such a concurrent visual display is available, means may also be included <span style="color:red">to respond to the users selection of a given program on the scrollable listing</span> by means of a mouse or the like, and then automatically continue the play at the beginning of the program segment thus selected."**

'076 patent, 12:43-57.

158

*Defendant's Proposal Improperly Reads in a Limitation Not Necessary to Perform the Claimed Function of Reproducing a Listener Selected Audio Program*

The display step 265 identified by the E.D. of Tex. as corresponding structure similarly does not mention linked passages or the "L" Selection_Record:

> **"Alternatively, a mouse click on a screen-displayed menu of items, or a push-button on a hand controller connected by an infrared link to the player computer, could similarly be processed as a command to go to a predetermined program segment associated with that command signal**. In such cases, the system records the start of the new segment on the log file (seen at 215 in FIG. 2) at 267 and switches the current playback position in the program sequence file 214 to the new setting at 269, and the playback continues at 235."

'076 patent, 14:26-34.

159

# *'Go' Command*

Defendant argues the phrase "whenever the user issues 'Go' command, (seen at 265 in Fig. 3), the player will execute a hyperlink jump to the location indicated by the last 'L' record" indicates that a L Selection_Record is required for all "Go" commands:

> "Hyperlinks are implemented by means of anchor passage identifiers, the **'A' and "B" Selection records** which respectively identify the anchor passage, and a "L" link identifier which holds the location of a subject, topic or highlight Selection Record.
>
> The **'A' and "B"** selection records enable the player to add an audio cue (such as a **tone, low-level chime**, or the like) to the beginning, end, or during any passage in any program selection. **Whenever the user issues a "Go' command (seen at 265 in FIG. 3), the player will execute a hyper link jump to the location indicated by the last "L' record in the selection file.**
>
> When the jump is made, the location in the "L" record is inserted into the CurrentPlay register 353 after the previous contents of the CurrentPlay register are saved in (pushed into) a zero-based stack 390 at the stack cell location specified by the contents of a StackPtr register 392, which is then incremented. Whenever the listener issues a "Return' command, the previously pushed selection file record location is popped from the stack 390 and returned to the CurrentPlay register 353, and the StackPtr register 392 is decremented. A "Return' command issued when StackPtr-Zero (indicating an empty stack) produces no effect."

'076 patent, 35:54-36:8.

160

## The "L" Selection_Record is Disclosed as Used With an Alternative Hyperlink "Go" Voice Command That Causes the Player to Follow a Hyperlink in the Sequence

"In the preferred arrangement, described in more detail in conjunction with FIG. 5 of the drawings, the program being played may contain passages which relate to other program segments in the compilation. **These passages may be indicated by direct announcement.** Such as: "Say Go' when any of the following automotive companies are named to obtain additional information: . . . Ford . . . General Motors . . . Chrysler... Honda...' **Alternatively, an audible cue signal, such a distinctive tone or chime, might immediately precede a passage which anchors a link to another program segment**. Players equipped with Stereo audio output capabilities can make cues distinctive by playing cued announcements in one Stereo channel, with or without a Supplemental cue signal in the other channel. **When a cue signal indicates a hyperlink passage, a simple "Go' voice command causes the player to reset to a new location from which playing continues until a "Return" command, seen at 266, causes the player to return to the original sequence.**"

'076 patent, 14:35-52.

161

# *'Go' Command*

**The recited function of the claimed "Go" command requires in response to a command:**

1) **discontinuing the currently playing program segment**

2) **reproducing a listener selected program segment in response to a program selection command from the listener**

### *Defendant's Relied Upon Alternative Embodiment of the 'Go' Command Does Not Perform the Recited Function and is Not Corresponding Structure*

Defendant's relied upon fetching passage refers to issuing a "Go" command in response to a voice prompt. The fetching of hyperlinks only discusses jumping to a predetermined linked passage denoted by a L Selection_Record in the sequencing file and <u>**not**</u> a "listener-selected program audio file in response to a program selection command" as explicitly required:

> "Hyperlinks are implemented by means of anchor passage identifiers, the 'A' and "B" Selection records which respectively identify the anchor passage, and a "L" link identifier which holds the location of a subject, topic or highlight Selection Record. **The 'A' and "B" selection records enable the player to add <u>an audio cue (such as a tone, low-level chime,</u> or the like) to the beginning, end, or during any passage in any program selection.** **Whenever the user issues a <u>'Go'</u> command (seen at 265 in FIG. 3), the player will execute a hyperlink jump to the location indicated by the <u>last 'L' record in the selection file</u>.**"

'076 patent, 35:54-64.

163

## *Defendant's Relied Upon Alternative Embodiment of the 'Go' Command Does Not Perform the Recited Function and is Not Corresponding Structure*

Further, the fetching quote occurs when the player advances to a selection record "A" or "B" in the sequencing file and a voice prompt is made, which **means that playback of the previous selection record has completed** and therefore, there is **no "discontinuing"** of a currently playing audio file when the "Go" command was issued, as required by the explicit function:

> "Hyperlinks are implemented by means of anchor passage identifiers, the 'A' and "B" Selection records which respectively identify the anchor passage, and a "L" link identifier which holds the location of a subject, topic or highlight Selection Record. **The 'A' and "B" selection records enable the player to add <u>an audio cue (such as a tone, low-level chime,</u> or the like) to the beginning, end, or during any passage in any program selection.** <span style="color:red">**Whenever the user issues a "Go' command (seen at 265 in FIG. 3), the player will execute a hyperlink jump to the location indicated by the last "L' record in the selection file."**</span>

'076 patent, 35:54-64.

164

### *Defendant's Proposal Improperly Reads in a Limitation Not Necessary to Perform the Claimed Function of Reproducing a Listener Selected Audio Program*

Defendant's passage is not directed to "Go" commands issued on the visual menu. "Go" commands using the visual menu respond to the "user" selection of an item on the menu using a visual display—not a LocType "A" in the sequencing file:

> "When such a concurrent visual display is available, means may also be included to **respond to the users selection** of a **given program on the scrollable listing** by means of a mouse or the like, and then automatically continue the play at the beginning of the program segment thus selected…"
>
> '076 patent, 12:53-57.

Thus, Defendant's passage is not directed to all 'Go' commands.

