## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PERSONAL AUDIO, LLC,

     Plaintiff,

     v.

GOOGLE LLC,

     Defendant.

C.A. No. 17-cv-1751-CFC

JURY TRIAL DEMANDED

**FILED UNDER SEAL**

## PERSONAL AUDIO'S OPPOSITION TO GOOGLE'S MOTION
## FOR JUDGMENT AS A MATTER OF LAW [D.I. 863]

Dated: July 18, 2023

Steven M. Hanle (Admitted *pro hac vice*)
Jason de Bretteville (Admitted *pro hac vice*)
Douglas Q. Hahn (Admitted *pro hac vice*)
Salil Bali (Admitted *pro hac vice*)
Lisa Northrup (Admitted *pro hac vice*)
Ahmad Takouche (Admitted *pro hac vice*)
**STRADLING YOCCA CARLSON & RAUTH, P.C.**
660 Newport Center Drive, Suite 1600
Newport Beach, CA  92660
Phone:  949-725-4138
Fax:  949-725-4100
Email:  shanle@stradlinglaw.com
Email:  jdebretteville@stradlinglaw.com
Email:  dhahn@stradlinglaw.com
Email:  sbali@stradlinglaw.com
Email:  lnorthrup@stradlinglaw.com
Email:  atakouche@stradlinglaw.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
Rosemary J. Piergiovanni (Bar No. 3655)
**FARNAN LLP**
919 North Market Street, 12th Floor
Wilmington, DE 19801
Phone: 302-777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com
rpiergiovanni@farnanlaw.com

*Attorneys for Plaintiff Personal Audio LLC*

i

**Victor G. Hardy**
Admitted *pro hac vice*
10703 Pickfair Drive
Austin, Texas 78750
Phone:  512-520-9407
Email:  vhardy@hpylegal.com

# TABLE OF CONTENTS

I.     THE LEGAL STANDARD IS EXTREMELY HIGH TO ABROGATE THE JURY'S VERDICT..............................................................1

II.    SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S FINDING OF DIRECT INFRINGEMENT.......................................................................1

    A.    Sequencing File ............................................................................1

    B.    Skip Forward and Continuous Playback Algorithms...........................6

        1.    Skip Forward.....................................................................7

        2.    Continuous Playback ................................................................10

IV.    SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S CONCLUSION THAT GOOGLE POSSESSED THE NECESSARY STATE OF MIND TO ACTIVELY INDUCE INFRINGEMENT AND ACTED WILLFULLY ...................................................................16

V.    THERE IS NO BASIS FOR A NEW TRIAL ON ANY ISSUE .................22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).............................................................................................1

*In re Bill of Lading Transmission*,
   681 F. 3d 1323 (Fed.Cir.2012) .........................................................................16

*Bio-Rad Labs., v. 10X Genomics Inc.*,
   967 F.3d 1353 (Fed. Cir. 2020) ........................................................................15

*Carson Optical Inc. v. eBay Inc.*,
   202 F.Supp.3d 247 (E.D.N.Y. 2016) ................................................................21

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (2016)...........................................................................................8

*Fussell v. Pokropski*,
   16-6708, 2019 U.S. Dist. LEXIS 149652 (D.NJ Aug. 30, 2019)........................1

*Galderma Labs., L.P. v. Medinter US, LLC*,
   18-cv-1892, 2020 U.S. Dist. LEXIS 48741 (D. Del. Mar. 11, 2020) ...............22

*Global-Tech Appliances, Inc. v. SEB SA*,
   563 US 754 (2011)......................................................................................17, 20

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
   426 F.Supp.2d 211 (D. Del. 2006)........................................................13, 15, 23

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed.Cir.2018) .............................................................................14

*Info-Hold, Inc. v. Muzak LLC*,
   783 F.3d 1365 (Fed.Cir. 2015) ....................................................................17, 21

*Lightning Lube, Inc. v. Witco Corp.*,
   4 F.3d 1153 ..........................................................................................................1

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ........................................................................21

*Lucent Techs., Inc. v. Newbridge Networks Corp.*,
  168 F.Supp.2d 181 (D. Del. 2001) .................................................6, 7

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
  420 F.3d 1369 (Fed. Cir. 2005) ..........................................................20

*Monsanto Co. v. Ralph*,
  382 F.3d 1374 (Fed. Cir. 2004) ..........................................................13

*Odetics, Inc. v. Storage Technology.*,
  185 F.3d 1259 (Fed. Cir. 1999) ...........................................6, 7, 8, 11

*Personal Audio, LLC. v. Apple, Inc.*,
  09-cv-111, 2011 WL 13135065 ............................................................8

*Ravgen, Inc. v. Ariosa Diagnostics, Inc.*,
  2021 WL 3526178 (D. Del. Aug. 11, 2021) ........................................22

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) .............................................................................1