## *Defendant's Proposal Improperly Reads in a Limitation Not Necessary to Perform the Claimed Function of Reproducing a Listener Selected Audio Program*

Rather, this passage specifically discloses the player accepts a segment identification from the user and sets the playback position to the start of the new segment:

> "A first command, "Go" indicated at 265, causes the player to make an **immediate shift** to a different program segment. **For example, the spoken voice command "FIVE" can indicate a request to go to a predetermined numbered program segment [i.e., segment number 5]** while the spoken command "NEWS" could switch to the subject announcement segment for news programs… **In such cases, the system records the start of the new segment on the log file (seen at 215 in FIG. 2) at 267 and switches the current playback position in the program sequence file 214 to the new setting at 269, and the playback continues at 235**."

'076 patent, 14:20-34.

166

# The "L" LocType is Not Necessary to Perform the Claimed Function

**Corresponding structure must be strictly construed to exclude those elements that are not necessary to perform the claimed function**:

"§ 112, ¶ 6 … does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim. **Nor does the statute permit incorporation of structure from the written description beyond that necessary to perform the claimed function.**"

*Micro Chem., Inc. v. Great Plains Chem. Co.,* 194 F.3d 1250, 1257-58 (Fed.Cir.1999)

167

# Defendant's Construction Submitted to the PTO Did Not Have the "L" Selection_Record

Defendant submitted this construction to the PTAB:

A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269 and 235 and more fully described at column 14, lines 25 to 26; column 14, lines 35 to 39; and column 34, line 19 to column 35, line 52. Specifically, this algorithm includes the following steps: (1) resetting the CurrentPlay variable to the record number of the listener-selected Selection_Record; and (2) fetching and playing the audio program file identified by the ProgramID contained in the new Selection_Record.

Ex. 1015 at 74. *See also*, Ex. 1013 at 44-46, modified by Ex. 1014 at 17-18.

D.I. 147, Exhibit F (Institution Decision) at 13.

168

# Nor Did the Prior Art that Invalidated Claims Teach the "L" Selection_Record

Defendant argued to the PTAB:

| 1.f | and for discontinuing the reproduction of the currently playing audio program file and instead continuing the reproduction at the beginning of the listener-selected one of said program files in said collection in response to a program selection command from said listener, | Chase discloses that the affiliate terminal's remote control terminal allows a user to **override the normal sequence of the audio segments by selecting audio programs out of sequence**… Out of an abundance of caution concerning the claim term "listener," Loeb teaches a personalized music system that has **a user interface for allowing a listener to control playback of songs including skipping through a list of selected songs**... **A POSITA would understand Loeb to teach that when the button to step forward through the list of selected songs is selected while a song is currently playing, the currently playing song is stopped and the next song on the list is played. The disclosed software code teaches a function rPlayer:FindNextElement that scans through in the play list to find the next playable element, including advancing the element pointer until it finds the first playable object (a track, play list, or cart) and then returns that pointer to the Event function...** A POSITA would have recognized that the application of this code (using common programming techniques) for a player to advance to the next song in the playlist, as taught by Chase, to implement the functionality of stopping the reproduction of a currently playing song and beginning playback of a listener-selected song (e.g., next song) in response to a command… |
|-----|---|---|

D.I. 147, Exhibit F (Institution Decision) at 11.

169

**The Claim Chart Submitted by Defendant in the IPR Relies on a Teaching of Advancing to the Next Program Segment and Does Not Allege the Prior Art Teaches the "L" Selection_Record**

| 1.f | and for discontinuing the reproduction of the currently playing audio program file and instead continuing the reproduction at the beginning of a listener-selected one of said audio program files in said collection in response to a program selection | The function of discontinuing the reproduction of a currently playing song and instead beginning playback of a listener-selected song was well known at the time of the alleged invention. For example, Personal Audio admitted that: "[i]t is to be understood that applicant does not claim that all of the functions set forth in the dependent claims are patentable *per se*. Plainly, for example, conventional CD players allow the user to skip forward to the beginning of the next track on the disk or to skip backward to proceeding tracks…" Ex. 1005 at 52 (emphasis added). |
|---|---|---|

| Claim | Claim Language | |
|---|---|---|
| | command from said listener. | Chase discloses that the affiliate terminal's remote control terminal allows a user to override the normal sequence of the audio segments by selecting audio programs out of sequence. Ex. 1007 at ¶ 0184. Control keys on the remote control terminal enable the user to select a desired program from within the play list. Ex. 1007 at ¶ 0185.  The affiliate terminal includes sensor inputs that monitor for play back requests including a request "that the DAC 52 start play of the next segment queued in the DAC 52, stop play of the current segment, fast forward/rewind through the current segment or to a next/previous segment." Ex. 1007 at ¶ 0186.  Out of an abundance of caution concerning the claim term "listener," Loeb teaches a personalized music system that has a user interface for |

| Claim | Claim Language | |
|---|---|---|
| | | allowing a listener to control playback of songs including skipping through a list of selected songs. Ex. 1011 at pg. 6 (lower right column); Fig. 3; pg. 7: ("The… interface contains buttons for controlling the playing of songs. These buttons allow the listener to step backward and forward through the list of selected songs…") and pg. 9: ("…[users] provided more implicit (skipping or replaying songs) than explicit feedback"). Figure 3 illustrates an interface that shows the song currently playing ("Aint Misbehavin – Louis Armstrong"), the previous song ("Elmers Tune – Benny Goodman"), and the next song in the list ("Gotta Give – Ella Fitzgerald"), and a button to step forward through the list of selected songs. A POSITA would understand Loeb to teach that when the button to step |

| Claim | Claim Language | |
|---|---|---|
| | | forward through the list of selected songs is selected while a song is currently playing, the currently playing song is stopped and the next song on the list is played. For instance, if the button to step forward is selected while the song "Aint Misbehavin – Louis Armstrong" is playing, that song will stop playing and the next song on the list ("Gotta Give – Ella Fitzgerald") will begin playing. |

# Defendant's Proposal Improperly Reads in a Limitation Not Necessary to Perform the Claimed Function of Reproducing a Listener Selected Audio Program

Defendant argues:

> "[T]he specification states: "**The hyperlink capability described above may be used to implement a program menu of the type described earlier in connection with FIG 3**." What is "described earlier in connection with FIG 3," is that "the playback session begins with the presentation of an audio (and/or displayed) menu which allows the user to jump to any program segment within that sequence . . ." In other words, not only does the specification state that the algorithm cited by Google is used "[w]henever the user issues a "Go" command", but – contrary to PA's assertions – it also explicitly states that the algorithm is used in the context of jumping to a user selected file on a visual menu display." D.I. 186 (Sur-reply Br.) at 11.