*Sheridan v. E.I. Dupont de Nemours & Co.*,
  100 F.3d 1061 (3d. Cir. 1996) ............................................................23

*Silicon Graphics, Inc. v. ATI Techs., Inc.*,
  607 F.3d 784 (Fed. Cir. 2010) ............................................................12

*Suprema Inc. v. ITC*,
  626 Fed.Appx. 27 (Fed.Cir.2015) .......................................................20

*Unisplay, S.A. v. Am. Elec. Sign Co., Inc.*,
  69 F.3d 512 (Fed.Cir.1995) ................................................................16

*Williamson v. Consol. Rail Corp.*,
  926 F.2d 1344 (3d. Cir. 1991) ............................................................22

*Zimmer Surgical, Inc. v. Stryker Corp.*,
  365 F. Supp. 3d 466 (D. Del. 2019) ....................................................13

**Statutes**

35 U.S.C. § 298 ......................................................................................20

## I.   THE LEGAL STANDARD IS EXTREMELY HIGH TO ABROGATE THE JURY'S VERDICT

Google can prevail on its motion "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d.Cir.1993).  The Court may not make credibility determinations or weigh the evidence—these "are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The Court "must consider all evidence presented at trial, not just that evidence presented during Plaintiff's case-in-chief." *Fussell v. Pokropski,* 16-6708, 2019 U.S. Dist. LEXIS 149652, at *11 (D.N.J. Aug. 30, 2019) (citing *Trs. Of the Univ. of Pa. v. Lexington Ins. Co.*, 815 F.2d 890, 903 (3d. Cir. 1987)); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## II.   SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S FINDING OF DIRECT INFRINGEMENT

### A.   Sequencing File

Google's motion is premised on GPM's use of a data structure called the queue to control playback, <u>in addition to</u> the downloaded playlist in the LISTITEMS file.  But this argument ignores both the Court's prior rulings and the <u>undisputed</u> evidence presented at trial that LISTITEMS is <u>also used</u> to control

1

playback, and is thus a "sequencing file" under the Court's construction.  GPM

engineer Razumeiko and Google's infringement expert both testified that each time

playback is initiated (with a "play" or "go" command), the GPM processor directly

references and therefore uses the playlist in LISTITEMS to seed the queue and to

commence playback.  Tr. 582:21-583:5;586:12-16 (Razumeiko); 682:13-683:9

(Mayer-Patel).  The GPM source code also explains that playback begins from the

playlist, and not from the queue.  PTX-53 at SC267:1059-62;1073 ("Add songs to

the queue from the list and start playback of a particular song **in the list**.")

Google's witnesses also admitted that the playlist in LISTITEMS is "used to

control the order of the songs that are used for playback."  Tr.336:9-20; 334:5-14;

335:8-11 (Evans); 586:6-9 (Razumeiko, agreeing with Evans).[1]  The *direct access*

of LISTITEMS during execution of a control command to control the sequence

that will be played back is a use of that file "to control playback of each song in the

ordered sequence."

The Court has repeatedly clarified that as long as the downloaded and stored

file is used, this does not "preclude the use of another file [the queue] to execute

the control function."  D.I. 823,130-31; D.I. 843 (precluding infringement theory

where "*only a second file* is used to control playback…").  Thus, the undisputed

---

[1]    GPM source code comments further confirm that the *playlist* is used to
control playback.  Tr.588:8-591:3; PTX-53 at SC210:907-08; SC255:784;
SC255:784; SC182:2292-3.

use of LISTITEMS in response to control commands meets the Court's "sequencing file" construction and, as discussed below, is consistent with the patents' specification and prosecution history.  Google did not even challenge at trial that LISTITEMS is directly accessed to control playback in response to a go command.[2]

The evidence also established that GPM continually references the downloaded LISTITEMS to confirm that *each song in the ordered sequence* is playable.  As the player identifies each song in the queue, the processor checks a variable called "listitemsid" contained in LISTITEMS to determine if the song is "playable" before it is played back.  Tr. 512:2-10 (Almeroth: "If the **audio ID and list item ID** equals no…It's….an invalid song in the queue.  Exit out."); 303:16-305:2 (Razumeiko); 466:1-9 (identifying the code at "310" for LISTITEMS content); PTX-53-SC310:1834, 1859 ("listitemsid" is in LISTITEMS).  This function "controls playback of each song in the ordered sequence" because if the "listitemsid" does not pass this test, it is not played.  Importantly, "listitemsid" is not found in the queue, and thus LISTITEMS is *directly* used for control, beyond seeding the queue.  Tr. 572:8-11 (Razumeiko); 659:1-19 (Mayer-Patel).

---

[2]     The go command is claimed as "continuing the reproduction at the beginning of a listener-selected one of said audio program files in said collection in response to a program selection command."  '178 Patent element 1(e)(2).  Because Google did not challenge that GPM met this element (Tr.487-88) it was not addressed extensively by Almeroth.