The full quote confirms the program menu is a **spoken** menu that prompts users to skip to a particular subject or topic– not the visual menu that enables users to select a particular program segment as required by the recited function:

> "**The hyperlink capability described above may be used to implement a program menu of the type described earlier in connection with FIG. 3.** A menu program segment may be included in the program compilation which includes **a series of spoken descriptions of subjects or topics, each description being the anchor portion of a hyperlink to the corresponding subject or topic**." '178 patent, 35:64-36:3.

**The spoken menu still does not meet the recited function because it does not discontinue the currently playing program segment.**

# "MEANS FOR DETECTING"

# *"Means For Detecting"*

| E.D. Tex.'s Construction | PTAB's Construction | Personal Audio's Construction (same as PTAB's) | Defendants' Construction |
|---|---|---|---|
| A general purpose computer programmed to perform the… following steps:<br><br>(1) determining whether input from the means for accepting control commands is a command using an "if-then-else" programming construct; and<br><br>(2) if the input is a command, using a "branch" programming construct to select one of the player's available commands, which include a "Skip" command, for execution. | A general purpose computer programmed to perform the… following steps:<br><br>(1) determining whether input from the means for accepting control commands is a command using a **_conditional_** programming construct; and<br><br>(2) if the input is a command, using a "branch" programming construct to select one of the player's available commands, which include a "Skip" command, for execution. | A general purpose computer programmed to perform the… following steps:<br><br>1. determining whether input from the means for accepting control commands is a command using a **_conditional_** programming construct; and<br><br>2. if the input is a command, using a "branch" programming construct to select one of the player's available commands, which include a "Skip" command, for execution. | A general purpose computer programmed to perform the… following steps:<br><br>(1) determining whether input from the means for accepting control commands is a command using a "if-then-else" programming construct; and<br><br>(2) if the input is a command, using a "branch" programming construct to select one of the player's available commands, which include a "Skip" command, for execution. |

173

# "means for detecting a first command indicative of a request to skip forward" ('076 patent, claim 1)

## *Identification of corresponding structure*

"As indicated at 261, the receipt of a command… may interrupt the playback of the current selection… the character of the command is evaluated at 262 to select one of six different types of functions."
'076 patent, 13:52-55

"The third command, the SKIP command indicated at 275 in FIG. 3, causes the player to advance to the beginning of the next program segment in the program sequence…"
'076 patent, 15:21-23



Fig. 3

174

# "means for detecting a first command indicative of a request to skip forward" ('076 patent, claim 1)

## *Identification of corresponding structure*

### *"Conditional" in place of "if-then-else"*

According to the E.D. Tex.'s prior claim constructions, "In Figure 3, box 261 is a diamond shape containing the text ''Command?'' and both a "Yes" and a "No" arrow leading away from the box. In the field of computer science, this type of drawing indicates an "*if-then-else*" programming construct."

D.I. 147 (Almeroth Dec.) at ¶¶106-109; Exhibit C at 3.



175

# "means for detecting a first command indicative of a request to skip forward" ('076 patent, claim 1)

## *Identification of corresponding structure*

### *"Conditional" is more appropriate than "if-then-else" because:*

"Conditional" is an inclusive term that does not limit the structure to any specific programming language.

The depiction in Figure 3 of a "Command" box 261 and both a "Yes" and a "No" arrow leading away from the box can be implemented via any number of computer programming languages, using slight variations on the "if-then-else" construct lo achieve a similar result, such as "when-then-else."



# "means for detecting a first command indicative of a request to skip forward" ('076 patent, claim 1)

## *Identification of corresponding structure*

### *"Conditional" is more appropriate than "if-then-else" because:*

Contemporaneous dictionaries support use of the term "Conditional."

Microsoft Press Computer Dictionary, 3rd. Ed. ( 1997) defines "conditional" as "of, pertaining to, or characteristic of an action or operation that takes place based on whether or not a certain condition is true." D.I. 147, Exhibit K.

Dictionary of Computer and Internet Terms, 5th. Ed. (1996) defines "conditional" as ''an instruction that causes the computer to jump to another location in the program only if a specified condition is true." D.I. 147, Exhibit J.



177

# "means for detecting a first command indicative of a request to skip forward" ('076 patent, claim 1)

## *Identification of corresponding structure*

### *"Conditional" is more appropriate than "if-then-else" because:*

The PTAB determined this modification was appropriate:

"Patent Owner argues that an "'if then-else' programming construct" is unduly narrow, and limited to particular programming languages. Prelim. Instead, Patent Owner argues, "'conditional' programming construct" is consistent with box 261 of figure 3 (shown as a diamond) and would encompass analogous operators, such as "when/then/else," occurring in other programming languages. *Petitioner has not pointed to persuasive evidence in the Specification that box 261 is limited to particular programming constructs appearing in specific programming languages. Moreover, although the District Court showed that it was known to represent an "if-then-else" construct using a diamond-shaped box, we are not persuaded… that such a graphical representation excludes analogous constructs from other programming languages. **Accordingly [we] replace "if-then-else" with "conditional"…"**

D.I. 147, Exhibit E (Inst. Dec.) at 22-23.

178

# "COMMUNICATIONS PORT"

# *"Communications Port"*

| E.D. Tex.'s Construction | PTAB's Construction | Personal Audio's Construction (same as PTAB's) | Defendants' Construction |
|---|---|---|---|
| "a port for establishing a connection between the player and a network." **Downloading:** "transferring a plurality of separate digital compressed audio program files and a separate sequencing file from the memory of one or more separate computers to the memory of the player upon a request by the player." "transferring at least some of said audio program files and said playback session sequencing file from the memory of one or more separate computers to the memory of the player upon a request by the player." | n/a | **Communication Port** "a port for establishing a connection between a player and a network" **Downloading** "transferring a file from a remote computer to the requesting computer by means of a modem or network" "transferring a plurality of separate digital compressed audio program files and a separate sequencing file one or more remote server computers via a modem or network to the player upon a request by the player." | **"communications port":** A port for establishing a connection between the player and a network. **"downloading":** '178 patent claims 1-13 Transferring digital compressed audio program files and a separate sequencing file from one or more separate computers to the player over a network upon a request by the player <span style="color:red">**identifying said digital compressed audio program files and said separate sequencing file**</span>. '178 patent claims 14-21, 28, 29 Transferring at least some of said audio program files and said playback session sequencing file from one or more separate computers to the player over a network upon a request by the player <span style="color:red">**identifying said digital compressed audio program files and said playback session sequencing file**</span>. |