Google argues in footnote 2 that the playlists identified by listed are not "files" under the Court's construction. But Google's witnesses admitted that both LISTITEMS and its playlists are files. Tr.685:25-686:2 (Mayer-Patel); 586:19-20 (Razumeiko). Further, this argument ignores both the evidence that playlists are stored using their listid and the Court's prior rulings. Tr.490:10-492:2 (Almeroth); 659:12-16 (Mayer-Patel); D.I. 731 (finding playlists and LISTITEMS meet the "file" construction); D.I. 735.[3] Further, the playlists are downloaded, stored, and collectively comprise the LISTITEMS table. Tr.463:23-464:22; 466:18-23. Because both the playlists individually and LISTITEMS as a whole are received by the player, stored, and directly used by the processor as described above, both meet the construction of "sequencing file."[4]

The above evidence supports Cases 1-3 that the Court already found, if proven, would meet the sequencing file construction. D.I. 720 p.3 (citing D.I. 598 pp.1-2, 4; D.I. 785).

| Play Playlist Command | Case 1 |
| Go Command | Case 2 |
| Find Playable Song | Case 3 |

---

[3]   Tr. 586:19-20; 426:2-18; 490:10-492:2; 494:12-15; 657:20-23 (database system); 463:23-467:8; 300:4-301:22.
[4]   Tr. 659:14-16; 419:15-423:17; 461:16-467:8; 490:10-495:8; 591:1-3; 557:24-558:15.

Google's motion ignores Cases 1, 2 and 3 and attacks Almeroth's explanation of _how_ the data from the LISTITEMS table is used to populate the queue in support of Use Case 4.  In focusing on Use Case 4, Google argues that there can only be a single file that controls playback and <u>only</u> that file must be continually referenced in the same storage location as each song is fetched and played.  This argument goes far beyond the plain language of the Court's construction and the lexicography it relied on.  Indeed, Google's narrow view of "used to control" is repudiated on one of the pages of the Reexam Response cited by the Court for its construction.  D.I. 447 pp.3-4, citing D.I. 160-1 Ex.11 (Appx. A) p. 5 ("The sequencing file 'provisionally identifies the order in which downloaded program segments are to be played,' [8:48-53] and is a file that is downloaded and used to control the playback session … .").  Cited Col. 8:48-53 refers to the "_recommended_ program sequence file…transferred to the subscriber."  This is Schedule Table 307, which "contains the _recommended_ sequence of program segments" (Col. 17:62-63), is "_downloaded_ to the player" (Col. 27:13-18 and 18:31-34), and used to compile "selections file" 351 (Col. 12:9-16; ).  Selections file 351 is then scanned by the controls (34:28-31).  Thus, the patent clearly describes a sequencing file that was used to populate another control structure that was then scanned by the controls.  Appx. B (D.I. 608) pp. 15-23; see D.I. 605, Ex. E¶¶175-188. Finally, the Reexam Response did not distinguish the prior art based on the use of <u>only</u> a single

data structure to control playback.  Rather, none of this prior art involved downloading  <u>any sequencing file</u> to a player.  Appx. A pp. 2,10-12; Appx. B pp. 9-13.  Thus, there was no "clear and unmistakable" disclaimer of an embodiment where <u>both</u> the downloaded file (e.g. LISTITEMS) and an additional data structure compiled from the downloaded file (e.g. the queue) are used to control playback. D.I. 823 at 130-31 ("that doesn't mean [the sequencing file] can't be used with something else.  But it must be used as *part of the control*.").

Accordingly, substantial evidence supported the jury's verdict that GPM implements a sequencing file.

### B.    Skip Forward and Continuous Playback Algorithms

Literal infringement of a means limitation requires the accused structure to perform the claimed function using structure identical <u>or equivalent to</u> the corresponding structure.  *Odetics, Inc. v. Storage Technology.*, 185 F.3d 1259, 1265, 1267 (Fed. Cir. 1999).  Structural equivalence is measured against "the <u>overall structure</u> corresponding to the claimed function … structures with different numbers of parts may still be equivalent."  *Id.* at 1267-68 (emphasis added). Unlike the DOE, structural equivalence does not require particularized/linking equivalence testimony.  *Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F.Supp.2d 181, 211-12 (D. Del. 2001).  In *Symbol*, "the Federal Circuit noted that equivalence under Section 112…is a question of fact, and the role of challenging

the factual underpinnings of an expert's position belongs to the opponent on cross examination." *Lucent*, 168 F.Supp.2d at 212 (*citing Symbol Technologies, Inc. v. Opticon*, Inc., 935 F.2d 1569, 1575 (Fed. Cir. 1991).  As noted by the Court, Google did not really challenge Almeroth's testimony about the overall similarities of GPM's algorithms in light of its use of a queue, in addition to the playlists in LISTITEMS.  Tr. 713:7-16; 1042:5-1043:10.