180

# "communications port…" ('178 patent, claims 1 and 14)

Defendant modifies the E.D. Tex.'s construction of download by requiring that it *must identify the files to be transferred*.

| E.D. Tex.'s Construction | Defendants' Construction |
|---|---|
| "transferring a plurality of separate digital compressed audio program files and a separate sequencing file from the memory of one or more separate computers to the memory of the player upon a request by the player."<br><br>"transferring at least some of said audio program files and said playback session sequencing file from the memory of one or more separate computers to the memory of the player upon a request by the player." | "transferring digital compressed audio program files and a separate sequencing file from one or more separate computers to the player over a network upon a request by the player **identifying said digital compressed audio program files and said separate sequencing file**."<br><br>"transferring at least some of said audio program files and said playback session sequencing file from the memory of one or more separate computers to the memory of the player over a network upon a request by the player **identifying said digital compressed audio program files and said playback session sequencing file**." |

181

# "communications port…" ('178 patent, claims 1 and 14)

Defendants seeks to arbitrarily limit "downloading" to requiring that "***a request*** by the player to transfer files ***must identify the files to be transferred***."

This limitation is outside the plain and ordinary usage of the term "download."  For example, in ordinary experience, one can simply press a button to initiate a download without identifying or even knowing the files one will receive (for example, Microsoft updates).



# "communications port…" ('178 patent, claims 1 and 14)

The requirement that "a request by the player to transfer files must identify the files to be transferred" is not part of the technical definitions provided by either party.

**Download**: "to transfer a copy of a file from a remote computer to the requesting computer by means of a modem or network."
D.I. 147, Exhibit K (Microsoft Press Computer Dictionary, 3rd Ed. (1997)).

**Download**: "to transfer a copy of a program, file, or other information from a remote database or other computer to the user's own terminal over a communications line."
D.I. 147, Exhibit L (Computer Dictionary (4th Ed.) by Charles Sippl (1986)).

**Download:** "to transfer some collection of data from a computer memory to another storage location"
Di. 147, Exhibit I (IEEE Stand. Dictionary of Electrical Terms, 6th Ed. (1997)).

183

# "communications port…" ('178 patent, claims 1 and 14)

Defendants rely upon this statement in the specification for their construction:

> "The download file or files containing programming and advertising segments as well as subscriber specific data are **designated by filenames provided by the requesting client/player** 103 and moved from storage unit 145 utilizing the FTP server 125 and the Internet connection into local storage at 107 in the client/player 103."  '076 patent, 8:29-34.

It is impermissible to incorporate limitations from the specification that are not in the claim language.  *See Superguide Corp. v. DirecTV Enterprises, Inc.,* 358 F.3d 870, 875 (Fed. Cir. 2004).

This statement merely says that the player provides names for the files and does not state that the ***download request*** must identify files by names provided by the player, as required by defendant's construction.

# "communications port…" ('178 patent, claims 1 and 14)

*The specification also discloses the program files may be identified by the host server and not by the player:*

> "As indicated at 203, an interested subscriber invokes programming services by first supplying personal information and initial programming preferences … Based on the information supplied by the user, **the server then compiles one or more files for downloading** to the subscriber at step 207 **which include programming** and advertising segments **as well as additional data and utility programs** needed by the player 103 to begin operation."

'076 patent, 8:29-34.

Defendant's proposed construction would exclude the explicitly disclosed embodiment where the server identifies the files to be downloaded. See *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004) (holding "a claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct").

# "communications port…" ('178 patent, claims 1 and 14)

Indeed, if the user does not provide selections, the host will prepare schedule table 307 of the "recommended program sequence file" without a specific selection request by the subscriber:

> "Indeed, if the subscriber provides no selections at all, the host will prepare a Schedule Table 307 containing program segment selected **entirely by the host** on the subscriber's behalf."
>
> '076 patent, 18:34-37 (using other types of preference data (e.g., music category)).

Identification of programs by the player is merely "preferable":

> "The selection of files to download is **preferably** made by the player which issues FTP download requests from the server by specifying the URLs of the needed files."
>
> '178 patent, 19:12-15.

# "[AUDIO PROGRAM] PLAYER"

# "[Audio Program] Player"

| E.D. Tex.'s Construction | PTAB's Construction | Personal Audio's Construction (same as PTAB's) | Defendants' Construction |
|---|---|---|---|
| A device that reproduces sound from digital audio content. | n/a | A device **or program** that reproduces sound including from digital audio content. | Plain and ordinary meaning. |

The specification discloses:

> To facilitate use of the system in an automobile, a "player" computer may [use systems that are] **small and can be easily incorporated into portable computers of the type which may be used in a car or on public transportation**. Alternatively, the files downloaded from the host may be stored on a replaceable media, such as an optical disk cartridge, which may then be inserted into **a portable computer or simplified player for mobile use**.

188

# "[SELECTED] AUDIO PROGRAM SEGMENTS"

# *"[Selected] Audio Program Segments"*

| E.D. Tex.'s Construction | PTAB's Construction | Personal Audio's Construction (same as PTAB's) | Defendants' Construction |
|---|---|---|---|
| Audio program segments that have been **chosen by or for a user**. | Audio program segments that have been **chosen by or for a user**. | Audio program segments that have been **chosen by or for a user**.<br><br>Preamble is limiting. | Plain and ordinary meaning.<br><br>Preamble is not limiting. |

**Defendant seeks a broader construction here than it did in the IPR. The District Court *Phillips* standard however does not allow a broader construction than the <u>broadest</u> reasonable standard.**

190

# *"Selected Audio Program Segments"* ('076 patent, claim 1)

The specification describes ***interactive selection*** of programs (*e.g.* music) from a ***program library*** as a key feature of the invention.

FIELD OF THE INVENTION

This invention relates to electronic information distribution systems and more particularly to a system for dynamically and interactively selecting and playing particular programs from a program library.