## 1.  Skip Forward

Google ignores *Odetics* and argues non-equivalence of step 1 of a three-step algorithm by contending a music id is not a LocType.  Google ignores Almeroth's step-by-step evidence as to the "way" GPM's code operates <u>as a whole</u> to perform the recited function in substantially the same way as the claimed structure and achieves the same or substantially the same result of locating the next song and playing it.  Tr.498:6-15; 499:12-19; 506:10-511:3; 512:2-514:7; 560:1-562:5; 582:21-584:1 (scanning: step 1); 506:16-24; 509:7-19 (incrementing and playing: steps 2-3); 583:21-584:1; 510:21-511:20; 516:22-517:18; 558:4-560:3; 583:21-584:1 (loctypes); 557:24-560:3 (differences insubstantial in view of overall similarity); 506:12-14; 507:17-18; 508:15-21(result).

Both algorithms scan for an identifier that indicates a characteristic of a selection record, *i.e.*, audio content.  Tr:304:25-305:2;583:21-584:1 (Razumeiko). Both discontinue playback, increment "current-play" type variables, and then play

the next audio segment.  Both achieve the same result of locating and playing the next audio segment in the sequence.  Google's reliance only on the type of identifier is exactly the impermissible "component by component analysis" rejected by the Federal Circuit.  *Odetics*, 185 F.3d at 1267-68.  Substantial evidence thus permitted the jury to reasonably conclude that the way that these algorithms perform the recited function and the result they achieve are substantially the same —despite the differences in identifiers.  See *Personal Audio, LLC. v. Apple, Inc.*, 09-cv-111, 2011 WL 13135065 at *4 (substantial evidence supported a finding of overall structural equivalence of algorithms where "playlists are simply an ordered list of ProgramIDs that identify songs and an order for playback"); Appx. C (D.I. 551, Ex. 8) at 36 (PTAB finding the claimed scanning limitation was disclosed by Chase's scanning forward in a play list to find a next playable element).

Even focusing only on the identifier, there was substantial evidence that scanning for a four-byte musicid or listitemsid to locate the next playable audio file (see Use Case 3, *supra*) is insubstantially different from scanning for a LocType p identifier, indicating a "content program segment" (Col. 32:9-10).  Almeroth testified this "minor difference" was insubstantial because, *inter alia*, "[t]he key to the invention is not having a single-byte or two-bytes."  Tr. 511:6-20 (Almeroth). Cf. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1346 (2016) (finding features

8

that are a "key benefit" of the invention relevant to equivalence).  Both identifiers indicate a characteristic of a selection record—*i.e.*, audio content—and Almeroth's opinion that the differences were insubstantial was not seriously challenged on cross-examination.  Tr. 510:21-512:18; 558:14-560:3;

Further, Quackenbush's testimony actually confirmed structural equivalence.  Chase's playlist contains no single-byte identifiers and its "TRACK" record uses full song titles to identify audio content, but Quackenbush testified that the "TRACK" identifier is equivalent to a LocType.  Tr. 877:5-879:25.

DTX230 p.16.  "[I]t does not matter if it's single-byte or not.  It contains the information needed....there is equivalent information regarding the track as a LocType."  Tr. 879:3-25.

Quackenbush similarly opined that the Chase "playlist" is a "sequencing file."  Tr.885:15-21; DTX-230 p.16.  He testified that a downloaded playlist is loaded into a "TreeNode" data structure (also called "nodes").  Tr. 836:7-837:3; see generally 885:15-891:25.  The Chase code then scans TreeNode to control playback and execute control commands.  Tr. 835-838; 885-889.  Although Chase does not scan the downloaded playlist, only the "nodes," Quackenbush testified

that scanning a data structure "loaded" from the downloaded playlist is "fully equivalent" and "interchangeable" with directly scanning the received playlist file. Tr. 888:12-889:6.  Substantial evidence supports using the queue, which is populated from the downloaded LISTITEMS, is likewise equivalent.  Since there was no evidence of any other differences in GPM's overall implementation of the skip means, substantial evidence supports the jury's determination that this limitation was met.

### 2. Continuous Playback

Almeroth provided detailed step-by-step testimony that the "way" GPM implements continuous playback—as a whole—performs the recited function in substantially the same way as the structure in the Court's construction, and that they achieve substantially the same result of continuous playback in a loop. Tr.495:25-500:18 (step 1); 500:25-502:2; 508:2-509:19 (step 2); 502:3-503:14 (step 3) 503:13-506:4; 557:14-559:23; 559:7-560:3  (LocType R and step 3); 503:8-505:3; 557:5-561:25; 511:6-17 (differences insubstantial); 414:1-5; 423:25-424:14; 495:9-496:16 (result).  Importantly, the Court denied summary judgment based on essentially the same evidence and over the same arguments now made again by Google.  D.I. 710 (citing Almeroth Report at D.I. 571, Ex. B ¶374); D.I. 730.