'076 patent, 1:6-9

It is accordingly an object of the present invention to provide easy access to rich selection of audio programming and to allow the listener to dynamically and interactively locate and select desired programming from the available collection in an easy and institutive way…

'076 patent, 1:64-2:3

# *"Selected Audio Program Segments"* ('076 patent, claim 1)

## The specification fully supports this position:

"Download processing… extracts from the library 130 data defining compressed program, advertising, and glue segments, and/or associated text program data, *based on selections and preferences made by (or inferred for) the user…*" ('076 patent, 6:62-66)

"The data downloaded includes a recommended program sequence file which provisionally identifies the order in which downloaded program segments are to be played, with *the initial selection and sequence being established based on user preference data* by the download compilation processing mechanism seen at 151 at the server." ('076 patent, 8:39-44)

"At the conclusion of a session*, subscriber is given the opportunity at 217 to select programming* which should be included in the next programming download." ('076 patent, 9:31-33)

# Selected Audio Program Segments Must be Read in Light of the Numerous Patent Statements Describing User Selection

"Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question… **In the face of the many statements in the written description that <u>define "the invention"</u> as employing a coaxial lumen structure… the three SciMed patents make clear that the lumens referred to in the claims are all coaxial in structure [and] the district court was correct to construe the patents as disclaiming the dual lumen configuration.**"

*Scimed Life Systems, Inc. v. Adv. Cardiovascular Systems, Inc.,* 242 F.3d 1337, 1341 (Fed. Cir. 2001).

193

## Selected Audio Program Segments Must be Read in Light of the Numerous Patent Statements Describing User Selection

"Importantly, the person of ordinary skill in the art is deemed to read the claim term **not only in the context of the particular claim** in which the disputed term appears, <span style="color:red">**but in the context of the entire patent, <u>including the specification</u>**</span>. **[One] cannot look at the ordinary meaning of the term in a vacuum**. Rather, we <span style="color:red"><u>**must**</u> **look at the ordinary meaning in the context of the written description**</span> and the prosecution history."

*Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005).

# *"Selected Audio Program Segments"* ('076 patent, claim 1)

The E.D. Tex. has already ruled that the preamble is necessary to give meaning to the claim:

> "[I]t appears to the court that construction of 'selected audio program segments' is necessary . . . to give meaning to the claim."

D.I. 147, Exhibit D at 10.

195

# *"Selected Audio Program Segments"* ('076 patent, claim 1)

It is well settled that the preamble is limiting where, as here, it adds an essential limitation or discloses a fundamental characteristic of the invention.

"The specification is replete with references to the invention as a "blown-film" liner, including the title of the patent itself and the "Summary of the Invention…" Our analysis shows that the inventor considered that the "blown-film" preamble language represented an important characteristic of the claimed invention. We therefore agree with the district court's conclusion that a review of the entirety of the '047 patent reveals that *the preamble language* relating to `blown-film' does not state a purpose or an intended use of the invention, but rather *discloses a fundamental characteristic of the claimed invention that is properly construed as a limitation of the claim itself*."

*Poly-America, L.P. v. GSE Lining Tech., Inc*., 383 F.3d 1303, 1310 (Fed. Cir. 2004)

196

# *"Selected Audio Program Segments"* ('076 patent, claim 1)

Additionally, the preamble is limiting where, as here, it provides necessary context or framework for the claimed inventions that is necessary to describe the invention.

"In considering whether a preamble limits a claim, the preamble is analyzed to ascertain whether it states a necessary and defining aspect of the invention, or is simply an introduction to the general field of the claim. In *Kropa v. Robie*, 38 C.C.P.A. 858, 187 F.2d 150, 152 (1951), the court aptly described the inquiry as whether the preamble is "necessary to give life, meaning and vitality to the claims or counts…" The preamble serves to focus the reader on the invention that is being claimed. We conclude that *the preamble in this case necessarily limits the claims, in that it states the framework of the invention*, whose purpose is rapid single-copy printing of a customer's selected book…"

*On Demand Mach. Corp. v. Ingram Indus*., 442 F.3d 1331, 1343 (Fed. Cir. 2006)

197

# *"Selected Audio Program Segments"* ('076 patent, claim 1)

**The preamble recites the fundamental teaching of the invention – a player for reproducing selected audio program segments.  Each element of the claim that follows teaches how the device handles the selected program segments.**

**A contrary conclusion would mean that the "program segments" in the claim body would be far broader that contemplated by the invention.**  It would also mean that one could then perform the steps in the body of the claim and never reproduce any "selected audio program segment"— the identified purpose of the method in the claim.

**Claim 1:** A player for reproducing ***selected audio program segments*** comprising, in combination:

means for storing a plurality of program segments, each of said program segments having a beginning and an end,

means for receiving and storing a file of data establishing a sequence in which said program segments are scheduled to be reproduced by said player,

means for accepting control commands from a user of said player,

means for continuously reproducing said program segments in the order established by said sequence in the absence of a control command,

means for detecting a first command indicative of a request to skip forward, and

means responsive to said first command for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which follows said currently playing program in said sequence.

198

# *"Selected Audio Program Segments"* ('076 patent, claim 1)

The E.D. Tex. also held that one of ordinary skill in the art would interpret the language in the preamble as limiting.

D.I. 147, Exhibit D at 44.

eye toward giving full meaning to every word of the entire claim term. *Gen. Atomics Diazyme Labs. Div. v. Axis-Shield ASA*, 277 F. App'x 1001, 1006 (Fed. Cir. 2008) (citing *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)). Claim 1 of the '076 patent does not merely claim a player for reproducing "audio program segments"; it claims a player for reproducing "*selected* audio program segments." '076 patent, col. 46, ll. 13-14.

The use of the word "selected" implies that the audio program segments reproduced by the player are not just any audio segments, but rather segments that have been picked or chosen for reproduction. The court concludes that a person of ordinary skill in the art reading the word "selected" in light of the numerous references in the specification to the user selecting programming or the host server selecting programming based on the user's preferences would understand that the "selected audio program segments" are audio program segments that have been chosen by or for the user. Accordingly, the court finds that "selected audio program segments" means "audio program segments that have been chosen by or for a user."[8] This construction gives full meaning to every word of the claim term; declining to construe "selected audio program segments" as Apple suggests would not give proper meaning to the word "selected."[9]

# *"Selected Audio Program Segments"* ('076 patent, claim 1)

Defendant argues that the preamble contains only redundant information and is not limiting. Yet, Defendant relies on the preamble language in order to interpret the body of claim 1 of the '076 patent.

# *"Selected Audio Program Segments"* ('076 patent, claim 1)

The E.D. Tex.'s previous construction of "file of data establishing a sequence" acknowledge the limitation from the preamble.