Almeroth described the "way" GPM's "next" function, upon completion of a song, will locate the next song in the sequence and increment the playposition variable (steps 1 and 2) and the way the "get next playposition" function uses the "position/order" identifier (located in LISTITEMS (535:23-536:3; 663:7-14)) to identify the end of the list to reset to beginning (step 3) by comparing the "position" of a song to the length of the playlist.  Tr. 501:3-503:7; 496:9-498:16; 500:8-505:3; 535:23-536:3; 663:7-14.[5]  Almeroth opined that this two-step process for identifying the end of a GPM playlist is insubstantially different from using a LocType R identifier in a single step. Tr. 496:9-498:16; 500:8-505:3  See *Odetics*, 185 F.3d at 1265, 1267.

A jury could reasonably conclude that the overall algorithms are equivalent despite the differences. Both automatically locate the next song after a song is completed without a command. Both use an identifier to indicate audio content. Both increment and update a "current-play" type variable.  Both use an identifier that is a characteristic of a selection record to determine the last audio in the playlist.  GPM checks for the end of the playlist in a similar way that the claimed algorithm reads each selection record for a LocType R.  Both achieve continuous playback and form an endless loop. *Traxcell* and *Steuben*, cited by Google, are

---

[5]     Position/order identifier of listitems is stored into queue items table which is further used by controls. 532:21-22; 572:21:23.

inapposite given the substantial technical evidence of <u>overall</u> similarity establishing insubstantial differences through the way/result test.

Google's argument that it does not use the exact single-byte LocType R identifier fails for the same reasons discussed previously in connection with the skip forward algorithm. Further, Google mischaracterizes Almeroth's testimony as simply being that a sequencing file with LocType is equivalent to one without LocType. Almeroth testified about the overall substantial similarity between the algorithms and explained that even the minor difference in the identifiers was insubstantial. Quackenbush also said the type of identifier is immaterial and opined that Chase disclosed this limitation, even though its playlist had no LocTypes and used a "null" generated in TreeNode as an "indicator" of the end of the list. Tr.837:4-12.

Google's argument that the result of the accused structure's performance is different because the Repeat All can be turned on or off is inapposite, because the mere capability of a device for infringing continuous playback is sufficient for infringement. *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 794 (Fed. Cir. 2010).

In view of the detailed evidence of overall similarity, the record includes substantial evidence of equivalence under the way/result test.

## III.    SUBSTANTIAL EVIDENCE SUPPORTED THE DAMAGES AWARD

Google fails to meet its heavy burden to show that the jury's award is, "in view of all the evidence, either so outrageously high or so outrageously low as to be unsupportable as an estimation of a reasonable royalty." *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1383 (Fed. Cir. 2004)

### A.    Substantial Evidence Supported Riley's Baseline $0.15 Royalty Rate and Her Royalty Base

"An expert witness may rely on existing royalty agreements entered into at arms-length[,] as long as those agreements are sufficiently comparable to the hypothetical license at issue in suit." *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 494 (D. Del. 2019).  PA's damages expert Michelle Riley described non-litigation license agreements between PA and third parties.  Tr.1515:10-1516:2.  SanDisk agreed to a $0.20 royalty rate; Archos and Aluratek agreed to $0.15.  Tr.1479:5-1482:2.  These agreements explicitly licensed only the '076 and '178 Patents and covered Android products with GPM installed.  See, e.g., PTX372.  Liddle also testified that PA "generally thought about any prelitigation licensing program to be at 15 cents per unit" and further explained why PA thought that was a reasonable royalty rate.  Tr.1471:12-1472:8. Thus, there is substantial evidence that $0.15 per activation is the proper baseline royalty rate.  Google's arguments challenging these licenses (pp. 22-23) only go to the weight of the evidence, which is in the sole purview of the jury.  *Honeywell Int'l Inc. v.*

*Universal Avionics Sys. Corp.*, 426 F. Supp. 2d 211, 223-26 (D. Del. 2006) (denying JMOL where the jury was presented with opposing arguments and testimony on the relevant licenses).

Substantial evidence also supported Riley's royalty base. She calculated the number of unlicensed Android activations by removing all licensed activations (using PTX14 and the licenses) from the total activations (using PTX44), using Google's own documents. Tr.1526:10-1527:5.[6]  Google's damages expert calculated the number of unlicensed Android devices using similar methodology but relied on third-party data.  Tr.1593:12-22.  The jury was free to believe either expert, in whole or in part.