The Court construed "file of data establishing a sequence" as "a file of data that identifies the order in which **audio program segments** are to be played and that may contain information about the sequence of events that occurred during playback"

D.I. 147, Exhibit D at 20.

201

# *"Selected Audio Program Segments"* ('076 patent, claim 1)

Defendant's proposed construction of "file of data establishing a sequence" acknowledge the limitation from the preamble.

Defendants propose that *"means for receiving and storing* ***file of data establishing a sequence*** *in which said program segments are scheduled to be reproduced by said player"* is "a file that is received by the player, stored, and used by the processor to both control playback of each ***song*** in the recommended order and respond to control commands"

# *"Selected Audio Program Segments"* ('076 patent, claim 1)

Personal Audio's proposed construction reflects the patents' emphasis on the "selection" of audio program segments as a fundamental characteristic of the claimed inventions.

# *"Selected Audio Program Segments"* ('076 patent, claim 1)

The specification describes ***interactive selection*** of programs (*e.g.* music) from a ***program library*** as a key feature of the invention.

FIELD OF THE INVENTION

    This invention relates to electronic information distribution systems and more particularly to a system for dynamically and interactively selecting and playing particular programs from a program library.

'076 patent, 1:6-9

It is accordingly an object of the present invention to provide easy access to rich selection of audio programming and to allow the listener to dynamically and interactively locate and select desired programming from the available collection in an easy and institutive way…

'076 patent, 1:64-2:3

204

# *"Selected Audio Program Segments"* ('076 patent, claim 1)

The term "selected audio program segments" is found in the preamble of claim 1 of the '076 patent.

**Claim 1:** A player for reproducing *selected audio program segments* comprising, in combination:

   means for storing a plurality of program segments, each of said program segments having a beginning and an end,

   means for receiving and storing a file of data establishing a sequence in which said program segments are scheduled to be reproduced by said player,

   means for accepting control commands from a user of said player,

   means for continuously reproducing said program segments in the order established by said sequence in the absence of a control command,

   means for detecting a first command indicative of a request to skip forward, and

   means responsive to said first command for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which follows said currently playing program in said sequence.

*'076 patent, claim 1*

205

"EDITING MEANS"

# *"Editing Means"*

| E.D. Tex.'s Construction | PTAB's Construction | Personal Audio's Construction | Defendants' Construction |
|---|---|---|---|
| n/a | A player client programmed to:<br><br>1. Add a program segment; and/or<br><br>2. Delete a program segment; and/or<br><br>3. Assign a new or different order to a given program segment; and update the order for the program segments in the serialized sequence. | A player client programmed to:<br><br>1. Add a program segment; and/or<br><br>2. Delete a program segment; and/or<br><br>3. Assign a new or different order to a given program segment; and update the order for the program segments in the serialized sequence.<br><br>Alternatively, the structure corresponding to the claimed function is the following structures and equivalents thereof:<br><br>A player client programmed to:<br><br>1. Access selections file 351; and<br><br>2. Alter identifiers of program segments within the selections file, including the following operations:<br><br>a. Add a program segment; and/or<br><br>b. Delete a program segment; and/or<br><br>c. Assign a new or different order to a given program segment; and update the order for the program segments in the serialized sequence. | Indefinite. |

207

# *"Editing Means"*

**Claim 5:** A player as set forth in claim 1 including **editing means for modifying said data establishing said sequence**.

*'076 patent, claim 5*

# *"Editing Means"*



Fig. 2

The specification discloses the corresponding structure is a provided utility program that performs steps 213 and 211 shown in Fig. 2:

"Utilizing the programming data and a utility program previously supplied by the server, the subscriber may alter the selection and sequence of program materials to be played…"

'076 patent, 8:49-51.

209

# *"Editing Means"*



Fig. 2

At **Step 213**, the algorithm **accesses the program sequence** to be edited:

"**As indicated at 213** in FIG. 2, the listener may at any time return to the sequence editing step  211 to manually reorder the playing sequence..."

'076 patent, 9:4-6.

By adding or deleting the **"segment identifiers" in selections file 351** shown in Fig. 5 **in step 211**, the playback session can be modified or resequenced.

210

# *"Editing Means"*



## Selections

| R | LastSubj. |
|---|-----------|
| S | ProgramID |
| T | ProgramID |
| P | ProgramID |
| H | Offset |
| E | Offset |
| A | Offset |
| B | Offset |
| L | Location |
| T | ProgramID |
| P | ProgramID |
| H | Offset |
| E | Offset |
| T | ProgramID |
| P | ProgramID |
| A | Offset |
| B | Offset |
| L | Location |
| S | ProgramID |
| T | ProgramID |
| P | ProgramID |
| R | 1 |

380

**specific structure**

Fig. 2

At step 211, the user many modify identifiers in the accessed sequencing file by: (1) adding a program identifier; (2) deleting a program identifier or (3) reordering the sequence of the program identifiers in the sequencing file:

"The playback operation… continues from the designated playback point in the selections file (seen at 351 in FIG. 5) which follows a program sequence initially created by the host server and downloaded with the program segments… and then… **modified by the addition, deletion and re-sequencing of segment identifiers as discussed earlier in connection with step 211 in FIG. 2…"**

'076 patent, 12:21-27.

211

## *"Editing Means"*

The PTAB determined this claim term was definite and adopted Plaintiff's proposed construction in the IPR:

> "Claim 5 recites a "player ... including editing means for modifying said data establishing said sequence." As explained in Section III.B.3.d above, the function of the "editing means" limitation is "modifying said data establishing said sequence" and **the corresponding structure is "a player client programmed to: 1. Add a program segment; and/or 2. Delete a program segment; and/or 3. Assign a new or different order to a given program segment; and Update the order for the program segments in the serialized sequence.""**

D.I. 147, Exhibit E (Institution Decision) at 31.

212

## *"Editing Means"*

Defendant argues the PTAB's decision is not determinative because:

> "The PTAB has no jurisdiction to address indefiniteness in IPRs, and as noted above, the claim construction standard is different in IPRs than in this Court."

D.I. 159, Responsive Br. at 29.

# *"Editing Means"*

The PTAB must determine whether a claim term is indefinite as a threshold issue before it can proceed on the merits in the institution decision. Only definite claims may be instituted.