**B.    The Applied Profit Multiplier Was Support by Substantial Evidence**

Google ignores the substantial evidence that it believed GPM was important to Google's profitability.  For example, Google acquired Songza for $50 million in 2014 and added its functionality to GPM.  Tr.1560:20-1561:6.  It also ignored the evidence that GPM "generates over $16 million in revenue per month," and

████████████████████████████████████████████ because

---

[6] Google points out errors in its own documents but Ms. Riley testified that, even if Google were correct, it would only change her allocations by "up to half a percent."  Tr.1539:1-19; *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 857-58 (Fed.Cir.2018) ("[A]ny reasonable royalty analysis necessarily involves an element of approximation, and uncertainty.").

"through greater integration of Android and Play Music and by more proactively using the Play Music as a retention tool, there is potential to impact Android churn" and increase this retention value.  Tr.1561:21-1562:2; 1562:7-17; 1563:8-14; PTX-17.  Thus, there was substantial evidence that Google believed GPM contributed to Google's overall ecosystem profit and kept Android users in Google's ecosystem, which was a primary driver of that profit.  Neither of the cases relied on by Google address this issue in any manner.  But in *Transcenic Inc. v. Google Inc.*, Judge Stark recognized Google's integrated "ecosystem predicated on provision of attractive services to increase users, ultimately generating higher advertising revenue…." See Appx. D.

Riley analyzed the *Georgia-Pacific* factors, including the relevance of Google's profitability to the hypothetical negotiation, and compared it to the profitability of other licensees.  Tr.1517:13-1518:18; 1523:7-15; 1532:23-1533:4; see *Honeywell*  426 F.Supp.2d at 225 (noting relevance of high profit margin). Substantial evidence thus supported applying a *Georgia-Pacific* multiplier to a baseline rate which already had "built in apportionment."  *Bio-Rad Labs., v. 10X Genomics Inc.*, 967 F.3d 1353, 1376-77 (Fed. Cir. 2020).  The jury was entrusted under the law to credit Riley's multiplier, to calculate its own, or to disregard it completely.

15

### C.   It Was Within The Jury's Discretion To Determine A Damages Award That Was Not Proffered by Either Party

"As long as the jury chose a damages amount that is 'within the range encompassed by the record as a whole,' as it did here, it should be upheld." *Power Integrations,* 2019 U.S. Dist. LEXIS 121675 at *14) (citing *Unisplay, S.A. v. Am. Elec. Sign Co., Inc.*, 69 F.3d 512, 519 (Fed.Cir.1995)); *Fuji Photo Film*, 394 F.3d at 1378. PA requested $30.3 million in damages based on a base rate of $0.15, a multiplier of 2.37, and a base of 86,481,443 activations. Tr.1644. Google presented different numbers for each component. Tr.1582-1597 (Martinez, ultimately acknowledging "licensing isn't an exact science"). The jury, after deliberation, was free to pick and choose from each component, or to adopt numbers within the range of each, and its award of $15.1 million was squarely "within the range encompassed by the record as a whole." *Unisplay, S.A.*, 69 F.3d at 519.

## IV.   SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S CONCLUSION THAT GOOGLE POSSESSED THE NECESSARY STATE OF MIND TO ACTIVELY INDUCE INFRINGEMENT AND ACTED WILLFULLY

In evaluating knowledge of infringement, the Court must consider the totality of the circumstances, "taken collectively and in context." *In re Bill of Lading Transmission*, 681 F. 3d 1323, 1340 (Fed.Cir.2012). Here, the unrebutted evidence showed that Google: knew about the patents in 2011; received notice from PA that

16

the combination of an GPM and an Android device infringed the patents in 2012; made multiple unfulfilled promises to investigate and respond in 2012 and 2013; and (required its customers to use GPM during the entire infringement period. This unrebutted evidence permits an inference of Google's knowledge of infringement, and thus requires denial of its motion.

Google's argument that knowledge of infringement requires a claim chart or claim-by-claim infringement allegations is unsupported and legally unfounded. *See, e.g.*, *Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1372-73 (Fed.Cir. 2015). Indeed, in the seminal case on induced infringement, *Global-Tech Appliances, Inc. v. SEB SA*, 563 US 754 (2011), the Supreme Court found willful blindness of infringement without any evidence that the defendant even knew about the patent before its customer was sued. *Id.* at 771. Here, the evidence of Google's knowledge of the patent and infringement, "taken collectively and in context," is overwhelming and went unrebutted by Google at trial.

__First__, Google learned about the Personal Audio patents on July 11, 2011, when it learned about the verdict that all of Apple's music player devices infringed PA's patents. Tr.1508:1-19 (Maccoun's 2019 deposition testimony); 1587:4-1588:22 (Martinez); DTX158 (Apple verdict). The jury could reasonably infer that Google perceived PA's patents and the verdict as highly significant—and thus recalled this event eight-years after the fact—because it understood the verdict to

suggest that GPM likewise infringed the asserted patents.  Google offered the jury no other explanation for its remarkable institutional memory.