If a claim term is indefinite, the PTAB will simply say so and decline to decline to institute the claim on the basis that the proper scope of the claim cannot be established without speculation. *See, e.g., Blackberry Corp. v. MobileMedia Ideas, LLC*, IPR2013-00036, Paper 65 (PTAB Mar. 7, 2014).

# *"Editing Means"*

## That is not the case here.

In Google's IPRs, the PTAB expressly adopted Plaintiff's proposed construction (submitted by Google to the PTO) and determined the prior art failed to teach the claim limitation:

> **"Petitioner does not explain persuasively how this disclosure shows that a program segment is added or deleted or that a new or different order is assigned to a given program segment. Petitioner also has not explained persuasively how this disclosure teaches updating the order for the program segments in the serialized sequence.** Rather, we agree with Patent Owner that "[w]hen a user skips to a different segment in the playlist, the playback sequence data and the play order of the play list itself has not changed; the user has merely skipped forward in the unedited play order." … Accordingly, **Petitioner has not demonstrated a reasonable likelihood that it would prevail in showing that claim 5 and claim 6, which depends from claim 5, would have been obvious** over Chase and Loeb."

D.I. 147, Exhibit E (Institution Decision) at 31.

215

# *"Editing Means"*

The PTAB could not have analyzed claim 5 and determined the prior art failed teach this claim if the claim was indefinite. PTAB procedure would have been to find the claim indefinite and decline to institute on that basis. *See, e.g., Blackberry Corp. v. MobileMedia Ideas, LLC*, IPR2013-00036, Paper 65 (PTAB Mar. 7, 2014).

# *"Editing Means"*

The BRI Standard does not change the analysis. The difference between the BRI standard and the *Phillips* standard is that under *Phillips* the claim term is presumed valid while BRI has no such presumption. *See* 35 U.S.C. § 282(a).

If a claim is definite before the PTAB under BRI, it should be presumed valid under *Phillips*.

217

# The Federal Circuit Does Not Require that Every Detail Must Be Disclosed

The Federal Circuit stated:

> "Algorithms in the specification need **only disclose adequate** defining structure to render the bounds of the claim understandable to one of ordinary skill in the art." AllVoice, 504 F. 2d at 1245. **A patentee is <u>not</u> required to disclose** a listing of source code or **a highly detailed description of the algorithm** to be used to achieve the claimed function in order to satisfy 35 USC § 112 ¶ 6."

*Aristocrat Tech. v. Intern. Game,* , 521 F. 3d 1328, 1338 (Fed. Cir. 2008), *see also Finisar Corp. v. DirecTV Group, Inc.*, 523 F. 3d 1323, 1341 (Fed. Cir. 2008)."

# Defendants' Additions Are Improper

It is well established that "it is not necessary to claim in a patent  every device required to enable the invention to be used." *Hughes Aircraft Co. v. United States*, 640 F. 2d 1193, 1197 (Ct. Cl. 1980).

"MEANS FOR TRANSLATING…"

# *"Means for Translating"*

| E.D. Tex.'s Construction | PTAB's Construction | Personal Audio's Construction | Defendants' Construction |
|---|---|---|---|
| n/a | n/a. | The structure corresponding to the claimed function is the following structure and equivalents thereof:<br><br>A microphone and voice recognition software (i.e., a voice command system). | Indefinite. |

# *"Means for Translating"*

**The voice command system is clearly linked to the function of "means for translating":**

mode at **233**. Using a hands free voice command system, the player may reproduce a menu program segment in which a sequence of options are enunciated on the system's audio output speaker with short pauses between the recited options. By providing the voice command "Go" during or shortly after a desired option, the user may cause the system to branch to that selection. Menu options of this type may be conveniently

'076 Patent, 16:54-60

222

# *"Means for Translating"*

## A voice command system is a known structure in the art for recognizing voice commands:

**Putting Together a Voice-Command System**

In this section we will describe the six steps you should take to build a voice-command system. As a real-world example of the application of each of these steps, I will be citing a multimedia technology demonstration system built for the Computer Corporation of America (CCA). This system was intended to demonstrate the integration of CCA's client-server tools with state-of-the-art personal computer technology, including voice recognition. The system was set up as a travel-planning aid, displaying a series of maps and, ultimately, detailed information about specific locales. The user could issue voice commands to navigate through the maps and the detailed information windows.

The six steps are as follows:

Putting Together a Voice-Command System
D.I. 147, Exhibit S, 35.15 (Jessica Keyes, Ultimate Multimedia Handbook (1997))

223

# *Voice Command Systems are Known Structures in the Art*

## Extrinsic evidence describes voice command systems that were available off the shelf around the filing date of the patents-in-suit:

**Command Corp.** Command Corp. offers the IN³ (pronounced *in-cube*) voice-command system. This originally was offered on Sun Sparcstations, and is now

\*\*\*

**Microsoft.** The Windows Sound System, Microsoft's business-oriented sound board, comes with Voice Pilot, a Windows voice-command system. This sys-

\*\*\*

**Covox.** Covox has been supplying consumer-oriented voice-recognition systems for the PC longer than anyone else. Their traditional product offering uses

\*\*\*

**Media Vision.** Media Vision recently has begun to offer a voice-command package with their ProAudio Spectrum line of sound cards. This package,

Commercial Applications: "Voice-recognition systems—voice-command systems" D.I. 147, Exhibit S**,** 35.22-.23 (Jessica Keyes, Ultimate Multimedia Handbook (1997))

# *Voice Command Systems are Known Structures in the Art*

**Extrinsic evidence describes voice command systems that were available around the filing date of the patents-in-suit:**

Voice-dictation systems

One note to be made before discussing Dragon Systems' and IBM's offerings is that, while their larger vocabulary systems clearly are targeted to the voice-dictation market, they both also offer configurations that are usable as voice-command systems. All of their products are discussed under this single heading for simplicity, but they also should be considered when evaluating voice-command systems.

Commercial Applications: "Voice-dictation systems"
D.I. 147, Exhibit S, 35.23 (Jessica Keyes, Ultimate Multimedia Handbook (1997))

# *Voice Command Systems are Known Structures in the Art*

**Similar patents around the filing date of the patents-in-suit described voice command systems as software to perform the function:**

rithm as well as suitable control programs (not shown). A voice command system of this type is described in copending application Ser. No. 07/523,486, filed May 15, 1990, to Hunt et al., titled "Simultaneous Speaker-Independent Voice Recognition And Verification Over A Telephone Network," assigned to the assignee of the present invention and incorporated herein by reference.