**Second,** Before PA's first infringement notice letter in 2012, PA filed an infringement lawsuit against Samsung for use of what is now GPM.  Tr.1467.  This public information indicated that every unlicensed Android device with GPM installed potentially infringed PA's patents.  A jury could reasonably infer that Google was aware that GPM was accused of infringing PA's patents, that Samsung had been in contact with Google about the infringement allegations, and that Google had investigated the allegations.  Google never denied having this knowledge.

**Third,** Google received PA's September of 2012 notice letter informing Google of the Apple verdict and license, informing Google that "a number of other companies that were selling Android operating system with Google Play Music on them," including Samsung, had taken a license to PA's patents, and asking Google to take a license.  Tr.1432:19-1434:5; PTX126.

**Fourth,** In November 2012, Google responded to the September letter, stating "we will review the matter and contact you soon to discuss it further."  PTX-163. PA offered to "provide more information at your request, including informally on a phone call, to make your analysis more efficient." *Id*.  Google never responded, and only re-engaged when PA reached out again in May 2013.  Google was aware that PA had successfully enforced its patents, including against Apple, and thus had a

18

reason to take PA's assertions seriously.   Accordingly, a jury could infer from Google's silence that Google had no good faith belief that it did not infringe or that the patents were invalid, because if it had such a belief it would have communicated it to PA to prevent litigation.

**Fifth**, Google received a second letter from PA in June of 2013, reiterating that "Google may wish to have its patent counsel determine whether Google Play, Chrome OS, Nexus tablets, and Nexus phones, and other similar products need a non-exclusive license from Personal Audio."  PTX-163; Tr.1435:20-1436:17.

**Sixth**, Google and PA had a July 30, 2013 video conference and discussed that Android resellers using GPM had taken a license, as well as "Google's potential liability based on the combination of Google Play Music and third-party Android devices."  *Id.*; Tr.1437:2-24.  This information again informed Google that every unlicensed Android device with GPM installed potentially infringed PA's patents. PA reached out to try to set up a follow-up meeting, but never got a response. Tr.1438:13-16 (Baker); 1461:3-11 (Liddle).

**Seventh,** Google never communicated any non-infringement defense— ever—before this lawsuit was filed.  Tr.1437:25-1438:12.  Google never asserted an invalidity defense until 2015, when it filed an IPR. Google's failure to introduce any evidence of contemporaneous belief or communication of non-infringement or invalidity, including its failure to introduce any opinion from counsel, supports an

inference that Google did not have a good faith belief of non-infringement. Importantly, 35 U.S.C. § 298 only applies "to patents issued on or after September 16, 2012." *Suprema Inc. v. ITC*, 626 Fed.Appx. 27, *282 n.2 (Fed.Cir.2015).

**Eighth,** Despite receiving notice of infringement in 2012, Google required GPM to be included on all Android devices, and GPM updates were pushed to users and automatically activated when a user opened GPM, from that date through the expiration of the patents in 2016.  PTX-50; PTX-63; Tr.592:25-593:13; 593:19-594:19; 604:9-23; 607:21-608:8; 608:12-609:10; 1500:2-1501:21; 1508:17-1510:5; 1567:15-1568:2; 1569:12-21.  Once knowledge of the patents and intent to induce the specific acts constituting infringement is established, as it was here, "intent additionally to cause an infringement [the *Global-Tech* standard] <u>can be presumed</u>." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369 (Fed. Cir. 2005)

**Ninth**, Because major Android manufacturers had taken licenses, and based on all the other evidence and inferences, a jury could reasonably infer that Google <u>**subjectively believed—at least as of July 30, 2013—that there was a high probability that Google was inducing infringement**</u> by pushing activations of GPM. Because Google failed to investigate or respond as promised in 2012, and failed to respond to PA requests for a follow-up meeting in 2013, the jury may infer that Google <u>**took deliberate actions to avoid further knowledge of infringement**</u>,

because PA would have provided further information regarding Google's infringement.

The Federal Circuit has found that substantially similar facts support a finding of willful blindness. *See Info-Hold*, 783 F.3d at 1372-73:

> Info-Hold repeatedly contacted Muzak in an effort to put Muzak on notice of the '374 patent and Muzak's patent infringement and . . . [Muzak's representative] said he would "look again at [Info-Hold's] patent."' Despite [Info-Hold's] letter requesting that [Muzak] honor [its] statement to look into whether Muzak's systems infringed the '374 patent, there is no evidence that Muzak did so.