D.I. 147, Exhibit V, 4:19-25 (U.S. Pat. No. 5,881,134)
(emphasis added)

226

# *Voice Command Systems are Known Structures in the Art*

## A voice command system is a known structure that requires no further description to a person of ordinary skill:

128.  It is my expert opinion that the term "means for translating said voice signals into said control commands" would be understood by a person of ordinary skill in the art to perform the function of "translating said voice signals into said control commands".  The structure discloses in the specification for performing this function is the speech recognition of portion of the described voice command system.  '076 Patent, 16:50.  In my expert opinion, Defendant's contention that no corresponding structure is disclosed in the patent is incorrect.

Almeroth Declaration, p. 64, ¶128;
see also id. at pp. 64-68, ¶¶129-137

227

# *Voice Command Systems are Known Structures in the Art*

**Defendant does not dispute the fact that a voice command system is a known structure in the art.**

**Defendant dismisses the opinion of Dr. Almeroth as conclusory, yet fails to address or rebut the contemporaneous evidence upon which he relied, including:**

- **Exhibit S** (Jessica Keyes, Ultimate Multimedia Handbook (1997))
- **Exhibit T** (U.S. Pat. No. 5,950,167)
- **Exhibit U** (U.S. Pat. No. 5,127,043)
- **Exhibit V** (U.S. Pat. No. 5,881,134)

See Almeroth Declaration, pp. 64-68, ¶¶127-137

228

# The Eastern District of Texas has held that "means for translating" is definite.

With respect to whether sufficient structure is in fact disclosed for the microphone embodiment, Apple argues that the specification does not disclose any voice recognition algorithm for accepting commands from a microphone. The court agrees that where a microphone is the structure corresponding to the function of "accepting," the player computer would need to have some means for translating sounds into commands. *Cf.* '076 patent, col. 47, ll. 33–37 (dependent claim 13 claims "a player as set forth in claim **1** wherein said means for accepting control command[s] from a user includes a microphone for accepting voice signals from said user *and means for translating said voice signals into said control commands*" (emphasis added)). And, unlike with mouse clicks or keyboard entries, translating audible sounds into commands arguably is not a detail so well-known in the art that no structure for performing that task need be disclosed. However, the specification of the '076 patent does in fact disclose some structure for recognizing voice commands, namely "conventional speech recognition mechanisms." *See,* '076 patent col. 36, ll. 65–66; *id.* at col. 43, ll. 53–54.

Further, Personal Audio's expert has testified that at the time of the invention, methods for recognizing speech commands were extremely well-known in the art, and a skilled artisan would know what software to use and how to implement it. [*See* Doc. # 174–1, Almeroth Decl. ¶¶ 11 —15.] There is no need for disclosure of specific program code if software is linked to the claimed function and one skilled in the art would know the kind of program to use. *See Med. Instrumentation & Diagnostics Corp. v. Elekta AB,* 344 F.3d 1205, 1214 (Fed.Cir.2003). The court is not persuaded that the disclosure of "a microphone" along with "conventional speech recognition mechanisms" is insufficient corresponding structure such that the bounds of the invention would not be understandable by a person of ordinary skill in the art.[7] *See AllVoice,* 504 F.3d at 1245–46; *see also Atmel Corp. V. Info. Storage Devices, Inc.,* 198 F.3d 1374, 1382 (Fed.Cir.1999) ("known circuit techniques" was sufficient disclosure of structure corresponding to "high voltage generating means ... for generating a high voltage from a lower voltage power supply" where expert testified that title of article cited in specification was sufficient to indicate precise structure to one skilled in the art); *In re Dossel,* 115 F.3d 942, 946–47 (Fed.Cir.1997) (sufficient structure where written description stated that "known algorithms" could be used to solve standard equations known in the art).

*Personal Audio, LLC v. Apple, Inc.,* No. 9:09-CV-111, 2011 WL 11757163 at *6-*7 (E.D. Tex. Jan. 31, 2011)

229

# *Med Instr. And Diagnostics Corp.*

In past cases, **we have been generous in finding something to be a corresponding structure when the specification contained <u>a generic reference to structure that would be known to those in the art</u> and that structure was clearly associated with performance of the claimed function**. . . . **There was no need for a disclosure of specific circuitry** in that case, just as here there would be no need for a disclosure of the specific program code if software were linked to the converting function and **<u>one skilled in the art would know the kind of program to use.</u>**

*Med. Instr. and Diagnostics Corp. v. Elekta AB*,
344 F.3d 1205, 1213-14 (Fed. Cir. 2003)
(emphasis added)

230

# *This Court Has Held that Identification of a Type of Software is Sufficient Corresponding Structure*

In *McKesson Info. Solutions LLC v. Trizetto Group, Inc.*, No. 1:04–cv-01258–SLR, ECF No. 307, 2006 WL 891048 (D. Del. Apr. 05, 2006), the claim term in dispute was "**means for operating on a predetermined database**."

The specification disclosed "the well-known IBM 'personal computer' containing sufficient data processing capabilities and memory and **suitable commercially available database management software programs**."

The Court held that a general identification of software was sufficient:

> The computer system 2 may be any type of suitable computer system which can interact with the program of the present invention. One such suitable computer system is the well-known IBM 'personal computer' containing sufficient data processing capabilities and memory and **suitable commercially available database management software programs to perform the desired functions**.

*Id.* at *2 n.4 (quoting specification of patent at issue).

231

# This Court Has Previously Construed "Voice Recognition System"

This Court previously considered the following specification disclosure:

> "One non-visual channel of communication between the surgeon and the system is the voice recognition and speech synthesis subsystem (**267**, FIG **1**). For example, synthesized voice messages can be issued by the system to inform the surgeon of the exact location of his surgical instrument with respect to an anatomical feature or interest. Likewise, synthesized messages confirming successful receipt of a voice command can be used to assure the surgeon that the system correctly interpreted his command(s). General system state or change of system state information can be relayed to the surgeon using synthesized voice as well. An example of this would be a synthesized speech message to the surgeon stating the exact distance by which the camera was moved during a zooming operation."

Based on this disclosure, this court construed "voice recognition system" to mean:

> The surgical robotic system contains an apparatus into which the surgeon speaks verbal instructions. <u>These terms are not limited to the structure of any embodiment described in the specification.</u>

*Intuitive Surgical, Inc. v. Computer Motion, Inc.*, 214 F. Supp. 2d 433, 441 (D. Del. 2002).