This evidence was sufficient to allow a jury to decide "whether Muzak may have subjectively believed there was a high probability it infringed the '374 patent and took deliberate actions to avoid learning whether it actually did.  In other words…whether Muzak willfully blinded itself to whether it acted to induce infringement after becoming aware of the existence and alleged functionality of the '374 patent." *Id.*, citing *Global-Tech*, 131 S. Ct. at 2070; *Carson Optical Inc. v. eBay Inc.*, 202 F.Supp.3d 247, 258-59 (E.D.N.Y. 2016) ("ignoring accusations of patent infringement after affirmatively vowing to look into such allegations" supports a finding of willful blindness).  Here, substantial evidence supported a finding that Google's failure to honor its promise to follow-up after notice of alleged infringement was a "deliberate act" comprising willful blindness.

The Federal Circuit has affirmed jury findings of induced infringement based on lesser showings of knowledge. *See, e.g., Lucent Techs., Inc. v. Gateway, Inc.*, 580

F.3d 1301, 1323 (Fed. Cir. 2009) (jury not unreasonable in finding the necessary state of mind based on defendant's knowledge that use of its application necessarily resulted in use of infringing forms).  Similarly, in *Galderma Labs., L.P. v. Medinter US, LLC*, 18-cv-1892, 2020 U.S. Dist. LEXIS 48741, *3, n.7 (D. Del. Mar. 11, 2020), the Court held that an induced infringement finding was plausible based upon evidence that the defendant:

> (a) knew of the patents-in-suit as of their issuance dates; (b) had previously cited to a foreign patent application that was related to the [asserted] patent; (c) was a company well familiar with the state of this art; and (d) had entered into an agreement with [a supplier] to manufacture what in fact is an infringing product.

*Id.*  Here, Google likewise: (a) knew of the patents in suit, (b) cited one of the patents in its own patent application (DTX-664), (c) was a company well familiar with the state of the relevant art (*id.*), and (d) had customer agreements that required installation of what is in fact an infringing product.  Google's willful blindness thus "may be inferred based on surrounding circumstances, 'taken collectively and in context.'"  See *Ravgen, Inc. v. Ariosa Diagnostics, Inc.*, 2021 WL 3526178 (D. Del. Aug. 11, 2021).

## V.   THERE IS NO BASIS FOR A NEW TRIAL ON ANY ISSUE

A district court should grant a new trial "only where a miscarriage of justice would result if the verdict were to stand."  *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352 (3d. Cir. 1991).  Here, it would be a miscarriage of justice to <u>grant</u>

Google's motion because the jury's verdict was supported by substantial evidence and entitled to deference. *Honeywell*, 426 F.Supp.2d at 223-24. This deferential standard is necessary "to ensure that a district court does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury." *Sheridan v. E.I. Dupont de Nemours & Co.*, 100 F.3d 1061, 1076 (3d. Cir. 1996). Google's motion for a new trial should be denied.

Dated:  July 18, 2023                    Respectfully submitted,

                                         **FARNAN LLP**

                                         */s/ Rosemary J. Piergiovanni*
                                         Brian E. Farnan (Bar No. 4089)
                                         Michael J. Farnan (Bar No. 5165)
                                         Rosemary J. Piergiovanni (Bar No. 3655)
                                         919 North Market Street, 12th Floor
                                         Wilmington, DE 19801
                                         Phone: 302-777-0300
                                         Email: bfarnan@farnanlaw.com
                                         Email: mfarnan@farnanlaw.com
                                         Email: rpiergiovanni@farnanlaw.com

                                         Steven M. Hanle (Admitted *pro hac vice*)
                                         Jason de Bretteville (Admitted *pro hac vice*)
                                         Douglas Q. Hahn (Admitted *pro hac vice*)
                                         Salil Bali (Admitted *pro hac vice*)
                                         Lisa Northrup (Admitted *pro hac vice*)
                                         Ahmad Takouche (Admitted *pro hac vice*)
                                         **STRADLING YOCCA CARLSON &
                                         RAUTH, P.C.**
                                         660 Newport Center Drive, Suite 1600
                                         Newport Beach, CA  92660
                                         Phone:  949-725-4138

Fax:  949-725-4100
Email:  shanle@stradlinglaw.com
Email:  jdebretteville@stradlinglaw.com
Email:  dhahn@stradlinglaw.com
Email:  sbali@stradlinglaw.com
Email:  lnorthrup@stradlinglaw.com
Email:  atakouche@stradlinglaw.com

**Victor G. Hardy**
Admitted *pro hac vice*
10703 Pickfair Drive
Austin, Texas 78750
Phone:  512-520-9407
Email:  vhardy@hpylegal.com

***Attorneys for Plaintiff, Personal Audio,
LLC***

## CERTIFICATE OF COMPLIANCE

The foregoing document complies with the type-volume limitation of this Court's March 2, 2020 form Scheduling Order for All Cases where Infringement is Alleged. The text of this brief was prepared in Times New Roman, 14 point. According to the word processing system used to prepare it, the brief contains 4,977 words, excluding the case caption and signature block.

Dated:  July 18, 2023                              */s/ Rosemary J. Piergiovanni*
                                                   Rosemary J. Piergiovanni